UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-_____ (        ) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------x

### DECLARATION OF LUIS A. HERNANDEZ, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF INTERFAITH MEDICAL CENTER, INC., IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Luis A. Hernandez, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the President and Chief Executive Officer ("**CEO**") of Interfaith Medical Center, Inc. ("**IMC**" or the "**Debtor**"), a non-profit corporation organized under the laws of New York (the "**State**").[2]  I was the Interim CEO of IMC from June 2008 through February 2010.  I have served as President and CEO of IMC since November 2011.  In my current capacity as President and CEO, I am familiar with the day-to-day operations, business, and financial affairs of IMC.

2.      On the date hereof (the "**Petition Date**"), IMC filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor intends to continue in possession of its property and management of its business as a

---

[1]     The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

[2]     I am an employee of Kurron Shares of America, Inc. ("**Kurron**"), which has provided management services to IMC since 1991, including providing personnel to serve in certain management roles at IMC.  The Debtor will file a motion seeking authorization to continue to employ Kurron as its manager and to provide certain Kurron personnel to serve as officers of IMC.

debtor in possession.  In order to enable the Debtor to operate effectively postpetition and to minimize adverse effects from its chapter 11 filing, the Debtor has requested various relief in "first day" applications and motions (collectively, the "**First Day Motions**") filed with the Court concurrently herewith.

3.    I submit this declaration pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York (the "**Local Rules**"):  (a) in support of the relief requested in the First Day Motions; (b) to explain to the Court and interested parties the circumstances that compelled the Debtor to seek relief under the Bankruptcy Code; and (c) to provide certain information required by Local Rule 1007-4.  Except as otherwise noted, all facts set forth in this declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this declaration.

4.    Part I of this declaration provides background respecting the Debtor's business and capital structure, as well as the events that precipitated commencement of this case. Part II sets forth the relevant facts supporting the Debtor's First Day Motions.  Part III provides the information required by Local Rule 1007-4.

## I.    BACKGROUND

### A.    The Debtor

5.    IMC was created in 1983 through the combination of St. John's Episcopal Medical Center in the Bedford-Stuyvesant section of central Brooklyn and Jewish Medical Center of Brooklyn in the Crown Heights section of central Brooklyn.  The Debtor operates a

multi-site health care system that provides medical, surgical, pediatric, dental, psychiatric, and other health care services throughout central Brooklyn.  The Debtor's facilities consist of a 287-bed acute care teaching hospital on Atlantic Avenue in Bedford-Stuyvesant, Brooklyn, and an ambulatory care network of 8 clinics located in the central Brooklyn communities of Crown Heights and Bedford-Stuyvesant.[3]  The communities in IMC's primary service area include a high proportion of indigent people and a substantial population in need of care for substance abuse, mental illness, and AIDS, many of whom lack ambulatory alternatives to inpatient care.

*(a) Corporate Governance, Senior Management and Employees*

6.    IMC is a New York not-for-profit corporation and is exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended. IMC's primary purpose is to maintain and operate a voluntary, not-for-profit hospital and provide health-related services in central Brooklyn, pursuant to Article 28 of the Public Health Law and the Mental Hygiene Law of the State of New York.  IMC is presently governed by a six-member board of trustees (the "**Board**").

7.    Since 1991, IMC has been managed by Kurron pursuant to successive management agreements.  IMC and Kurron entered into their current management agreement effective as of November 29, 2012.  As of the Petition Date, IMC's Chief Restructuring Officer, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Special Counsel are employed by, and provided to IMC through, Kurron.

8.    As of the Petition Date, IMC employed approximately 1,639 full-time, part-time, and *per diem* employees, some of whom are represented by various labor unions.  IMC

---

[3]    A list of the Debtor's facilities is annexed hereto as <u>Exhibit G</u>.

has entered into collective bargaining agreements with such labor unions that require IMC to, among other things, contribute to various health and welfare benefit funds and pension funds.

#### (b) Related Entities

9.     Interfaith Emergency Medicine, P.C., Interfaith Professional Physician Services, P.C., and Interfaith Psychiatry Services, P.C. (collectively, the "**PCs**") were created to provide health care services to IMC's patients.  The PCs are operated pursuant to a management agreement between each PC and IMC.  The PCs are not owned by IMC and each PC is wholly-owned by an individual.  The PCs are not debtors.

10.     I M Foundation, a non-profit organization separate from IMC, supports the charitable, educational, and scientific purposes of IMC.  I M Foundation is not a debtor.

#### (c) Accreditations, Affiliations and Training Programs

11.     IMC is licensed or accredited by various governmental agencies and other organizations, including the United States Department of Health and Human Services, New York State Department of Health ("**DOH**"), and New York State Department of Mental Health.  IMC is a teaching institution that sponsors residency training programs in medicine, ophthalmology, dentistry, podiatry, and psychiatry, and fellowship training in pulmonary diseases, gastroenterology, and cardiology.  The teaching programs are an important aspect of IMC's mission and enhance IMC's ability to provide high-quality health care services to the medically underserved residents of the central Brooklyn community.

### B.     Capital Structure

#### (a) DASNY Loans

12.     Prior to the Petition Date, the Dormitory Authority of the State of New York ("**DASNY**") made loans and extended other financial accommodations to IMC.  In February 1998, DASNY first issued its secured hospital revenue bonds relating to the Debtor

(the "**1998 Bonds**") and loaned the proceeds to the Debtor to be used to fund construction

projects and to satisfy other obligations. Thereafter, in connection with a Loan Agreement

between DASNY and IMC, dated as of January 24, 2007 (as amended, restated, supplemented or

otherwise modified from time to time, and together with all agreements, documents, notes and

instruments in respect thereof, the "**Prepetition Loan Agreement**"), DASNY issued its Secured

Hospital Revenue Refunding Bonds, Interfaith Medical Center, Series 2007 in the aggregate

principal amount of $122,475,000 (the "**Series 2007 Bonds**"). The proceeds from the Series

2007 Bonds were loaned by DASNY to the Debtor pursuant to the Prepetition Loan Agreement.[4]

The Debtor used these loan proceeds to make payments to DASNY to refinance the 1998 Bonds

and to fund certain reserves.

13.    To secure IMC's obligations under the Prepetition Loan Agreement,

DASNY was granted a lien on and security interest in the Debtor's gross receipts (including

receipts, revenues, income and other moneys received by the Debtor or derived from the

operation of the Debtor's facilities, except for restricted contributions, grants, gifts and bequests)

and a first lien mortgage on, among other things, certain of the Debtor's real property located in

Kings County, New York, NY (the "**Mortgaged Property**"), the Debtor's interest in various

easements, licenses, permits, and rights related to the Mortgaged Property, the Debtor's

equipment and personal property located on the Mortgaged Property, and proceeds of the

foregoing (collectively, the "**Prepetition Loan Collateral**"). Pursuant to a Reimbursement

---

[4]    IMC's payments under the Prepetition Loan Agreement are to be used to make principal and interest payments on the Series 2007 Bonds. Also, the Authority and New York State (the "**State**") entered into a service contract to provide additional security for the Series 2007 Bonds. Under the service contract, the New York Director of the Budget will request an appropriation from the State in an amount equal to the payments of principal and interest due on the Series 2007 Bonds within one year of the appropriation request to the extent all pledged and available funds for servicing the Series 2007 Bonds are inadequate to make such payments.

