UNITED STATES BANKRUPTCY COURT        **Hearing Date: January 14, 2013**
EASTERN DISTRICT OF NEW YORK       **Hearing Time: 2:00 p.m.**
---------------------------------------------------------------x
                              :
In re                                   :       Chapter 11
                              :
INTERFAITH MEDICAL CENTER, INC.,       :       Case No. 12-48226 (CEC)
                              :
                              :
                 Debtor.          :
                              :
---------------------------------------------------------------x

**OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO APPLICATIONS OF DEBTOR FOR SEPARATE ORDERS AUTHORIZING THE EMPLOYMENT AND RETENTION OF I) WILLKIE FARR & GALLAGHER LLP AS COUNSEL TO THE DEBTOR, II) COHNREZNICK LLP AS FINANCIAL ADVISORS TO THE DEBTOR, III) NIXON PEABODY LLP AS SPECIAL CORPORATE AND HEALTHCARE COUNSEL TO THE DEBTOR AND IV) DONLIN, RECANO & COMPANY, INC. AS A) CLAIMS AND NOTICING AGENT FOR THE DEBTOR AND B) ADMINISTRATIVE AGENT FOR THE DEBTOR**

       Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"),

by and through her counsel, respectfully submits these objections (the "Objections") to the

applications (collectively, the "Applications") of Interfaith Medical Center, Inc. ("IMC" or the

"Debtor") for orders: 1) pursuant to sections 327(a), 328 and 1107(b) of title 11 of the United

States Code (the "Bankruptcy Code"), authorizing the employment and retention of Willkie Farr

& Gallagher ("WF&G") as counsel to the Debtor (the "WF&G Application"); 2) pursuant to

sections 327(a), 328, 331 and 1107(b) of the Bankruptcy Code, authorizing the employment and

retention of CohnReznick LLP ("CohnReznick") as financial advisors to the Debtor (the

"CohnReznick Application"); 3) pursuant to sections 327(e), 328 and 1107(b) of the Bankruptcy

Code, authorizing the employment and retention of Nixon Peabody LLP ("Nixon Peabody") as

special corporate and healthcare counsel to the Debtor (the "Nixon Peabody Application"); 4)

pursuant to sections 327(a), 328(a), 330, and 331 of the Bankruptcy Code, authorizing the

employment and retention of Donlin, Recano & Company, Inc. ("Donlin Recano," and

collectively with WF&G, CohnReznick and Nixon Peabody, the "Professionals") as

administrative agent to the Debtor and, 5) pursuant to section 105(a) of the Bankruptcy Code and

section 156(c) of title 28 of the United States Code, appointing Donlin Recano as claims and

noticing agent for the Debtor (the "Donlin Recano Applications"). In support of the Objections,

the United States Trustee represents and alleges as follows:

## I.    SUMMARY OF OBJECTION

As set forth below, the Applications at issue here either contain or propose provisions

that are impermissible, or do not comply with the Bankruptcy Code or Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"). Specifically, the United States Trustee objects

to the Applications on the following grounds:

- WF&G, CohnReznick and Donlin Recano are holding retainers that they received pre-petition as evergreen retainers and seek approval to hold their respective retainers until the end of the case, rather than drawing down on them upon the approval of the first interim fee applications. These firms are already the beneficiaries of multiple risk minimizing devices which ensure that they will receive almost all of their fees and expenses on a monthly basis and guarantee payment in the event of the failure of the case. Accordingly, the retention of an evergreen retainer is unwarranted and would allow these Professionals to be treated differently than other professionals or administrative claimants in this case leading to a potentially inequitable result.

- The Debtor has not met its burden to show that the retention of multiple professionals is warranted. More specifically, the Debtor has not established how the services proposed to be rendered by 1) WF&G and Nixon Peabody and 2) CohnReznick and the Debtor's proposed manager, Kurron Shares of America, Inc. ("Kurron"), do not overlap.

- The Applications do not support approval of the each firm's retention under the improvident standards of Section 328.

- Consistent with the Bankruptcy Rules, the Professionals should be required to properly disclose any rate increases.

- The WF&G, CohnReznick and Nixon Peabody Applications contain various other

impermissible provisions or omissions, as outlined below.

As set forth in detail herein, absent modification of certain provisions, the Applications should not be approved.

## II.    STATEMENT OF FACTS

### A.    General Background

1.     On December 2, 2012 (the "Petition Date"), IMC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  ECF Doc. No. 1.  The Debtor designated itself as a health care business on its petition.  *Id.* at 1.

2.     The Debtor operates a multi-site health care system that provides medical, surgical, pediatric, dental, psychiatric and other health care services throughout central Brooklyn. *See* Declaration of Luis A. Hernandez (A) Pursuant to Local Bankruptcy Rule 1007-4, and (B) in Support of First Day Applications, executed on December 2, 2012 (the "Hernandez Declaration"), at 3, ¶ 5, ECF Doc. No. 2.  The Debtor's facilities consist of a 287-bed acute care teaching hospital on Atlantic Avenue in Bedford-Stuyvesant, Brooklyn, and an ambulatory care network of eight clinics located in the central Brooklyn communities of Crown Heights and Bedford-Stuyvesant.  *Id.*

3.     The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     On December 13, 2012, the United States Trustee appointed an official committee of unsecured creditors.  ECF Doc. No. 59.

**B.      Cash Collateral and the Carve-Out**

5.       On December 4, 2012, the Court issued an interim Order[1] (the "Cash Collateral

Order"), pursuant to sections 105, 361, 362 and 363(c)(2) of the Bankruptcy Code, Rules 2002,

4001 and 9014 of the Bankruptcy Rules and Rule 4001-5 of the Local Rules for the United States

Bankruptcy Court for the Eastern District of New York (the "Local Rules"), authorizing the

Debtor to use, in accordance with an annexed budget (the "Budget"), the cash collateral of the

Dormitory Authority of the State of New York ("DASNY"), its senior secured creditor.  ECF

Doc. No. 59.

