| UNITED STATES BANKRUPTCY COURT | Hearing Date: January 14, 2013 |
| EASTERN DISTRICT OF NEW YORK | Hearing Time: 2:00 p.m. |

-------------------------------------------------------------x
:
In re : Chapter 11
:
INTERFAITH MEDICAL CENTER, INC., : Case No. 12-48226 (CEC)
:
:
Debtor. :
:
-------------------------------------------------------------x

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC. AS MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE DEBTOR'S SENIOR MANAGEMENT**

Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee"), by and through her counsel, respectfully submits this objection (the "Objection") to the motion (the "Motion") of Interfaith Medical Center, Inc. ("IMC" or the "Debtor") for an order, pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the Debtor to employ and retain (i) Kurron Shares of America, Inc. ("Kurron") as manager for the Debtor and (ii) Kurron personnel as the Debtor's senior management. In support of the Objection, the United States Trustee represents and alleges as follows:

**I.  SUMMARY OF OBJECTION.**

The Motion should be denied because the Debtor has not demonstrated a good business reason to approve Kurron's retention. The information currently available, while scant, suggests that retention of Kurron could actually be an impediment to reorganization. Kurron has managed and controlled the Debtor for over twenty years. In addition, Corbett Price, the proposed CRO of the Debtor and the CEO of Kurron, served on the Debtor's Board from at least 2002 until October 2011. This long history is critical, given the Debtor's disclosed exit strategy of pursuing

an affiliation or other relationship with one or more other hospitals. Kurron derives a substantial amount of income from its relationship with this non-profit Debtor, which it apparently wishes to continue post-confirmation. Presumably, any affiliation or relationship with another hospital will involve some degree of shared management and governance, which would likely reduce, or even eliminate, the substantial income Kurron derives from the Debtor. The Debtor has not established that Kurron, with its powerful interest in continuing its profitable relationship with the Debtor, is an appropriate entity to manage the Debtor through this crucial period or that Kurron is capable of fulfilling its fiduciary duty to the Debtor, the estate and creditors. In addition, the compensation proposed to be paid to Kurron is excessive and the services proposed to be rendered by Kuron exceed those of managers retained pursuant to section 363, and overlap significantly with services proposed to be provided by other professionals. For all of these reasons, the Motion should be denied.

## II.     STATEMENT OF FACTS

### A.     General Background

1. On December 2, 2012 (the "Petition Date"), IMC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. ECF Doc. No. 1. The Debtor designated itself as a health care business on its petition. *Id.*, at 1.

2. The Debtor operates a multi-site health care system that provides medical, surgical, pediatric, dental, psychiatric and other health care services throughout central Brooklyn. *See* Declaration of Luis A. Hernandez (A) Pursuant to Local Bankruptcy Rule 1007-4, and (B) in Support of First Day Applications, executed on December 2, 2012 (the "Hernandez Declaration") at 3, ¶ 5, ECF Doc. No. 2. The Debtor's facilities consist of a 287-bed acute care teaching hospital on Atlantic Avenue in Bedford-Stuyvesant, Brooklyn, and an ambulatory care

network of 8 clinics located in the central Brooklyn communities of Crown Heights and Bedford-Stuyvesant. *Id.*

3. The Debtor is operating its businesses and managing its affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. On December 13, 2012, the United States Trustee appointed an official committee of unsecured creditors. ECF Doc. No. 59.

**B.     Kurron**

5. Kurron was founded in 1990 by former hospital executives who had operated hospitals in the United States. Motion at 3, ¶ 5.

6. The Motion discloses that

> Kurron has managed numerous hospitals and health care facilities and provides a full range of management, consulting, strategic advisory, and restructuring services to a wide range of businesses within the health care sector. Kurron specializes in crisis management for financially troubled health care entities.

*Id.* The Motion does not disclose any examples of such previous Kurron engagements.

7. The Motion further discloses that

> Kurron and the Kurron Officers [defined below] have extensive experience in providing management services to health care facilities in reorganization proceedings and have a reputation for providing excellent services on behalf of debtors and creditors in reorganization cases nationwide.

*Id.* at 4, ¶ 5. The Motion does not disclose any examples of such reorganization cases.

8. The Debtor originally engaged Kurron in 1991 to provide management services and to address the Debtor's operating performance. *Id.* at 3, ¶ 6. Continuously since that time, Kurron has provided the Debtor's senior management and related services. *Id.*

3

### C. The Motion

9. On December 2, 2012, the Debtor filed the Motion. ECF Doc. No. 16. The Motion is supported by the Declaration of Corbett Price (the "Price Declaration") and seeks approval of an engagement letter (the "Kurron Engagement Letter"), dated November 29, 2012, by and between Kurron and the Debtor. *Id.*, Exhibits A and B.

