Alan J. Lipkin
Shaunna D. Jones
Jack M. Tracy II
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                       :       Chapter 11
                                            :
Interfaith Medical Center, Inc.,[1]         :       Case No. 12-48226 (CEC)
                                            :
                        Debtor.             :
--------------------------------------------------------x

**DECLARATION OF BERNARD A. KATZ IN SUPPORT
OF DEBTOR'S MOTION FOR ORDER, PURSUANT TO
SECTION 363 OF BANKRUPTCY CODE, AUTHORIZING
DEBTOR TO EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC.
AS MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE
DEBTOR'S SENIOR MANAGEMENT, NUNC PRO TUNC TO THE PETITION DATE**

I, Bernard A. Katz, declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that:

1.        I am a Partner in the Restructuring, Litigation & Transactional Services

group of CohnReznick LLP ("**CohnReznick**"), an accounting, consulting, tax and financial

advisory firm with its headquarters in the State of New York.  I am authorized to execute this

declaration on behalf of CohnReznick.  Unless otherwise stated in this declaration, I have

personal knowledge of the facts set forth herein.  I submit this declaration in support of the

---

[1]        The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing
address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

Debtor's Motion for Order Pursuant to Section 363 of Bankruptcy Code, Authorizing Debtor to

Employ and Retain Kurron Shares of America, Inc. as Manager for the Debtor and Kurron

Personnel as the Debtor's Senior Management, *Nunc Pro Nunc* to the Petition Date (the

"**Motion**").

**COHNREZNICK'S HOSPITAL BANKRUPTCY EXPERIENCE**

2.      CohnReznick (formerly J.H. Cohn LLP) has been actively involved in

over thirty hospital bankruptcy cases throughout the United States representing the debtor,

committee of unsecured creditors, secured creditors, bondholders and/or trustees.  I am familiar

with these cases.  During the pendency of at least a half dozen of these cases, the debtor's

management hired restructuring firms to consult with them in both the management of the

debtor's business, preparation for the debtor's bankruptcy filing, and reporting of information to

the court and parties in interest.  CohnReznick's experience includes working with those retained

restructuring firms as well as many other restructuring firms outside of the healthcare industry.

**KURRON'S PREPETITION ROLE AT IMC AND IMC'S OPERATING RESULTS**

3.      It is my understanding that Kurron Shares of America, Inc. ("**Kurron**")

was first retained to provide personnel to manage Interfaith Medical Center, Inc. (the "**Debtor**"

or "**IMC**") in late 1991 as a result of IMC's operating losses aggregating almost $50.0 million in

1990 and 1991 combined.  Under the management of Kurron personnel, IMC reduced its annual

loss to approximately $5.9 million in 1992 and operated profitably from 1993 through 2009

except for 2003 and 2004.  Starting in 2010, largely as a result of government patient

reimbursement rate reductions, IMC suffered losses that have culminated in the filing of this

chapter 11 case.  Although Kurron personnel have implemented significant expense reductions

and eliminated non profitable services, IMC was unable to overcome the financial impact of the

reimbursement rate coupled with the cashflow requirements of medical malpractice claims and debt service reductions. However, it appears today that IMC cash basis losses have been essentially eliminated as IMC is at a breakeven level (before medical malpractice expense, Chapter 11 professional fees and debt service).

4.      Although I understand that Kurron personnel have significant crisis management experience, Kurron has not been and is not serving as a crisis manager for IMC. Based on what I have observed since CohnReznick's retention, it appears that Kurron's role since the inception of its retention (and certainly during my involvement at IMC) was very different from the typical restructuring engagement or crisis manager. Like many hospital services, IMC's senior executive team has been "outsourced" to Kurron. Although IMC's executive team is made of employees of Kurron, they function as employees of the hospital, including the Chief Executive Officer, Chief Financial Officer and Chief Operating Officer. Their duties are no different than other hospital Chief Executive Officers, Chief Financial Officers and Chief Operating Officers of today. They are intimately involved in the management and daily routine of the hospital pro-actively managing and meeting with doctors, nurses, department managers, creditors and secured creditors.

## KURRON'S POSTPETITION ROLE

5.      The Kurron personnel provided to IMC postpetition are the same as the Debtor's prepetition management personnel provided to the Debtor. The Kurron personnel are providing the same services to IMC postpetition that such personnel provided to IMC prepetition.

