Alan J. Lipkin
Shaunna D. Jones
Jack M. Tracy II
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-48226 (CEC) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------x

# DEBTOR'S REPLY TO
## OBJECTIONS TO DEBTOR'S MOTION FOR ORDER, PURSUANT TO SECTION 363 OF BANKRUPTCY CODE, AUTHORIZING DEBTOR TO EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC. AS MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE DEBTOR'S SENIOR MANAGEMENT, NUNC PRO TUNC TO THE PETITION DATE

---

[1]     The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

    The UST Objection ...............................................................................................................2

    The Committee Objection.....................................................................................................3

RELEVANT FACTS .............................................................................................................5

    Kurron .................................................................................................................................5

    IMC's Current Dire Situation ..............................................................................................7

REPLY ...................................................................................................................................8

I.     IMC'S RETENTION OF KURRON SATISFIES SECTION 363 ....................................8

    A.     IMC's Retention of Kurron
           Does Not Require Court Approval ........................................................................8

    B.     Any Requisite Court Approval of
           Kurron's Retention is Warranted .........................................................................9

         1.     Kurron's Long Relationship with the Debtor
                Warrants Approval of Kurron's Retention .................................................9

         2.     Kurron's Proposed Compensation is Reasonable .....................................10

         3.     Kurron's Proposed Services are
                Consistent with a Section 363 Retention ...................................................11

II.    SECTION 363 GOVERNS IMC'S RETENTION OF KURRON ...................................12

III.   SECTION 327 DOES NOT GOVERN IMC'S RETENTION OF KURRON
      BECAUSE KURRON IS NOT A PROFESSIONAL WITHIN THE MEANING
      OF SECTION 327...........................................................................................................15

IV.   EVEN IF THERE ARE POTENTIAL TECHNICAL FLAWS
      CONCERNING KURRON'S RETENTION, THIS COURT STILL
      MAY AND SHOULD APPROVE IMC'S RETENTION OF KURRON ........................18

    A.     Section 105(a) Provides A Separate Basis For Granting The Motion ..................19

    B.     Under No Circumstances Is The Entire Kurron Firm Ineligible To Be
           Retained .............................................................................................................20

CONCLUSION......................................................................................................................21

**DEBTOR'S REPLY TO**
**OBJECTIONS TO DEBTOR'S MOTION FOR ORDER, PURSUANT TO**
**SECTION 363 OF BANKRUPTCY CODE, AUTHORIZING DEBTOR TO**
**EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC. AS**
**MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE DEBTOR'S**
**SENIOR MANAGEMENT, NUNC PRO TUNC TO THE PETITION DATE**

Interfaith Medical Center, Inc., the debtor and debtor-in-possession in the above-captioned case (**"IMC"** or the "**Debtor**"), submits this reply to the Objection (the "**Committee Objection**" or "**Committee Obj.**") of the Official Committee of Unsecured Creditors (the "**Committee**") to the Debtor's Motion for Order Pursuant to Section 363 of Bankruptcy Code, Authorizing Debtor to Employ and Retain Kurron Shares of America, Inc. as Manager for the Debtor and Kurron Personnel as the Debtor's Senior Management, *Nunc Pro Nunc* to the Petition Date (the "**Motion**") and the Objection of the United States Trustee (the "**U.S. Trustee**") to the Motion (the "**UST Objection**" or "**UST Obj.**"). Responses to the Committee Objection are also responses to the joinders thereto filed by the New York State Nurse's Association ("**NYSNA**") and 1199 SEIU United Healthcare Workers East ("**1199**").

## PRELIMINARY STATEMENT

Before the Court is the following issue: Should IMC – when faced with an existential crisis during which over the next few months IMC will: (a) continue to operate; (b) repeatedly negotiate extensions of interim financing; (c) engage in active business combination negotiations with multiple parties that are critical to IMC's survival and ability to continue to serve its disadvantaged community; and (d) formulate, negotiate, and seek confirmation of a chapter 11 plan – now be deprived of its entire management team that has operated IMC for over 20 years based on alleged technicalities unrelated to any conflict of

interest?  This Court has and should exercise the power to ensure that IMC may retain that vital management team and have the opportunity to successfully reorganize.

The UST Objection

The UST Objection concedes that the section 363 business judgment standard is the appropriate basis for evaluating IMC's retention of Kurron, but opposes that retention based on unfounded conjectures and certain misunderstandings regarding Kurron.  IMC and Kurron have clarified or otherwise modified Kurron's proposed retention order to address <u>all</u> of the concerns specifically raised by the U.S. Trustee.  A revised Kurron retention order, and a black-line to reflect those changes, is attached hereto as <u>Exhibit A</u> (the "**Revised Proposed Order**").  Consequently, the UST Objection should be overruled.

<u>First</u>, contrary to the U.S. Trustee's argument that there is no "good business reason" to approve Kurron's retention, there are multiple, persuasive reasons for the Debtor's continued retention of Kurron.  UST Obj. ¶ 19.  In particular, Kurron has provided the Debtor's entire senior management team for over 20 years and the Debtor is under a <u>de</u> <u>facto</u> mandate from various New York State agencies and its cash collateral and anticipated DIP financing lender to resolve this case within less than five months.  Consequently, IMC will be in simultaneous, active interim financing, business combination, and plan negotiations and drafting continuously during the next few months.  Thus, not only is Kurron's retention vital to IMC keeping its senior management in order to continue to operate and succeed in this case, but the time pressures imposed on IMC signify that IMC's failure to obtain approval of Kurron's retention would have disastrous consequences for IMC, the community IMC serves, and IMC's creditors and employees.

Second, the U.S. Trustee is under the mistaken impression that "Kurron wishes to continue its management of the Debtor post-confirmation."  UST Obj. ¶ 20.  In fact, Kurron has

made clear that Kurron does not want or expect to be retained by IMC post confirmation. In any event, the anticipated business combination involving IMC would preclude that result. Further, IMC has included a new provision in the Revised Proposed Order explicitly prohibiting Kurron's retention by IMC post-emergence.

Third, contrary to the U.S. Trustee's unfounded suggestion that Kurron's compensation is excessive, Kurron's compensation is a market rate. See id. ¶ 22. Kurron provides IMC with three full time senior officers (CEO, CFO, and COO), three other employees working numerous hours, and other backup personnel as and when needed (all at no additional charge), while covering all of those individuals' compensation, employer tax liability, and benefits. The salaries for those personnel plus another estimated 35% for their taxes and benefits absorbed by Kurron would equal or exceed Kurron's cost to IMC.

Fourth, contrary to the UST Objection, Kurron is not providing legal work or financial advisory services for IMC. See id. ¶¶ 25-26. Hence, Kurron's services do not run afoul of any legal restrictions or overlap with those of IMC's financial advisor.

