**Hearing Date and Time:  August 15, 2013 at 9:30 a.m. (Eastern Time)**
**Objection Deadline:  August 12, 2013 at 4:00 p.m. (Eastern Time)**

Alan J. Lipkin
Shaunna D. Jones
Anna C. Burns
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-48226 (CEC) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------x

### NOTICE OF HEARING ON DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363 AND 1108 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO IMPLEMENT, IN ACCORDANCE WITH NEW YORK STATE LAW, A PLAN OF CLOSURE FOR THE DEBTOR'S <u>HOSPITAL AND CERTAIN AFFILIATED OUTPATIENT CLINICS AND PRACTICES</u>

PLEASE TAKE NOTICE that annexed hereto as **<u>Exhibit 1</u>** is the Debtor's

Motion for Entry of an Order Pursuant to Sections 105, 363 and 1108 of the Bankruptcy Code,

Authorizing the Debtor to Implement, in Accordance with New York State Law, a Plan of

Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics and Practices (the

"**<u>Motion</u>**").

PLEASE TAKE FURTHER NOTICE that at the July 30, 2013 omnibus hearing

in the above-captioned case, the Honorable Carla E. Craig, United States Bankruptcy Judge, so

ordered that a hearing (the "**<u>Hearing</u>**") on the Motion be scheduled for **<u>August 15, 2013 at 9:30</u>**

---

[1]    The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

**a.m. (prevailing Eastern Time)** before Judge Craig in Courtroom 3529 of the United States Bankruptcy Court, 271 Cadman Plaza East - Suite 1595, Brooklyn, New York 11201-1800.

PLEASE TAKE FURTHER NOTICE that responses or objections, if any, to entry of the order requested in the Motion must be made in writing, state with particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of New York, be filed electronically in text searchable portable document format (PDF) with the Court by registered users of the Court's case filing system and by all other parties in interest (with a hard-copy delivered directly to the Judge's Chambers), and be served upon:  (i) Interfaith Medical Center, 1545 Atlantic Avenue, Brooklyn, NY 11213 (Attn: Patrick Sullivan  and Robert Mariani); (ii) counsel for the Debtor, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Alan J. Lipkin, Esq. and Shaunna D. Jones, Esq.); (iii) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, NY 11201 (Attn: William E. Curtin, Esq. and Susan D. Golden, Esq.); (iv) counsel to the Dormitory Authority of the State of New York, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166-4193 (Attn: David Neier, Esq. and Carey D. Schreiber, Esq.); and (v) counsel to the Official Committee of Unsecured Creditors, Alston & Bird LLP, 90 Park Avenue, New York, NY 10016 (Attn: Martin G. Bunin, Esq. and Craig Freeman, Esq.), **so as to be actually received on or before 4:00 p.m. (prevailing Eastern Time) on August 12, 2013, as so ordered by Judge Craig.**

PLEASE TAKE FURTHER NOTICE that if you wish to be heard with respect to any of the foregoing matters, you must attend the Hearing.  The Hearing may be adjourned from time to time in open court.

PLEASE TAKE FURTHER NOTICE that if you would like to receive copies of the Motion set forth above, (a) you may access such documents online from either the Bankruptcy Court's electronic case filing system located at http://www.nyeb.uscourts.gov/ or the website of the Debtor's claims agent at http://www.donlinrecano.com/interfaithmedical, or (b) you may contact Anna C. Burns, Esq., at Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, by telephone at (212) 728-8000 or by e-mail at aburns@willkie.com.

Dated: July 30, 2013

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Alan J. Lipkin
      Alan J. Lipkin
      Shaunna D. Jones
      Anna C. Burns
      787 Seventh Avenue
      New York, New York 10019
      Tel:  (212) 728-8000
      Fax:  (212) 728-8111

*Attorneys for the Debtor and Debtor in Possession*

**EXHIBIT 1**

**Hearing Date and Time:  August 15, 2013 at 9:30 a.m. (Eastern Time)**
**Objection Deadline:  August 12, 2013 at 4:00 p.m. (Eastern Time)**

Alan J. Lipkin
Shaunna D. Jones
Anna C. Burns
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                             :    Chapter 11
                                                  :
Interfaith Medical Center, Inc.,[1]               :    Case No. 12-48226 (CEC)
                                                  :
                          Debtor.                 :
-------------------------------------------------------x

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363 AND 1108 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO IMPLEMENT, IN ACCORDANCE WITH NEW YORK STATE LAW, A PLAN OF CLOSURE FOR THE DEBTOR'S <u>HOSPITAL AND CERTAIN AFFILIATED OUTPATIENT CLINICS AND PRACTICES</u>