Agreement between DASNY and IMC, dated as of November 21, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Pool Loan Agreement**"), DASNY loaned the Debtor $2,000,000 to fund the Debtor's working capital.  That loan matures on January 1, 2013.  To secure the Debtor's obligations under the Pool Loan Agreement, DASNY was granted a security interest in certain State funds allocated to the Debtor from funding pools for bad debt and charity care  (collectively, with the Prepetition Loan Collateral, the "**Prepetition Collateral**"). The Debtor is obligated to cause the DOH to pay those funds directly to DASNY.

14.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Loan Agreement and the Pool Loan Agreement was approximately $117,936,438 (the "**Prepetition Loan Obligations**").[5]

15.     In addition, DASNY made an unsecured, interest-free loan to IMC in the amount of $15,122,204 (the "**Fund B Loan**"), pursuant to a Reimbursement Agreement between the Authority and IMC, dated as of March 29, 2005 (as amended on June 14, 2011, and as further amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Fund B Loan Agreement**", and together with the Prepetition Loan Agreement, the Series 2007 Bonds, and the Pool Loan Agreement, the "**Prepetition Loan Documents**").  IMC was to use the proceeds from the Fund B Loan to satisfy certain amounts due to the DOH in connection with prior DOH distributions from certain bad debt and charity care funding pools.  Pursuant to the Fund B Loan

---

[5]    Certain of the Prepetition Loan Obligations might be subject to an original issue discount.

Agreement, the Debtor commenced repayment of the Fund B Loan in May 2008.  On June 14, 2011, DASNY and the Debtor amended the Fund B Loan Agreement to, among other things, extend the final payment date of the Fund B Loan to April 1, 2024, and defer the twelve monthly installments originally payable April 1, 2011 through March 1, 2012.  As of the Petition Date, the aggregate principal amount outstanding under the Fund B Loan was approximately $12,181,775.

### (b) Other Significant Obligations

16.    IMC has settled various medical malpractice actions on bases requiring scheduled payments over multiple years.  As of the Petition Date, an aggregate of approximately $22.5 million (payable over extended time periods) was outstanding on such settlements.  In addition, one judgment in the amount of $7 million is not subject to a settlement agreement at this time.[6]

### C.    Events Leading to Commencement of the Chapter 11 Case

17.    IMC operates in an increasingly challenging environment.  In the central Brooklyn communities in which IMC is located, approximately 31% of residents live below the poverty line and approximately 65% receive Medicaid, the government insurance program for the needy.  As Medicaid eligibility has expanded for such individuals, Medicaid reimbursement rates for hospitals such as IMC repeatedly have been cut, including cuts of approximately 40% over the past two years.  Also, approximately 33% of IMC's adult patients are uninsured,

---

[6]    IMC is also subject to other judgments in Kings County, New York, not currently subject to settlement agreements, for less substantial amounts.

particularly illegal immigrants.  Meanwhile, the costs of providing medical care by IMC and other hospitals continue to increase.

18.     IMC has made great strides to address these operational financial issues as well as the substantial amount of long term debt incurred years ago.  For example, over the past two years, IMC has cut approximately $30 million of annual expenses.  Nevertheless, while IMC is approaching a breakeven level on operational revenue and expenses, the Medicaid and other reimbursement cuts imposed in past years have made it impossible for the Debtor to fully address its legacy debt service and other financial obligations.

19.     Also, past medical malpractice claims remain a significant concern.  There are judgments aggregating approximately $9 million outstanding against the Debtor, including a jury verdict entered on July 20, 2012 against IMC in a medical malpractice action in Kings County, New York in the amount of $7 million.  A motion requesting reduction in the amount of the jury verdict and granting a new trial is currently pending, and entry of a judgment is imminent.  IMC also has obligations under settled malpractice actions that are payable over time, of which approximately $22.5 million was outstanding as of the Petition Date.  While most of such medical malpractice claims relate to obstetrics and gynecology services no longer provided by IMC, these claims present a substantial economic burden.

20.     Notwithstanding these financial challenges, the local community's need for IMC's services is critical.  Annually, IMC has approximately 11,000 admissions, 49,000 emergency room visits, and 135,000 outpatient visits.  The local community's need is particularly acute as many residents have no primary care physician and, therefore, rely on IMC for all health services.  Also, Brooklyn now has 2.3 beds per 1,000 residents, compared with 4.7

in Manhattan and 3.1 in New York State.  Additionally, IMC serves other needs as a teaching hospital and major employer in the area.

21.     Accordingly, while IMC fulfills a vital mission in its community, the economic pressures on IMC, particularly Medicaid reimbursement cuts in the face of legacy long term debt and medical malpractice liabilities relating to services no longer performed, now impose an unbearable economic burden.

22.     Further, on November 28, 2011, the Brooklyn Health Systems Redesign Work Group issued a Report that questioned IMC's long term viability and thereby created near term financial pressures on IMC from vendors and other creditors.  In February 2012, IMC and The Brooklyn Hospital Center developed and submitted an application for a HEAL 21 grant in order to fund the development and implementation of a cohesive health system for North/Central Brooklyn.  As of today, IMC is working to develop a plan to create a financially viable healthcare system to address the needs of IMC's community.  Specifically, IMC is engaged in discussions regarding the terms of a potential affiliation or other relationship with one or more other hospitals.  Such discussions will continue during IMC's chapter 11 case, and have the active support of the relevant New York State agencies.

23.     In light of all these developments, IMC determined that reorganizing under chapter 11 was the best alternative available for IMC to maximize its value for all stakeholders, continue to serve its community, preserve jobs, and effectuate any negotiated affiliation or other relationship with one or more other hospitals.

## II.    <u>SUMMARY OF FIRST DAY MOTIONS</u>[7]

24.    To enable the Debtor to operate effectively and to minimize adverse effects from its chapter 11 filing, the Debtor has filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.

25.    In connection with preparing for this case, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtor's ability to preserve the value of its estate, succeed in its reorganization efforts, and continue to provide quality care to its patients.

### A.    Motions Related to Case Management

#### *Case Management Motion and Form and Manner of Notice Motion*

26.    To ease the administrative burden of this case on the Debtor's estate, the Debtor requests relief regarding creditor lists and the form and manner of the notices in this case.  Specifically, the Debtor requests entry of an order establishing omnibus hearing dates and certain notice, case management, and administrative procedures.  The Debtor further requests entry of an order: (a) waiving the requirement for filing a list of creditors; and (b) authorizing the Debtor to establish procedures for notifying creditors of the commencement of the case.  I believe the relief requested will reduce the administrative costs of this case and is in the best interests of the estate.