6.       The Cash Collateral Order provides that the Debtor may use cash collateral, *inter*

*alia*, to

> fund postpetition allowed fees and expenses incurred by (x) the Debtor's Retained
> Professionals [defined to include the Professionals], (y) any statutory committee,
> including  [the Committee] and its Retained Professionals, and (z) any appointed
> Ombudsman [] and its Retained Professionals

*Id.*, at 1-2, ¶ (i)(2).

7.       The Budget reflects $2.2 million available to pay professional fees incurred

between the Petition Date and January 18, 2013.  *Id.*, Ex A.

8.       The Cash Collateral Order defines the term Carve-Out to include

> the reasonable fee and expense claims of . . . the respective retained professionals of the
> Debtor, the Committee and any appointed ombudsman . . ., if any, that have been
> approved by this Court during the Chapter 11 [c]ase pursuant to sections 327, 328, and
> 1103 of the Bankruptcy Code or otherwise . . . .

*Id.*, at 13, ¶ 13(a)(i).

9.       The Cash Collateral Order further defines Carve-Out Trigger Date to mean

---

[1]      A final hearing on the Debtor's use of cash collateral is currently scheduled for January 14, 2013 at 2:00
p.m.

the date on which the Prepetition Lender provides written notice to the Debtor, the U.S. Trustee and counsel to the Committee that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an [e]vent of [d]efault or upon the [t]ermination [d]ate.

*Id.*, at 14, ¶ 13(b).

10.     The Cash Collateral Order provides that, upon the occurrence of the Carve-Out Trigger Date, the DASNY liens and administrative claims become subject to the payment of the Carve-Out, from either cash collateral or proceeds resulting from the liquidation of any prepetition collateral, in an aggregate amount not to exceed $1.5 million.  *Id.* at 13, ¶ 13(a)(i).

11.     As further protection for professionals, the Cash Collateral Order provides that

if after liquidation of substantially all of the [p]repetition [c]ollateral there are insufficient funds to fund the entire Carve-Out, [DASNY] shall provide sufficient funds so as to fund the entire Carve-Out.

*Id.* at 14, ¶ 13(a)(iii).

### C.     The Monthly Compensation Motion

12.     On December 10, 2012, the Debtor filed a motion (the "Monthly Compensation Motion"), pursuant to sections 105(a) and 331 of the Bankruptcy Code and Local Rule 2016-1, seeking an order (the "Monthly Compensation Order") establishing procedures for interim compensation and reimbursement of expenses incurred by professionals retained in the Debtor's case.[2]  ECF Doc. No. 59.

13.     If the Monthly Compensation Motion is granted, the Professionals will be eligible to seek 80% of their invoiced fees and reimbursement of 100% of their invoiced out-of-pocket expenses on a monthly basis.  *Id.* at 3-6, ¶ 7.

---

[2]     A hearing on the Monthly Compensation Motion is currently scheduled for January 14, 2013 at 2:00 p.m. and the motion has not yet been opposed.

**D.      The WF&G Application and Proposed Retention Order**

14.      On December 2, 2012, the Debtor filed the WF&G Application.  ECF Doc. No.

13.  The WF&G Application is supported by the Declaration of Alan J. Lipkin (the "Lipkin

Declaration").  *Id.*, Exhibit 2.

15.      In his declaration, Mr. Lipkin makes the following representations:

      a.      In November 2011, WF&G received a $300,000 retainer.  During the 90
           days prior to the Petition Date, WF&G received additional retainers
           aggregating $120,000.  *See* Lipkin Declaration at 8, ¶ 11.

      b.      WF&G seeks to hold its retainer during the chapter 11 case as security for
           the payment of postpetition fees and expenses.  *Id.*

      c.      The WF&G attorneys that are likely to represent the Debtor in this case
           have current standard hourly rates ranging between $330 and $1,130.  The
           paralegals that likely will assist the attorneys have current standard hourly
           rates ranging between $120 and $310. These rates are subject to periodic
           adjustments.  *Id.* at 7, ¶ 8.

16.      The WF&G Application provides that, ". . . WF&G may be requested to render

the following services to the Debtor:

        (a) prepare, on behalf of the Debtor, as a debtor in possession, all necessary
        petitions, motions, applications, answers, orders, reports and papers in connection
        with the administration of this case;

        (b) counsel the Debtor with regard to its rights and obligations as a debtor in
        possession;

        (c) provide the Debtor with advice, represent the Debtor, and prepare all
        necessary documents on behalf of the Debtor in the areas of corporate finance,
        employee benefits, real estate, tax and bankruptcy law, as well as with regard to
        commercial litigation, debt restructuring and asset dispositions;

        (d) advise the Debtor with respect to actions to protect and preserve the Debtor's
        estate during the pendency of this case, including the prosecution of actions by the
        Debtor, the defense of actions commenced against the Debtor, negotiations
        concerning litigation in which the Debtor is involved and the objections to claims
        filed against the estate; and

(e) perform all other necessary or requested legal services.

WF&G Application, at 3-4, ¶ 8.

17.     The proposed order approving WF&G's retention (the "Proposed WF&G

Retention Order") provides that

> WF&G shall provide written notice to the Debtor, the United States Trustee and any official committee prior to any increases in any of WF&G's rates for any individual retained by WF&G.

Proposed WF&G Retention Order at 2, ¶ 6.

18.     The WF&G Application states that WF&G seeks approval of its hourly fee

structure pursuant to Section 328(a) of the Bankruptcy Code. *Id.* at 1.  In addition, the Proposed

WF&G Retention Order approves WF&G's retention pursuant to section 328 of the Bankruptcy

Code. *Id.* at 2, ¶ 3.

**D.     The CohnReznick Application and Proposed Retention Order**

19.     On December 2, 2012, the Debtor filed the CohnReznick Application.  ECF Doc.

No. 14.  The CohnReznick Application is supported by the Declaration of Bernard A. Katz (the

"Katz Declaration") and seeks approval of an engagement letter (the "CohnReznick Engagement

Letter"), dated October 18, 2012, by and between CohnReznick and the Debtor.  CohnReznick

Application, Exhibits A and B.