10. The Motion seeks authorization to retain and employ Kurron as manager for the Debtor, and to employ (i) Corbett Price as Chief Restructuring Officer (ii) Luis Hernandez as President and Chief Executive Officer; (iii) Patrick Sullivan as Chief Operating Officer; (iv) Robert Mariani as Chief Financial Officer; and (v) Pamela Bradshaw as Special Counsel (collectively, the "Kurron Officers"). *Id.* at 4, ¶ 7.

11. The Motion further seeks authority for, "other Kurron personnel [to] provide services to the Debtor as needed and mutually agreed." *Id.*

12. The Motion provides that Kurron, ". . . will perform the following services, among others, in connection with this case as requested and mutually agreed with the Debtor:

> (a) assist in the preparation and evaluation of the Debtor's financial forecasts and budgets;
>
> (b) review and provide advice to the Debtor on its current and prospective business plans (including detailed financial projections);
>
> (c) assist the Debtor in its negotiations with the Debtor's creditors, including the Dormitory Authority of the State of New York ("DASNY"), and provide periodic reports to DASNY on the progress of the Debtor's restructuring efforts;
>
> (d) participate in meetings of the Debtor's Board as appropriate, and provide reports and advice to the Board as requested;
>
> (e) assist in the performance of cost/benefit analyses related to executor contracts and the assumption/rejection of each;

>   (f) assist in the evaluation and reconciliation of claims asserted against the Debtor in this case;
>
>   (g) assist in the Debtor's overall financial reporting and addressing the administrative requirements of the Bankruptcy Code, including postpetition reporting requirements and claims reconciliation efforts; and
>
>   (h) perform such other services as Kurron and the Debtor mutually agree.

*Id.* at 6-7, ¶ 13.

13. The Motion further provides that

>   All of the services that Kurron and the Kurron Officers will provide to the Debtor will be undertaken at the request of the Debtor and will be under the ultimate direction of the Board.

*Id.* at 7, ¶ 14.

14. With regard to connections between the Debtor and Kurron, the Motion discloses that in addition to the approximately twenty years of pre-petition management services provided to the Debtor by Kurron,

>   Mr. Price served on the Board from about 2002 (after Kurron had been engaged by the Debtor for several years) until October 2011, and as CEO of the Debtor from about 1993 to January 2002.

*Id.* at 7, ¶ 15.

15. With regard to Kurron's compensation, the Motion discloses that

>   The Debtor proposes to compensate Kurron for services to be performed by the Kurron Officers in this case by a weekly payment of $62,500.

*Id.* at 8, ¶ 17.  In addition, the Motion proposes that

>   For the services of any Kurron personnel in addition to the Kurron Officers, Kurron shall be compensated by IMC according to Kurron's hourly consultant rates.

*Id.*

16. The Motion further proposes that, Kurron not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code, but that

> Instead, Kurron would file with the Court, and provide notice to the U.S. Trustee and all official committees, reports of compensation earned and expenses incurred on at least a quarterly basis. Such compensation reports and expenses shall be subject to Court review in the event an objection is filed.

*Id.* at 9, ¶ 21.

### III. OBJECTION

#### A. Governing Law

17. Section 363(b)(1) provides that a debtor-in-possession

> may use, sell or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b)(1). A debtor-in-possession's use of funds outside of the ordinary course of business is governed by Section 363. *See, e.g. In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003). For a Court to approve an application under Section 363(b), it must "expressly find from the evidence presented before [it] at the hearing a good business reason to grant such application." *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (requiring a proper business justification for Section 363 approval). In deliberating on such a finding, the Court must "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders." *Id.*

18. Section 363(b)(1) is a proper source of authority for debtors to retain executives and professionals. *See, e.g. In re Enron Corp., et al.*, 335 B.R. 22, 29 (S.D.N.Y. 2005). Courts have held, however, that transactions that benefit insiders must be subjected to heightened

6

scrutiny before they can be approved under Section 363(b). *Id..* at 28, citing *In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 378 (Bankr. N.D. Okla 2004) ("when the representative of the debtor in possession, a fiduciary, invokes a provision in an employment contract favorable to himself and unfavorable to the estate, the insider transaction should at the very least be disclosed to the creditors and to the Court for scrutiny"); *see also In re Wingsread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (holding that insider transactions under Section 363(b) "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

> B. **The Court Should Not Grant the Debtor Authority to Retain and Employ Kurron or the Kurron Personnel**

19. There is no "good business reason" to approve the Kurron Retention. *See Lionel*, 722 F.2d at 1071 (articulating sound business judgment standard of Section 363). In fact, currently available information actually suggests that retention of Kurron could be an impediment to reorganization and calls into question the ability of Kurron to fulfill its fiduciary duty to the Debtor, the estate and creditors.