6.      Notably, based on personal observation and in comparison with other hospitals with which I have been involved, Kurron personnel also have excelled in maintaining

the Debtor's books and records and related efforts. Kurron personnel provide the nuts and bolts financial information, including, but not limited to, financial statements, initial drafts of schedules, projections, and budgets, that a debtor's management typically produces. In contrast, CohnReznick, as IMC's financial advisor, supplements and revises such materials for presentation to the Court, IMC's Board of Trustees, the Dormitory Authority of the State of New York ("**DASNY**"), the Official Committee of Unsecured Creditors (the "**Committee**") and certain other key parties. Accordingly, Kurron personnel do <u>not</u> provide financial advisory services for IMC, but rather maintain managerial and day-to-day IMC operations.

<b><u>KURRON'S COMPENSATION</u></b>

7.      Kurron's postpetition compensation from IMC is consistent with (or less than) its prepetition compensation.

8.      Prior to the Petition Date, IMC paid Kurron a few days in advance for Kurron's services to be provided for December 2012 as otherwise consistent with customary prepetition practice of paying monthly in advance. Thus, IMC did not pay Kurron a retainer.

9.      Attached hereto as <u>Exhibit A</u> is a chart reflecting compensation levels of senior officers at other hospitals located in Brooklyn, Queens and the Bronx. The chart demonstrates that the proposed compensation of Kurron at a rate of approximately $3.0 million per annum is within the range for the personnel provided for the other hospitals, particularly as <u>Exhibit A</u> does not include the values for the listed hospitals of the services equivalent to those of Kurron personnel provided to IMC other than the Chief Executive Officer, Chief Financial Officer and Chief Operating Officer.

## THE CREDITORS' COMMITTEE

10.     Based on property appraisals in hand (prepared by affiliates of the Committee's own proposed Financial Advisors) and other materials concerning the Debtor's asset values as well as the apparent fact that DASNY has well over a $100 million claim and a lien or security interest on or in substantially all of the Debtor's assets, it appears that the economic interest of unsecured creditors represented by the Committee in terms of likely recoveries in this case is minimal.

11.     During this chapter 11 case, the Committee has never met with, nor, to my knowledge asked to meet with, the Debtor's management supplied by Kurron. Further, to my knowledge, the Committee failed to advise the Debtor of any specific concern about Kurron prior to filing its objection to the Motion.

Dated: January 11, 2013

By: /s/ Bernard A. Katz

Bernard A. Katz

**EXHIBIT A**

**Executive Compensation Analysis:  Comparison of 2011 Senior Officer Compensation at Area Hospitals***
($000)

| Hospital | CEO | | COO | CFO | Salary Subtotal | 35%*** | Total**** |
|---|---|---|---|---|---|---|---|
| Bronx-Lebanon | 3,603 | | 554 | 757 | **4,914** | **1,720** | **6,634** |
| Brooklyn Hospital | 1,062 | | 425 | 443 | **1,930** | **676** | **2,606** |
| Kingsbrook Jewish | 4,200 | ** | 597 | 403 | **5,200** | **1,820** | **7,020** |
| Lutheran | 991 | | 563 | 524 | **2,078** | **727** | **2,805** |
| Maimonides | 1,008 | | 699 | 589 | **2,296** | **804** | **3,100** |
| Montefiore | 1,970 | | 1,452 | 1,735 | **5,157** | **1,805** | **6,962** |
| NY Hospital Queens | 837 | | 523 | 517 | **1,877** | **657** | **2,534** |
| NY Downtown | 673 | | 316 | 316 | **1,305** | **457** | **1,762** |
| NY Methodist | 1,143 | | 438 | 586 | **2,167** | **758** | **2,925** |
| St Barnabas | 781 | | 373 | 380 | **1,534** | **537** | **2,071** |
| Wyckoff Heights | 488 | | 309 | 349 | **1,146** | **401** | **1,547** |


*Source: 2011 Crains Health Pulse Executive Compensation.

**Includes $2.9 million of other compensation.

***Estimated costs of fringe benefits including, but not limited to, health insurance, pension, payroll taxes, life and disability insurance and workers compensation.

****Totals do not include comparable costs for all other Kurron personnel provided to IMC at no additional cost.