Given the clarifications and modifications reflected in the Revised Proposed Order and that the UST Objection's arguments are unfounded, the UST Objection should be overruled.

The Committee Objection

Unlike the UST Objection, the bulk of the Committee Objection makes the untenable argument that Kurron is a "professional" that IMC must retain under section 327, but IMC may not do so because Kurron has provided the Debtor's senior management for over 20 years. Notably, in this recently filed case, the Committee has never met with nor asked to meet with the Debtor's management supplied by Kurron and failed to advise the Debtor of any specific concern about Kurron prior to filing the Committee Objection. See Supplemental Price

Declaration ¶ 21; Katz Declaration ¶ 11.[1] Hence, the Committee Objection is not about Kurron per se, but rather a transparent attempt to seek relief analogous to a motion to appoint a trustee by circumventing the heavy burden in that regard that the Committee could not possibly satisfy. In fact, the joinders in the Committee Objection filed by 1199 and NYSNA, two unions that dominate the Committee and have experienced the impacts of the extensive cost cutting implemented by Kurron managers that has successfully led IMC back to operating on a cash break-even basis, see Katz Declaration ¶ 3, suggests that the Committee Objection prioritizes union interests over those of unsecured creditors. Indeed, the Committee has failed to articulate how the interests of unsecured creditors possibly could be served by suddenly removing IMC's entire senior management team or what practical alternative to Kurron there is under the short restructuring timeline now imposed on IMC. Notably, the Dormitory Authority of the State of New York ("DASNY"), by far IMC's largest secured and unsecured creditor, did not join in the Committee Objection and has imposed time deadlines that presume IMC's continued engagement of Kurron. Regardless, even the cases cited by the Committee (which represents a constituency of unsecured creditors with very limited financial interests in this case) demonstrate Kurron's retention under section 363 is appropriate and that IMC, as a chapter 11 debtor-in-possession, is entitled to choose to keep its existing management in place. Accordingly, the Committee Objection should be overruled.

---

[1]     Citations herein are to the Supplemental Declaration of Corbett Price and the Declaration of Bernard Katz being filed contemporaneously herewith.

## RELEVANT FACTS

Kurron

Since 1990, Kurron has managed numerous hospitals and health care facilities. While the challenging economic environment for many hospitals during that time period has led to Kurron professionals gaining significant crisis management experience, Kurron is not a crisis manager for hospitals, but rather a hospital manager with experience in an industry with many financially distressed hospitals. See Supplemental Price Declaration ¶ 2; Katz Declaration ¶ 4.

As to IMC, that conclusion is demonstrated by the fact Kurron is not a recent arrival at IMC, but has been providing senior management and other key personnel to IMC for over 20 years. See Supplemental Price Declaration ¶ 3. For example, Kurron provides a full time CEO, CFO and COO for IMC. Also, Kurron provides a nursing quality assurance individual (Diane Kelly) who is a professor at Duke University and spends approximately 70 hours per month at IMC. Further, Ms. Kelly is otherwise available for calls from IMC as and when needed. Additionally, Mr. Price has been working long term for IMC to, inter alia, assist on debt restructuring and related senior management issues. See Supplemental Price Declaration ¶ 4.

Prepetition, Kurron expanded those part time individuals' time commitments or provided additional personnel. See Supplemental Price Declaration ¶ 6. Specifically, Mr. Price is now spending approximately 40 hours per week on IMC matters and the IMC Board determined to give Mr. Price the title of CRO, which merely reflected the executive level of commitment that he is bringing to Kurron's management of the hospital. See Supplemental Price Declaration ¶ 13. Also, Kurron provided IMC with the services of Pamela Bradshaw, who was originally identified as "Special Counsel" in the Kurron retention application (because she is a lawyer by background), but who will not provide legal services for IMC in this case. Instead,

Ms. Bradshaw prepares board minutes, assists IMC's Risk Manager with administrative oversight of medical malpractice claims, and handles other special projects as and when another educated hand would be helpful to IMC. Currently Ms. Bradshaw spends up to 40 hours per week on IMC matters. <u>See</u> Supplemental Price Declaration ¶ 4.

In addition to its successful day to day management of the hospital, Kurron personnel have achieved admirable results in getting IMC to a cash break-even point for operations under extremely difficult circumstances, including the dramatic cuts in reimbursement rates for the Medicaid payments that are IMC's lifeblood. <u>See</u> Katz Declaration ¶ 3; Supplemental Price Declaration ¶ 9. Unfortunately, those efforts have in part involved massive cuts, including cuts in payments to IMC's unions and union members. <u>See</u> Supplemental Price Declaration ¶ 9.

Notably, Kurron also has excelled in maintaining the Debtor's books and records and related efforts. In that regard, Kurron personnel provide the nuts and bolts financial information, such as financial statements, initial drafts of schedules, projections, and budgets, etc. that a debtor's management typically produces. IMC's financial advisor (CohnReznick LLP) then supplements and revises such materials for presentation to the Court, the IMC Board, DASNY, the Committee and certain other key parties. Accordingly, Kurron does not provide financial advisory services, but rather maintains IMC's managerial and day-to-day operations. <u>See</u> Supplemental Price Declaration ¶ 10; Katz Declaration ¶ 6.

In recognition of Kurron's contributions to IMC, it was the New York Department of Health (the "DOH") that requested that Mr. Price serve on IMC's Board of

Trustees for a limited period.[2]  Mr. Price resigned from the board 15 months ago.  <u>See</u>

Supplemental Price Declaration ¶ 5.  It is that active (but unpaid) Board that supervises Kurron.

<u>See</u> <u>id</u>. ¶ 3.

Kurron's compensation is well within market rates for the personnel provided.

Annexed to the Katz Declaration (and to this Reply) is a chart demonstrating that fact (which

builds in an additional 35% for the Kurron personnel's taxes and benefits packages covered by

Kurron, but does not reflect the substantial additional value of services comparable to those

supplied by the Kurron personnel other than the CEO, COO and CFO at no additional cost to

IMC).  <u>See</u> Katz Declaration ¶ 9.  Further, Kurron is limiting its fixed compensation rate to

payments necessary to generate $3 million per annum (rather than the $3.25 million annual rate

inherent in a weekly rate of $62,500), will not charge hourly rates for the various supplemental

personnel Kurron has provided, and will continue to provide to IMC during this case, and is

waiving any right to increase its fees during this case.  <u>See</u> Supplemental Price Declaration ¶¶

16, 17, 18.