TO THE HONORABLE CARLA E. CRAIG,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Interfaith Medical Center, Inc., the debtor and debtor in possession in the above-captioned case (the "**Debtor**" or "**IMC**"), hereby moves for entry of an order, pursuant to sections 105(a), 363 and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") authorizing the Debtor to implement, in accordance with New York State law and in coordination with the New York State Department of Health ("**DOH**"), a plan of closure ("**Closure Plan**") for the Debtor's main hospital facility and certain affiliated outpatient clinics and practices (which might be closed or transferred).  In support of this motion, the Debtor, by and through its undersigned counsel, respectfully represents:

---

[1]    The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

## FACTS

**A.    General Background**

1.    On December 2, 2012 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues in possession of its property and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    On December 13, 2012, the Office of the United States Trustee for the Eastern District of New York appointed an official committee of unsecured creditors in this case.

**B.    Events Leading to Commencement of IMC's Chapter 11 Case**

(i)    Community Needs

3.    The local Brooklyn community's need for IMC's services is critical. Accordingly, IMC fulfills a vital mission in the community IMC serves.  Indeed, in his May 7, 2013 letter to HHS Secretary Kathleen Sebelius seeking an 1115 Medicaid waiver amendment, Governor Cuomo referred to IMC and other Brooklyn hospitals in danger of closing as "essential components of the health care services system in Brooklyn".  Governor Cuomo also stated that "the outcome will be disastrous" if those hospitals close because among other things, "[a]ccess to care will be compromised and the remaining health care providers in the borough will be destabilized."  In fact, as the Debtor is the primary acute care provider to its community, failure of IMC to survive likely will have serious consequences for the provision of healthcare in that community, the extent of the jobs created by such services, and the value of the Debtor's estate. Consequently, IMC consistently has sought every means available for maximizing the chances for its survival.

(ii)        Major Rate Reimbursement Reductions and
Other Operational Financial Issues IMC Has Faced

4.        IMC operates in an increasingly challenging environment.  In the central Brooklyn communities in which IMC is located, approximately 31% of residents live below the poverty line and approximately 65% receive Medicaid, the government insurance program for the needy.  Additionally, Medicaid eligibility for such individuals is expanding.  Further, Medicaid reimbursement rates for hospitals such as IMC repeatedly have been cut, including cuts of approximately 40% from 2010 to 2012.  Moreover, substantial Medicare reimbursement cuts occurred during that period.  Also, approximately 33% of IMC's adult patients are uninsured, particularly illegal immigrants.  Meanwhile, the costs of providing medical care by IMC and other hospitals has continued to increase significantly.

(iii)        Expense Cutting

5.        Prepetition, IMC made great strides to address these enormous operational financial issues.  For example, from 2010 to 2012, IMC cut approximately $30 million of annual expenses.  Nevertheless, while IMC approached a breakeven level on operational revenue and expenses, the Medicaid and other reimbursement cuts imposed in recent years made it impossible for the Debtor to fully address its legacy debt service and other financial obligations.

(iv)        Potential New Business Relationship(s)

6.        Beyond cost cutting, one alternative strategy pursued by IMC was to seek a new business relationship with one or more other hospitals.  In that regard, IMC contacted several other hospitals in Brooklyn.  As a result, in February 2012, IMC and The Brooklyn Hospital Center ("**TBHC**") developed and submitted an application for a HEAL 21 grant in order to fund the development and implementation of a cohesive health system for North/Central Brooklyn.  Unfortunately, no funds have come to IMC from any HEAL 21 grant.

7.      Subsequently, during July of 2012, IMC and TBHC reached an agreement in principle regarding the terms of a business combination.  Thereafter, DOH vetoed that deal based on criteria of which IMC and TBHC were not previously apprised, including among other things, a requirement for a much more active managerial role by TBHC than was contemplated by the parties' agreement in principle.

8.      Partly in response, during November of 2012, the Dormitory Authority of the State of New York ("**DASNY**") organized an all-hands meeting among the parties to try to put a deal between TBHC and IMC back together.  Key personnel and counsel from DASNY, TBHC, and IMC attended the meeting.  While invited, DOH was not represented at the meeting. Despite DASNY's and IMC's efforts, the meeting did not result in a new agreement in principle between TBHC and IMC.  A few weeks later, IMC filed for chapter 11 protection without the substantial benefit of having a potential transaction partner lined up before the filing.

**C.      IMC's Post Petition Restructuring Efforts**

9.      As it did prepetition, the Debtor continued to focus on its exit strategy after the Petition Date.  Thus, IMC continued working to develop a plan to create a financially viable healthcare system to address the needs of IMC's community.  Among other things,  IMC was engaged in discussions regarding the terms of a potential affiliation or other relationship with one or more other hospitals.