---

[7]    Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

*Motion to Grant an Extension of Time to*
*File Debtor's Schedules and Statement of Financial Affairs*

27.     The Debtor and its professional advisors are working diligently to prepare the required Schedules of Assets and Liabilities and the Statement of Financial Affairs (collectively, the "**Schedules**") to reflect accurately the Debtor's financial circumstances as of the Petition Date.  However, prior to filing this case, the Debtor was unable to devote the resources necessary to complete the Schedules due to the substantial time spent preparing for the chapter 11 filing and attending to operations.  Furthermore, the Debtor has a significant number of creditors and executory contracts and runs a complex business.  Thus, the Debtor will require additional time to review its books and records to accurately reflect its obligations and financial position in the Schedules.  Accordingly, the Debtor respectfully requests an extension of the deadline to file its Schedules to the date that is forty-five (45) days after the Petition Date.

**B.     Applications and Motions Related to the Retention of Professionals**

*Application to Employ and Retain Willkie Farr & Gallagher LLP*

28.     Concurrently herewith, the Debtor has filed a motion to retain Willkie Farr & Gallagher LLP ("**WF&G**") as bankruptcy counsel with regard to the filing and administration of this case.  In October 2011, WF&G was retained by the Debtor to represent it in connection with general restructuring matters, including the preparation for and potential commencement of this case.  The Debtor desires to employ WF&G to continue to provide such restructuring advice as is necessary and requested by the Debtor, including, without limitation, bankruptcy, debt restructuring, and related corporate, employee benefit, and litigation services.

29.     I understand that WF&G's attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, reorganizations of hospitals and healthcare facilities, tax, employee benefits and

commercial litigation, among others.  In addition, WF&G has become familiar with the Debtor's

operations and business due to the services WF&G provided prepetition to the Debtor and has

provided to other hospitals.  Accordingly, I believe WF&G is well-qualified to represent the

Debtor in this case.

### *Application to Employ and Retain CohnReznick LLP*

30.    The Debtor has filed an application to employ and retain CohnReznick

LLP ("**CohnReznick**") as financial advisor to the Debtor.  Prior to the Petition Date, and after a

diligent process by which the Debtor assessed competing advisors, the Debtor retained

CohnReznick to provide financial advisory services in connection with the Debtor's restructuring

efforts.  I understand that CohnReznick has extensive experience in the fields of restructuring

and providing financial guidance to companies, including multiple hospitals and other care

providers, in distressed situations and has provided financial advisory services to debtors and

creditors in other chapter 11 cases.  CohnReznick has become familiar with the Debtor and its

operations through CohnReznick's prepetition representation of the Debtor.  Accordingly, I

believe CohnReznick is well-qualified to represent the Debtor in this case.

### *Application to Employ and Retain Kurron Shares of America, Inc.*

31.    The Debtor will file an application to employ and retain Kurron to

continue as manager of the Debtor and to continue to provide Kurron personnel to serve as

IMC's senior management.  Kurron has provided management services to the Debtor since 1991.

In furtherance of its management agreement duties, Kurron has assisted the Debtor with its

restructuring efforts.

32.    Kurron is a leading provider of management, consulting, strategic

advisory, and restructuring services within the healthcare industry, and has extensive experience

in assisting health care facilities through complex financial restructurings, including reorganizations.  Also, the Kurron personnel currently serving as the Debtors' Chief Restructuring Officer, President and Chief Executive Officer, Chief Financial Officer ("**CFO**"), Chief Operating Officer, and Special Counsel have extensive experience with IMC specifically, and in providing management services to hospitals generally.  Additionally, the CFO and I both have experience in reorganization proceedings and advising troubled companies regarding operational and financial issues.  In providing management services to the Debtor prior to commencement of this case, Kurron personnel have worked closely with the Board and the Debtor's professionals and have become intimately familiar with the Debtor's business, capital structure, financial affairs and related matters.  Accordingly, I believe the other Kurron personnel and I are well-qualified to serve as IMC's senior management and the Debtor's retention of Kurron as manager is essential to the Debtor's successful reorganization.

*Applications to Employ and Retain Donlin Recano & Company, Inc.*

33.    Concurrently herewith, the Debtor filed applications to retain Donlin Recano & Company, Inc. ("**Donlin**") as this Court's notice and claims agent, and the administrative agent for the Debtor's case.  I believe retention of Donlin is critical because of the large number of creditors identified in this case.

34.    I understand that Donlin is a data processing firm with extensive experience in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases.  Given the need for the services described above and Donlin's expertise in providing such services, I believe that retaining Donlin will expedite service of notices, streamline the claims administration and balloting processes, reduce the administrative costs associated with such tasks, and permit the Debtor to focus on both patient care and its reorganization efforts.

*Motion to Authorize Employment of Ordinary Course Professionals*

35.    In the ordinary course of its business prior to the Petition Date, the Debtor retained certain professionals to provide, among other services, legal and accounting advice and auditing and lobbying services (the "**OCP Professionals**").  The Debtor intends to seek authority to retain and, up to certain limits, pay in the ordinary course its OCP Professionals without the submission of separate retention applications and the issuance of separate orders approving the retention of each such individual professional.  I believe retention of these OCP Professionals is vital to the Debtor's business and is in the best interest of the Debtor's patients, creditors, community and other parties in interest.

**C.    Motions Related to Cash Management and Financing of Operations**

*Motion to Authorize Continued Use of the Debtor's Cash Management System*
*and Bank Accounts, and Interim Waiver of Certain Bank Account Requirements*

36.    In the ordinary course of its business prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtor maintained a centralized cash management system to collect, transfer, and disburse funds received through its operations efficiently and to record such transactions accurately (the "**Cash Management System**").

37.    It is my understanding that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts that must be designated debtor in possession bank accounts, obtain, establish, and maintain separate debtor in possession accounts, and utilize new checks for all debtor in possession accounts, which bear the designation "Debtor in Possession" and contain certain other information related to the case. The Debtor requests a waiver of the requirement that the Debtor open new bank accounts. During this case, the Debtor shall stamp or print its check stock with "Debtor in Possession" and the case number under which this case is being administered.

38.     I believe the Debtor's existing cash management procedures are essential to the orderly operation of the Debtor's business.  Changing bank accounts and creating a new cash management system would not only cause the Debtor to incur significant and unnecessary costs, but could hinder the Debtor's operations when the Debtor and its management should be focused primarily on operational stability and patient care.  A new cash management system could also cause confusion, diminish the prospects for a successful reorganization, disrupt payroll, introduce inefficiency when efficiency is most essential, and strain the Debtor's relationships with critical third parties.  Thus, through its cash management motion, the Debtor seeks authorization to continue the management of its cash receipts and disbursements as they were handled immediately prior to the Petition Date.