20.     The CohnReznick Application provides that, "[t]he professional services that

CohnReznick will render to the Debtor may include the following:

> (a) assisting the Debtor in the preparation of short and long term projections through analysis of historical financial statements and financial information, inquiries to management and analysis of historical information including the reasonableness of projected margins, accounts payable and expense levels;

> (b) assisting the Debtor in the preparation of thirteen week cash flow forecasts;

7

(c) assisting the Debtor in the preparation of financial-related disclosures required by the Court, including the Debtor's schedules of assets and liabilities, statement of financial affairs and first-day pleadings;

(d) assisting the Debtor with information and analyses require[d] pursuant to the Debtor's debtor-in-possession ("DIP") financing;

(e) assisting the Debtor with the identification and implementation of short-term cash management procedures;

(f) providing advisory assistance in assessing whether vendors would qualify for critical vendor status;

(g) assisting with communications with doctors, labor and key vendors;

(h) attending meetings and assisting Debtor in discussions with parties-in-interest, including potential DIP lenders; and

(i) rendering such other general business consulting or other such assistance as the Debtor's management or counsel may deem necessary.

*Id.* at 4-5, ¶ 7. The CohnReznick Application further discloses that, "[s]ubsequent to IMC's chapter 11 filing, the professional services that CohnReznick will render may also include the following:

(a) assisting the Debtor with the preparation and submission of financial information to the United States Trustee . . . and Bankruptcy Court;

(b) assisting the Debtor in its communication with and dissemination of financial information to secured and unsecured creditors;

(c) assisting the Debtor in the preparation of customary reporting for chapter 11 debtors, including monthly operating reports;

(d) assisting the Debtor in the analysis and preparation of weekly compliance reporting in connection with DIP loan financing and cash collateral requirements;

(e) reviewing financial aspects of motions and responses thereto for accuracy;

(f) preparing alternative dividend and liquidation analyses (high and low scenarios);

(g) assisting in the preparation of business plans to be utilized as the basis for a plan of reorganization;

(h) identifying and analyzing potential avoidance action claims;

(i) assisting the Debtor in the claim estimation and resolution process;

(j) assisting IMC in the evaluation of potential reorganization scenarios and in the preparation of documents and analyses needed for the plan confirmation process;

(k) attending meetings and conducting telephone calls with management, counsel and other parties, as necessary; and

(l) performing other services as requested by the Debtor.

*Id.* at 5-6, ¶ 8.

21. The CohnReznick Engagement Letter provides that

a. CohnReznick revises its hourly rates on February 1 of each year and will provide advance notice of such revised rates to IMC and, if applicable, the United States Trustee. CohnReznick Engagement Letter at 2.

b. . . . [A]ll services to be provided will be paid in advance through an ongoing retainer replenishment program. [CohnReznick] will require an initial retainer of $250,000 that will be applied to the final invoice for services rendered. *Id.*

c. [CohnReznick] reserves the right to immediately stop work should IMC fail to replenish the retainer upon request, subject to any applicable orders of the Bankruptcy Court. *Id.*

d. [The Debtor] agrees that CohnReznick's and its personnel's maximum liability to [the Debtor] for any errors arising out of or relating to this agreement or the services rendered will be limited to the amount actually paid for the services. *Id.*, at 3.

e. Any dispute, controversy or claim arising out of or relating to the services or the performance or breach of this agreement [ ] shall be finally resolved by arbitration. *Id.*

22. The CohnReznick Application states that CohnReznick seeks approval of its

hourly fee structure pursuant to Section 328(a) of the Bankruptcy Code. CohnReznick

Application at 1. In addition, the proposed order approving the retention of CohnReznick (the "Proposed CohnReznick Retention Order"), approves CohnReznick's retention pursuant to section 328 of the Bankruptcy Code." Proposed CohnReznick Retention Order at 2, ¶ 3.

### E. The Nixon Peabody Application and Proposed Retention Order

23.     On December 20, 2012, the Debtor filed the Nixon Peabody Application. ECF Doc. No. 75. The Nixon Peabody Application is supported by the Declaration of Peter A. Egan (the "Egan Declaration"). *Id.*, Exhibit A.

24.     The Nixon Peabody Application provides that, "[s]ubject to the allocation of assignments among the Debtor's other professionals, as described herein, Nixon Peabody may be requested to render the following services to the Debtor:

> a) act as lead counsel in connection with any proposed transaction between the Debtor and one or more other hospitals regarding a future relationship[;]
>
> b) act as health care regulatory counsel;
>
> c) counsel the Debtor with respect to compliance matters, including matters that implicate health care fraud and abuse laws; and
>
> d) perform all other necessary or requested legal services.

Nixon Peabody Application, at 3, ¶ 8.

25.     The Nixon Peabody Application also discloses that

> Nixon Peabody holds a claim against the Debtor for approximately $13,000 for prepetition services.

Nixon Peabody Application at 4, n.2. Notwithstanding this disclosure, the proposed order granting the retention of Nixon Peabody (the "Proposed Nixon Peabody Retention Order") seeks a finding that

> Nixon Peabody is a "disinterested person" as such term is defined under section 101(14), as modified by section 1107(b), of the Bankruptcy Code. . .

Proposed Nixon Peabody Retention Order, at 1.

26.    The Nixon Peabody Application states that Nixon Peabody seeks approval of its

hourly fee structure pursuant to Section 328(a) of the Bankruptcy Code.  Nixon Peabody

Application at 1.  In addition, the Proposed Nixon Peabody Retention Order approves the

retention pursuant to section 328 of the Bankruptcy Code.  Proposed Nixon Peabody Retention

Order at 2, ¶ 3.