> 1. **The Long History of the Debtor's Relationship with Kurron Raises Concerns Regarding the Propriety or Desirability of the Kurron Retention**

20. Kurron and Mr. Price have had a hand in managing and controlling the Debtor for over twenty years. Accordingly, this proposed engagement differs greatly from the cases cited by the Debtor in support of the Motion, all of which, as the Debtor candidly admits, involved "interim officers or managers." Motion at 11, ¶ 28. The relationship between the Debtor and Kurron is anything but interim. In fact, the Debtor originally engaged Kurron in 1991, and Kurron has provided the Debtor's senior management and related services continuously since that time. Motion at 3, ¶ 6. In addition, Mr. Price served on the Debtor's Board from at least

7

2002 until October 2011. *Id.*, at 4, ¶ 7. Though not discussed in the Motion or the Price Declaration, it seems that Kurron wishes to continue its management of the Debtor post-confirmation.

21. This long history, coupled with Kurron's presumed aspirations for a long-term future relationship with the Debtor, is especially critical given the Debtor's disclosed exit strategy in this case of pursuing an affiliation or other relationship with one or more other hospitals. *See* Hernandez Declaration at 9, ¶ 22. The disclosed recent payments from the Debtor[1] to Kurron and the amount of compensation the Debtor proposes to be paid to Kurron post-petition reveal that Kurron derives a substantial amount of income from its relationship with this non-profit Debtor. Presumably, any affiliation or relationship with another hospital will involve some degree of shared management and governance. The Debtor has not established that Kurron, with its powerful interest in continuing its profitable relationship the Debtor, is an appropriate entity to manage the Debtor through this crucial period or is capable of fulfilling its fiduciary duty to the Debtor, the estate and creditors..

      **2.  The Requested Compensation is Excessive**

22. The Motion proposes that Kurron receive a flat fee of $62,500 per week for the services of the Kurron Officers. Motion at 8, ¶ 17. This would obligate the Debtor to pay Kurron $3.25 million annually for the services of five individuals. Very little information relevant to a determination of the reasonableness of this compensation is available. For example, the Motion, the Price Declaration and the Kurron Engagement Letter provide no specific information about whether each individual will render services to the Debtor on a full-time or

---

[1]   In just the ninety days prior to the Petition Date, Kurron received payments totaling $724,205.40 from the Debtor. Motion at 9, ¶ 20.

part-time basis[2], how many hours Kurron estimates each individual will spend on the Debtor's case or the assumptions underlying the figure. It is impossible to determine, based upon the minimal information provided, whether the proposed compensation structure passes muster under the "heightened scrutiny" it must be subjected to. *In re Wingsread Corp.*, 92 B.R. at 93.

23. In addition to the $3.25 million proposed annual payment for the services of the five Kurron Officers, the Debtor proposes that it also be authorized to compensate Kurron for the services other Kuron employees render to the Debtor, as agreed by and between Kurron and the Debtor, without prior notice to parties in interest, the Committee, the United States Trustee, or the Court, at hourly rate ranging from $90 to $650. Kurron Engagement Letter, Ex. A.

24. The compensation requested by Kurron appears, based upon the information available, to be excessive. The Court should not approve the proposed compensation structure absent additional disclosures and concessions.

### 3. Many of Kuron's Proposed Services Exceed Management Services Generally Authorized Under Section 363

25. In contrast to services that generally fall within the scope of management services, many of the services proposed by the Debtors to be performed by Kurron appear to involve legal work. Specifically, the Motion seeks authority to retain Pamela Bradshaw as Special Counsel. Retaining an attorney to provide legal services to the Debtor pursuant to section 363 is an improper end-run around the disinterestedness requirement of section 327(a) or the limited disinterestedness requirement of section 327(e). 11 U.S.C. §§ 327(a) and (e), *see also In re Ginco, Inc.*, 105 B.R. 620, 621 (Bankr. D. Colo. 198) (finding that under either Section 327(a) or 327(e), proposed counsel cannot represent an interest adverse to the estate, with the

---

[2] As Mr. Price is also the CEO of Kurron and Ms. Bradshaw is the General Counsel of Kurron, it would seem that at least two of the five will be rendering services to the Debtor on a part-time basis.

only difference in the adverse interest standard being that subsection (e) mandates that the interest not be adverse with respect to the matter on which the attorney is to be employed).