<u>IMC's Current Dire Situation</u>

As has been noted before this Court, IMC is operating under severe time pressures

in this case.  As to financing, the initial order providing for IMC's use of cash collateral was for

only 47 days and the proposed second cash collateral order now before the Court is only for an

additional 35 days.  Thus, IMC (through Kurron) is (and will be) almost constantly negotiating

---

[2]     Kurron's contract was revised slightly prior to IMC's chapter 11 filing to make the agreement more
suitable for approval in a chapter 11 case (and somewhat <u>less</u> favorable to Kurron).  DOH currently is
reviewing that contract and has filed a statement to that effect with the Court.  <u>See</u> Docket No. 107.  Kurron
is cooperating with the DOH in that process.  In the past, it has taken DOH several months to address issues
concerning a Kurron contract and Kurron personnel have managed IMC throughout those periods without
incident or objection from the DOH.  <u>See</u> Supplemental Price Declaration ¶ 8.  In the unlikely event the
DOH requires any material changes to Kurron's agreement adverse to IMC, then the Debtor will return to
the Court to seek approval of any such changes.

extensions for financing.  Further, that proposed second cash collateral order is based on IMC

entering "into a memorandum of understanding with a sponsor acceptable to the Authority [i.e.,

DASNY] and the New York State Department of Health ("<u>DOH</u>") on or before February 1,

2013."  Proposed Second Interim Cash Collateral Order ¶ 4(d).  [Docket No. _____].  Active

negotiations on that memorandum are ongoing and Kurron has been instrumental in the progress

made to date.  <u>See</u> Supplemental Price Declaration ¶ 11.

       Additionally, with Kurron's assistance, IMC and DASNY have negotiated a

separate memorandum of understanding (about to be executed) that provides for IMC to file a

chapter 11 plan acceptable to DASNY and DOH by early March 2013 and confirm such an

acceptable plan by early June 2013.  Assuming DASNY consents, there may be brief extensions

of such deadlines due to the numerous challenges in this case, including the variety of parties and

New York State agencies involved (and also if the Committee continues its adversarial

approach).   Regardless, the length of this case will be measured in months, not years, because,

among other things, the consent of (and funding from) New York State agencies will be critical

to IMC's reorganization.  Thus, it would be catastrophic and counterproductive to replace the

Debtor's entire management team at this critical juncture because the resulting disruption would

preclude IMC from coming close to meeting the mandated time deadlines or otherwise achieving

a successful reorganization.  <u>See</u> <u>id</u>. ¶ 12.

## **REPLY**

I.     <u>IMC'S RETENTION OF KURRON SATISFIES SECTION 363</u>

    A.    IMC's Retention of Kurron
           <u>Does Not Require Court Approval</u>

       The fact Kurron has provided IMC with senior management and related personnel

for over 20 years signifies IMC's continued retention of Kurron is actually an ordinary course

transaction that does not require Court approval. Out of an abundance of caution and to avoid

any subsequent issues concerning full disclosure regarding Kurron and to minimize risks to

Kurron receiving compensation for its extensive services provided in this case, IMC has sought

Court approval for Kurron's engagement. Nonetheless, there is precedent that would allow this

Court to rule that such approval is not required. See, e.g., In re Quigly Co., Inc., 437 B.R. 102,

157 n. 68 (Bankr. S.D.N.Y. 2010) (continued employment of president and chairman of debtor

"under the same terms for less money for another year was ordinary course transaction and did

not require a motion"); In re All Seasons Industries, Inc., 121 B.R. 822, 826 (Bankr. N.D. Ind.

1990) ("the continued employment and compensation of management constitutes a part of the

ordinary course of the debtor's business operations, which is entitled to continue without court

approval."). Hence, the Kurron retention issue may be resolved without further dispute if the

Court finds that no Court approval is necessary.

      B.     Any Requisite Court Approval of
               Kurron's Retention is Warranted

Assuming the Court determines approval of Kurron's retention is required, then as

conceded by the U.S. Trustee, "[s]ection 363(b)(1) is a proper source of authority for debtors to

retain executives and professionals." UST Obj. ¶ 18 (citation omitted). The U.S. Trustee also

contends that full disclosure and heightened scrutiny are required for section 363 transactions

that benefit insiders. See id. Whether or not the insider standard applies here, it is satisfied. No

question ever has been raised as to full disclosure concerning Kurron. Further, as demonstrated

below, Kurron satisfies section 363 regardless of the scrutiny level applied.

      1.     *Kurron's Long Relationship with the Debtor*
               *Warrants Approval of Kurron's Retention*

Contrary to the UST Objection, Kurron's longevity in providing management for

IMC fully supports approval of Kurron's retention under section 363(b)(1). In effect, as Kurron

now provides IMC's entire senior management team plus other critical personnel and has done so for many years, Kurron is irreplaceable in the near term and enormous disruption would result from any management change at IMC.  Thus, the multiple short term time constraints on IMC extending its financing and resolving this case establishes an indisputable business reason for IMC's retention of Kurron so as to avoid the disastrous disruption from a sudden management change.  Further, Kurron personnel have been valuable and constructive in assisting IMC to make progress towards a resolution of this case within the time constraints imposed by New York State.  Consequently, the U.S. Trustee has no basis to assert "[t]here is no 'good business reason' to approve the Kurron Retention."  UST Obj. ¶ 19.

Equally flawed is the U.S. Trustee's unfounded speculation that Kurron is conflicted here because it seeks a "long-term future relationship with the Debtor."  Id. ¶ 21.  In fact, Kurron has no interest in continuing or expectation "to continue its management of the Debtor post-confirmation."  Id. ¶ 20.  Indeed, the anticipated new affiliation or other relationship of IMC with one or more other hospitals that should resolve this case would preclude an ongoing Kurron relationship with IMC.  See Supplemental Price Declaration ¶ 19.  Regardless, the Revised Proposed Order now precludes Kurron's post-confirmation retention.[3]  Hence, Kurron is no different than any other debtor's management team that wants to accomplish a successful result while working its way out of a job during the debtor's chapter 11 case.

2.      *Kurron's Proposed Compensation is Reasonable*

Without any foundation whatsoever, the U.S. Trustee asserts that Kurron's proposed compensation is "excessive."  UST Obj. ¶ 24.  Yet, as demonstrated by the Katz

---

[3]      Should there come a need for individual Kurron personnel to be retained to wind-down IMC's remaining estate or to be employed post-confirmation by the reorganized IMC, that can be addressed in the future.

Declaration and the chart annexed hereto, Kurron's proposed compensation is well within market range for the compensation for the personnel provided, particularly after factoring in an additional 35% for the personnel's taxes and benefits and the value of the Kurron personnel other than the CEO, COO, and CFO.  <u>See</u> Katz Declaration ¶ 9.  Moreover, the following concessions and clarifications (each contained in the Revised Proposed Order) more than satisfy the U.S. Trustee's stated concerns:

- Kurron's annual compensation rate will be calculated at $3 million per annum rather than the $3.25 million annual rate stated in the UST Objection.  <u>See</u> Supplemental Price Declaration ¶ 16.