(i)      The TBHC MOU

10.     Ultimately, IMC entered into a Memorandum of Understanding (the "**TBHC MOU**") between IMC and TBHC that IMC intended to help reconfigure, enhance, and expand resources to improve the provision of healthcare to the community now served by IMC and of healthcare outcomes in Brooklyn generally.  Among other things, TBHC agreed in the TBHC MOU that there would be commercially reasonable, good faith efforts to maintain the

New IMC as a general hospital with inpatient services, but did not commit to that result.  See

TBHC MOU, ¶ 3(a)(i)(C).  The TBHC MOU also included a provision precluding IMC from

soliciting alternative transactions while TBHC performed its due diligence.  Those provisions

were included despite IMC's strong insistence on better protections for IMC largely because

DOH (and DASNY) required that IMC enter into the TBHC MOU at that time.  On March 22,

2013, the Court approved the Debtor's entry into the TBHC MOU.

11.    The TBHC MOU also set forth the general terms pursuant to which IMC

and TBHC would continue their negotiations and due diligence efforts concerning a potential

business integration.  Yet months passed and TBHC never initiated the formal due diligence

process under the TBHC MOU despite repeated efforts by IMC to facilitate and kick start that

process.  IMC understands that TBHC required and had been promised $1.6 million of State

financing to fund TBHC's due diligence, but that funding never materialized.  During that

extended delay, the TBHC MOU precluded IMC from pursuing an alternative transaction.

(ii)    Other Progress Towards Confirmation of a Chapter 11 Plan

12.    As the prospects for a transaction with TBHC faded, IMC worked to

identify and pursue alternatives that would preserve operations at IMC.  During the limited time

available to IMC to explore alternatives, IMC's efforts did not yield a transaction with a third

party that would support operations by IMC.  Nonetheless, IMC developed a proposed draft

restructuring business plan that would form the basis for a stand-alone restructuring of IMC and

prepared a related chapter 11 term sheet.  Meanwhile, IMC also pursued and obtained an

agreement for DOH (through DASNY) to provide IMC debtor in possession financing from New

York State to help IMC continue its operations while a comprehensive restructuring blueprint for

many of Brooklyn's hospitals was being developed or to bridge IMC until a potential stand-alone plan for IMC.[2]

13.    As part of its exit strategy, the Debtor also negotiated a memorandum of understanding with DASNY (the creditor holding by far the largest secured claim against the Debtor) regarding, <u>inter alia</u>, plan treatment of DASNY's multiple claims, chapter 11 financing arrangements, and related issues (the "**DASNY MOU**").  Further, to date the Debtor has negotiated with DASNY, and obtained Court approval of, eight interim orders approving the limited use of cash collateral.

14.    The Debtor also was engaged in plan related negotiations with certain key constituents other than DASNY.  For example, the orders resolving both the Debtor's motion to extend the automatic stay's protection to most of the Debtor's staff and the Medical Malpractice Indemnity Claims Motion (as defined below) led to productive discussions regarding plan treatment of medical malpractice claims against the Debtor as well as the establishment of a $400,000 restricted fund to cover medical malpractice related indemnity claims against IMC that potentially could be used in connection with a chapter 11 plan.  Additionally, counsel for the Debtor and the IM Foundation, Inc. had preliminary discussions regarding resolution of potential claims and issues between IMC and the IM Foundation, Inc.  Also, the Debtor's interim settlement with the East Building "landlord" formed the basis for comprehensive plan related negotiations concerning that "landlord's" claim.

15.    Meanwhile, the Debtor consistently sought consensual resolution of contested matters in this case, many of which resolutions could ultimately also help facilitate confirmation of a chapter 11 plan for IMC.  Those efforts included the successful resolution of,

---

[2]    DOH later withdrew its approval of that financing as discussed below.

among other things:  (a) the Committee's Rule 2004 discovery motion; (b) the objections to the

Debtor's motion to extend the protections of the automatic stay to the Debtor's staff; (c) the

motion of the Ad Hoc Doctors' Group and the Committee of Interns and Residents seeking

allowance of an administrative claim based on potential post petition medical malpractice

indemnity claims (the "**Medical Malpractice Indemnity Claims Motion**"); (d) the claims

between IMC and The Max Group so that The Max Group again could pursue collections of

IMC receivables collections; (e) the respective appeals of IMC and Ms. Lawrence regarding a

prepetition medical malpractice claim and related escrowed funds; and (f) the East Building

"landlord's" objection regarding the purported East Building lease.