39.     It is also my understanding that the section 345(b) of the Bankruptcy Code sets forth requirements that protect creditors of a debtor's estate against the loss of funds of the estate through deposit or investment.  The Debtor believes it is in compliance with such requirements with the exception of one minor account.  Thus, the Debtor requests that the Court enter an order temporarily waiving such requirements while the Debtor discusses with the U.S. Trustee any additional arrangements potentially necessary to adequately protect estate funds.

*Motion Authorizing the Debtor to*
*Use Cash Collateral and Scheduling a Final Hearing*

40.     During this case, the Debtor intends to initially support its operations primarily through the use of cash claimed as collateral by DASNY ("**Cash Collateral**"), and also with a debtor in possession loan facility to the extent needed in the future.  The Debtor has filed a motion (the "**Cash Collateral Motion**") that sets forth the terms and conditions upon which DASNY will consent to the Debtor's use of Cash Collateral.  The proposed use of Cash

Collateral will be the Debtor's primary source of liquidity to fund operations and needed working capital expenditures during this chapter 11 case.

41.    The Debtor's request for authority to use Cash Collateral and the terms and conditions thereof is justified for multiple reasons.  Such relief is critical to the Debtor's ability to continue providing quality medical care and serve its community while the Debtor navigates the chapter 11 process.  Also, the relief requested would enable the Debtor to preserve, protect and maximize the value of its assets for the benefit of all stakeholders.  In particular, use of Cash Collateral would enable the Debtor to purchase inventory, goods and services, meet the needs of its patients, and pay its employees and ordinary course operational expenses, all of which are necessary to continue the high level of healthcare services that the Brooklyn community expects from the Debtor.  Without the requested relief, the Debtor's ability to preserve its value as a going concern would be jeopardized.  Indeed, the Debtor's continued viability and its ability to reorganize successfully and maximize the going concern value of its business depends upon timely approval of the Debtor's use of the Cash Collateral.

42.    DASNY has agreed to the Debtor's use of Cash Collateral, consisting of funds held in the Debtor's bank operating accounts as of the Petition Date and the proceeds of DASNY's Collateral, subject to the Interim Order.  The Debtor's use of Cash Collateral will be pursuant to a budget, in form and manner reasonably acceptable to DASNY.  The Debtor believes the Cash Collateral budget, along with certain permitted variances to account for timing differences and the inherent imprecision of any budget, will be adequate to pay all administrative expenses due or accruing from the date of the Interim Order until the date the Court enters the Final Order.

43.     In exchange for the use of the Cash Collateral, the Debtor proposes to grant adequate protection to DASNY consisting of replacement liens, superpriority claims pursuant to section 507(b) of the Bankruptcy Code, and adequate protection payments.

44.     The terms and conditions of that would govern the Debtor's use of Cash Collateral are fair and reasonable, and were negotiated by the parties in good faith and at arms' length.  Therefore, I believe it is in the best interests of the Debtor's estate, patients, creditors, and all parties in interest for this Court to approve the Debtor's use of Cash Collateral on the terms requested.

**D.     Motions Related to Employee and Independent Contractor Matters**

*Motion for Authorization to Pay Certain Prepetition*
*Claims of Employees and in Respect of Employee-Related Obligations*

45.     Concurrently herewith, the Debtor has filed a motion seeking authority to, among other things, satisfy certain prepetition obligations to its current employees (the "**Employees**"), maintain certain prepetition benefit programs, reimburse Employees for prepetition expenses that were incurred on behalf of the Debtor, and pay prepetition withholdings from employee wages.  This relief is critical to the Debtor's business and reorganization efforts.

46.     In order to achieve a successful reorganization, it is essential that the Debtor's Employees work with the same or greater degree of commitment and diligence as they did prior to the Petition Date.  The Debtor's payment of outstanding prepetition wages and other compensation as well as maintenance of current employee benefits are critical to ensuring the Debtor remains an attractive employer to the Debtor's Employees.

47.     If this motion were not granted, I believe significant deterioration in morale among Employees would result at this critical time, which undoubtedly would have a devastating impact on the Debtor, its patients, the value of estate assets, and the Debtor's ability

to reorganize.  Importantly, the total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtor's estate and the importance of the Employees to the Debtor's restructuring effort, particularly as many of the claims satisfied would be entitled to priority under the Bankruptcy Code.  I believe authorizing the Debtor to pay these obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor, its Employees, its creditors, its patients, its community, and all other parties in interest, and would enable the Debtor to continue to operate its business with minimal disruption to its labor force.

*Motion for Authorization to Pay Certain Prepetition*
*Medical Provider Obligations and Independent Contractor Obligations*

48.    Concurrently herewith, the Debtor has filed a motion seeking authority to, among other things, satisfy certain prepetition obligations to its Medical Providers and Other Independent Contractors.  This relief is critical to the Debtor's business and reorganization efforts, because the Debtor's operations require that the Medical Providers and Other Independent Contractors work as diligently throughout this case as they did prior to the Petition Date.  Given the exigencies of the Debtor's chapter 11 process, it would be difficult, time-consuming, and impractical to replace the Medical Providers and Other Independent Contractors who are an important part of the Debtor's team.  If the Debtor were required to replace the Medical Providers or the Other Independent Contractors all at once, such requirement could adversely impact the timeliness and quality of operations and patient care at IMC.

49.    I believe authorizing the Debtor to pay these obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor, its Employees, its creditors, its patients, its community, and all other parties in interest, and would

enable the Debtor to continue to operate its business with minimal disruption to its provision of quality patient care.

## E.    Certain Other Motions

*Motion to Approve Procedures for*
*Providing Adequate Assurance to Requesting Utilities*

50.    In connection with the operation of its business and management of its property, the Debtor obtains water, natural gas, electricity, telephone, and other similar utility products and services (collectively, the "**Utility Services**") from approximately 9 utility companies (collectively, the "**Utility Companies**").  The Debtor is seeking an order of this Court prohibiting the Utility Companies from altering or discontinuing services and establishing procedures to provide the Utility Companies with adequate assurance of future performance.

51.    As adequate assurance of payment for future service, the Debtor proposes to provide a deposit equal to two (2) weeks of Utility Service, calculated as a historical average over the past 12 months, to any Utility Company that requests such a deposit (the "**Adequate Assurance Deposit**").

52.    I believe the Debtor's Adequate Assurance Deposit would constitute sufficient adequate assurance to any Utility Company.  Further, the Debtor fully intends to timely comply with its postpetition obligations to the Utility Companies.  However, in light of the severe consequences to the Debtor and, most importantly, its patients upon any interruption in services by the Utility Companies, and recognizing that Utility Companies have the right to evaluate the proposed adequate assurance on a case-by-case basis, if any Utility Company believes additional assurance is needed, then the Debtor has proposed procedures for the Utility Companies to request such additional adequate assurance.  I believe these procedures, as outlined

in the motion, are not only fair and reasonable, but also necessary for the Debtor to be able to continue to operate properly.