**F.    The Donlin Recano Applications and Proposed Retention Orders**

27.    On December 2, 2012, the Debtor filed the Donlin Recano Applications.  ECF

Doc. Nos. 6 and 15.  The Donlin Recano Applications are supported by the Declarations of

Colleen McCormick (the "McCormick Declarations").  Id., Exhibits B.

28.    The Donlin Recano Applications disclose that

> Prior to the Petition Date, the Debtor provided [Donlin Recano] a retainer in the
> amount of $30,000.00. [Donlin Recano] seeks to first apply the retainer to all pre-
> petition invoices, thereafter, to have the retainer replenished to the original
> retainer amount, and thereafter, to hold the retainer under the Engagement
> Agreement during the chapter 11 case as security for the payment of fees and
> expenses under the Engagement Agreement.

ECF Doc. No 6, ¶ 12.

29.    By Order dated December 4, 2012, the Court granted the claims agent portion of

the Donlin Recano Applications, but deferred ruling on the issue of the post-petition application

of the pre-petition retainer.  ECF Doc. No 37.

**G.    The Kurron Application**

30.    In addition to the Applications addressed herein, on December 2, 2012, the

Debtor filed an application (the "Kurron Application"),  pursuant to section 363 of the

"Bankruptcy Code, seeking an order authorizing the Debtor to employ and retain (i) Kurron as

manager for the Debtor and (ii) Kurron personnel as the Debtor's senior management. ECF

Doc. No. 16. The United States Trustee's objection to the Kurron Application is being filed

contemporaneously herewith, as a separate pleading.

## III. OBJECTION

### A. The Governing Law

31. The Applications primarily seek relief pursuant to Sections 327(a), 328, 330 and

331 of the Bankruptcy Code.

#### 1. Section 327(a)

32. Pursuant to Section 327(a):

> the trustee, with the court's approval, may employ one or more attorneys,
> accountants, appraisers, auctioneers, or other professional persons, that do not
> hold or represent an interest adverse to the estate, and that are disinterested
> persons, to represent or assist the trustee in carrying out the trustee's duties under
> this title.

11 U.S.C. § 327(a).

33. "[A]pproval under Section 327 [of the Bankruptcy Code] establishes only that [a

professional] may be employed by the debtor-in-possession, *and not that his employment will*

*therefore or thereafter be compensated from estate funds.*" *In re Engel*, 124 F.3d 567, 572 (3d

Cir. 1997) (emphasis added); *see also In re Johns-Manville Corp.*, 32 B.R. 728, 731 (S.D.N.Y.

1983) ("section 327 approvals are merely preliminary 'go aheads' rather than conclusive

determinations [of fees and expenses]"). Therefore, Section 327 establishes no guaranteed right

to payment of fees. Rather, this provision simply sets the guideposts for retention, such as

requiring that the professional is disinterested and lacks any materially adverse interest. *See* 11

U.S.C. § 327(a). The term adverse interest is not defined in the Bankruptcy Code. However, the

Second Circuit has defined the term as:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.

In re Worldcom, 311 B.R. 151, 163 (Bankr. S.D.N.Y. 2004) (quoting Bank Brussels Lambert v. Coan (In re AroChem Corp.), 176 F.3d 610, 623 (2d Cir.1999)).

### 2.    Section 327(e)

34.    Pursuant to Section 327(e):

The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

35.    The language of Section 327(e) sets up a three-prong test for the employment of special counsel.  First, the employment may only be authorized for a "specified special purpose" other than "conducting the case." *Id.*  The "specified special purpose" must be unrelated to the reorganization and must be explicitly described in the application. *In re Congoleum Corp.*, 426 F.3d 678, 689 (3d Cir. 2005); *In re Star Ready Mix, Inc.*, 2008 WL 5338746 (Bankr. E.D. Cal. Dec. 18, 2008).  The second and third prongs of the "special counsel" test are dependent on the first. *Star Ready Mix*, 2008 WL 5338746 at *2.  Once the purpose for special counsel's employment is adequately and specifically defined, a debtor must show that the proposed counsel "does not represent or hold any interest adverse to the estate" with respect to the proposed employment.  11 U.S.C. § 327(e).  A debtor must also show that the employment of special counsel is in the best interest of the estate. *Id.*

36.    The "requirements for retention under section 327(a) that a professional not

hold or represent an interest adverse to the estate apply equally to retention under section 327(e)*." In re JMK Constr. Group, Ltd.*, 441 B.R. 222, 230-31 (Bankr. S.D.N.Y. 2010) (citation omitted). The only substantive difference in application is that under section 327(e) the adverse interest analysis is with respect to "*the matter on which such attorney is to be employed*." 11 U.S.C. §327(e) (emphasis added); *see also In re Ginco, Inc.*, 105 B.R. 620, 621 (Bankr. D. Colo. 198) (finding that under either Section 327(a) or 327(e), proposed counsel cannot represent an interest adverse to the estate, with the only difference in the adverse interest standard being that subsection (e) mandates that the interest not be adverse with respect to the matter on which the attorney is to be employed).

### 3. Section 328

37. Likewise, Section 328 creates no automatic right of payment. This provision authorizes:

> employment of a professional person under section 327 or 1103 of this title, as the case may be, *on any reasonable terms and conditions of employment*, including on a retainer, on an hourly basis, or on a contingency fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, *if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions*.

11 U.S.C. § 328(a) (emphasis added).

38. Under Section 328(a), the Court "may not award a fee different from one that it has approved in a retention order unless it finds that the terms in the retention order were 'improvident in light of developments not capable of being anticipated at the time.' " *Riker, Danzig et al. v. Official Committee (In re Smart World Techs., LLC)*, 383 B.R. 869, 877 (S.D.N.Y. 2008); *see also In re High Voltage Eng'g Corp.*, 311 B.R. 320, 332 (Bankr. D. Mass.

2004) (once a fee arrangement is approved under Section 328, the ability of the bankruptcy court to review the amount of compensation payable to the professional is circumscribed).