26. In addition, many of the services proposed by the Debtors to be performed by Kurron appear to involve financial advisory services. For example, the Debtor proposes to employ Kurron to, "assist in the preparation and evaluation of the Debtor's financial forecasts and budgets," and to, "assist in the Debtor's overall financial reporting and addressing the administrative requirements of the Bnakruptcy Code, including post-petition reporting requirements and claims reconciliation efforts." Kurron Application at 6-7, ¶¶13(a) and (h). Any approved retention on Kurron should be limited to management services only and not extend to legal or financial advisory services.

### 4. Many of Kurron's Proposed Services Overlap With Those Proposed to be Rendered by the Debtor's Financial Advisors.

27. In addition to the Kurron Application, the Debtor seeks to retain CohnReznick LLP ("CohnReznick") as financial advisors to the Debtor pursuant to section 327(a).[3] ECF Doc. No. 14. The United States Trustee objects to the Kurron application because many of the services proposed to be performed by Kurron overlap with those proposed to be performed by CohnReznick, and the circumstances of this case do not warrant the need for two firms to perform what appear to be many of the same services.

28. For example, the Debtor proposes to employ CohnReznick to,"[assist] the Debtor in the preparation of thirteen week cash flow forecasts." CohnReznick Application at 4, ¶ 7(b). Similarly, the Debtor proposes to employ Kurron to,"assist in the preparation and evaluation of the Debtor's financial forecasts and budgets." Kurron Application at 6, ¶ 13(a). In addition, the

---

[3] The United States Trustee's objection to the CohnResnick Application is being filed contemporaneously herewith, as part of an omnibus objection to various retention applications.

Debtor proposes to employ CohnReznick to, "[assist] the Debtor with the preparation and submission of financial information to the United States Trustee [] and Bankruptcy Court," and, "[assist] the Debtor in the claim estimation and resolution process." CohnReznick Application at 5, ¶ 8(a) and (i). Similarly, the Debtor proposes to employ Kurron to, "assist in the Debtor's overall financial reporting and addressing the administrative requirements of the Bnakruptcy Code, including post-petition reporting requirements and claims reconciliation efforts." Kurron Application at 7, ¶ 13(h). If this proposed arrangement is approved, there will be two sets of professionals providing financial services to the Debtor, inevitably leading to duplication of efforts and overbilling.

29. In addition, the "catch-all" scope of services provisions of the CohnReznick and Kurron overlap. *See* CohnReznick Application at 6, ¶ 8(l) ("performing other services as requested by the Debtor") and Kurron Application, at 7, ¶ 13(h) ("perform such other services as Kurron and the Debtor mutually agree").

    **C.    If the Court Approves Kurron's Retention, Terms of Retention Should be Modified.**

30. If the Court authorizes Kurron's retention the terms of the retention should be substantially modified, as outlined above. In addition, the Proposed Kurron Retention Order should amended as outlined below.

31. The Proposed Kurin Retention Order should state that the, "Motion is granted to the extent set forth herein." Proposed Kurron Retention Order at 2, ¶ 1. The Order should similarly state that the Kurron Engagement Letter is being approved only to the extent set forth in the Order.

32. The Proposed Kurron Retention Order should provide that where its terms

conflict with the terms of either the Kurron Application, the Price Declaration or the Kurron Engagement Letter, the Order controls.

33. The Proposed Kurron Retention Order is silent with respect to Kuron providing any notice of when rate increases go in effect for its professionals. In order to alleviate this concern, the United States Trustee suggests, as has been done in other cases, that the following provision be added to the Proposed Retention Order to alleviate the concerns set forth above:

> ORDERED, that prior to any increases in Kuron's rates, Kuron shall file a supplemental affidavit with the Court and provide ten business days' notice to the Debtors, the United States Trustee and any official committee. The supplemental affidavit shall explain the basis for the requested rate and state whether the Debtor has consented to the rate increase. The United States Trustee retains all rights to object to any rate increase on all grounds, and the Court retains the right to review any rate increase.

## IV. CONCLUSION

WHEREFORE, based on the foregoing, the United States Trustee requests that the Court deny the Motion and grant any other and further relief as is just.

Dated: Brooklyn, New York
January 7, 2013

                Respectfully submitted,

                TRACY HOPE DAVIS
                UNITED STATES TRUSTEE
                FOR REGION 2

                By: _/s/ William E. Curtin_
                William E. Curtin
                Susan D. Golden
                Trial Attorneys
                271 Cadman Plaza East, Suite 4529
                Brooklyn, New York 11201
                Tel. No. (718) 422-4960
                Fax. No. (718) 422-4990