- Kurron will provide a minimum of three full time personnel (CEO, CFO and COO) as well as the three referenced "part-time" individuals (some of whom work up to 40 hours per week on IMC matters).  Hence, the full time services of the key IMC officers are confirmed as well as the services of three additional part-time individuals for a total of 6, not 5, persons as stated in the UST Objection.  <u>See</u> <u>id</u>. ¶ 4.

- Kurron will not charge separately on an hourly basis for any additional personnel provided by Kurron (including Ms. Kelly who provides valuable services in assisting IMC's nursing staff).  <u>See</u> <u>id</u>. ¶ 17.

- Kurron will not seek to raise its fees for IMC during this case.  <u>See</u> <u>id</u>. ¶ 18.

Accordingly, the U.S. Trustee's concerns regarding Kurron's compensation have been fully addressed.

> 3. *Kurron's Proposed Services are*
>    *Consistent with a Section 363 Retention*

Contrary to the U.S. Trustee's contention, Kurron has not provided and will <u>not</u> be providing legal services to IMC.  By referring to Ms. Bradshaw as "Special Counsel" given her legal training, IMC created confusion as to the services she would provide.  While Ms. Bradshaw is a lawyer, she will not be acting as a lawyer for IMC.  To appropriately reflect her role, Ms. Bradshaw's title will be changed to Special Assistant.  In that role, she will continue to

prepare Board minutes, assist IMC's Risk Manager with overseeing medical malpractice claims, and handle other special projects for IMC as and when they arise.  See id. ¶ 4.  Thus, there will be no (and has been no attempt at an) "improper end-run around the disinterestedness requirement of section" 327.  See UST Obj. ¶ 25.

Correspondingly, Kurron will not provide IMC with financial advisory services as suggested by the U.S. Trustee.  See UST Obj. ¶ 26.  Instead, Kurron only will provide management services.  To the extent those services relate to financial matters, Kurron's services merely would entail the same work done by any debtor's management team in preparing certain materials that are reviewed and relied upon by IMC's financial advisor.  Kurron's role in this regard is in the best interest of IMC's estate because as Kurron personnel will do much of the preliminary work on financial matters (as would be expected of a debtor's internal finance team), that will reduce the fees incurred on an hourly basis by IMC's financial advisor, CohnReznick LLP ("**CohnReznick**").  Nevertheless, it is CohnReznick alone that will provide financial advisory services to IMC that are generally attendant to chapter 11 cases.  See Supplemental Price Declaration ¶ 10; Katz Declaration ¶¶ 4, 6.  Hence, the U.S. Trustee's concern regarding Kurron providing financial advisory work is misplaced.

Consequently, all of the U.S. Trustee's objections, regarding a section 363 retention have been addressed and, therefore, Kurron's retention should be approved.

## II.     SECTION 363 GOVERNS IMC'S RETENTION OF KURRON

Although the U.S. Trustee concedes that section 363 governs Kurron's retention, the Committee argues Kurron may not be retained under section 363.  See Committee Obj. ¶¶ 32-39.  Incredibly, the Committee makes that argument even though the  two cases the Committee primarily relies on for this argument each underlined approved a debtor's retention of managers under section 363.   See Committee Obj. ¶¶ 32-33 (citing In re Mirant Corp., 354 B.R. 113, 127

(Bankr. N.D. Tex. 2006) (manager "was retained, pursuant to Code § 363"); In re Saint Vincent Catholic Med. Ctrs.; 2492787 *13 (Bankr. S.D.N.Y.) ("approval of SW Management Agreement under section 363")). Indeed, a debtor's retention of a management firm under section 363 is common-place in the Second Circuit. See Motion ¶ 28 (citing numerous cases approving management retentions under § 363); Committee Obj. ¶ 33 ("the Debtor correctly notes that courts sometimes apply section 363(b) to retain restructuring firms outside the ordinary course of business.").

Implicitly recognizing that section 363 is available for Kurron's retention, the Committee next argues Kurron must, but cannot, comply with the so-called Alix Protocol. See id. Yet, the Alix Protocol:

> concerns the role of financial advisors acting as both financial advisors and crisis managers in the same case. The protocol recognizes there is an inherent conflict between an advisor's duty to a debtor and its own business interests where the advisory firm serves as both a financial advisor retained under Section 327 of the Bankruptcy Code and as a crisis manager and where the advisory firm's staff serve as officers of the corporation.

Saint Vincent, 2007 WL 2492787 *3, n. 3 (emphasis added). Thus, the conflict of interest harm the protocol was primarily meant to address is not present here.

Additionally, the Alix Protocol does not apply to Kurron because it is neither a financial advisor nor a crisis management firm (and certainly not both). As detailed above, Kurron is providing management services for IMC, while the CohnReznick firm is the Debtor's financial advisor. Also as explained above, Kurron is not a crisis management firm, but rather a health care management firm with experience in crisis management due to the extensive financial difficulties of many hospitals generally. In fact, IMC's retention of Kurron for over 20 years negates any contention that Kurron is a crisis manager for IMC.

Nonetheless, by focusing on labels rather than facts, the Committee

mischaracterizes Kurron's role here and improperly places form over substance.  See, e.g., In re Madison Mgmt. Corp., 137 B.R. 275, 283 (Bankr. N.D. Ill. 1992) ("Form is not determinative.  The bankruptcy court should consider the substance of the person's employment over the form in determining whether the person is a professional for purposes of section 327 of the Bankruptcy Code") (citation omitted).  Here, Mr. Price is not a traditional CRO: (a) who is a turnaround and workout consultant; (b) who is hired shortly before a chapter 11 filing; and (c) who supplants management and the board in whole or part.  See, e.g., In re Blue Stone Real Estate, Construction & Development Corp., 392 B.R. 897, 899 n. 5 (Bankr. M.D. Fl. 2008).  First, Mr. Price is not a turnaround consultant, but rather part of IMC's management team.  While the rest of IMC's senior management is focused on the day to day functioning of the hospital and other duties typical of any debtor's management team, Mr. Price's role is to provide the additional oversight necessary to ensure coordination among IMC's management, Board of Trustees, and chapter 11 professionals.  That is the same work traditionally done by any debtor's senior officers, not by a CRO who generally plays a much more active role in case administration.  The management of IMC, unlike certain other debtors, does not have the luxury of sufficient time and resources to focus simultaneously on the competing responsibilities of running a business and coordinating the Debtor's reorganization efforts.  Second, unlike a typical CRO, Mr. Price has had a long term tenure with IMC and was not hired on the eve of filing to focus on IMC's reorganization.  Third, Mr. Price and the entire Kurron team remain fully subordinate to and subject to the direction of IMC's Board of Trustees rather than replacing or overseeing it.