**D.**    **Other DOH Actions**

16.    DOH's Deputy Commissioner handling IMC issues during most of IMC's

chapter 11 case recently left DOH to accept a senior position at SUNY Downstate Medical

Center to assist in its restructuring efforts.  Notably, Downstate is a large Brooklyn healthcare

operation with substantial financial problems that, therefore, competes with IMC for the State's

limited financial resources available to aid Brooklyn healthcare facilities such as IMC.

17.    For over 20 years prior to IMC's chapter 11 filing, the same hospital

management firm had provided senior management personnel to IMC.  Despite DOH's prior

approval of and/or acquiescence in that contractual arrangement and multiple attempts by IMC to

address any specifics concerns raised by DOH, DOH expressed objections to this long standing

arrangement and ultimately disapproved the then operative management contract.  The

management firm then voluntarily released its employees from any noncompete agreements and

IMC hired the same senior management team to operate IMC that had been providing

management services under the just cancelled management contract.

18.     The only management change at IMC resulting from the termination of that contract was the eventual replacement of IMC's Chief Restructuring Officer ("**CRO**") with John Leech.  That change did not generate cost savings for IMC.  Further, by the time Mr. Leech and his colleagues from Gordian Dynamis Solutions LLC got up to speed regarding IMC, DOH withdrew its approval of the debtor in possession bridge financing for IMC that previously had been approved to help fund IMC's development of and path to confirmation of a chapter 11 plan.  That loss of needed financing left little time for Mr. Leech, as CRO, and his colleagues to help IMC develop the restructuring plan for which they had been retained.

19.     Not long thereafter, at a meeting with IMC representatives on June 25, 2013, and by letter, dated June 25, 2013, DOH told IMC that DOH only would consider a restructuring plan for IMC that was submitted to DOH by July 9, 2013, and that would enable IMC to operate outside of chapter 11 without future State funding.  Although this was the first time DOH had required a restructuring plan for IMC to exclude any future State funding, DOH gave IMC only two weeks to submit the Plan.  Moreover, DOH imposed the requirement of no State funding for IMC even though certain operations of IMC, such as Behavioral Health, would – if not provided by IMC – need to be transferred to other operators who then probably would require comparable or higher State funding than IMC would need to continue such operations.  Additionally, DOH stated that if IMC were to agree to a plan of closure, then IMC could anticipate substantial debtor in possession financing to facilitate an orderly and planned closure of IMC's facilities.

20.     On July 9, 2013, IMC timely provided to DOH a working draft of such a proposed restructuring plan.

21.    By letter, dated July 19, 2013, and received by IMC late on that Friday afternoon, DOH told IMC:  (a) its proposed restructuring plan was not accepted based on various DOH findings; (b) IMC's plan could not be resubmitted; and (c) IMC must commence implementation of a closure plan.  DOH's Friday letter required IMC to make substantial revisions to its draft closure plan by the immediately following Monday, July 22.[3]

22.    By letter, dated July 22, 2013, IMC promptly advised DOH of certain errors in DOH's July 19 letter regarding the bases DOH stated for rejecting IMC's restructuring plan, clarified various other points raised by DOH, confirmed IMC's restructuring plan was a discussion document subject to revision, and requested to meet with DOH immediately to work together to agree on an acceptable restructuring plan.  Since then, DOH has not responded to IMC's July 22 letter other than to communicate informally that DOH still wanted implementation of a closure plan for IMC to begin immediately.

23.    By letter, dated July 24, 2013, DASNY advised IMC that, among other things:  (a) based on DOH's July 19, 2013 letter to IMC, "DASNY believes that there is no viable prospect of any additional funding [for IMC] coming from the State of New York or any other source, other than in connection with a prompt closure of IMC"; (b) "DASNY's consent to continued use of cash collateral starting on Monday, July 29, 2013, is expressly conditioned on IMC's agreement to implement the closure plan and use cash collateral based solely on the closure budget"; (c) DASNY expects, "in connection with DASNY's consent to use cash collateral that IMC will file the closure motion prior to Monday, July 29, 2013"; and (d) DASNY believes "IMC should as soon as practicable send out WARN notices to all of its affected

---

[3]    At IMC's request, that unattainable deadline later was extended by DOH to July 25, 2013.

employees; and [DASNY is] adding that as a requirement in the proposed Cash Collateral

Order". [4]

## E.    The Closure Plan and Related Matters

24.    IMC believes it presented DOH with a viable business restructuring plan

on July 9 that would not require post-chapter 11 State funding for IMC.  IMC also believes that

other aspects of IMC's operations such as Behavioral Health could continue without the

requirement for greater State funding for IMC than likely would be required from the State when

those operations necessarily are  transferred to other operators who also would require State

funding.  Moreover, throughout its chapter 11 case, IMC has complied with its cash collateral

orders, has operated better than the cash collateral budgets approved by DASNY, and has sought

to comply with and follow the multiple directives of DOH and its sister agencies as well as

DASNY.