53.     I believe that without the relief requested in the motion, the Debtor could be forced to address numerous requests for onerous concessions by Utility Companies in an unorganized manner at a critical period in the Debtor's reorganization efforts, and when those efforts could be more productively focused on patient care.

*Motion to Authorize Payment of*
*Prepetition Claims of Certain Critical Vendors*

54.     In order to continue operating its business, the Debtor must rely on certain suppliers (the "**Critical Vendors**")  that provide the Debtor with certain goods and services that are critical to the Debtor's operations.  Absent these Critical Vendors, the Debtor might be unable to continue its operations without materially inflated costs or substantial interruptions.  Unless their prepetition claims are satisfied, I believe the Critical Vendors will refuse to supply the Debtor postpetition.  Further, replacing the Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible.  Further, certain of such Critical Vendors have provided the Debtor within twenty (20) days prior to the Petition Date with materials, supplies, goods, products, and related items that are essential to the sustained operations of the Debtor.  Accordingly, such Critical Vendors would be entitled to a priority claim and the relief requested would simply alter the timing of payments that such vendors are already entitled to receive by statute.  Thus, the Debtor seeks authorization to pay the Critical Vendors in the ordinary course of business.

### III.     INFORMATION REQUIRED BY LOCAL RULE 1007-4

55.     It is my understanding that Local Rule 1007-4 requires certain information related to the Debtor, which is set forth below and on the attached exhibits.

56.     As noted on Exhibit A, no committees for the Debtor were established prior to the Petition Date.

57.     Exhibit B provides the following information, to the extent available, with respect to each of the holders of the Debtor's twenty (20) largest unsecured claims:  the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address); telephone number; the name(s) of person(s) familiar with the Debtor's account, the nature and approximate amount of such creditor's claim; and an indication of whether the claim is contingent, unliquidated, disputed, or subject to setoff.

58.     Exhibit C provides the following information with respect to the holders of the three (3) largest secured claims against the Debtor:  the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address); the amount of the claim; a description and an estimate of the value of the collateral securing the claim; and whether the claim or lien is disputed.

59.     Exhibit D provides an unaudited balance sheet, dated September 30, 2012, of the Debtor's assets and liabilities as of such date.

60.     As noted on Exhibit E, the Debtor is a not-for-profit corporation. Accordingly, there are no shares of stock of the Debtor that are publicly held.  Further, there are no debentures or other securities of the Debtor that are publicly held.

61.     As noted on Exhibit F, there is no property of the Debtor in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

62.     Exhibit G sets forth a list of the owned or leased premises, or premises held under any other arrangement, from which the Debtor operates its business.

63.　　Exhibit H sets forth the location of the Debtor's significant assets and the location of its books and records.  The Debtor has no significant assets held outside the territorial limits of the United States.

64.　　Exhibit I sets forth the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment or seizure of its property may be imminent.

65.　　Exhibit J provides a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

66.　　Exhibit K sets forth the estimated amount of the weekly payroll to be paid to: (a) employees; (b) officers, stockholders and directors; and (c) financial and business consultants retained by the Debtor, for the thirty-day period following the Petition Date.

67.　　Exhibit L sets forth a list of the Debtor's estimated cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees for the thirty (30) day period following the Petition Date.

## **CONCLUSION**

In furtherance of its reorganization efforts, the Debtor respectfully requests that orders

granting the relief requested in the First Day Motions be entered.

Dated: December 2, 2012

Interfaith Medical Center, Inc.
Debtor and Debtor in Possession


/s/ Luis A. Hernandez
Luis A. Hernandez
President & CEO

## **EXHIBIT A**

Committees Organized Prior to the Order for Relief

No *ad hoc* committees of creditors of the Debtor were formed prior to the Petition Date.

# EXHIBIT B

## 20 Largest Unsecured Claims[1]

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of 11/30/2012[2] | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|
| **Centers for Medicare & Medicaid Services** 5000 Brittonfield Parkway, Suite 100 East Syracuse, NY 13057 | Christopher Botti Phone: 315-442-4884 Fax: 315-442-4258 | Contract | $16,118,281.00 | Potentially Subject to Setoff or Recoupment |
| **The Dormitory Authority of the State of New York** 515 Broadway Albany NY 12207 | Jamie Bullock Phone: 518-257-3438 Fax: 518-257-3100 | Unsecured Loan | $12,181,775.00 | |
| **Jean Benoit** c/o Bonina & Bonina, PC 16 Court Street, Suite 1800 Brooklyn, NY 11241 | Phone: 718-522-1786 Fax: 718-243-0414 | Medical Malpractice Claim Jury Verdict | $7,000,000.00 | Disputed |
| **Interfaith Medical Center Nurses Pension** Health Services Retirement Plan 555 West 57th Street Suite 1532 New York, NY 10019 Email: agutsin@hsrp.com | Clarick Gueron Reisbaum LLP 40 West 25th Street, 12th Floor New York, NY 10010 Phone: (212) 633-4310 Fax: (646) 478-9484 Albert Kalter Law Offices of Albert Kalter, P.C. 225 Broadway, Suite 1806 New York, NY 10007 Phone: 212-964-5485 Fax: 212-964-8696 | Pension | $5,351,555.00 | |
| **Local 1199 National Benefit Fund** 330 West 42nd Street, 27th Floor New York NY 10036 | Timothy Wells Phone: 212-582-1890 Fax: 646-473-6500 | Union Benefit Fund | $4,047,915.00 | |
| **Rudolph Fagan** 15 Stratford Road, Apt. #3C Brooklyn, NY 11218 | Rudolph Fagan c/o Sanocki Newman & Turret, LLP 225 Broadway 8th Floor New York, NY 10007 Phone: 212-962-1190 Fax: 212-964-1573 | Medical Malpractice Claim Settlement | $3,305,556.00 | |

---

[1]    The list does not include (1) persons who are "insiders" as defined in 11 U.S.C. § 101 or any entity related to the Debtor or (2) secured creditors with claims that exceed the value of their collateral.