39.     Thus, in approving a fee arrangement under Section 328(a), it has been held that "a court may not revisit the reasonableness" of the arrangement when approval of the fees eventually is sought.  *In re XO Commcn's, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005).  Because a finding of improvidence is a high and subjective standard, courts rarely disturb the original terms of a professional's employment.  *In re Yablon*, 136 B.R. 88, 92 (Bankr. S.D.N.Y. 1992).  Under Section 328, improvidence requires a finding there was an intervening circumstance that would have affected the court's decision in the first instance.  *High Voltage*, 311 B.R. at 331.  The circumstance must have been relevant to that decision in some way, rendering it untenable or unwise in hindsight.  *Id.*

**4.     Sections 330 and 331**

40.     Section 330(a) provides:

After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee . . . an examiner, . . . or a professional person employed under section 327 or 1103-

(A)     reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)     reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1)(A) and (B).

41.     Section 331 further permits a professional to apply to the court for compensation "before such date as is provided under section 330 of this title."  11 U.S.C. § 331.  Interim fee awards under section 331 are discretionary, and are subject to reexamination and adjustment during the course of the case.  *See In re Regan, Jr.*, 135 B.R. 216, 217 (Bankr. E.D.N.Y. 1992),

("[i]nterim allowances under the Bankruptcy Code remains a payment on account of an ultimate final allowance, in order that the administration of a debtor's estate may be carried on") "Final allowances under section 330 of the Bankruptcy Code are ordinarily to be determined at the conclusion of the case since only then is a thorough analysis of the various factors enumerated in Section 330 possible." *Id.* at 218. Any interim fees awarded or paid are payable on account of such services and are subject to the court's review at the time of the final fee applications. *Id.*

**B.      The Professionals Holding Pre-Petition Retainers Should Apply the Balance of the Retainers to Fees Awarded Pursuant to the First Interim Fee Applications**

**1.      Evergreen Retainers**

42.      The type of retainer sought by WF&G, CohnReznick and Donlin Recano in this case is commonly referred to as an "evergreen retainer." *See In re Insilco Technologies, Inc.*, 291 B.R. 628, 632 (Bankr. D. Del. 2003). Evergreen retainers are designed to minimize a professional's exposure to the risk of non-payment. *Id.* at 632. In certain jurisdictions evergreen retainers are sometimes authorized. *See, e.g. In re Knudsen Corp.*, 84 B.R. 668, 672-73 (9th Cir. B.A.P. 1988); *Insilco*, 291 B.R. at 635; *In re Pan American Hosp. Corp.*, 312 B.R. 706, 712-13 (Bankr. S.D. FL 2004).

43.      In *In re Knudsen*, the 9th Circuit B.A.P. established a four-part test for courts to consider when ruling on the propriety of an evergreen retainer:

a.      The case is an unusually large one in which an exceptionally large amount of fees accrue each month;

b.      The court is convinced that waiting an extended period for payment would place an undue hardship on counsel;

c.      The court is satisfied that counsel can respond to any reassessment; and

> d. The fee retainer procedure is, itself, the subject of a noticed hearing prior to any payment thereunder.

84 B.R. at 672-73.

44. Similarly, in *Insilco*, the Delaware Bankruptcy Court rejected blanket approvals of evergreen retainers, noting that evergreen retainers must be tailored to the circumstances of a particular case. 291 B.R. at 634. The *Insilco* Court relied upon a five-factor test, which is somewhat broader than the *Knudsen* test;

> a. Whether the terms of an engagement agreement reflect normal business terms in the marketplace;
>
> b. The relationship between the Debtor and the professionals, *i.e.*, whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms length negotiation;
>
> c. Whether the retention, as proposed, is in the best interests of the estate;
>
> d. Whether there is creditor opposition to the retention and retainer provisions; and
>
> e. Whether given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization" especially in light of the existence of any other "risk minimizing" devices, such as an administrative order and/or carve out.

*Id.*

45. The *Insilco* Court also discussed the

> need for greater clarity in engagements the terms of which are intended to include evergreen retainers . . . . Henceforth, if the terms of a proposed engagement include a provision for an evergreen retainer, such term should be highlighted and summarized in the application; moreover a copy of the engagement agreement should be attached as an exhibit to the application containing language which makes it clear that the applicant intends to hold such retainer until the end of the case . . . .

*Id.* at 636.

46.     In *In re Pan American Hospital*, 312 B.R. 706, 712-13 (Bankr. S.D. Fla. 2004), the Southern District of Florida Bankruptcy Court incorporated both the *Knudsen* and *Insilco* analyses, by applying the *Knudsen* approach on the size of the case and the substantiality of counsel's need for the retainer with the *Insilco* approach on reasonableness. The *Pan American* Court also placed a high evidentiary burden on lawyers seeking multiple risk-minimizing devices to establish the existence of undue hardship, and found it sufficient to approve one risk minimizing device, the evergreen retainer, but unnecessary and unreasonable to approve any more such devices. *Id.*, at 711. The Court also noted the *Insilco* court's insistence that the engagement agreement be highlighted, summarized and attached as an exhibit to the retention application. *Id.* at 712 n. 1.

### 2. WF&G, CohnReznick and Donlin Recano Have Failed to Meet Their Burden to Show That They Are Entitled to Evergreen Retainers

47.     WF&G, CohnReznick and Donlin Recano have not, and cannot, meet their burden of establishing their entitlement to hold their retainers until the Court's approval of their final fee applications. In the Eastern District of New York, retained professionals holding pre-petition retainers typically draw down on the retainers upon the Court's approval of the professional's first interim fee application. *See, e.g., In re Global Aviation Holdings Inc., et al.*, Case No. 12-40783 (CEC); *In re Caritas Health Care, Inc., et al.*, Case No. 09-40901 (CEC); *In re Victory Memorial Hospital, et al.*, Case No. 06-44387 (CEC); *In re Brooklyn Hospital Center*, Case No. 05-26990 (CEC). This is also the regular practice in the Southern District of New York. *See In re AMR Corporation*, Case No. 11-15463 (SHL); *In re Old Carco LLC (f/k/a Chrysler LLC)*, Case No. 09-50002 (ALG); *Motors Liquidation Company (f/k/s/ General Motors Corporation)*,

Case No. 09-50026 (REG); *In re Chemtura Corp.*, Case No. 09-11233 (REG); *In re Almatis B.V.*, Case No. 10-12308 (MG).[3] This immediate draw down is used to balance the rights among the various constituencies which have claims against the Debtor's post-petition cash.