Consequently, the Committee should not misuse Mr. Price's title as "CRO" to mislead the Court into interpreting Mr. Price's role as being greater than it actually is.  In effect, Mr. Price specifically and Kurron generally are merely continuing their prepetition management

of the Debtor, which has had to address IMC's financial challenges for decades.  Accordingly, the Alix Protocol does not preclude IMC's retention of Kurron.

The Committee's final futile attempt to preclude Kurron's retention under section 363 is to question "whether the debtor can provide a sound business justification" for such retention.  Committee Obj. ¶ 38.  The Committee's willful blindness to IMC's current financial crisis and the immediate time pressures on IMC detailed above is astounding.  There simply is no question that Kurron's continued retention is essential to IMC's reorganization prospects because during the next few months IMC will engage in ongoing, active, and simultaneous negotiations and implementation of financing extensions, a business combination, and confirmation of a chapter 11 plan.  These endeavors cannot succeed while IMC seeks to fill its entire senior management roster.  Moreover, the Committee's criticism of Kurron's management of IMC ignores Kurron's many accomplishments, including, without limitation, dramatically reducing IMC's losses and even producing profits during most of Kurron's over 20 year tenure and in expertly maintaining IMC's books and records.  See Katz Declaration ¶ 3, 6.  Instead, the Committee merely cites the Brooklyn Health Systems Redesign Work Group Report for the proposition that IMC has substantial financial difficulties, which are  inherent in any not-for-profit hospital serving a severely disadvantaged  community such as IMC's.  See Committee Obj. ¶ 38.

Consequently, Kurron may and should be retained by IMC under section 363.

III.    SECTION 327 DOES NOT GOVERN IMC'S RETENTION OF KURRON BECAUSE KURRON IS NOT A PROFESSIONAL WITHIN THE MEANING OF SECTION 327

While the discussion above demonstrates that section 363 governs IMC's retention of Kurron regardless of whether section 327 might otherwise apply, the inaccuracies in the Committee's section 327 argument still warrant a short response.

Kurron provides the Debtor with its senior management team and certain other key personnel who have worked for IMC for extended periods prepetition. "[A] majority of the courts have held that continued employment of the debtor corporation's officers does not require court approval." In re Bartley Lindsay Co., 137 B.R. 305, 308 (multiple citations omitted). See In re Madison Mgmt. Corp., 137 B.R. at 283 ("Officers and employees of the debtor are usually not professionals for the purpose of section 327 of the Bankruptcy Code, and thus, their employment is not subject to court approval."); In re Lyon & Reboli, Inc. 24 B.R. 152, 153 (Bankr. E.D.N.Y. 1982) ("Officers of a debtor-in-possession are not within the genre of professional persons contemplated by § 330, and would not need prior court approval under § 327 to continue in the employ of the debtor.). Hence, while Kurron is somewhat unique, ultimately its retention must be viewed as a continuation of the employment of IMC's prepetition management, for which retention under section 327 is not required.

Correspondingly, as all or all but one of the personnel Kurron supplies to IMC primarily handle the day to day operations of the hospital, even the cases cited by the Committee for the definition of a professional person for purposes of requiring a section 327 retention would not apply to those individuals. See, e.g., In re Palm Coast, Matanza Shores L.P., 101 F. 3d 253, 257 (2d Cir. 1996) (Second Circuit states that "for purposes of section 327(a), 'professional person' is limited to persons in those occupations which play a central role in the administration of the proceeding.") (citations omitted); In re Johns Manville Corp., 60 B.R. 612, 620 (Bankr. S.D.N.Y. 1986) (S.D.N.Y. Bankruptcy Court states that "§ 327(a) created a distinction between those persons who were merely involved in the mechanics of the debtor's business operations, . . ., and those persons whose employment actually effected the administration of the debtor's reorganization.") (citations omitted).

Even, however, factoring Mr. Price's role as the primary bridge between IMC's senior management and Board on one hand and IMC's bankruptcy professionals and to some extent, the relevant New York State agencies on the other hand, does not change that conclusion. Such interfacing with bankruptcy professionals and key parties is totally consistent with the role of a debtor's management, rather than of a debtor's professionals. Additionally, numerous attributes of Kurron are <u>not</u> consistent with those of a professional, including, <u>inter alia</u>, the following:

- All Kurron personnel are performing "duties executive in nature" rather than "consulting" functions. <u>See</u> Supplemental Price Declaration ¶ 10.

- Kurron personnel are the Debtor's prepetition management. <u>See id</u>. ¶ 7; Katz Declaration ¶ 5.

- Kurron personnel are making "executive decisions" at IMC.

- Kurron personnel's "primary employment [is not] as consultant or work out specialist [but as] trained executive[s]."

- Kurron's post-petition compensation is consistent with its pre-petition compensation. <u>See</u> Supplemental Price Declaration ¶ 14; Katz Declaration ¶ 7.

- Kurron's employment by IMC has been for over 20 years, not a recent short-term period to solve IMC's financial problems. <u>See</u> Supplemental Price Declaration ¶ 3.

- Kurron was not retained by IMC just for "the filing of the bankruptcy case."

- Most Kurron personnel are "working full time" or primarily for IMC. <u>See id</u>.¶ 4.

- Unlike IMC's professionals, Kurron was <u>not</u> "paid a retainer", but merely received its typical month payment in advance for December 2012.  <u>See</u> Katz Declaration ¶ 8.[4]

<u>In re Madison Mgmt. Corp.</u>, 137 B.R. at 283-84.  Hence, Kurron does not satisfy 9 of the 12 "factors that should be considered in determining whether an officer of the debtor is a professional" according to <u>Madison Management</u>, <u>id.</u> at 284, <u>a case repeatedly cited by the Committee</u>.  <u>See</u> Committee Obj. ¶ 18.  Of course, Kurron also has several attributes of a professional, but that is true for any manager of a debtor.

Consequently, Kurron is not a "professional" for purposes of section 327 and, therefore, section 327 is inapplicable here.

IV.    EVEN IF THERE ARE POTENTIAL TECHNICAL FLAWS
CONCERNING KURRON'S RETENTION, THIS COURT STILL
<u>MAY AND SHOULD APPROVE IMC'S RETENTION OF KURRON</u>

The key technical retention issue asserted by the Committee, but not the U.S. Trustee, is that Mr. Price, a Kurron principal, was a director of IMC within two years of, even though he resigned well over one year prior to, IMC's petition date.[5]  The numerous reasons why that issue is irrelevant here are demonstrated above.  Nevertheless, should the Court remain concerned about that issue, the Court still has the power to approve and should approve IMC's retention of Kurron in light of the disastrous consequences to IMC, its estate, creditors, and employees as well as to the community IMC serves should the Court rule otherwise.