25.    Nevertheless, in light of, among other things:  (a) DASNY's refusal to

consent to IMC's use of cash collateral after July 29, 2013 unless IMC agrees to implement a

closure plan; (b) DOH's rejection of IMC's July 9 restructuring plan; (c) DOH's direction to

IMC to begin implementing a closure plan; and (d) IMC's lack of alternative funding, the Debtor

determined it had no choice but to approve a plan of closure for IMC.  Additionally**,** the Debtor

determined that under all such circumstances, including repeated representations that IMC would

receive debtor in possession financing to help fund an orderly and planed closure of and/or

transition of IMC's facilities, it is in the best interests of the Debtor and its creditors, employees,

community, and other constituencies to agree to:  (x) the closure of IMC's hospital; (y) the

transfer of IMC's patients to alternate healthcare providers; and (z) the transfer of all of IMC's

---

[4]        The July 29 date became July 30 when this Court adjourned the July 29 hearing to July 30.

outpatient programs to alternate providers to continue the operation of each such program, or, if an alterative provider cannot be found, the closure of such programs and the transfer of each then current patients to an alternative provider for ongoing services.

26.    In that regard, the Debtor submitted a form of the Closure Plan to DOH on July 25, 2013 for approval.  In connection therewith, IMC also submitted to DASNY a request for the debtor in possession financing relied upon by IMC to help fund the Closure Plan.  IMC anticipates receiving and is relying on receiving such debtor in possession financing from DOH through DASNY to help fund an orderly closure of IMC.  Further, IMC authorized the distribution of WARN notices to all of IMC's employees to the extent, if any, such notices potentially are required by applicable law based on the impact of the Closure Plan.[5]

27.    Until this motion is heard, IMC will continue its normal operations while preparing to implement the Closure Plan.

## JURISDICTION

28.    This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363 and 1108 of title 11 of the Bankruptcy Code, as supplemented by Rule 6004 of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

29.    By this motion, the Debtor seeks entry of an order authorizing implementation of the Closure Plan in accordance with the directives of the DOH, other relevant regulatory agencies, and applicable law.  As the Closure Plan document is a work in progress,

---

[5]    IMC reserves all rights as to whether or not such WARN notices are required and as to any liability that might be asserted related to such notices.

will change substantially over time, and contains certain confidential information, a copy of the current version being reviewed by DOH is not attached to this motion.

## THE CLOSURE PLAN

30.     New York State regulations require a hospital to obtain written approval from the DOH before the hospital may close.  N.Y. Comp. Codes Rules & Regulations, title 10 § 401.3(g).  The regulations further provide that, before closure, a hospital must notify each patient of the closure, discharge or transfer all existing patients to other appropriate facilities, and make provisions for the maintenance, storage and safekeeping of patient medical records.  Id. at § 401.3(h), (i)

31.     In accordance with these regulations, on July 25, 2013, the Debtor submitted the Closure Plan to the DOH for approval.  The submission of the Closure Plan followed discussions between and among the Debtor, DOH, DASNY, and other relevant New York State entities regarding the possibility of and terms of a closure, and submission by IMC to DOH of an earlier draft of the Closure Plan.  The Closure Plan incorporates initial comments made by the DOH.  Therefore, while DOH has not yet formally approved the Closure Plan – and is likely to  request further modifications of the Closure Plan – the Debtor anticipates DOH will do so soon.  Meanwhile, the Debtor's circumstances require the Debtor to begin the closure process.

## A.     Overview of the Closure Plan

32.     The Debtor is working with DOH to implement the Closure Plan.  Upon approval of this motion, subject to certain limited exceptions, the Closure Plan calls for all patients to have been transferred or discharged by, and all inpatient operations at the hospital to cease by, September 12, 2013.  The Closure Plan provides for the continuation of ambulatory

care services through October 12, 2013, to provide time for IMC and DOH to search for alternate

sponsors to whom these programs may be transferred.  Other key elements of the Closure Plan

are listed below.

33.     The Closure Plan provides for the closure of the Debtor's hospital and the

transfer – or, failing transfer, closure – of the outpatient programs and clinics associated with and

operated by IMC.  The Closure Plan details the steps for termination of hospital services,

including:

- Cessation of new inpatient admissions;

- Transfer, discharge, and referral of patients;

- Communication to employees, patients, providers, government entities, area
  hospitals, and the community at large;

- Safeguarding, transfer, and storage of medical records;

- Disposition of pharmaceuticals;

- Decontamination of facilities and disposal of medical waste;

- Surrender of licenses and certificates;

- Wind-down of business including, among other things, liquidation of
  equipment, furniture and fixtures.