[2]    These claim amounts represent maximum potential liabilities. Any actual amounts owed may be significantly lower.  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of 11/30/2012[2] | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|
| **Drita Manuka**<br>374 94th Street, 1st Floor<br>Brooklyn, NY 11209 | Drita Manuka<br>c/o Kramer, Dillof,<br>Livingston & Moore<br>217 Broadway, 10th Floor<br>New York, NY 10007<br>Phone: 212-267-4177<br>Fax: 212-233-8525 | Medical Malpractice Claim Settlement | $3,055,555.00 | |
| **Health Services Retirement Plan**<br>555 West 57th Street<br>Suite 1532<br>New York, NY 10019 | Keith McMurdy<br>Fox Rothschild LLP<br>100 Park Avenue, 15th Floor<br>New York, NY 10017<br>Phone: (212) 878-7900<br>Fax: (212) 692-0940 | Pension | $2,111,473.00 | |
| **Pacific Life & Annuity Services, Inc.**<br>700 Newport Center Drive<br>Newport Beach, CA 92660-6397 | Phone: 800-722-2333<br>Fax: 888-837-8192 | Medical Malpractice Claim Settlement | $1,600,000.00 | |
| **New York EM-I Medical Services PC**<br>7032 Collection Center Drive<br>Chicago, IL 60693 | Shaw Baloch<br>Phone: 214-712-2452<br>Fax: 214-712-2444 | Trade | $1,433,469.00 | |
| **Leonard & Tia Burnett**<br>c/o Fitzgerald & Fitzgerald<br>538 Riverside Ave<br>Yonkers, NY 10705 | Leonard & Tia Burnett<br>c/o Fitzgerald & Fitzgerald<br>538 Riverside Ave<br>Yonkers, NY 10705<br>Phone: 914-378-1010<br>Fax: 914-378-1092 | Medical Malpractice Claim Settlement | $1,415,250.00 | |
| **Lilith James**<br>c/o The Law Offices of Craig M. Rothenberg<br>2444 Morris Avenue<br>Union, NJ 07083 | Lilith James<br>c/o The Law Offices of Craig M. Rothenberg<br>2444 Morris Avenue<br>Union, NJ 07083<br>Phone: 908-688-5111<br>Fax: 908-688-5178 | Medical Malpractice Claim Settlement | $1,383,721.00 | |
| **Kiyanna Cush**<br>274 East 93rd Street, Apt. #3A<br>Brooklyn, NY 11212 | Kiyanna Cush<br>c/o Silverstein & Bast<br>217 Broadway, Suite #306<br>New York, NY 10007<br>Phone: 212-608-4040<br>Fax: 212-608-1258 | Medical Malpractice Claim Settlement | $1,350,000.00 | |
| **Deloitte Consulting LLP**<br>2 Jericho Plaza<br>Jericho, NY 11753 | Christopher Giuliano<br>Phone: 516-918-7357<br>Fax: 516-918-8196 | Trade | $745,942.00 | |
| **Advanced Medical Staffing Corp**<br>331 Rutledge Street, Suite 204<br>Brooklyn, NY 11211 | Mendy Hirsch<br>Phone: 718-643-9316<br>Fax: 718-643-9318 | Trade | $742,908.75 | |
| **Medline Industries, Inc.**<br>One Medline Place<br>Mundelein, IL 60060 | Lisa Foreman<br>Phone: 847-643-4233<br>Fax: 847-949-2287 | Trade | $545,945.00 | |
| **New York State Nurses Association**<br>Building 3 Pine West Plaza<br>Washington Ave. Ext<br>Albany, NY 12205 | Jill Fisher<br>Phone: 518-869-9501x2235<br>Fax: 518-869-5032 | Union Benefit | $538,588.00 | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and fax number of employees, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Amount of claim as of 11/30/2012[2] | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff |
|---|---|---|---|---|
| **TD Bank** 211 Montague Street Brooklyn, NY 11201 | Sergine Louis Phone: 718-290-1200 Fax: 718-290-1202 | Bank Loan | $525,614.00 | Potentially subject to Setoff |
| **Empire Health Choice Assurance Inc.** 3 Huntington Quandrangle,4S Melville, NY 11747 | Indroutie Sandra Gopaul Phone: 347-480-5232 Fax: 877-487-6732 | Benefit | $494,047.00 | |
| **Con Edison** 4 Irving Place, 9th Floor South New York, NY 10003 | Jo-ann Marrero Phone: 212-780-6761 Fax: 718-246-3145 | Utility | $469,119.00 | |

## EXHIBIT C

### Holders of Three Largest Secured Claims against the Debtor[1]

| Creditor | Mailing Address & Phone Number | Counsel[2] | Approximate Amount of Claim[3] as of 11/30/12 | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|---|
| The Dormitory Authority of the State of New York | 515 Broadway Albany, NY 12207-2964 Phone: (518) 257-3000 | Winston & Strawn LLP 200 Park Ave New York, NY 10166-4193 Phone: 212-294-6700 Fax: 212-294-4700 | $123,837,460.00 | Gross receipts, property, real property, and equipment | |
| Corey Lovett (an infant) | 1549 Fulton St, Apt 4L Brooklyn, NY 11216 | Fitzgerald & Fitzgerald 538 Riverside Ave Yonkers, NY 10705 Phone: 914-378-1010 | $6,372,000.00 | Settlement Escrow Account* | |
| Isaiah Holmes (an infant) | c/o Fitzgerald & Fitzgerald 538 Riverside Ave Yonkers, NY 10705 | Fitzgerald & Fitzgerald 538 Riverside Ave Yonkers, NY 10705 Phone: 914-378-1010 | $2,712,500.00 | Settlement Escrow Account* | |

\* - Inclusion of this claim on this list does not, and shall not be deemed to, constitute a determination or representation as to whether any amounts held in such account constitute estate property.

---

[1]    The Debtor has included all information reasonably available to the Debtor to date.  To the extent additional information becomes available, the Debtor will supplement such information in its Statement of Financial Affairs and/or Schedules of Liabilities, as applicable.  In addition to the secured creditors listed herein, the Debtor is also party to secured leases that might be recharacterized as unsecured or secured loans.

[2]    The Debtor has provided information for counsel that are known to the Debtor as of the date hereof.

[3]    The information herein shall not constitute an admission of liability or of a proper security interest or lien by, nor is it binding on, the Debtor.  These amounts exclude accrued and unpaid interest and applicable fees and expenses.