48.    Conversely, evergreen retainers are designed to minimize a professional's exposure to the risk of non-payment. *Insilico*, 291 B.R. at 632. Under the Bankruptcy Code priority scheme, the fees and expenses of retained professionals are administrative claims governed by section 507(a)(1) and the claims are paid *pari passu*. 11 U.S.C. 507(a)(1). Allowing WF&G, CohnReznick, and Donlin Recano to hold the retainers under the end of the case provides them with preferential protection against risk that is not available to other professionals. In fact, professionals have already taken a series of steps to mitigate risk, including the $1.5 million carve-out and DASNY's guarantee in the Cash Collateral Order, which protect them even if the case fails or becomes administratively insolvent. In addition, the Monthly Compensation Order, which the Court will likely approve, provides for the payment of 80 percent of the Professionals' fees and 100 percent of their expenses each month. WF&G, CohnReznick, and Donlin Recano have not demonstrated the necessity for the evergreen retainers, in light of the other risk minimizing devices, or any undue hardship. *See In re Pan American Hospital,* 312 B.R. at 711 (high evidentiary burden for lawyers seeking multiple risk-minimizing devices to establish the existence of undue hardship). In fact, the Professionals face minimal exposure to the risk of nonpayment of their fees whether the case succeeds or fails. Allowing WF&G, CohnReznick, and Donlin Recano to hold their retainers until the end of the

---

[3]    *But see Saint Vincents Catholic Medical Center of New York*, Case No. 05-14945 (CGM) (Bankr. S.D.N.Y. July 1, 2010) (bench decision) (overruling the United States Trustee's objection to evergreen retainer held by Debtors' professionals).

case reallocates the risk of loss to the detriment of other Professionals. Any risk of nonpayment should be borne by all Professionals, *pari passu*, as contemplated by the Bankruptcy Code.

**C.** **The Debtor Has Not Met Its Burden to Establish That the Services to Be Provided by 1) WF&G and Nixon Peabody, and 2) CohnReznick and Kurron, Are Necessary and Do Not Overlap**

49.     Prior to approving the retention of a professional, the Court should inquire whether the retention is necessary for the administration of the case. *See, e.g.*, 3 *Collier on Bankruptcy* ¶ 327.02[1] (16th Ed. Rev.) ("The determinative question in approving the employment of a professional person is whether it is reasonably necessary during the administration of the estate to have professional persons, such as attorneys or accountants, employed. An attorney for a trustee should not be employed unless the attorney's special professional skills are necessary for the protection and benefit of the estate or will further the aims of the case."); *see also In re Allegheny Int'l*, 117 B.R. 171 (W.D. Pa. 1990) (citing *In re Yeisley*, 64 B.R. 360, 362 (Bankr. S.D. Tex. 1986) (noting that the policy reasons for the requirement of court approval of a professional retention include cost control, provisions for an opportunity for objection to unnecessary expenditures and avoidance of duplicative services and costs).

50.     The Debtor has the burden of establishing that a proposed employment application is proper. *In re Borders Group, Inc.*, 465 B.R. 195, 199 (Bankr. S.D.N.Y. 2011) ("[a] retention application must comply with section 327 of the Bankruptcy Code and Bankruptcy Rule 2014, which impose legal requirements and burdens on a debtor presenting the retention application and upon the professional that seeks to be retained").

51.     As discussed below, the Debtor has failed to satisfy its burden that some of the firms it seeks to retain, and the scope of certain services proposed to be provided, are necessary and that the cost to the estate for these firms is warranted:

### 1.      WF&G and Nixon Peabody

52.     The Debtor seeks to retain WF&G as general counsel pursuant to section 327(a) and Nixon Peabody as special healthcare and corporate counsel pursuant to section 327(e).  ECF Doc. Nos. 13 and 75.  The United States Trustee objects to the WF&G and Nixon Peabody Applications because the circumstances of this case do not warrant the retention of two law firms to perform what appear to be many of the same services.

53.     For example, the Debtor proposes to employ Nixon Peabody to, among other duties, "act as lead counsel in connection with any proposed transaction between the Debtor and one or more other hospitals regarding a future relationship."  Nixon Peabody Application at 3, ¶ 8(a).  Similarly, the Debtor proposes to employ WF&G to, "provide the Debtor with advice, represent the Debtor, and prepare all necessary documents on behalf of the Debtor in the areas of corporate finance, employee benefits, real estate, tax and bankruptcy law, as well as with regard to commercial litigation, debt restructuring and asset dispositions."  WF&G Application at 3, ¶ 8(c).

54.     If this proposed arrangement is approved, there will be two sets of eyes examining the same documents and negotiating and potentially litigating issues regarding the central disclosed purpose of the Debtor's chapter 11 case – an affiliation or transaction between the Debtor and another hospital.[4]  The inherent risk of permitting such overlapping retentions is

---

[4]         In addition to the duplication of services issue, retention of Nixon Peabody under section 327(e) to, "act as lead counsel in connection with any proposed transaction between the Debtor and one or more other hospitals

duplication of services and the naturally accompanying overbilling. Indeed, WF&G or Nixon Peabody Applications do not set forth in any comprehensive detail the division of duties and delegation of authority between the law firms. Beyond *pro forma* pledges to avoid duplication, neither application describes with any specificity what procedures the firms explicitly intend to undertake to avoid duplication and overbilling. Moreover, neither application gives an explanation, as required by Bankruptcy Rule 2014, as to why one firm cannot perform the services that the other professionals are being retained to provide.