---

[4]    While the monthly payment to Kurron for December 2012 was described as a retainer in connection with the Motion, that was simply because that one payment was paid a few days early as at that point it was uncertain if and on what date IMC would file for chapter 11.  <u>See</u> Supplemental Price Declaration ¶ 15.

[5]    The Committee also argues that Mr. Hernandez's pre-petition service as IMC's CEO is not permitted by the Alix Protocol.  <u>See</u> Committee Obj. ¶ 36.  Nevertheless, the Alix Protocol expressly provides that "service as a pre-petition officer will not <u>per se</u> cause disqualification."  Alix Protocol ¶ E. 3.

A.     Section 105(a) Provides A Separate Basis For Granting The Motion

One ground for approval of Kurron's retention is section 105(a), which provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of title 11." 11 U.S.C. § 105(a). Certainly, there is no better way to carry out the provisions of this title than to facilitate a debtor's reorganization. That is particularly true for a not-for-profit debtor such as IMC serving a severely disadvantaged community that is desperately in need of IMC's services.

In Blue Stone Real Estate, the Court was faced with a somewhat analogous quandary. Multiple parties sought appointment of a trustee due to alleged extensive misconduct by the debtors' principal.   See Blue Stone Real Estate, 392 B.R. at 900.  In response, the debtors sought appointment of a CRO, who the opposing parties feared "would be some toady or crony of the principal [who controlled the debtors' boards] instead of an independent professional with absolute control over the Debtors."  Id. at 903.  The Court approved the CRO motion notwithstanding the pending trustee motion by modifying the powers of the parent debtor's board of directors.  See id. at 902-03.  The Court relied on "its power under section 105(a) to grant the CRO Motion pursuant to section 327(a)."  Id. at 907, n. 15.  The Court reasoned in part that notwithstanding the principal's alleged misdeeds, the Court should give very strong preference to having a debtor in possession choose its management.  See id. at 905 (citing In re Adelphia Communications Corp., 336 B.R. 610, 665 (Bankr. S.D.N.Y. 2006) ("Chapter 11 . . . is designed to allow the debtor-in-possession to retain management and control of the debtor's business operations . . . and there is a strong presumption that the debtor should be permitted to remain in possession . . . .)).  The Court further reasoned that "[a] troubling aspect of the United States trustee's argument that authorization of a CRO treads on its domain is that it elevates a parochial policy concern over the potential harm that could come to these Debtors' estates and

creditors . . .") (emphasis added).

Similarly, here, while the "parochial policy concern" is being advocated by the Committee rather than the U.S. Trustee, the result should be the same. The interests of IMC's estate, creditors, and employees as well as of the community IMC serves should be paramount. Correspondingly, in weighing those interests, the Court may take notice of the fact that the Committee's constituency of unsecured creditors appears to have a very small economic interest in the outcome of this case. See Supplemental Price Declaration ¶ 20; Katz Declaration ¶ 10. Further, in relying on section 105(a), the Court need not find itself constrained under the Bankruptcy Code because to the extent applicable at all here, the Alix Protocol is not a statute. Accordingly, the Motion may and should be granted under sections 105(a) and 363.[6]

> B.    Under No Circumstances Is The Entire Kurron Firm Ineligible To Be Retained

A separate basis for granting the Motion is that the Committee misstates the law in arguing that Kurron "is entirely disqualified if even one of its employees . . . fails the disinterested requirement of section 327(a) of the Bankruptcy Code." Committee Obj. ¶ 29 (citing In re Capital Metals Co., 228 B.R. 724 (9th Cir. B.A.P. 1998)).[7] Yet, the Committee

---

[6]    Additionally, there is precedent that even if Kurron were a "professional" that was required to be retained under section 327, given Kurron's long tenure providing managers for IMC, neither Mr. Price's nor Mr. Hernandez's prepetition roles at IMC would render them not "disinterested". For example, in In re Madison Mgmt. Group, Inc., the Court authorized the debtor's retention under section 327 of a financial advisor and workout specialist that was appointed prepetition as the debtor's sole director and president 137 B.R. at 284. The Court noted: "Notwithstanding the fact that Abrams is a professional for the purpose of Section 327 of the Bankruptcy Code, because Abrams was appointed sole director and elected president prior to the time the Petition for Relief was filed, Section 1107(b) allows the Debtor to retain Abrams regardless of whether he is disinterested. Accordingly, the Court authorizes the retention of Abrams as a professional." Id. (emphasis added). The Committee Objection fails to identify any reason that the Kurron personnel would not be disinterested other than their prepetition roles with IMC. Also, section 1107 of the Bankruptcy Code plainly operates to allow a debtor to continue to benefit from services provided by entities that were retained prior to the Debtor's chapter 11 filing. While IMC submits that Kurron is not a professional that needs to be retained under section 327, what IMC seeks to do is no different than the outcome already sanctioned by the Bankruptcy Code.

[7]    Capital Metals holds that "it is the combination of a prepetition officer of the Debtor being hired as a financial advisor and investment banker that runs afoul of the disinterest requirements." Id. at 727. Here,

- 20 -

miscites <u>Capital Metals</u> to hold that if one person at a firm is not disinterested, then the entire firm must be disqualified. Instead, <u>Capital Metals</u> makes clear its concern is that "the only person working with the Debtor is the person who is not disinterested." <u>Id</u>. Further, <u>Capital Metals</u> cites approvingly <u>In re S.S. Retail Stores Corp.</u>, 211 B.R. 699, 704 (9th Cir. B.A.P. 1997), which held that the disqualification of one law firm attorney who served as a prepetition officer of the debtor did <u>not</u> disqualify the entire firm from representing the debtor. Hence, even in the unlikely event Mr. Price were not able to continue to serve IMC, Kurron and the rest of the Kurron management team could continue.

<u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court enter the revised proposed order annexed hereto as <u>Exhibit A</u> and grant IMC such other and further relief as may be just or proper.

Dated: January 11, 2013

WILLKIE FARR & GALLAGHER LLP

By: <u>/s/ Alan J. Lipkin</u>
    Alan J. Lipkin
    787 Seventh Avenue
    New York, New York 10019
    Tel: (212) 728-8000
    Fax: (212) 728-8111

*Proposed Counsel to Debtor and
Debtor in Possession*

---

however, Kurron and its personnel are being hired to perform exactly the same functions they performed prepetition and have no additional role. <u>See</u> Supplemental Price Declaration ¶ 7. Therefore, there is no disinterestedness problem created by conflicting roles here.