34.     The Closure Plan emphasizes patient safety.  The Debtor plans to work

with the DOH, other government agencies, and area providers to prevent disruption of patient

care and ensure a smooth transition of the Debtor's patients to new care providers.

**B.    <u>Operations to be Closed</u>**

35.     The Closure Plan provides for closure of IMC's main hospital facility and

its emergency and inpatient services, as well as the closure and/or transfer to other providers of

those outpatient services available at other clinic locations.  In addition, the Closure Plan calls

for IMC to seek to transfer to alternative sponsors IMC's Primary Care Designated HIV

Treatment Center (the "**Center**") and other clinics.  If the Debtor is unable to find alternate

sponsors for the Center or its clinics, they also will be closed.

**C.**     **Timeline**

36.     Although subject to modification based on patient safety concerns and

input from the DOH, the Debtor anticipates the timeline for complete shut-down of operations

will be substantially as follows:

| | |
|---|---|
| July 31, 2013 | Provision of WARN Act notifications as soon as practicable, but no later than July 31, 2013 |
| August 12, 2013 | Cease inpatient admissions |
| August 12, 2013 | Emergency Department on permanent diversion and transitioned to "treat and release or transfer" site; two (2) ambulances continue to be stationed at Emergency Department through September 11, 2013 |
| August 19, 2013 | Discontinuance of elective surgeries |
| September 11, 2013 | Closure of Emergency Department |
| September 12, 2013 | Cessation of inpatient care services; discharge or transfer of remaining inpatients |
| October 12, 2013 | Cessation or transfer of outpatient programs |
| November 11, 2013 | Cessation or transfer of HIV, detox and rehabilitation programs |

37.     This timeline is subject to modification after consulting with DOH and

other related healthcare state agencies and the Debtor's lender, DASNY.

**D.**     **Transfer and Discharge of Patients**

38.     The Closure Plan ensures continuity of care for the Debtor's patients.  The

majority of currently admitted patients will be discharged in the ordinary course and, if

necessary, provided with information and assistance to make follow-up appointments with

outpatient providers, subject to patient choice. As to those inpatients who cannot be discharged, after obtaining appropriate patient consent, the Debtor will arrange to transfer such patients to other hospitals or to long-term care or specialty facilities, subject to patient choice. The Debtor already has begun the process of identifying and evaluating alternative healthcare providers for patients requiring transfer.

39.     The Debtor expects to complete the transfer and discharge of acute care patients by September 12, 2013. If any undischarged patient cannot be placed at another facility within that timeframe, the Debtor will continue to provide care while enlisting the assistance of the DOH and other applicable State agencies in finding a suitable transfer facility.

40.     The Debtor is in discussions with other institutions and the DOH and other State agencies regarding the transfer of IMC's programs, clinics and the Center to new sponsors. If alternate sponsors cannot be found, the Debtor will refer all patients in its outpatient programs to other area providers, subject to patient choice.

**E.      <u>Medical Records</u>**

41.     The Closure Plan also addresses the protection, transfer, and storage of medical records. The Debtor has instituted heightened security measures to ensure that medical records are not removed from the Debtor's facilities without authorization. In connection with the transfer and discharge of active patients, the Debtor will provide for the appropriate transfer of custody of medical records to new sponsors of the programs, or to other providers if a patient makes such a request.

42.     The Debtor currently stores the bulk of its patient medical records with CitiStorage and Iron Mountain, major vendors for document management. The Debtor plans to solicit and negotiate bids from CitiStorage and Iron Mountain for the continued storage of

medical records post-closure, in accordance with applicable law.[6]  Going forward, IMC will

maintain its main telephone number and callers will be directed to contact the appropriate storage

vendor directly for access to medical records.  Consistent with past practice, vendor storage and

access protocols will comply with applicable regulations governing confidentiality of medical

records.

## F.    Communications

45.    The Closure Plan outlines a comprehensive approach to keep patients,

employees, government agencies, area hospitals, and IMC's community at large informed of

IMC's closure.

44.    The Debtor has begun contacting area hospitals to inform them of the

closure and to discuss procedures for the transfer of patients.  In addition, the Debtor intends to

coordinate with the fire department, government agencies, and various community members

regarding the closure.