# EXHIBIT D

## Summary of Debtor's Assets and Liabilities[1]

| | (unaudited) | (audited) |
|---|---|---|
| *(In thousands, except share data)* | **Sept. 30, 2012** | **Dec. 30, 2011** |
| **Assets** | | |
| Current assets | | |
|   Cash and cash equivalents | $ 526,927 | $ 9,914,451 |
| Accounts receivable: | | |
|   Patient care, less allowance for uncollectibles | 19,306,215 | 18,411,552 |
|   Receivable from public goods pools | 6,451,725 | 4,710,018 |
|   Grants and other receivable | 4,514,894 | 2,753,972 |
| Net accounts receivable | 30,272,833 | 25,875,542 |
| Inventories | 891,312 | 580,066 |
| Prepaid and other current assets | 785,715 | 788,810 |
| Assets limited as to use-current portion | 1,096,654 | 5,604,454 |
| Total current assets | 33,573,442 | 42,763,323 |
| | | |
| Noncurrent assets: | | |
| Assets limited as to use | | |
|   Marketable securities | | |
|    Under bond indenture | 10,560,145 | 15,092,036 |
| Lovett Escrow | 5,825,726 | 6,785,398 |
| Escrow funds | 42,292 | 22,214 |
| Self Insured malpractice fund | 13,465 | 14,324 |
| Permanently restricted | 1,108,865 | 1,108,930 |
| | | |
| Less assets limited as to use-current portion | (1,096,654) | (5,604,454) |
| Total assets limited as to use-noncurrent | 16,453,839 | 17,418,448 |
| | | |
| Property, buildings and equipment-net | 76,224,762 | 86,564,470 |
| Deferred financing fees | 1,773,303 | 1,922,181 |
| Other long term assets | 14,392,488 | 13,440,818 |
| **Total assets** | **$ 142,417,834** | **$162,109,240** |
| | | |
| **Liabilities and Equities** | | |
| Current liabilities | | |
|   Accounts payable and accrued expenses | $ 19,116,555 | $ 23,035,203 |
|   Accrued salaries and related withholdings | 1,947,413 | 3,035,027 |
|   Accrued vacation payable | 3,589,889 | 3,589,889 |
|   Accrued fringe benefits payable | 1,301,485 | 1,948,399 |
|   Accrued interest payable | 714,188 | 2,224,678 |
|   Bond payable | 120,186,704 | 125,343,934 |
|   Current portion of long term debt | 24,742,825 | 25,448,698 |
|   Other current liabilities | 1,483,000 | 1,483,000 |
|   Current portion of estimated professional liabilities | 5,702,053 | 5,145,297 |
|   Deferred revenue | 33,050 | - |
| Total current liabilities | 178,817,162 | 191,254,125 |
| | | |
| Noncurrent liabilities | | |

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

| | | |
|---|---:|---:|
| Long-term debt, less current installments | 141,942 | 933,892 |
| Estimated professional liabilities, less current portion | 56,798,833 | 61,038,179 |
| Accrued retirement benefits | 55,277,189 | 52,367,516 |
| Lease obligations | 14,816,053 | 14,949,404 |
| Other noncurrent liabilities, less current portion | 35,171,301 | 23,926,038 |
| Total noncurrent liabilities | 162,205,319 | 153,215,029 |
| Total liabilities | 341,022,481 | 344,469,154 |
| | | |
| Fund balance | | |
| Unrestricted fund balance | (199,877,094) | (183,629,277) |
| Specific Purpose funds | 163,598 | 160,515 |
| Permanently restricted funds | 1,108,848 | 1,108,848 |
| *Net assets deficiency* | (198,604,648 | (182,359,914) |
| | | |
| **Total Liabilities and net deficit** | $ 142,417,833 | $ 162,109,240 |

## EXHIBIT E

**Shares of Stock, Debentures, or Other Securities**

The Debtor is a not-for-profit corporation. Accordingly, there are no shares of stock of the Debtor that are publicly held.  Furthermore, there are no debentures or other securities of the Debtor that are publicly held.

## <u>EXHIBIT F</u>

**Debtor's Property Not in the Debtor's Possession**

There is no property of the Debtor in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity, except as listed below.[1]

The Debtor has funded an escrow account maintained at T.D. Bank, N.A. (Acct. No. 70-T472-01-1) to secure the structured settlement payments of two medical malpractice claims.  As of October 31, 2012, the cash balance of the escrow account was $5,832,599.[2]

---

[1]    Certain of the Debtor's landlords and utility providers hold security deposits.  In addition, certain third parties may hold prepayments on account of services performed for the Debtor.

[2]    Inclusion of this escrow account on this exhibit does not, and shall not be deemed to, constitute a determination or representation as to whether any amounts held in such account constitute estate property.

## EXHIBIT G

**Debtor's Premises**

Pursuant to Local Rule 1007-4(a)(x), the following chart lists the premises owned, leased, or held under other arrangement from which the Debtor operates its businesses:

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| Interfaith Medical Center, Inc. | 1545 Atlantic Ave<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 1569-1571 Atlantic Ave<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 1577 Atlantic Ave<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 489 Herkimer St<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 495 Herkimer St<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 506 Herkimer St<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 508 Herkimer St<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 515 Herkimer St<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 480 Albany Ave<br>Brooklyn, NY 11213 | N/A | Owned |
| Interfaith Medical Center, Inc. | 1028-1032 Broadway<br>Brooklyn, NY 11221 | N/A | Owned |

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| Interfaith Medical Center, Inc. | 38-40 Ralph Ave<br>Brooklyn, NY 11221 | N/A | Owned |
| Interfaith Medical Center, Inc. | 528 Prospect Place<br>Brooklyn, NY 11238 | N/A | Owned |
| Interfaith Medical Center, Inc. | 1366 East New York Ave<br>Brooklyn, NY 11212 | N/A | Owned |
| Interfaith Medical Center, Inc. | 1545 Atlantic Ave East Bldg<br>Brooklyn, NY 11213 | 5/16/2033 | Occupancy Lease* |
| Interfaith Medical Center, Inc. | 1545 Atlantic Ave East Bldg<br>Brooklyn, NY 11213 | 5/16/2033 | Development Lease* |
| Interfaith Medical Center, Inc. | 880 Bergen St<br>Brooklyn, NY 11238 | 1/31/2024 | Leased |
| Interfaith Medical Center, Inc. | 882 Bergen St<br>Brooklyn, NY 11238 | 1/31/2024 | Leased |
| Interfaith Medical Center, Inc. | 1267-1275 Bedford Ave<br>Brooklyn, NY 11216 | 11/30/2018 | Leased |
| Interfaith Medical Center, Inc. | 391 Eastern Parkway<br>Brooklyn, NY 11216 | 9/30/2013 | Leased |
| Interfaith Medical Center, Inc. | 250 Crown St, Apt 2B<br>Brooklyn, NY 11225 | 03/31/13 | Managed |
| Interfaith Medical Center, Inc. | 270 Crown St, Apt 3E<br>Brooklyn, NY 11225 | 12/31/13 | Managed |
| Interfaith Medical Center, Inc. | 712 Crown St, Apt A4<br>Brooklyn, NY 11213 | 01/31/14 | Managed |