55. In addition, the "catch-all" scope of services provisions of the WF&G and Nixon Peabody Applications overlap. *See* WF&G Application at 4, ¶ 8(e) ("perform all other necessary or requested legal services") and Nixon Peabody Application, at 3, ¶ 8(d) ("perform all other necessary or requested legal services"). The WF&G and Nixon Peabody Applications must clearly delineate the services to be performed and propose appropriate safeguards to prevent duplication.

### 2. CohnReznick and Kurron

56. The Debtor seeks to retain CohnReznick as financial advisors pursuant to section 327(a). ECF Doc. No. 14. The Debtor also filed the "Kurron Application seeking to retain Kurron as manager for the Debtor.[5] ECF Doc. No. 16. The United States Trustee objects to the CohnReznick Application because the circumstances of this case do not warrant the need for two firms to perform what appear to be many of the same services.

57. For example, the Debtor proposes to employ CohnReznick to, among other duties, "[assist] the Debtor in the preparation of thirteen week cash flow forecasts." CohnReznick

---

regarding a future relationship," is potentially improper. *See, eg., In re Congoleum Corp.*, 426 F.3d at 689 ("specified special purpose" must be unrelated to the reorganization).

[5] The United States Trustee's objection to the Kurron Application is being filed contemporaneously herewith, as a separate pleading.

Application at 4, ¶ 7(b).  Similarly, the Debtor proposes to employ Kurron to, "assist in the preparation and evaluation of the Debtor's financial forecasts and budgets."  Kurron Application at 6, ¶ 13(a).  In addition, the Debtor proposes to employ CohnReznick to, among other duties, "[assist] the Debtor with the preparation and submission of financial information to the United States Trustee [] and Bankruptcy Court," and, "[assist] the Debtor in the claim estimation and resolution process."  CohnReznick Application at 5, ¶ 8(a) and (i).  Similarly, the Debtor proposes to employ Kurron to, "assist in the Debtor's overall financial reporting and addressing the administrative requirements of the Bankruptcy Code, including post-petition reporting requirements and claims reconciliation efforts."  Kurron Application at 7, ¶ 13(h).  If this proposed arrangement is approved, there will be two sets of professionals providing financial services to the Debtor, inevitably leading to duplication of efforts and overbilling.

58.     In addition, the "catch-all" scope of services provisions of the CohnReznick and Kurron overlap.  *See* CohnReznick Application at 6, ¶ 8(l) ("performing other services as requested by the Debtor") and Kurron Application, at 7, ¶ 13(h) ("perform such other services as Kurron and the Debtor mutually agree").  The CohnReznick and Kurron Applications must clearly delineate the services to be performed and propose appropriate safeguards to prevent duplication.

**D.     The Applications Do Not Support Approval of the Retentions Under the Improvident Standard of Section 328**

59.     The Applications seek approval of their hourly fee structures pursuant to Section 328.  Proposed WF&G Retention Order at 2, ¶ 3, Proposed CohnReznick Retention Order at 2, ¶ 3, Proposed Nixon Peabody Retention Order at 2, ¶ 3, and Proposed Donlin Recano Retention Order at 1.  The United States Trustee objects to approval of these Applications under Section

328 and requests that the proposed orders be modified to delete any reference to Section 328.

60.     Sections 328 and 330 establish a two-tiered system for judicial review and approval of the terms of a professional's compensation.  Section 330 authorizes the bankruptcy court to award a retained professional "reasonable compensation" based on an after-the-fact consideration of "the nature, the extent, and the value of such services, taking into account all relevant factors." 11 U.S.C. § 330(a).  However, Section 328(a), the standard of review that the Professionals appear to seek, requires a bankruptcy court to forgo a full post-hoc reasonableness inquiry if it pre-approves the "employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis."  11 U.S.C. § 328(a).

61.     If the Court pre-approves the terms and conditions of these retentions under Section 328(a), its power to amend those terms will be severely constrained.  It may only "allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  *Id., see, e.g., Smart World*, 552 F.3d at 232 (stating that "pre-approval of a fee agreement under 11 U.S.C. §328(a) depends on the totality of the circumstances, including whether the professional's application, or the court's order, referenced section 328(a), and whether the court evaluated the propriety of the fee arrangement before granting final, and not merely preliminary, approval").

62.     Under the circumstances of this bankruptcy case, it would be inappropriate to apply Section 328(a) to the Court's and the parties' review of the fees of the Professionals.  Instead, sole reliance upon the reasonableness standard of Section 330 is justified and

appropriate.  The burden of proof to establish that the terms and conditions of employment – including the imposition of Section 328(a) – is on the Debtor, as applicant.  *See Nischwitz v. Miskovic (In re Airspect Air, Inc.)*, 385 F.3d 915, 921 (6th Cir. 2004) (applicant has burden of establishing reasonableness of terms and conditions of retention).  To meet its burden, the Debtor must provide specific evidence to establish that "the terms and conditions are in the best interest of the estate."  *In re Gillett Holdings, Inc.*, 137 B.R. 452, 455 (Bankr. D. Colo. 1991).  A professional's requested invocation of Section 328(a) is neither mandatory nor automatic, regardless of the proposed compensation scheme.  *Id.*  A professional should not automatically expect approval of its retention under Section 328 solely because it asks for it.

63.     The invocation of Section 328 is usually granted in retention applications of financial advisors or investment bankers, when the fee arrangement includes a flat monthly fee and a success or transaction fee.  It is not the norm for Debtor's counsel, special counsel and hourly financial advisor to seek retention under Section 328, because, in essence, it is asking the Court to bless their fees without giving any parties in interest the opportunity to review them under the "reasonableness" standard.  Neither the Debtor, nor the Professionals, have met their burden of proof to demonstrate why – or how – the hourly fee structures proposed by the Professionals are reasonable under Section 328(a).  *See Airspect Air*, 385 F.3d at 921 ("burden should rest on the applicant to ensure that the court notes explicitly the terms and conditions if the applicant expects them to be established at that early point.").  Accordingly, approval of the proposed hourly fee structures and the reimbursement of its expenses of the Professionals pursuant to Section 328 should be denied, and the retention of the Professionals should be pursuant solely to Section 327(a) or 327(e), as appropriate.