**Revised Proposed Order and Black-line**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                            :     Chapter 11
                                   :

Interfaith Medical Center, Inc.,[1]      :     Case No. 12-48226 (CEC)
                                   :

              Debtor.     :
--------------------------------------------------------x

## ORDER, PURSUANT TO SECTION 363 OF BANKRUPTCY CODE, AUTHORIZING DEBTOR TO EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC. AS MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE <u>DEBTOR'S SENIOR MANAGEMENT, NUNC PRO TUNC TO THE PETITION DATE</u>

        Upon the motion (the "**Motion**") of Interfaith Medical Center, Inc., the debtor and debtor in possession in the above-captioned case (the "**Debtor**"), for an order, pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the Debtor to employ and retain: (a) Kurron Shares of America, Inc. ("**Kurron**") as manager for the Debtor; (b) Kurron personnel as the Debtor's senior management; and (c) related relief, *nunc pro tunc* to the commencement of this case; and upon consideration of the Motion and all pleadings related thereto, including the Declaration of Corbett Price, in Support of the Debtor's Motion for Order, Pursuant to Section 363 of the Bankruptcy Code, Authorizing Debtor to Employ and Retain Kurron Shares of America, Inc. as Manager for the Debtor and Kurron Personnel as the Debtor's Senior Management, *Nunc Pro Tunc* to the Petition Date (the "**Price Declaration**"), attached to the Motion as <u>Exhibit A</u>, the objections to the Motion, the Debtor's reply to those objections, and the Declarations filed in support of the Motion; and due and sufficient notice of the Motion having been given; and no other or further notice being necessary; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, its

---

[1]    The last four digits of the Debtor's federal tax identification number are 6155. The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

patients, its creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is granted to the extent provided herein.

2.      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

3.      Pursuant to section 363 of the Bankruptcy Code, the Debtor is authorized to employ and retain Kurron as manager in this case, pursuant to the terms of the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order.

4.      The Debtor is authorized to employ Corbett Price as CRO for the Debtor on the terms set forth in the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order.

5.      The Debtor is authorized to continue to employ Kurron personnel as President and CEO, CFO, COO and Special Assistant (fka Special Counsel) for the Debtor on the terms set forth in the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order, with the President and CEO, CFO and COO to be retained on a full time basis.

6.      The Debtor is authorized to pay Kurron monthly, pursuant to the terms of the Engagement Letter, for services rendered to the Debtor, and shall reimburse Kurron for reasonable out of pocket expenses incurred in connection with such services; provided, however, that Kurron's fees shall:  (a) be calculated at a $3 million annual rate; (b) not include any hourly charges for additional personnel provided to IMC; and (c) not include any rate increases during this case.

7.     Kurron shall apply the prepetition advance payment from the Debtor for December 2012 and, to the extent, if any, amounts remain, subsequent postpetition periods.

8.     All compensation and reimbursement due to Kurron shall be treated in the Debtor's case as allowed administrative expenses in accordance with section 503 of the Bankruptcy Code and shall be paid in accordance with the terms and provisions of the Engagement Letter.

9.     Kurron is not required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Instead, Kurron shall file with the Court, with copies served on the U.S. Trustee and all official committees contemporaneously with such filing, quarterly reports of compensation earned and expenses incurred ("**Quarterly Reports**").

10.    Parties-in-interest in this chapter 11 case shall have the right to object to fees paid and expenses reimbursed to Kurron within 20 days after Kurron files a Quarterly Report.

11.    Kurron shall file with the Court (and serve copies to the U.S. Trustee and all official committees contemporaneously with such filing) a report on staffing on the engagement for the previous month.  Such report shall include the names and functions filled of the individuals assigned.  All staffing shall be subject to review by the Court in the event that an objection is timely filed to a Quarterly Report.

12.    Notwithstanding anything in the Motion, the Price Declaration, the Hernandez Declaration or the Engagement Letter to the contrary:  (a) the terms of this Order shall control; and (b) the indemnification provisions of the Engagement Letter shall not apply to Kurron and the Debtor shall only indemnify those Kurron employees serving as executive officers of the Debtor on the same terms as provided to the Debtor's other officers and directors

under the Debtor's by-laws and applicable state law.  Those Kurron employees serving as executive officers of the Debtor may assert claims against the Debtor's directors' and officers' insurance policies to the extent available under such policies.

13.  Kurron shall not be retained by the Debtor after the effective date of any chapter 11 plan for the Debtor.

14.  The Debtor is authorized to agree to any changes to the Engagement Letter as may be required by the New York State Department of Health that are not materially adverse to the Debtor without further Court approval; provided, however, that the Debtor shall provide advance notice to the U.S. Trustee and any official committees (the "**Notice Parties**") of any such proposed changes and the Notice Parties shall have five (5) business days to object from the date of receipt of notice from the Debtor of any such modification.  If the Notice Parties object to any modification of the Engagement Letter, the Notice Parties shall seek an expedited hearing before this Court to resolve the objection.  The Debtor must seek Court approval for any other changes to the Engagement Letter.

15.  Notwithstanding the provisions related to the potential arbitration of disputes contained in the Engagement Letter, this Court shall retain all jurisdiction to resolve disputes.

16.  The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

17.  The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

18.	This Court shall retain jurisdiction over any matters arising from or related to the implementation or interpretation of this Order.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re                                          :        Chapter 11
                                               :
Interfaith Medical Center, Inc.,[1]            :        Case No. 12-48226 (        CEC)
                                               :
                        Debtor.                :
-----------------------------------------------------x

**ORDER, PURSUANT TO SECTION 363 OF**
**BANKRUPTCY CODE, AUTHORIZING DEBTOR TO**
**EMPLOY AND RETAIN KURRON SHARES OF AMERICA, INC. AS**
**MANAGER FOR THE DEBTOR AND KURRON PERSONNEL AS THE**
**DEBTOR'S SENIOR MANAGEMENT, NUNC PRO TUNC TO THE PETITION DATE**

Upon the motion (the "**Motion**") of Interfaith Medical Center, Inc., the debtor and

debtor in possession in the above-captioned case (the "**Debtor**"), for an order, pursuant to section

363 of title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the Debtor to

employ and retain: (a) Kurron Shares of America, Inc. ("**Kurron**") as manager for the Debtor;

(b) Kurron personnel as the Debtor's senior management; and (c) related relief, *nunc pro tunc* to

the commencement of this case; and upon consideration of the Motion and all pleadings related

thereto, including the Declaration of Corbett Price, in Support of the Debtor's Motion for Order,

Pursuant to Section 363 of the Bankruptcy Code, Authorizing Debtor to Employ and Retain

Kurron Shares of America, Inc. as Manager for the Debtor and Kurron Personnel as the Debtor's

Senior Management, *Nunc Pro Tunc* to the Petition Date (the "**Price Declaration**"), attached to

the Motion as Exhibit A, the objections to the Motion, the Debtor's reply to those objections, and

the Declarations filed in support of the Motion; and due and sufficient notice of the Motion

having been given; and no other or further notice being necessary; and the Court having

determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, its

---

[1]   The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is
      1545 Atlantic Avenue, Brooklyn, New York 11213.

patients, its creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is granted to the extent provided herein.