45.    The Closure Plan provides that the Debtor will take the following

additional steps to disseminate appropriate information:

- Notify all patients of the program changes and impending closure;

- Notify all IMC employees, union representatives, the Office of the Mayor of
the City of New York, the State Relocation Worker's Unit, all IMC based
private practices, The Brooklyn Hospital Center, New York Methodist
Hospital, SUNY Downstate, Woodhull Medical and Mental Health Center,
Kingsbrook Medical Center, Kings County Medical Center, Hunt Ambulance,
First Response Ambulance, NYS Department of Health, NYC Department of
Health and Mental Hygiene, the New York State Attorney General, and
various other governmental entities of its impending closure;

- Notify the fire department and area hospitals that the Emergency Department
will go on permanent diversion status at 6 a.m. August 13, 2013, for all
services;

---

[6]    The Debtor reserves all rights respecting § 351 of the Bankruptcy Code.

- Notify all facilities with active transfer agreements that the Emergency Department is on diversion status and their patients should be directed to other facilities for care;

- Issue a DOH-approved press release to local newspapers;

- Place informational signs in high traffic areas, including the Emergency Department, and other locations in the hospital and at off-site clinics;

- Remove or cover all signs at the hospital identifying it as an Emergency Receiving Hospital;

- Coordinate with the New York Department of Transportation for the removal of blue hospital signs; and

- Post signs in English, Spanish, and French Creole at the Emergency Department entrance informing the public of the plan to close the Emergency Department and directing patients to the nearest alternative Emergency Department.

**G.**     **Disposition of Pharmaceuticals, Hazardous Materials, and Medical Waste**

46.     The Debtor will manage and dispose of pharmaceuticals, hazardous materials, and medical waste in accordance with New York State and federal guidelines. Medications, radioactive materials, chemicals, medical waste, infectious materials and other hazardous materials will be identified, secured and inventoried, then destroyed, disposed of, returned to vendors, or transferred to other providers as appropriate.  IMC has a contract with Steri-cycle to manage the appropriate disposal of all such materials.

**H.**     **Surrender of Licenses**

47.     After the closure and cessation of all hospital services, the Debtor will surrender all related licenses and registrations to applicable government agencies as directed by such agencies.

**BASES FOR RELIEF**

48.     Section 1108 grants a debtor in possession the right to operate its businesses by providing the trustee (or debtor in possession) "<u>may</u> operate the debtor's

business." 11 U.S.C. § 1108 (emphasis added). In its use of the permissive "may," the statute "clearly indicates that a trustee is not required to operate the debtor's business." In re Thrifty Liquors, Inc., 26 B.R. 26, 28 (Bankr. D. Mass. 1982). In fact, section 1108 "necessarily implies the lesser authority to modify the operation of the business on such grounds as [the debtor/trustee] deems appropriate under the circumstances." Id. Thus, a debtor is not required to operate its business "if such operations will reduce the value of the debtor's assets or if the debtor's business is moribund." 7 Collier on Bankruptcy § 1108.13 [(16th ed. 2009)]. Indeed, in such circumstances "continued operation of a business that ought to be closed down and liquidated may be a breach of the fiduciary duties of a trustee or debtor in possession." Id.

49.     Based on the circumstances enumerated above, IMC has determined its continued operation of its hospital are not possible. Hence, there are compelling reasons for IMC not to exercise its right to continue the operation of IMC's hospital, and instead to cease those operations. Operations at associated outpatient clinics and practices will be addressed individually. Accordingly, the Debtor has sought appropriate relief from DOH as required by applicable law. Although the Bankruptcy Code does not clearly require court approval of the closure, IMC recognizes that closure of its hospital affects the core of its business and, therefore, directly impacts many, if not all, of its creditors, patients, community, and other parties in interest. Thus, in an abundance of caution, the Debtor seeks approval of implementation of the Closure Plan as a non-ordinary course transaction.

50.     Section 363 governs use of property of the estate by a debtor in possession. A debtor in possession may enter into transactions involving property of the estate in the ordinary course of business without first obtaining bankruptcy court approval. See 11 U.S.C. § 363(c)(1). Where, however, a proposed transaction is outside the ordinary course of the

debtor's business, the Bankruptcy Code prohibits the debtor from using property of the estate until creditors and other parties in interest are given notice and an opportunity to be heard.  See 11 U.S.C. § 363(b)(1).  Section 363 does not set forth a standard for determining when it is appropriate for a court to authorize a non-ordinary course transaction.  However, courts in the Second Circuit require that such a transaction be supported by a "good business reason."  See, e.g., Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

51.     Here, the business reasons for IMC's closure are compelling.  While IMC has spent substantial time and effort pursuing restructuring alternatives and searching for strategic partners both prior to and during this case, and while IMC made substantial progress towards confirming a chapter 11 plan, IMC has been unable to conclude an arrangement with a third party or develop a stand-alone plan acceptable to relevant New York State authorities.  Hence, the Debtor has no alternative but to close, particularly as the Debtor lacks access to sufficient cash to continue operations on a stand-alone basis.