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| Interfaith Medical Center, Inc. | 921 Montgomery St, Apt 7A Brooklyn, NY 11213 | 01/31/14 | Managed |
| Interfaith Medical Center, Inc. | 921 Montgomery St, Apt 7E Brooklyn, NY 11213 | 01/31/14 | Managed |
| Interfaith Medical Center, Inc. | 1024 Montgomery St, Apt 3H Brooklyn, NY 11213 | 01/31/13 | Managed |
| Interfaith Medical Center, Inc. | 9621 Ave B, Ground Floor Brooklyn, NY 11236 | 02/28/13 | Managed |
| Interfaith Medical Center, Inc. | 9625 Ave B, Ground Floor Brooklyn, NY 11236 | 12/31/12 | Managed |
| Interfaith Medical Center, Inc. | 145 East 18th St, Apt 5D Brooklyn, NY 11226 | 03/31/14 | Managed |
| Interfaith Medical Center, Inc. | 451 Kingston Ave, Apt 7E Brooklyn, NY 11225 | 11/30/14 | Managed |
| Interfaith Medical Center, Inc. | 1330 Eastern Pkwy Brooklyn, NY 11233 | 10/31/13 | Managed |
| Interfaith Medical Center, Inc. | 1070 East New York, Apt 6J Brooklyn, NY 11212 | 05/31/13 | Managed |
| Interfaith Medical Center, Inc. | 1070 East New York, Apt 6H Brooklyn, NY 11212 | 6/30/2013 | Managed |
| Interfaith Medical Center, Inc. | 60 East 93rd St, Apt B326 Brooklyn, NY 11212 | 07/31/13 | Managed |
| Interfaith Medical Center, Inc. | 60 East 93rd St, Apt A642 Brooklyn, NY 11212 | 07/31/13 | Managed |

| Debtor/Lessee | Property Address | Lease Expiration Date | Type of Interest |
|---|---|---|---|
| Interfaith Medical Center, Inc. | 60 East 93rd St, Apt D602 Brooklyn, NY 11212 | 07/31/13 | Managed |
| Interfaith Medical Center, Inc. | 60 East 93rd St, Apt D312 Brooklyn, NY 11212 | 07/31/13 | Managed |
| Interfaith Medical Center, Inc. | 60 East 93rd St, Apt B601 Brooklyn, NY 11212 | 07/31/13 | Managed |

\* The Debtor reserves the right to dispute the characterization of the agreements governing the ownership of these properties as 'leases' and inclusion on this exhibit shall not be deemed a concession on the part of the Debtor.

# EXHIBIT H

Pursuant to Local Rule 1007-4(a)(xi), the following lists the location of the Debtor's substantial assets, books and records, and nature, location, and value of any assets held by the Debtor outside the United States:

## Location of Debtor's Substantial Assets

1545 Atlantic Ave
Brooklyn, NY 11213

The Debtor's real property, leaseholds and inventory, and the location of these assets are provided in Exhibit G.

## Location of the Debtor's Books and Records:

1545 Atlantic Ave
Brooklyn, NY 11213

## Debtor's Assets Outside of the United States

The Debtor holds no assets outside of the United States.

## EXHIBIT I

**Summary of Actions or Proceedings Pending Against the Debtor Where a Judgment or Seizure May Be Imminent[1]**

| Plaintiff and Case Number | Court or Agency and Location | State | Status or Disposition | Nature of Proceeding |
|---|---|---|---|---|
| Benoit, Jean, Case No. 6432/2008 | New York State Supreme Court, Kings County | NY | Judgment Entered; Appeal Pending | Medical Malpractice Claim |

---

[1] The Debtor has included all information reasonably available to the Debtor to date.  To the extent additional information becomes available, the Debtor will provide such information in the Debtor's Statement of Financial Affairs and/or Schedules of Liabilities, as applicable.

## EXHIBIT J

### Senior Management of the Debtor

| Name | Tenure in Position | Position | Responsibilities |
|---|---|---|---|
| Corbett Price* | November 2012 – Present | Chief Restructuring Officer | As Chief Restructuring Officer, Mr. Price is responsible for supervising the Debtor's restructuring and advising the Board of Trustees on matters including, but not limited to, debtor-in-possession financing, exit financing, and general restructuring strategy, as well as assisting in the preparation of pleadings related to the restructuring. |
| Luis A. Hernandez* | November 2011-Present | President and Chief Executive Officer | As President and CEO, Mr. Hernandez is responsible for directing, coordinating, and supervising the business affairs and properties of IMC along with the administration of IMC in all its activities and departments. |
| Predeep Chandra, M.D. | July 2010-Present | Chief Medical Officer | Dr. Chandra is responsible for overall management of all medical related activities as well as planning, organizing and directing physician services for the Hospital. |
| Patricia Cahill | January 2011-Present | Chief Nursing Officer | Ms. Cahill is responsible for leading, planning and directing administrative and Patient Care Services. Ms. Cahill is also responsible for the adherence to professional practice guidelines and developing management practices and leadership skills among nurse managers. |
| Patrick J. Sullivan* | December 2010-Present | Chief Operating Officer | Mr. Sullivan is responsible for spearheading comprehensive daily operations and plays a key role in strategic planning and revenue-generating programming. |
| Robert Mariani* | October 2011-Present | Chief Financial Officer | Mr. Mariani directs the Debtor's financial planning and accounting practices as well as its relationship with lending institutions, shareholders and the financial community. |
| Farooq Ajmal | May 2011-Present | Chief Information Officer | Mr. Ajmal is responsible for the development and implementation of the Medical Center's strategic plan for Information Technologies. |
| Denise McLellan | October 2012-Present | Director of Human Resources | Ms. McLellan plans, organizes and directs all aspects of both the Human Resources and Employee Health Services Departments for the Medical Center. |
| Sandra Dwyer | September 2012-Present | Director of Risk Management and Corporate Compliance Officer | Ms. Dwyer acts in her capacity as V.P. of Director of Risk Management and Corporate Compliance Officer to develop, initiate, maintain, and revise policies, procedures, and practices to prevent illegal, unethical or improper hospital conduct. Ms. Dwyer is also analyzes risk management data and advises senior management on mitigation process. |

\*   Indicates that such professionals serve in their respective capacities by virtue of the Management Agreement, dated November 29, 2012, between Interfaith Medical Center, Inc. & Kurron Shares of America, Inc.

# EXHIBIT K

## Payroll

Pursuant to Local Rule 1007-4(a)(xiv)-(xv), the following provides the estimated amount of payroll to the Debtor's employees (not including officers and directors) and the estimated amount to be paid to officers, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the chapter 11 petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers and Directors)[1]** | $8,790,000 |
| **Payments to Officers and Directors** | $250,000[2] |
| **Payments to Financial and Business Consultants** | $0 |

---

[1]    Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

[2]    Inclusive of the estimated amount to be paid to Kurron Shares of America, Inc., which provides management services to the Debtor.

## EXHIBIT L

### Debtor's Estimated Cash Receipts and Disbursements for the
### Thirty (30) Day Period Following the Filing of the Chapter 11 Petition

Pursuant to Local Rule 1007-4(a)(xvi), the following provides, for the 30-day period following the filing of the Debtor's chapter 11 petition, the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $13,1434,000 |
| **Cash Disbursements** | $15,314,000 |
| **Net Cash Gain/Loss** | ($1,879,000) |

| | |
|---|---|
| **Unpaid Obligations** | $7,000,000 |
| **Unpaid Receivables** | $26,463,000 |