### E.    The Proposed Retention Orders Should Require the Professionals to File Notice of Any Rate Increases

64.    The proposed retention orders of the Professionals are either silent with respect to the firms providing any notice of rate increases for their respective professionals or contain inadequate rate change notice provisions.  Bankruptcy Rule 2014 expressly provides, among other things, that a retention application:

> shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, *any proposed arrangement for compensation* and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in office of the United States Trustee.

Fed. R. Bankr. P. 2014 (emphasis added).  The law is clear in this Circuit that a professionals' duty of disclosure under Fed. R. Bankr. 2014 continues through closure of the case.  *See, e.g., In Granite Partners,* 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (although Bankruptcy Rule 2014 does not expressly require supplemental or continuing disclosure, Section 327(a) implies a continuing duty of disclosure).

65.    The United States Trustee Guidelines require that every fee application provide, among other information, the "names and hourly rates of all applicant's professionals and paraprofessionals who billed time, explanation of any changes in hourly rates from those previously charged, and statement of whether the compensation is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under title 11."  *See* United States Trustee Guidelines § (b)(1)(iii).  Where, however, fee applications do not conspicuously disclose rate increases, the reviewer is left to sift through various applications and figures contained therein to determine whether a professional's rate increase went into effect at

any time during the fee application period.  This adds considerably to the time it takes to review fee applications.[6]  *See* Fed. R. Bankr. P. 2014.

### F.  Additional Terms of WF&G Retention Should be Modified

66.  The Proposed WF&G Retention Order should provide that where its terms conflict with the terms of either the WF&G Application or the Lipkin Declaration, the Order controls.

67.  Paragraph 4 of the Proposed WF&G Retention Order should provide that 1) WF&G "may seek to be" compensated instead of "shall be" compensated, and 2) all fee applications shall be in compliance with the United States Trustee Guidelines.  Proposed WF&G Retention Order at 2, ¶ 4.

68.  The WF& G Application provides that WF&G is being retained, *inter alia*, to "perform all other necessary or requested legal services."   WF&G Application, at 4, ¶ 8(e).  This "catch-all" description of services should be deleted or more narrowly tailored.

### G.  Additional Terms of CohnReznick Retention Should be Modified

69.  The Proposed CohnReznick Retention Order should state that the, "Application is granted to the extent set forth herein."  Proposed CohnReznick Retention Order at 2, ¶ 1.

---

[6] In order to alleviate these concerns, the United States Trustee suggests that the following provision be added to the proposed retention orders to alleviate the concerns set forth above:

> ORDERED, that prior to any increases in [Professional]'s rates, [Professional] shall file a supplemental affidavit with the Court and provide ten business days' notice to the Debtors, the United States Trustee and any official committee.  The supplemental affidavit shall explain the basis for the requested rate increases in accordance with Section 330(a)(3)(F) of the Bankruptcy Code and state whether the Debtor has consented to the rate increase.  The United States Trustee retains all rights to object to any rate increase on all grounds including, but not limited to, the reasonableness standard provided for in Section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to Section 330 of the Bankruptcy Code.

70.     Paragraph 8 of the CohnReznick Retention Order should provide that 1) CohnReznick "may seek to be" compensated instead of "shall be" compensated, and 2) all fee applications filed pursuant to sections 330 and 331 of the Bankruptcy Code or any order of this Court shall be in compliance with the United States Trustee Guidelines.  Proposed CohnReznick Retention Order at 2, ¶ 8.

71.     The Application provides that CohnReznick's services will include, *inter alia*, "[r]endering such other general business consulting or other such assistance as the Debtor's management or counsel may deem necessary," and, "[p]erforming other services as requested by the Debtor."  CohnReznick Application at 5-6, ¶¶ 7(i) and 8(l).  These "catch-all" descriptions of services should be deleted or more narrowly tailored.

72.     The limitation of liability and mandatory arbitration provisions of the CohnReznick Engagement Letter should be specifically carved out from the Court's approval.  CohnReznick Engagement Letter, at 3.

**H.     Additional Terms of Nixon Peabody Retention Should be Modified**

73.     The Proposed Nixon Peabody Retention Order should provide that where its terms conflict with the terms of either the Application or the Egan Declaration, the Order controls.

74.     Paragraph 4 of the Nixon Peabody Retention Order should provide that 1) Nixon Peabody "may seek to be" compensated instead of "shall be" compensated, and 2) all fee applications shall be in compliance with the United States Trustee Guidelines.  Proposed Nixon Peabody Retention Order at 2, ¶ 4.

75.     The Nixon Peabody Application provides that Nixon Peabody is being retained, *inter alia*, to "perform all other necessary or requested legal services."  Application, at 3, ¶ 8(d). This "catch-all" description of services should be deleted or more narrowly tailored.

76.     The finding that Nixon Peabody is a "disinterested person," as such term is defined under section 101(14), should be removed from the Proposed Nixon Peabody Retention Order.  Proposed Nixon Peabody Retention Order at 1.

## IV.   CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court (a) sustain the foregoing Objections, (b) deny the Applications in their current forms, and (c) grant such other and further relief as the Court may deem just and proper.

Dated: Brooklyn, New York
        January 7, 2013

                          Respectfully submitted,

                          TRACY HOPE DAVIS
                          UNITED STATES TRUSTEE
                          FOR REGION 2

                          By: */s/ William E. Curtin*
                          William E. Curtin
                          Susan D. Golden
                          Trial Attorneys
                          271 Cadman Plaza East, Suite 4529
                          Brooklyn, New York 11201
                          Tel. No. (718) 422-4960
                          Fax. No. (718) 422-4990