2.      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

3.      Pursuant to section 363 of the Bankruptcy Code, the Debtor is authorized to employ and retain Kurron as manager in this case, pursuant to the terms of the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order.

4.      The Debtor is authorized to employ Corbett Price as CRO for the Debtor on the terms set forth in the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order.

5.      The Debtor is authorized to continue to employ Kurron personnel as President and CEO, CFO, COO and Special Assistant (fka Special Counsel of) for the Debtor on the terms set forth in the Engagement Letter, *nunc pro tunc* to the Petition Date, to the extent consistent with this Order, with the President and CEO, CFO and COO to be retained on a full time basis.

6.      The Debtor is authorized to pay Kurron monthly, pursuant to the terms of the Engagement Letter, for services rendered to the Debtor, and shall reimburse Kurron for reasonable out of pocket expenses incurred in connection with such services; provided, however, that Kurron's fees shall:  (a) be calculated at a $3 million annual rate; (b) not include any hourly charges for additional personnel provided to IMC; and (c) not include any rate increases during this case.

7.      Kurron shall apply ~~its retainer to invoices for services rendered to~~the prepetition advance payment from the Debtor ~~in~~for December 2012 and, to the extent, if any, amounts remain, subsequent postpetition periods.

8.      All compensation and reimbursement due to Kurron shall be treated in the Debtor's case as allowed administrative expenses in accordance with section 503 of the Bankruptcy Code and shall be paid in accordance with the terms and provisions of the Engagement Letter.

9.      Kurron is not required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  Instead, Kurron shall file with the Court, with copies served on the U.S. Trustee and all official committees contemporaneously with such filing, quarterly reports of compensation earned and expenses incurred ("**Quarterly Reports**").

10.      ~~Kurron shall submit to the Court, with copies to the U.S. Trustee and all official committees~~ ~~contemporaneously with such filing, quarterly reports of compensation~~ ~~earned, and parties~~Parties-in-interest in this chapter 11 case shall have the right to object to fees paid and expenses reimbursed to Kurron within 20 days after Kurron files ~~such reports~~a Quarterly Report.

11.      Kurron shall file with the Court (and serve copies to the U.S. Trustee and all official committees contemporaneously with such filing) a report on staffing on the engagement for the previous month.  Such report shall include the names and functions filled of the individuals assigned.  All staffing shall be subject to review by the Court in the event that an objection is timely filed to a Quarterly Report.

12.      Notwithstanding anything in the Motion, the Price Declaration, the Hernandez Declaration or the Engagement Letter, ~~the Debtor shall only indemnify those Kurron~~

3

employees serving as executive officers of the Debtor on the same terms as provided to the Debtor's other officers and directors under the Debtor's by-laws and applicable state law, along with insurance coverage under the Debtor's directors' and officers' insurance policies, and to the contrary:  (a) the terms of this Order shall control; and (b) the indemnification provisions of the Engagement Letter shall not apply to Kurron and the Debtor shall only indemnify those Kurron employees serving as executive officers of the Debtor on the same terms as provided to the Debtor's other officers and directors under the Debtor's by-laws and applicable state law.  Those Kurron employees serving as executive officers of the Debtor may assert claims against the Debtor's directors' and officers' insurance policies to the extent available under such policies.

13. Kurron shall not be retained by the Debtor after the effective date of any chapter 11 plan for the Debtor.

14. The Debtor is authorized to agree to any changes to the Engagement Letter as may be required by the New York State Department of Health that are not materially adverse to the Debtor without further Court approval; provided, however, that the Debtor shall provide advance notice to the U.S. Trustee and any official committees (the "**Notice Parties**") of any such proposed changes and the Notice Parties shall have five (5) business days to object from the date of receipt of notice from the Debtor of any such modification.  If the Notice Parties object to any modification of the Engagement Letter, the Notice Parties shall seek an expedited hearing before this Court to resolve the objection.  The Debtor must seek Court approval for any other changes to the Engagement Letter.

15. 13. Notwithstanding the provisions related to the potential arbitration of disputes contained in the Engagement Letter, this Court shall retain all jurisdiction to resolve disputes.

16. ~~14.~~ The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

17. ~~15.~~ The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

18. ~~16.~~ This Court shall retain jurisdiction over any matters arising from or related to the implementation or interpretation of this Order.

Dated: Brooklyn, New York
~~_____ __, 2012~~January __, 2013

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

## Hospital Executive Compensation Chart

**Executive Compensation Analysis:  Comparison of 2011 Senior Officer Compensation at Area Hospitals***
($000)

| Hospital | CEO | | COO | CFO | Salary Subtotal | 35%*** | Total**** |
|---|---|---|---|---|---|---|---|
| Bronx-Lebanon | 3,603 | | 554 | 757 | **4,914** | **1,720** | **6,634** |
| Brooklyn Hospital | 1,062 | | 425 | 443 | **1,930** | **676** | **2,606** |
| Kingsbrook Jewish | 4,200 | ** | 597 | 403 | **5,200** | **1,820** | **7,020** |
| Lutheran | 991 | | 563 | 524 | **2,078** | **727** | **2,805** |
| Maimonides | 1,008 | | 699 | 589 | **2,296** | **804** | **3,100** |
| Montefiore | 1,970 | | 1,452 | 1,735 | **5,157** | **1,805** | **6,962** |
| NY Hospital Queens | 837 | | 523 | 517 | **1,877** | **657** | **2,534** |
| NY Downtown | 673 | | 316 | 316 | **1,305** | **457** | **1,762** |
| NY Methodist | 1,143 | | 438 | 586 | **2,167** | **758** | **2,925** |
| St Barnabas | 781 | | 373 | 380 | **1,534** | **537** | **2,071** |
| Wyckoff Heights | 488 | | 309 | 349 | **1,146** | **401** | **1,547** |

*Source: 2011 Crains Health Pulse Executive Compensation.

**Includes $2.9 million of other compensation.

***Estimated costs of fringe benefits including, but not limited to, health insurance, pension, payroll taxes, life and disability insurance and workers compensation.

****Totals do not include comparable costs for all other Kurron personnel provided to IMC at no additional cost.