52.     In light of IMC's extensive efforts to sustain the hospital as a going concern, the Debtor respectfully submits that its inability to complete a strategic transaction or alternative business restructuring plan constitutes a "good business reason" for the closure.  In fact, without access to financing to support continued operations rather than closure and without a potential third party transaction or approved stand alone business restructuring plan in hand, IMC has no choice but to close.

53.     Accordingly, granting the relief requested herein is appropriate and in the best interests of all parties in interest.

54.     Relief similar to that requested herein has been granted in other chapter 11 cases.  See, e.g.,  In re North General Hospital, Case No. 10-13553 (SCC) (Bankr. S.D.N.Y. Aug. 27, 2010); In re Saint Vincents Catholic Medical Centers of New York, Case No. 10-11963 (CGM) (Bankr. S.D.N.Y. May 14, 2010) (order authorizing closure of Manhattan hospital and affiliated outpatient clinics); In re Saint Vincents Catholic Medical Centers of New York, Case No. 05-14945 (PCB) (Bankr. S.D.N.Y. Sept. 20, 2005) (order authorizing closure of St. Mary's hospital).

## REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

55.     Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Pursuant to Bankruptcy Rule 6004(h), the Debtor seeks: (a) immediate entry of an order granting the relief sought herein; and (b) a waiver of any stay of the effectiveness of such an order.

56.     Here, the failure to grant immediate relief would risk immediate and irreparable harm to the Debtor's patients.  It is essential that the closure process progress as expeditiously as possible.  Patients cannot be left in limbo pending entry of or the 14 day period after entry of an order authorizing a plan of closure.  Notwithstanding the unquestioned skill and dedication of the Debtor's employees, the continued needs of the Debtor's patients, including ensuring their safe and orderly transfer, requires that the Debtor be permitted to move expeditiously to implement the Closure Plan, in coordination with DOH.  Thus, the Debtor seeks immediate entry and effectiveness of an order granting the relief requested in this motion.

## NOTICE

57.     Notice of this motion will be given in accordance with this Court's *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates*, dated as of December 4, 2012 [Docket No. 35].  The Debtor submits that, under the circumstances, no other or further notice is required.

58.     No previous motion for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto as Exhibit A, granting the relief requested in this motion and granting the Debtor such other and further relief as may be just and proper.

Dated: July 30, 2013

WILLKIE FARR & GALLAGHER LLP

By:  /s/ Alan J. Lipkin
　　　Alan J. Lipkin
　　　Shaunna D. Jones
　　　Anna C. Burns
　　　787 Seventh Avenue
　　　New York, New York 10019
　　　Tel:  (212) 728-8000
　　　Fax:  (212) 728-8111

　　　*Attorneys for the Debtor and Debtor in Possession*

## **EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                            :     Chapter 11

                               :

Interfaith Medical Center, Inc.,[1]   :     Case No. 12-48226 (CEC)

                               :

              Debtor.     :

---------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 105, 363 AND 1108 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO IMPLEMENT, IN ACCORDANCE WITH NEW YORK STATE LAW, A PLAN OF CLOSURE FOR THE DEBTOR'S HOSPITAL AND CERTAIN AFFILIATED OUTPATIENT CLINICS AND PRACTICES

Upon the motion (the "**Motion**") of Interfaith Medical Center, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**" or "**IMC**"), for entry of an order, pursuant to section 105(a), 363 and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order authorizing the Debtor to implement, in accordance with New York State law and in coordination with the New York State Department of Health ("**DOH**"), a plan of closure for the Debtor's main hospital facility and certain affiliated outpatient clinics and practices; and notice of the Motion having been provided in accordance with the Motion; and it appearing that no other or further notice is required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is, hereby

ORDERED, ADJUDGED, AND DECREED that:

1.      The Motion is granted to the extent set forth herein.

---

[1]      The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

2.        Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

3.        The Debtor is hereby authorized and empowered – in coordination with DOH, other regulatory agencies, and pursuant to applicable law – to take all actions necessary to complete implementation of the Closure Plan, including, without limitation, to finalize the Closure Plan in coordination with DOH and to mail WARN Act notices as they relate to the Closure Plan, but subject to a full reservation of rights by all parties as to whether or not such notices are required and as to any alleged liability related to such notices.

4.        The Debtor is hereby authorized to transfer and discharge patients, transfer and store medical records, dispose of pharmaceuticals and inventory, dispose of medical waste and hazardous materials, and cease operations at the hospital and associated clinics and practices.

5.        The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

6.        Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.        This Court retains jurisdiction over any and all matters or disputes with respect to any of the relief granted in this Order.