Hearing Date and Time:  August 26, 2013 at 10:00 a.m. (Eastern Time)
Objection Deadline:  August 19, 2013 at 11:59 p.m. (Eastern Time)

Alan J. Lipkin
Shaunna D. Jones
Anna C. Burns
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-48226 (CEC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

**SECOND SUPPLEMENT TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363, AND 1108 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO IMPLEMENT, IN ACCORDANCE WITH NEW YORK STATE LAW, A PLAN OF CLOSURE FOR THE DEBTOR'S HOSPITAL AND CERTAIN AFFILIATED OUTPATIENT CLINICS AND PRACTICES**

TO THE HONORABLE CARLA E. CRAIG,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Interfaith Medical Center, Inc., the debtor and debtor in possession in the above-captioned case (the "**Debtor**" or "**IMC**"), hereby submits this Second Supplement to the Debtor's Motion for Entry of an Order Pursuant to Sections 105, 363, and 1108 of the Bankruptcy Code, Authorizing the Debtor to Implement, in Accordance with New York State Law, a Plan of Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics and Practices [Docket No. 602] (the "**Motion**"), [2] and through its undersigned counsel, respectfully represents as follows:

---

[1]  The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

[2]  All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

1.      As required by the Revised Order of the Court, dated August 8, 2013 [Docket No. 620], annexed hereto as Exhibit 1 and Exhibit 2, respectively, are:  (a) the $15,000,000 Senior Secured Priming Superpriority DIP Facility Commitment Letter (the "**DIP Commitment Letter**") from the Dormitory Authority of the State of New York; and (b) the Debtor's proposed DIP Budget.

2.      On August 2, 2013, the Debtor filed the first supplement to the Motion [Docket No. 606], which attached a copy of the then-current version of the Debtor's proposed Closure Plan.  Since then, based on the ongoing dialogue between IMC and the New York State Department of Health (the "**DOH**"), subsequent changes were made to the Closure Plan.  Consequently, on August 12, 2013, an updated version of the Closure Plan was submitted to DOH.  The updated Closure Plan is annexed hereto as Exhibit 3.  A redline of the updated Closure Plan showing changes from the version filed on August 2, 2013 is attached hereto as Exhibit 4.

Dated:  August 12, 2013

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Alan J. Lipkin
       Alan J. Lipkin
       Shaunna D. Jones
       Anna C. Burns
       787 Seventh Avenue
       New York, New York 10019
       Tel:  (212) 728-8000
       Fax:  (212) 728-8111

*Attorneys for the Debtor and Debtor in Possession*

## <u>EXHIBIT 1</u>

**DIP Commitment Letter**

 | WE FINANCE, BUILD AND DELIVER.

Alfonso L. Carney, Jr., Cha
Paul T. Williams, Jr., Preside

August 12, 2013

Interfaith Medical Center
1545 Atlantic Avenue
Brooklyn, New York 11213
Attention: Robert Mariani

Re:    $15,000,000 Senior Secured Priming Superpriority
       <u>DIP Facility Commitment Letter</u>

Dear Mr. Mariani:

      Interfaith Medical Center, Inc. (the "<u>Borrower</u>") is requesting a loan from the Dormitory Authority of the State of New York ("<u>DASNY</u>") in connection with its bankruptcy case (the "<u>Bankruptcy Case</u>") pending in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>").  DASNY hereby advises you of their commitment (the "<u>Commitment</u>") to provide the Borrower with a senior secured, priming, and superpriority multiple draw term credit facility of $15,000,000 (the "<u>DIP Facility</u>") on the terms and subject to the conditions described in this letter agreement (together with all exhibits hereto, the "<u>Commitment Letter</u>") and in the Outline of Terms and Conditions for Senior Secured Priming Superpriority DIP Facility in the Aggregate Amount of $15,000,000 annexed hereto as Exhibit "<u>A</u>" (the "<u>Outline of Terms and Conditions</u>").  The Commitment is subject to, among other things, the Borrower fulfilling its obligations set forth in the Outline of Terms and Conditions, including, without limitation, (a) the Borrower ceasing business and healthcare operations and promptly implementing a closure plan (the "<u>Closure Plan</u>") pursuant to the regulations of the New York State Department of Health ("<u>DOH</u>") and related healthcare agencies, and (b) the negotiation, execution and delivery of all loan documents (including, without limitation, the form of court order approving the DIP Facility).

      The entering into of definitive documentation for and the satisfaction of the conditions precedent to the closing of the DIP Facility, the closing of the DIP Facility and all transactions related to the DIP Facility are hereinafter collectively referred to as the "<u>DIP Transaction</u>".  All terms not defined in this Commitment Letter shall have the meanings ascribed to them in the Outline of Terms and Conditions.

      The Borrower hereby represents, warrants and covenants that (a) all information which has been or is hereafter made available to DASNY in connection with any aspect of the DIP Transaction (the "<u>Information</u>") is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading, and (b) all financial

**CORPORATE HEADQUARTERS**

515 Broadway
Albany, New York 12207-2964

T  518.257.3000
F  518.257.3100

**NEW YORK OFFICE**

One Penn Plaza, 52nd Floor
New York, New York 10119-0098

T  212.273.5000
F  212.273.5121

**BUFFALO OFFICE**

539 Franklin Street
Buffalo, New York 14202-1109

T  716.884.9780
F  716.884.9787

www.dasny.org

**D A S N Y** | WE FINANCE, BUILD AND DELIVER.

DORMITORY AUTHORITY STATE OF NEW YORK

projections concerning the Borrower that have been or are hereafter made available to DASNY or any of its representatives or advisors (or on behalf of any of the aforementioned parties) (the "Projections") have been or will be prepared in good faith based upon assumptions believed to be reasonable. The Borrower agrees to furnish to DASNY such Information and Projections as DASNY may reasonably request, and to supplement such Information and the Projections from time to time until the Closing Date so that the representations, warranties and covenants in the immediately preceding sentence are true and correct on the Closing Date. In issuing this commitment, DASNY is and will be using and relying on the Information and the Projections without independent verification thereof.

By executing this Commitment Letter, the Borrower agrees to reimburse DASNY from time to time on demand for all reasonable out-of-pocket fees and expenses (including, without limitation, the reasonable fees, disbursements and other charges of Winston & Strawn LLP, as counsel to DASNY, and all reasonable due diligence expenses) incurred in connection with the DIP Transaction, the preparation of the definitive documentation for the DIP Facility and the other transactions contemplated hereby.

Subject to Bankruptcy Court approval, the Borrower agrees (a) to indemnify and hold harmless DASNY, its successors and assigns, and each of its officers, directors, employees, agents, advisors and other representatives (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) any aspect of the DIP Transaction or (ii) the DIP Facility and any other financings, or any use made or proposed to be made with the proceeds thereof, except, in each case, to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct, and (b) to reimburse each Indemnified Party, within five (5) business days of demand, for all reasonable out-of-pocket expenses (including, without limitation, due diligence expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the DIP Transaction and any related transactions (including, without limitation, preparation of this Commitment Letter and the definitive financing documentation for the DIP Facility) or the amendment, modification or waiver thereof. In the case of any investigation, litigation or proceeding to which the indemnity in clause (a) of this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, any of their respective equity holders or creditors or any Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not any aspect of the DIP Transaction is consummated. The Borrower also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Borrower or to any of its respective equity holders or creditors arising out of, related to or in connection with (x) any aspect of the DIP Transaction, except for direct, as opposed to indirect, consequential (including, without limitation, any loss of profits, business or anticipated savings), special or punitive,

damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct, or (y) the use by others of information or other materials obtained through the internet, electronic, telecommunications or other similar information systems in connection with any aspect of the DIP Transaction.

All payments made by the Borrower hereunder shall be made free and clear of any set-off, withholding, claims or applicable taxes and shall be made in U.S. dollars (unless otherwise specified).

Except for assignment to a chapter 7 trustee as provided herein, this Commitment Letter shall not be assignable by the Borrower without the prior written consent of DASNY (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Parties. This Commitment Letter may not be amended or waived except by an instrument in writing signed by the Borrower and DASNY. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. The Borrower and DASNY each hereby irrevocably waive all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including, without limitation, the Outline of Terms and Conditions), the DIP Transaction and the other transactions contemplated hereby and thereby or the actions of DASNY in the negotiation, performance or enforcement hereof.

DASNY hereby notifies the Borrower that, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law on October 26, 2001)) (the "Act"), DASNY may be required to obtain, verify and record information that identifies the Borrower. This notice is given in accordance with the requirements of the Act.

This Commitment Letter and the Outline of Terms and Conditions, embodies the entire agreement and understanding among DASNY and the Borrower with respect to the DIP Transaction and the DIP Facility, and supersedes all prior agreements and understandings, written or oral, relating to the specific matters addressed herein. However, please note that the terms and conditions of the Commitment are not limited to those set forth herein or in the Outline of Terms and Conditions that is incorporated herein. Those matters that are not covered or made clear herein or in the Outline of Terms and Conditions incorporated herein are subject to mutual agreement of the parties. No party has been authorized by DASNY to make any oral or written statements that are inconsistent with this Commitment Letter.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Outline of Terms and Conditions incorporated herein by returning to us



WE FINANCE, BUILD AND DELIVER.

Mr. Robert Mariani
August 12, 2013
Page 4

an executed counterpart hereof not later than 5:00 p.m., New York City time, on August 27, 2013. This offer will automatically expire at such time if we have not received such executed counterpart in accordance with the preceding sentence.

We are pleased to have the opportunity to work with you on this important financing.

DORMITORY AUTHORITY OF THE STATE OF NEW YORK

By:_____

Name: Portia Lee

Title: Managing Director Public Finance + Portfolio Monitoring

ACCEPTED AND AGREED TO THIS ___ DAY OF _____, 2013

INTERFAITH MEDICAL CENTER, INC.

By:_____

Name:

Title:



WE FINANCE, BUILD AND DELIVER.

Alfonso L. Carney, Jr., Cha
Paul T. Williams, Jr., Preside

## EXHIBIT A

## <u>Outline of Terms and Conditions</u>

**CORPORATE HEADQUARTERS**

515 Broadway
Albany, New York 12207-2964

T  518.257.3000
F  518.257.3100

**NEW YORK OFFICE**

One Penn Plaza, 52nd Floor
New York, New York 10119-0098

T  212.273.5000
F  212.273.5121

**BUFFALO OFFICE**

539 Franklin Street
Buffalo, New York 14202-1109

T  716.884.9780
F  716.884.9787

www.dasny.org

**Outline of Terms and Conditions
for Senior Secured Priming Superpriority
DIP Facility in the Aggregate Amount of Up to $15,000,000**

**August 12, 2013**

THIS OUTLINE OF TERMS AND CONDITIONS FOR A SENIOR SECURED PRIMING SUPERPRIORITY DIP FACILITY (THE "<u>DIP FACILITY</u>") IN THE AGGREGATE AMOUNT OF $15,000,000 IS NOT EXHAUSTIVE AS TO ALL TERMS AND CONDITIONS WHICH WOULD GOVERN ANY PROPOSED FINANCING.  THE ACTUAL TERMS AND CONDITIONS UPON WHICH CREDIT MAY BE EXTENDED ARE SUBJECT TO SATISFACTORY COMPLETION OF DEFINITIVE DOCUMENTATION.

| | |
|---|---|
| Borrower: | Interfaith Medical Center, Inc., (the "<u>Borrower</u>") pursuant to a contemplated Debtor-In-Possession Credit Agreement, (as may be amended or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>," and together with the other agreements, documents, notes and instruments in respect thereof contemplated by this Term Sheet, the "<u>DIP Loan Documents</u>"), including any order of the Bankruptcy Court approving the DIP Facility on an interim basis (the "<u>Interim DIP Order</u>"), and any order of the Bankruptcy Court approving the DIP Facility on a final basis (the "<u>Final DIP Order</u>," and together with the Interim DIP Order, collectively, the "<u>DIP Order</u>"). |
| DIP Lender: | Dormitory Authority of the State of New York. |
| Prepetition Lender and Prepetition Loan Documents: | As defined in the Eighth Interim Cash Collateral Order (the "<u>Cash Collateral Order</u>") entered by the Bankruptcy Court.  Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the Cash Collateral Order |
| Maximum Amount: | $15 million in multiple draws pursuant to requests by the Borrower. |
| DIP Transaction: | This Outline of Terms and Conditions (this "<u>Outline</u>") sets forth the proposed structure and terms of the DIP Facility in the bankruptcy case (the "<u>Bankruptcy Case</u>") commenced by the Borrower in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>") in exchange for senior secured, priming and superpriority liens and claims (collectively "<u>DIP Liens</u>"). <br><br> The DIP Transaction is as follows: <br><br>     (a) Up to 25% of the DIP Facility (i.e., $3.75 million) shall be available for borrowing prior to confirmation, remainder |

to be drawn upon the earlier of (a) December 31, 2013 or (b) confirmation of a chapter 11 plan.

(b) The Borrower will fully implement the Closure Plan.

(c) The Borrower will confirm a plan of reorganization (the "Plan") on or before December 31, 2013, unless the DIP Lender agrees in writing in its sole discretion to extend that deadline (the "DIP Transaction Deadline").

(d) If the Plan is not confirmed by the DIP Transaction Deadline, the DIP Transaction will nevertheless be consummated as set forth below, except that the DIP Lender shall retain a $50 million secured prepetition claim and a postpetition claim for (i) any amounts borrowed on DIP Facility and (ii) pursuant to the Cash Collateral/DIP Order.

(e) On the DIP Transaction Deadline, the DIP Lender (and/or a subsidiary of the DIP Lender and/or another party or parties designated by the DIP Lender) will receive (i) all Borrower owned real property, or, at the DIP Lender's option, designation rights ("Designation Rights") for all Borrower owned real property; (ii) Designation Rights or assignment of all real property leases and executory contracts (related cure costs for any such assignments to be resolved between the DIP Lender and Borrower); (iii) Designation Rights or transfer of all clinic operations and assets; (iv) Designation Rights or transfer of all inventory, furniture, fixtures, and equipment needed for clinic operations, real property and leases; and (v) $5 million of cash (primarily to pay for maintenance and disposition of assets transferred to the DIP Lender or as otherwise determined in the DIP Lender's sole discretion); provided, however, that if the DIP Transaction occurs after the DIP Transaction Deadline, then such amount shall be reduced by an amount agreed upon by the DIP Lender and the Borrower to reflect the post-December 31, 2013 carrying costs borne by the Borrower for the assets to be transferred to the DIP Lender under this paragraph.

(f) On the DIP Transaction Deadline, the Borrower will receive the remaining estate assets free and clear of any of the DIP/Prepetition Lender's liens, including, without limitation, the following; (i) remaining cash on hand; (ii) accounts receivable; (iii) grant receivables; (iv) restricted cash; (v) any rights concerning the I M

| | |
|---|---|
| | Foundation; (vi) any interests in HealthFirst; (vii) inventory, furniture, fixtures, and equipment not designated by the DIP Lender; and (viii) Avoidance Actions and Avoidance Action Proceeds and other causes of action. |
| | (g) If Borrower does not otherwise have sufficient cash to pay the DIP Lender the $5 million on the DIP Transaction Deadline, then that amount would be paid from the DIP loan proceeds and/or from monetization of certain of the Borrower's assets set forth in (f) above, with the exact procedure to be agreed upon. |
| | (h) In connection with the DIP Transaction, the DIP/Prepetition Lender and the Borrower will each receive a mutual release from all claims except for enforcement of this agreement (including, for the avoidance of doubt, any claims by the DIP Lender for repayment of the DIP Facility except as set forth herein). If the Plan is confirmed, these releases will also be incorporated into the Plan. |
| | (i) After the DIP Transaction Deadline, the Borrower would continue to be able to have use of and access to space in the hospital for records storage and administrative purposes until December 31, 2014: provided, however, that after reasonable notice, the DIP Lender would be able to move or evict the Borrower from such space if the DIP Lender is able to dispose of the relevant property or negotiate a new use that precludes Borrower from continuing to use and such space. |
| | (j) The DIP Loan Documents will be binding on a subsequent chapter 7 trustee for Borrower in the event the case is converted to chapter 7. |
| Maturity Date: | The date that is the earliest of the following: (a) December 31, 2013; (b) the earlier of (i) the date upon which any Interim DIP Order expires or (ii) thirty-five (35) days after the entry of any Interim DIP Order, if the Final DIP Order has not been entered prior to the expiration of such period, which period can be extended by mutual written agreement of the Borrower and DIP Lender; (iii) the closing of sales or other transactions for disposing all or substantially all of the assets of the Borrower; (c) the date of indefeasible prepayment in cash in full by the Borrower of all obligations under the DIP Facility in accordance with the terms hereof and thereof; (d) upon acceleration of the |

| | |
|---|---|
| | DIP Facility (e) the consummation of a plan of reorganization; or (f) consummation of the DIP Transaction; <u>provided</u>, <u>however</u>, the DIP Lender may extend such date in its sole discretion. |
| DIP Budget: | A rolling, weekly budget, in form and substance satisfactory to the DIP Lender (with such supporting detail as the DIP Lender or its financial advisors, if any, may reasonably request), shall be provided to the DIP Lender prior to the any funding of the DIP Facility.    Upon the completion of each weekly period, the Borrower shall deliver on the fourth business day of each week a variance analysis, which shall be in a form reasonably acceptable to the DIP Lender, with respect to all items from the most recently completed weekly period.  Other reports and terms with respect to the DIP Budget shall be similar to those required pursuant to the Cash Collateral Order and usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender. |
| Security: | Excluding those same items not subject to the Adequate Protection Liens of the Prepetition Lender in the Cash Collateral Order, priming liens under, as applicable, section 364(d) of the Bankruptcy Code on (i) all assets of the Borrower, including assets that are subject to liens granted pursuant to the Prepetition Secured Loan Documents; (ii) junior liens granted pursuant to section 364(c)(3) of the Bankruptcy Code; and (iii) liens on all unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code (collectively, the "<u>DIP Liens</u>," and all collateral subject to such DIP Liens, the "<u>DIP Collateral</u>.")<br><br>Excluding those same items not subject to the Superpriority Claim of the Prepetition Lender in the Cash Collateral Order Pursuant to section 364(c)(1) of the Bankruptcy Code, DIP Obligations shall be entitled to allowed superpriority expense claim status in the Chapter 11 Cases (the "<u>DIP Superpriority Claim</u>") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code. |
| Interest Rate: | 1% per annum.  Calculation of interest shall be computed on the basis of a year of 360 days, consisting of twelve months of 30 days each, calculated from and including the date of such Borrowing to but excluding the date of repayment thereof, and interest shall be payable quarterly in arrears. |
| Default Interest: | During the continuance of an Event of Default, principal, interest, fees and all other amounts due under the DIP Facility will bear |

| | |
|---|---|
| | interest at a rate that is 200 basis points per annum greater than the rate otherwise applicable to the DIP Facility at such time. |
| Fees: | None. |
| Affirmative and Negative Covenants, and Representations and Warranties: | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender. |
| Conditions Precedent to all Drawings: | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including as follows:<br><br>All drawings under the DIP Facility shall be subject to the following conditions precedent (in addition to the conditions precedent set forth below under "Conditions Precedent to Initial Drawings" in the case of the initial drawing): (a) delivery of a notice of borrowing to the DIP Lender; (b) truth of representations and warranties in all material respects; (c) no default or event of default shall have occurred and be continuing; (d) the aggregate outstanding amount of the loans shall not exceed the amount authorized by the DIP Order in effect at such time; (e) the Interim DIP Order (in the case of an initial drawing under the DIP Facility prior to entry of the Final DIP Order) or the Final DIP Order (in the case of all other drawings) shall have been entered and (i) shall not have been vacated, stayed, reversed, modified or amended without the DIP Lender's consent, (ii) shall otherwise be in full force and effect and (iii) shall not be the subject of a timely appeal or a stay pending appeal; and (f) in the case of any drawing after the initial drawing, such drawing shall not be made until the earlier of (i) the Maturity Date and (ii) the date on which a plan of reorganization acceptable to the DIP Lender shall have been confirmed. |
| Conditions Precedent to Initial Drawing: | The conditions precedent to the initial funding of the DIP Facility are those set forth under "Conditions Precedent to All Drawings" above and the following:<br><br>(a) payment of fees and expenses as required hereby; (b) delivery of a customary secretary's certificate with customary attachments; (c) delivery of a customary officer's certificate; (d) execution and delivery of the DIP Credit Agreement and related DIP Loan Documents in form and substance satisfactory to the DIP Lender and the Borrower; (e) delivery of customary insurance certificates; (f) grant and perfection of security interests as set forth under "Security" above; (g) delivery of reports, documents and agreements reasonably requested by the DIP Lender |

| | |
|---|---|
| | customarily delivered in connection with security interests in real property assets; (h) delivery of historical financial statements; (i) receipt of any necessary governmental or third party consents and approvals; (j) absence of threatened or pending litigation, governmental, administrative or judicial action that could, if successful, reasonably be expected to restrain, prevent or impose materially burdensome conditions on the transactions contemplated hereby;  (k) upon request of the DIP Lender, delivery of a HIPAA Business Associate Agreement satisfactory to the DIP Lender; (l) delivery of a satisfactory DIP Budget; and (m) all legal matters incident to the DIP Credit Agreement, the DIP Facility and the related loan documents shall be satisfactory to the DIP Lender. |
| **Financial Covenants:** | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order. |
| **Voluntary and Mandatory Prepayments:** | Usual and customary for facilities of this nature, and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order as follows:<br><br>Subject to the release of such claims in connection with the DIP Transaction, the principal amount of the DIP Facility shall be due and payable, with accrued interest, on the Maturity Date.  The Borrower may prepay the DIP Facility in whole or in part at any time without premium or penalty.  In addition, the net cash proceeds of any asset sale outside of the ordinary course of business for cash consideration in excess of $1,000,000, any recovery event in excess of $250,000 and any extraordinary receipt in excess of $1,000,000 shall be segregated into an account for the benefit of the DIP Lender and, at the written direction of the DIP Lender, subject to the release of such claims in connection with the DIP Transaction, applied to reduce the amount outstanding under the DIP Facility (with a corresponding reduction in the commitments thereunder) and the obligations under the Prepetition Secured Loan Documents. |
| **Events of Default:** | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order. |
| **Other Conditions:** | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order. |

| Adequate Protection for Prepetition Lender: | As set forth in the Cash Collateral Order. |
|---|---|
| Remedies: | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order. |
| Expenses and Indemnification: | Usual and customary for facilities of this nature and others to be reasonably specified by the DIP Lender, including those set forth in the Cash Collateral Order. |
| Governing Law and Forum: | New York, except as governed by the Bankruptcy Code. |

## **EXHIBIT 2**

**Proposed DIP Budget**

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**


These Projections (as defined below) were prepared by Interfaith Medical Center, Inc.'s (the "Hospital" or the "Debtor") management, with the assistance of CohnReznick, the Hospital's financial advisor.  The Projections present to the best of the Debtor's management's knowledge, information and belief, the expected cash flows of the Hospital for the period August 31, 2013 through June 30, 2014. Accordingly, these Projections, including the assumptions thereto, reflect Management's reasonable judgment and estimation as of the date of this Closure Plan, of expected future cash requirements arising from closure and business decisions, which are subject to change. The assumptions disclosed herein are those the Hospital believes are significant to the Projections.


**THE DEBTOR CAUTIONS THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION CONTAINED HEREIN (THE "PROJECTIONS") OR THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. ALTHOUGH THE DEBTOR AND ITS ADVISORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES, NO ASSURANCE CAN BE GIVEN THAT THE ASSUMPTIONS WILL PROVE TO BE ACCURATE. MANY OF THE ASSUMPTIONS UPON WHICH THESE PROJECTIONS ARE BASED ARE NOT DIRECTLY DERIVED FROM HISTORICAL RESULTS AND ARE SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES. IT IS LIKELY THAT SOME ASSUMPTIONS WILL NOT MATERIALIZE BECAUSE OF UNANTICIPATED EVENTS AND CIRCUMSTANCES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD ARE LIKELY TO VARY FROM THE PROJECTED RESULTS. THOSE VARIATIONS MIGHT BE MATERIAL AND ADVERSE.**


**THE FOLLOWING ARE SOME OF THE SIGNIFICANT RISKS ASSOCIATED WITH THE ASSUMPTIONS OUTLINED BELOW: (1) THERE WILL BE A CLOSURE DELAY IF THE DEBTOR IS UNABLE TO FIND APPROPRIATE FACILITIES FOR ITS BEHAVIORAL HEALTH PATIENTS IN A TIMELY MANNER, (2) THERE WILL BE A CLOSURE DELAY IF THE DEBTOR IS UNABLE TO TRANSFER HIGH RISK PATIENTS IN A TIMELY MANNER, (3) THIRD PARTY PAYORS MIGHT SETOFF, RESULTING IN DECREASED ACCOUNTS RECEIVABLE COLLECTIONS, (4) COLLECTION OF PATIENT REVENUES DURING THE CLOSURE PERIOD WILL BE SUBJECT TO INCREASED UNCERTAINTY, (5) VARIABLE AND FIXED COSTS REDUCTIONS MIGHT NOT BE MANAGED EFFECTIVELY DURING THE CLOSURE PERIOD, AND (6) A CHAPTER 11 PLAN MIGHT NOT BE CONFIRMED AND CONSUMMATED BY DECEMBER 31, 2013 AND JUNE 30, 2014, RESPECTIVELY.**

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**

**General**

1)  The Projections assume the Hospital continues to operate in the ordinary course through August 30, 2013 and the Closure Plan commences on August 31, 2013. (Such commencement might start a few days earlier if the Bankruptcy Court grants the closure motion currently set for hearing on August 26, 2013.)

2)  The notes detailed below describe the assumptions utilized in the closure of hospital operations. The Projections assume the Debtor will cease admitting patients starting August 31, 2013, and complete the wind-down of inpatient services by September 30, 2013. Outpatient services are projected to begin winding down August 31st and are assumed to be completely wound down by November 30, 2013. Specifically, outpatient services related to Psych services are assumed to be closed within 60 days and all other outpatient services (ER, Rehab, Detox and HIV clinics) are assumed to be closed within 90 days. Based on recent length of stay statistics, the Projections assume inpatient census and its associated revenue decreases during the 30 day closure period of 40% in week 1 after commencement of the closure, an additional 35% in week 2 after commencement of the closure and the balance by Day 30 after commencement of the closure.

3)  The Projections assume that by July 31, 2013, the Debtor will inform its employees of the closure, commencing the notice period for WARN Act and applicable state law purposes. In fact, such notices were sent on July 30, 2013.

4)  The Projections assume all leased property is vacated by the Debtor by December 31, 2013. For the period January 1, 2014 through June 30, 2014, the projections assume the Debtor will have free use of a portion of the hospital building for records storage and administrative office space.

5)  The Projections assume confirmation and consummation of a Chapter 11 Plan by December 31, 2013 and June 30, 2014, respectively.

6)  The Projections assume that other than payroll and utilities, all expenses will be paid with COD terms. In addition, for contract vendors with stated contractual terms, it is assumed the Debtor has already taken advantage of such terms, resulting in immediate payments as services are rendered in the future.

7)  The Projections calculate revenues based on historical revenue per patient day by service line. As the census and visits decline, the revenues decline accordingly. Following is the historical revenue per patient day by service line:

| Inpatient | | | Outpatient | | |
|---|---|---|---|---|---|
| Med Surg | $ | 2,482 | Medical Clinic | $ | 172 |
| Ped | | 2,632 | Ref Amb | | 95 |
| Psych | | 783 | Behavioral Health Clinic | | 113 |
| Detox | | 710 | ER | | 285 |
| Rehab | | 568 | Amb Surg | | 1,031 |
| | | | Dental | | 180 |

Above revenue information per day includes the CMS passthrough for GME.

8)  Variable costs are projected based on actual historical costs per patient day. As the census declines, the associated variable costs decline accordingly. In addition, timing of payroll cost reductions are assumed to be lagged to the corresponding 1 week of revenue decline. Following is the variable cost per patient day by service line:

| | **Med/Surg** | **Peds** | **Psych** | **Detox** | **Rehab** | **Medical** | **Ref Amb** | **Behavior** | **ER** | **Amb** | **Dental** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll and benefits | $ 1,886 | $ 736 | $ 601 | $ 486 | $ 479 | $ 145 | $ - | $ 134 | $ 462 | $ 277 | $ 295 |
| Physicians and temp. help | 41 | 66 | 20 | 11 | 12 | 0 | - | 0 | 8 | - | - |
| Medical supplies | 179 | 72 | 24 | 29 | 20 | 3 | - | 4 | 28 | 36 | 12 |

9)  Fixed costs such as purchased services (excluding patient account collections and food service, see assumption number 20 below), building rent, insurance, utilities and other costs are projected to decline as the closure plan is implemented. The Projections assume the Debtor maintains its property, liability and umbrella insurance policies through December 31, 2013.

10)  Grant revenue is assumed to cease immediately upon the commencement of the closure process (Day 1).

11)  The Projections assume severance and vacation pay accruals are paid during the closure period and at Plan consummation (See assumption number 16 below) . Any WARN and other accrued employee related liabilities are assumed to be paid pursuant to a Chapter 11 Plan and are reflected in the Projections as Chapter 11 exit costs paid upon consummation of a Chapter 11 Plan.

12)  Certain personnel (administrative, medical records and accounting) are assumed to enter into consulting agreements with the Debtor at an aggregate cost of $165K per month through December 31, 2013, with such consulting arrangements to continue for the period January 1, 2014 through June 30, 2014, but at reduced levels.

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**

**Cash Flow**

13) Patient receipts excluding PIP are projected as follows:

    A)   Medicaid revenues are assumed to be collected through the period of Plan consummation.
    B)   Medicare, commercial insurance and self-pay, net of reserves, are assumed to be collected and in full by Plan consummation.
    C)   **THE PROJECTIONS ASSUME THIRD PARTY PAYORS DO NOT APPLY THEIR RECOUPMENT RIGHTS AGAINST PAYMENTS.**

14) PIP and PIP recoupments are projected to continue through Day 45 of the commencement of the implementation of the Closure Plan.

15) Grant receipts for current programs are assumed to cease at the commencement of the closure. However, grant receivables for completed programs are assumed to be collected over time, aggregating approximately $1 million.

16) Salaries and benefits decrease in direct relation to the declining census, during the closure period. $1.6 million of PTO is assumed to be paid on the employee termination dates. $1 million of severance is assumed to be paid during the closure period, with the remaining $4 million to be paid as part of Chapter 11 exit costs to the extent required by applicable agreement or policies. $2.3 million of vacation liabilities is assumed to be paid during the closure period with the remaining $2.5 million to be paid as part of the Chapter 11 exit costs to the extent required by applicable agreements or policies. Certain personnel related to wind-down and administrative functions are assumed to be retained by the Debtor as independent contractors, at an aggregate cost of approximately $165K per month through December 31, 2013 and thereafter at reduced levels.

17) The Debtor, with the assistance of its professionals, reviewed recent Court filings relating to document retention costs in other hospital closures. Total costs ranged from approximately $400K to $1.5 million. The Projections assume document retention costs will be $1 million, paid in October 2013. The Hospital is awaiting bids from potential vendors to manage the medical records process post closure.

18) Temporary labor and medical supplies decrease in direct relation to the declining census.

19) Other expenses include building and equipment rent, repairs and maintenance, and patient transportation. Following are the assumptions associated with these expenditures:

    Building rent of $110K per month and lease of the East Building of $25K per month are assumed to be paid through December 31, 2013.

    Repairs and maintenance expenditures are assumed to decline by 75% by Day 30 and remain at that level (approximately $10K per month) until December 31, 2013.

    Patient Transportation of $300K is projected to be incurred in months one and two during closure to transport patients to other facilities.

20) Purchased services include patient account collections, consulting and service contracts, food service, mental health clinic and quality assurance global communications and security. Following are the assumptions associated with these expenses:

    Patient accounts collections is projected to decline in direct relation to patient revenues.
    Consulting and service contracts are projected to decline by 75% by Day 60 and an additional 25% by Day 90.
    Food services (Sodexho) expenditures decline in direct relation to patient census.
    Mental health clinic expenses are assumed to be eliminated by the end of Day 60 of the Closure Plan as outpatient operations are assumed to be wound down.
    Security expenses decline by 75% by Day 60 (from $350K per month to $90K), and remains at that level ($90K per month) through confirmation.

21) Utilities are projected to decline by 50% by Day 60 (from $300K per month to $150K) another 50% by Day 90, and remain at that level until the building is vacated (December 31, 2013).

22) Insurance expenditures are projected at $4K per month through December 31, 2013, in line with an insurance schedule received from the Debtor's insurance broker. The projections assume the Debtor maintains it insurance coverage for property, liability, umbrella and other insurance coverages through December 31, 2013.

23) The projections assume there are no capital expenditures during the closure period.

24) The projections assume restructuring fees are paid to professionals or funded to the professional fee escrow account as in the Debtor's Court approved Cash Collateral Budgets through December 31, 2013. The Projections reflect professional fee estimates from the respective professionals for illustrative purposes. Professional fees post confirmation are estimated primarily for administrative and priority claims resolution work.

25) The projections assume $300K in KERP payments is disbursed to employees at consummation. Accordingly, the KERP payments are reflected as part of the Chapter 11 exit costs.

26) WARN Act penalties, if any, are projected to be paid in pursuant to and upon consummation of a Chapter 11 Plan.

**Interfaith Medical Center, Inc.**
**Weekly Cash Flow Projections**

($ in thousands)

| Week Ending | 9/6/13 | 9/13/13 | 9/20/13 | 9/27/13 | 10/4/13 | 10/11/13 | 10/18/13 | 10/25/13 | 11/1/13 | 11/8/13 | 11/15/13 | 11/22/13 | 11/29/13 | 12/6/13 | 12/13/13 | 12/20/13 | 12/27/13 | 1/3/14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | | | | |
| Medicaid Receipts | $1,038 | $1,038 | $1,038 | $1,038 | $701 | $701 | $501 | $501 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $7,069 |
| Other patient receipts | 932 | 1,152 | 1,152 | 2,009 | 880 | 880 | 880 | 1,109 | 193 | 193 | 193 | 193 | 370 | 177 | 177 | 177 | 137 | 137 | 10,940 |
| Total Patient receipts (excl. PIP) | 1,970 | 2,190 | 2,190 | 3,047 | 1,580 | 1,580 | 1,380 | 1,610 | 245 | 245 | 245 | 245 | 422 | 228 | 228 | 228 | 188 | 188 | 18,009 |
| PIP | 1,270 | 0 | 1,270 | 0 | 1,270 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,810 |
| Less: PIP recoupments | 0 | 0 | 0 | 0 | -330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -330 |
| Grants | 0 | 0 | 0 | 0 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 777 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Cash Receipts** | 3,240 | 2,190 | 3,460 | 3,047 | 2,576 | 1,636 | 1,436 | 1,665 | 300 | 300 | 300 | 300 | 478 | 284 | 284 | 284 | 244 | 244 | 22,266 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | |
| Salaries and taxes | 1,883 | 1,832 | 1,103 | 1,240 | 528 | 430 | 219 | 292 | 177 | 170 | 155 | 168 | 36 | 36 | 36 | 36 | 36 | 36 | 8,415 |
| PTO | 0 | 0 | 1,192 | 718 | 807 | 343 | 280 | 143 | 190 | 115 | 111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,900 |
| Union benefits | 1,500 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 705 | 0 | 0 | 0 | 233 | 0 | 0 | 0 | 0 | 0 | 3,938 |
| Other benefits - unemployment | 0 | 105 | 0 | 0 | 0 | 102 | 0 | 0 | 0 | 0 | 105 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 312 |
| Other benefits - other | 0 | 208 | 0 | 0 | 0 | 181 | 0 | 0 | 0 | 0 | 70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 460 |
| Document retention | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 |
| Temporary labor | 18 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 |
| Medical supplies | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50 |
| Building Maintenance | 6 | 6 | 6 | 6 | 5 | 5 | 5 | 5 | 5 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 62 |
| Other | 234 | 74 | 74 | 74 | 157 | 13 | 13 | 13 | 150 | 4 | 4 | 4 | 4 | 29 | 4 | 4 | 4 | 4 | 866 |
| Purchased services - security | 70 | 70 | 70 | 70 | 70 | 70 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 637 |
| Purchased services - other | 194 | 194 | 194 | 194 | 107 | 107 | 89 | 71 | 53 | 7 | 7 | 7 | 7 | 2 | 2 | 2 | 2 | 2 | 1,240 |
| Utilities | 0 | 0 | 315 | 0 | 0 | 0 | 179 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 651 |
| Insurance | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 15 |
| Physicians | 19 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 |
| Capital expenditures | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Operating Disbursements** | 3,928 | 2,526 | 3,004 | 2,302 | 4,174 | 1,255 | 803 | 542 | 1,299 | 319 | 550 | 199 | 300 | 91 | 141 | 62 | 62 | 62 | 21,619 |
| **Cash Flow from Operations** | **-688** | **-336** | **456** | **745** | **-1,598** | **381** | **633** | **1,124** | **-999** | **-19** | **-250** | **101** | **178** | **193** | **143** | **222** | **182** | **182** | **647** |
| Restructuring fees * | 206 | 206 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 164 | 164 | 164 | 164 | 164 | 3,130 |
| **Net Cash Flow** | -893 | -542 | 283 | 572 | -1,771 | 209 | 460 | 951 | -1,171 | -192 | -423 | -72 | 5 | 29 | -21 | 58 | 18 | 18 | -2,482 |
| Cash, beginning | 3,599 | 2,706 | 2,164 | 2,447 | 3,019 | 1,248 | 1,457 | 1,917 | 2,868 | 1,697 | 1,505 | 1,082 | 1,011 | 1,016 | 1,045 | 1,024 | 1,082 | 1,100 | 3,599 |
| **Cash, ending before proposed DIP loan** | $2,706 | $2,164 | $2,447 | $3,019 | $1,248 | $1,457 | $1,917 | $2,868 | $1,697 | $1,505 | $1,082 | $1,011 | $1,016 | $1,045 | $1,024 | $1,082 | $1,100 | $1,118 | $1,118 |
| Proposed DIP loan | | | | | | | | | | | | | | | | | | 15,000 | 15,000 |
| **Cash Ending** | | | | | | | | | | | | | | | | | | $16,118 | $16,118 |

* Represents monies paid into a professional fee escrow account, which will only be disbursed to professionals pursuant to the Interim Compensation Order or other applicable Court Order.

**INTERFAITH MEDICAL CENTER**
**MONTHLY CASH FLOW**
**January 1, 2014 through June 30, 2014 (Post Confirmation Through Plan Consummation)**

*($ in thousands)*

| | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|
| | | | | 2014 | | | |
| **Cash Receipts:** | | | | | | | |
| Accounts receivable | $699 | $893 | $699 | $699 | $893 | $699 | $4,584 |
| Grants receivable | 0 | 0 | 0 | 0 | 0 | 284 | $284 |
| Health First pools | 1,600 | 0 | 0 | 0 | 0 | 0 | 1,600 |
| Health First membership interests **(A)** | 0 | 0 | 0 | 0 | 0 | 11,000 | 11,000 |
| Net proceeds from sale of equipment **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| Avoidance actions **(C)** | 0 | 0 | 0 | 0 | 0 | 1,540 | 1,540 |
| IM Foundation **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| Release of restricted funds **(D)** | 0 | 0 | 0 | 0 | 0 | 1,109 | 1,109 |
| Miscellaneous assets **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| **Total Cash Receipts** | 2,299 | 893 | 699 | 699 | 893 | 14,633 | 20,117 |
| **Cash Disbursements:** | | | | | | | |
| Salaries and taxes | 163 | 163 | 163 | 130 | 104 | 83 | 807 |
| Other | 10 | 10 | 10 | 10 | 10 | 10 | 60 |
| **Total Operating Disbursements (E)** | 173 | 173 | 173 | 140 | 114 | 93 | 867 |
| **Cash Flow from Operations** | 2,126 | 720 | 526 | 559 | 779 | 14,539 | 19,250 |
| Restructuring fees | 345 | 345 | 375 | 345 | 345 | 375 | 2,130 |
| **Net Cash Flow** | 1,781 | 375 | 151 | 214 | 434 | 14,164 | 17,120 |
| Cash, beginning | 16,118 | 17,899 | 18,274 | 18,425 | 18,639 | 19,073 | 16,118 |
| Cash, available to fund Administrative and Priority Claims **(F)** | $17,899 | $18,274 | $18,425 | $18,639 | $19,073 | $33,237 | $33,237 |

**(A)** The receipt included for the price to be paid for the Health First stock is based on the purchase price formula in the Second Amended and Restated Operating Agreement of HF Management Services, LLC and does not reflect a discount for the fact that the purchase price formula provides for payment over time. In addition, the listed amount of receipts includes IMC's retained capital in Health First. No assurance can be given that such retained value can be monetized in the near future.

**(B)** Assumes that the aggregate value (not the purpose) of any equipment that is not retained by DASNY, any contributions from the IM Foundation, and other miscellaneous assets would aggregate not less than the $5 million needed to pay DASNY pursuant to the DIP Loan Agreement Order.

**(C)** Net proceeds from avoidance actions are estimated at 10% of total payments, other than to professionals, made by IMC during the 90 days preceding IMC's petition date.

**(D)** Might require further legal analysis.

**(E)** Assumes free use of certain hospital space for record storage and offices.

**(F)** See schedule of Administrative and Priority Claims (page 6).

**INTERFAITH MEDICAL CENTER**

**SCHEDULE OF POTENTIAL RANGE OF ADMINISTRATIVE AND PRIORITY CLAIMS, SUBJECT TO REVISION**

*($ in thousands)*

|  | Low | High |  |
|---|---|---|---|
| Priority Claims | $3,500 | $14,600 | **A** |
| WARN | 0 | 22,000 | **B** |
| Severance | 4,093 | 4,093 | **C** |
| Accrued PTO | 2,457 | 2,457 | |
| KERP | 300 | 300 | |
| Accounts Payable | 3,950 | 3,950 | **D** |
| Accrued Expenses (Nursing, Medical Supplies, Purchased Services, Utilities, etc.) | 5,109 | 5,109 | **D** |
| Accrued Malpractice Claims (Post-Petition) | 0 | 2,200 | **E** |
| Due to IM Foundation (Post-Petition) | 0 | 0 | **F** |
| Pension Obligations (Post-Petition) | 2,798 | 2,798 | **G** |
| 503(b)(9) and Reclamation Claims | 500 | 500 | |
| Meditech Lease | 0 | 520 | |
| East Building Lease | 0 | 1,280 | **H** |
| NYS Unemployment Insurance Claims | 0 | 16,000 | **I** |
| | $22,708 | $75,808 | |

**A**   The estimated priority claims are based on the total amount in the claims register as of August 8, 2013 of $14.6 million except for duplicate and other obviously misfiled claims. Of the $14.6 million, claims relating to pensions aggregate approximately $13 million. Aggregate priority pension claims however, should be limited to at most $2.6 million, resulting from the statutory cap on priority claims for liabilities accrued during the 180 days preceding IMC's chapter 11 filing. The $900 balance of the low estimate (of $3,500) is for tax claims which are yet to be vetted.

**B**   No amount for potential WARN Act liability is included in the budget. IMC's maximum potential WARN Act liability is approximately $22 million. Nonetheless, IMC believes it should have no liability related to the WARN Act because under applicable law, no such liability exists if the hospital's closure is due to unforeseeable business circumstances, such as the government ordered closing that occurred for IMC, or due to the faltering business exception also applicable to WARN Act claims. Further, even if IMC had any WARN Act liability, the aggregate amount would be substantially reduced due to resignations of some employees and due to wages and benefits paid to IMC employees for working during any period of an asserted violation of the WARN notice requirement.

**C**   Severance includes 1 week's salary for each year employed, capped at 4 weeks. It does not include contractual severance liabilities.

**D**   Represents balance per IMC's books and records as of June 30, 2013.

**E**   Represents approximate actuarial computed post-petition liability, less $400 held in a restricted indemnity account. To date, no post-petition medical malpractice claims have been asserted against IMC. The $400 held in a restricted account is incremental to both the low and high claims estimates.

**F**   Although the IM Foundation might assert an administrative claim against IMC for $4.3 million based on an alleged post petition unsecured loan to IMC, no amount is included in the budget for any such liability. Due to a variety of factors, IMC does not expect that any such claim will be allowed. First, any such alleged loan liability to the IM Foundation could be recharacterized as a contribution to IMC. Second, the IM Foundation could be liable to IMC for an at least an equal amount based on an avoidance action. The IM Foundation, however, has neither been consulted on nor agreed to disallowance of any such claim.

**G**   Pension Obligations include amounts due during the post-petition period through July 31, 2013 (less the quarterly payment made in April 2013). This analysis assumes contract rejections as of July 31, 2013.

**H**   East Building lease expense assumes rejection (to the extent, if any, the applicable agreement is a lease) or termination of the "lease" effective December 31, 2013,with (x) the minimum payment $0 and based on the $25 per month paid pursuant to a stipulation and (y) the maximum based on post petition payments to that date accrued at the contractual rate, less the aggregate amounts already paid during the post petition period pursuant to the Court approved interim stipulation.

**I**   IMC's maximum theoretical liability for New York State unemployment related claims is approximately $16 million. That amount is unrealistic, however, because some IMC employees will resign rather than be laid off and most IMC employees are anticipated to be able to obtain new jobs immediately or soon after any such lay offs. IMC intends to seek a negotiated resolution of any unemployment insurance related claims.

## **EXHIBIT 3**

**Updated Closure Plan, Dated August 12, 2013**

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***



August __, 2013

<u>VIA FACSIMILE AND REGULAR MAIL</u>

Karen S. Westervelt
Deputy Commissioner
Office of Health Systems Management
NYS Department of Health
Corning Tower
Empire State Plaza
Albany, New York, 12237

   Re: <u>Interfaith Medical Center</u>

Dear Ms. Westervelt:

   The following is a draft of the Plan of Closure (the "<u>Closure Plan</u>") required by 10 NYCRR §401.3 for Interfaith Medical Center ("<u>IMC</u>") (Operating Certificate #7001046H).

   In summary, IMC's Emergency Department will go on permanent diversion status on [August 26, 2013]. IMC will cease accepting new inpatient admissions as of 12:01 a.m. on [August 26, 2013]. On [August 27, 2013] at 6 a.m., the Emergency Department will be transitioned to a "treat and release or transfer" site. All in-patients will be discharged or transferred by [September 26, 2013]; all outpatients will be discharged or transferred by [October 26, 2013]; and all HIV, detox and rehabilitation patients will be discharged or transferred by [November 25, 2013]. IMC will cease all operations as of [November 25, 2013] ("<u>closure date</u>"). IMC will use its best efforts to work closely with New York State Department of Health ("<u>NYS DOH</u>") and other applicable regulatory agencies to identify and make arrangements with alternative providers for the continuance of all outpatient programs operated by IMC or, if such arrangements can not be made, the transfer of each then-current outpatient to an alternative provider for ongoing care. Set forth below is a description of all elements of the Closure Plan. This Closure Plan is subject to approval by the NYS DOH and the United States Bankruptcy Court of the Eastern District of New York (the "<u>Bankruptcy Court</u>").

## I.  Introduction

On July 24, 2013 the Board of Trustees of IMC directed management to develop and implement a plan for the closure of its inpatient care facilities, and to provide for the identification of alternative providers for the continuance of its outpatient programs, and the transfer of its outpatients to alternative providers if such arrangements cannot be made. This decision was reached after concluding that we have exhausted all efforts to preserve IMC as an inpatient hospital and as a result of the directive set forth in that certain letter from Karen Westervelt,

Deputy Commissioner, Office of Primary Care and Health Systems Management, dated July 19, 2013. Without an approved reorganization plan and financing to maintain operations in bankruptcy, IMC expects changes may occur quickly as suppliers, staff, physicians, and others respond to initial communications regarding sale and closure of IMC. While IMC will comply with all Federal and State employee notification requirements, IMC needs to avoid any situation that might represent a threat to patient health and will seek to reduce in-patient census as quickly as safely manageable.

## II. IMC Overview

IMC's core business is anchored in Central Brooklyn. The Community of Central Brooklyn faces serious health care access issues. IMC is located in a primary medical care Health Professional Shortage Area as designated by the federal government. The shortage of primary care providers combined with the social problems that plague low income, high poverty communities have led to serious health status consequences for its residents.

The services provided by IMC are reflected on its operating certificate attached as **Exhibit A**. These services include a broad spectrum of inpatient services with 287 beds. IMC also has outpatient facilities including 3 clinics and 7 behavioral health sites.

The closure of IMC requires communication to employees, patients, families, providers, and the community at-large, transfer/removal of medical records, disposition of equipment, pharmaceuticals and inventory. In anticipation of the closing of IMC and in preparation for the transition of the community and patients to alternative delivery sites, IMC management is working with other area organizations and providers to plan for communication and transition. IMC is involving other stakeholders in the closure process, including:

- IMC Medical Staff
- IMC Employees
- Collective Bargaining Units, including 1199/SEIU, NYSNA, CIR, Federation of Union Doctors
- Governor Andrew Cuomo
- Mayor Michael Bloomberg
- U.S. Senator Charles Schumer
- Brooklyn Borough President, Marty Markowitz
- Congressman Hakeem Jeffries
- State Senator Velmanatte Montgomery
- Assemblywoman Annette Robinson
- Assemblyman Walter Mosley
- Councilman Albert Vann
- Local Fire, Police, and EMS Units
- NYC Office of Emergency Management
- Other Brooklyn-based health care providers
- NYC DOHMH
- NYS DOH
- ACGME

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

- NYS Office of Mental Health ("<u>OMH</u>")
- NYS Office of Alcoholism and Substance Abuse Services ("<u>OASAS</u>")
- The Joint Commission ("<u>TJC</u>")
- The Centers for Medicare and Medicaid Services ("<u>CMS</u>")
- NYS Attorney General's Office ("<u>NYS AG</u>")

## III.    Board of Trustees Authorization

The Board of Trustees of IMC voted to approve the closure of IMC's inpatient services, and to provide for the transfer of all outpatient programs to alternative providers to continue the operation of each such program, or, if an alternative provider cannot be found, to close such program and transfer each then-current patient to an alternative provider for ongoing services and to approve the submission of this Plan to DOH, at its meeting on July 24, 2013.

## IV.    Operating Certificates

A copy of IMC's Operating Certificate is attached as **<u>Exhibit A</u>**.

## V.    Services to Close or Transfer

A.    In-Patient Services at IMC.

B.    Outpatient Services/Hospital Extension Clinics.

1.    IMC Primary Care Designated HIV Treatment Center at 880 Bergen Street, Brooklyn, NY 11238
2.    Bishop O.G. Walker Jr. Health Care Center at 528 Prospect Place, Brooklyn, NY 11238
3.    Dental Center at 1536 Bedford Avenue, Brooklyn, NY 11216
4.    Behavioral Health Alternative Housing Program at 1366 East New York Avenue, Brooklyn, NY 11233
5.    Behavioral Health Program Adult Clinic at 1038 Broadway, Brooklyn, NY 11238
6.    Mobile Crisis Unit at 880 Bergen Street, Brooklyn, NY 11238
7.    Methadone Maintenance Treatment Program at 882 Bergen Street, Brooklyn, NY 11213

C.    Mental Health/Substance Abuse Programs at IMC's primary location, 1545 Atlantic Avenue, Brooklyn NY 11213

1.    Mental Health Clinic Treatment Program
2.    Partial Hospitalization Program
3.    Intensive Psychiatric Rehabilitation Treatment Program
4.    Polysubtance Detoxification Unit
5.    Intensive Psychiatric Rehabilitation Treatment Program
6.    Chemical Dependency Outpatient Services

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

D.    OPWDD services provided at various locations throughout Brooklyn at facilities neither owned or leased by IMC through a contract with Global Communication Services, Inc.

E.    Urgi-Center operated by Atlantic Urgent Care, P.C., a captive professional corporation of IMC, at 1545 Atlantic Avenue, Brooklyn, NY 11213.

F.    Graduate Medical Education/Undergraduate Medical Education:

IMC is the primary training site for 117 residents and fellows in the following specialties, through affiliation with State University of New York, Downstate.

| | | |
|---|---|---|
| Internal Medicine | 91 Residents | Sponsored by IMC |
| Dental | 9 Residents | Sponsored by IMC |
| Podiatry | 7 Residents | Sponsored by IMC |
| Ophthalmology | 6 Residents | Sponsored by St. John's Episcopal Hospital |
| Gynecology | 4 Residents | Sponsored by The Brooklyn Hospital Center |
| APA Approved Psychology | 4 Residents | Sponsored by New York Methodist Hospital |

Fellows        9 (4 Pulmonary, 3 Gastroenterology, 2 Cardiology)

In addition, IMC is a participating teaching site for medical students from NY Medical College (12), Saint Matthew's University (8) and SABA University Medical School (7).

## VI.    Closure Impact

The primary service area for IMC includes Central Brooklyn.

Continuity of care for IMC's inpatient population will be provided by a number of providers, including:

- Brookdale Hospital Medical Center

- The Brooklyn Hospital Center

- Kings County Medical Center

- Kingsbrook Medical Center

- New York Methodist Hospital

- SUNY Downstate

- Woodhull Medical and Mental Health Center

- Wykoff Heights Medical Center

  IMC management has reached out to each of these facilites to advise them of the impending closure.  There will be significant impact on each of these facilities, as they will need to absorb IMC's emergency room volume, inpatient medical/surgical and inpatient psychiatric admissions.  IMC will work closely with each facility to ensure as smooth a transition as possible.  These facilities are accessible via public transportation and private automobile.  We are drafting notification letters to be given to inpatients, family members and visitors, indicating the intention of IMC to transfer its patients to alternative providers (subject to patient choice), the closure of IMC and how they may obtain a copy of their medical records.  Posters will be prominently displayed in high traffic areas such as: the emergency room, the lobby, waiting areas, and the cafeteria.

## VII.   Emergency Department Closure Process

IMC intends to coordinate with **FDNY**, concerning the plan for the closure of IMC, the Emergency Department and IMC's ambulance services.  When the Closure Plan is approved by NYS DOH and Bankruptcy Court, IMC will send a letter to Commissioner Salvatore J. Cassano and Chief Robert Hannafey outlining the proposed closure and transition plan for the Emergency Department and IMC's 911 EMS ambulance routes.  The proposed closure and transition plan is as follows:

1.  Notify FDNY and area hospitals that the Emergency Room will go on permanent diversion status at 6 a.m. [August 26, 2013], for all services.

2.  Notify all facilities with active transfer agreements that the Emergency Department is on diversion status and their patients should be directed to other facilities for care;

3.  Send a DOH and Bankruptcy Court approved press release to local newspapers;

4.  Post signs in English, Spanish, and French Creole at the Emergency Department entrance and other locations in the hospitals and off-site clinics, informing the public of our plan to close the Emergency Department on [August 19, 2013];

5.  On [August 27, 2013], IMC will cease admitting Emergency Department patients to the hospital.  All patients treated in the Emergency Department after that date will be treated and released or transferred to other facilities, as necessary;

6.  Remove or cover all signs at the hospital identifying it as an Emergency Receiving Hospital;

7.  Notify New York Department of Transportation that all blue hospital signs need to be removed;

8.  The Emergency Department will cease operations on [September 25, 2013] at 6 a.m.  The hospital will maintain two (2) non-911 ambulances (1 basic life support

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

ambulance and 1 advanced life support ambulance) to be stationed at the Emergency Department until [September 25, 2013] or such time as may be agreed to by IMC and DOH to facilitate any necessary transfers (this will be assessed at the time of closing);

9.   A security department staff member will remain in the Emergency Department for a thirty (30) day period following the closure to provide information to persons who may arrive at the Emergency Department seeking care;

10.  Post closure of the Emergency Department Signs in English, Spanish, French Creole will be placed at the Emergency Department entrance providing emergency 911 contacts and directing patients to the nearest Emergency Department; such signs shall remain in place as long as may be feasible;

11.  Summary of 9-1-1 Receiving Hospital and Ambulance Services

a.   IMC intends to collaborate with the Director of NYSDOH Bureau of Medical Services, and FDNY EMS Chief regarding the impact of the proposed closure on the EMS system.

## VIII.   Plans for Continuity of Care

A.   <u>Inpatient Services</u> – It is anticipated that all general acute care hospital beds will close by [September 26, 2013]. IMC will cease accepting new admissions as of 12:01 a.m. on [August 26, 2013]. All inpatients at IMC will be discharged or transferred by [September 26, 2013]. It is anticipated that the majority of these patients will be discharged with the remaining patients requiring transfers to other hospitals or placement in long-term care or specialty facilities. Subject to patient choice, IMC will transfer those patients requiring continued hospitalization to other area hospitals after obtaining appropriate patient consent. All medical records will be maintained and stored per section XIII below. It is assumed that the acute care volume normally treated at IMC will be absorbed by other hospitals in the vicinity including Brookdale Hospital Medical Center, The Brooklyn Hospital Center, Kings County Medical Center, Kingsbrook Medical Center, New York Methodist Hospital, SUNY Downstate, Woodhull Medical and Mental Health Center, and Wyckoff Heights Medical Center The chief executive officer of each of these hospitals will be notified of the impending closure.

The following inpatient services, and all other inpatient services necessary to support patient care for remaining patients, will be continued until all patients are transferred or discharged on or before [September 16, 2013].

(a)   radiology (diagnostic) services;
(b)   nuclear medicine (diagnostic) services;
(c)   pharmaceutical services; and
(d)   laboratory services.

B.   <u>Surgical Services</u> – Elective surgeries will be discontinued as of [August 26, 2013]. All surgeries scheduled after that date will be cancelled or transferred. Physicians

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

utilizing hospital surgical services will be notified in writing of the projected date of closure of the service.

     C.    <u>Outpatient Services/Hospital Extension Clinics</u> – IMC is working with DOH to provide for the transfer of IMC's clinics to or with alternative providers to continue the operation of the clinics.  If, however, alternative providers cannot be found by a date to be determined in consultation with DOH, the clinics will cease operations.  All patients will be notified of the transfer or closure, as the case may be, of each of clinic and will be transferred or referred to other area clinics for continued care and treatment, subject to patient choice.  All patient records will be stored and will be forwarded to other clinics or practitioners as and when directed by the patient.  The clinics and specific information relating to each is set forth below:

     1.    IMC Primary Care Designated HIV Treatment Center at 880 Bergen Street, Brooklyn, NY 11238.

          IMC is currently in discussions with Brookdale Hospital Medical Center, The Brooklyn Hospital Center and Kingsbrook Medical Center to either assume operations of this clinic or accept patients from this clinic.

          IMC has contacted Deborah Dewey, MUP, Statewide Coordinator, Designated AIDS Center Program, for a Closure Plan template, Closure Plan tracking form and additional guidance.  We will employ the draft patient letter samples provided in making notice to patients attached hereto as **<u>Exhibit B</u>** regarding program changes and **<u>Exhibit C</u>** in the event the clinic closes.

     2.    Bishop O.G. Walker Jr. Health Care Center at 528 Prospect Place, Brooklyn, NY 11238

          IMC is currently in discussions with Brookdale Hospital Medical Center, The Brooklyn Hospital Center and Kingsbrook Medical Center to assume operations of this clinic.

     3.    Dental Center at 1536 Bedford Avenue, Brooklyn, NY 11216

          IMC is currently in discussions with Brookdale Hospital Medical Center, The Brooklyn Hospital Center and Kingsbrook Medical Center to assume the operations of this clinic.

     4.    Behavioral Health Alternative Housing Program at 1366 East New York Avenue, Brooklyn, NY 11233

          IMC is currently in discussions with Service for the UnderServed to assume the services of this program.

     5.    Behavioral Health Program Adult Clinic at 1038 Broadway, Brooklyn, NY 11238

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

On August 7, 2013, OMH issued a Request for Interest seeking Brooklyn based OMH licensed mental health clinic providers who are interested in assuming the operations of this clinic. Interested parties are requested to respond by August 16, 2013.

6.      Mobile Crisis Unit at 880 Bergen Street, Brooklyn, NY 11238

The Mobile Crisis Unit will cease operations. The NYS DOH is working with the appropriate entities to direct referrals elsewhere, primarily in Kings County.

7.      Methadone Maintenance Treatment Program at 882 Bergen Street, Brooklyn, NY 11213

IMC is currently in discussions with Addiction Research & Treatment Corporation to assume the operations of this clinic at its current location.

D.      Mental Health/Substance Abuse Programs at IMC's primary location, 1545 Atlantic Avenue, Brooklyn NY 11213

1.      Mental Health Clinic Treatment Program

On August 7, 2013, OMH issued a Request for Interest seeking Brooklyn based OMH licensed mental health clinic providers who are interested in assuming operations of this program. Interested parties are requested to respond by August 16, 2013.

2.      Partial Hospitalization Program

3.      Intensive Psychiatric Rehabilitation Treatment Program

4.      Polysubtance Detoxification Unit

5.      Intensive Psychiatric Rehabilitation Treatment Program

6.      Chemical Dependency Outpatient Services

IMC is currently in discussions with Addiction Research & Treatment Corporation to assume the operations of this clinic at another location.

E.      OPWDD services provided at various locations throughout Brooklyn at facilities neither owned or leased by IMC through a contract with Global Communication Services, Inc.

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

IMC is working with Global Communication Services, Inc. to transition the services historically provided by IMC.  FEGS, Inc. and Terence Cardinal Cooke Health Care Center have both expressed interest in assuming such services.

F.    Urgi-Center operated by Atlantic Urgent Care, P.C., a captive professional corporation of IMC, at 1545 Atlantic Avenue, Brooklyn, NY 11213.

IMC is currently in discussions with Brookdale Hospital Medical Center and Kingsbrook Medical Center to assume the operations of the Urgi-Center.

## IX.    Human Resource Services and Employee Relocation

IMC employs approximately 1,500 FTE employees.

IMC is coordinating efforts to assist IMC's staff in receiving supplemental unemployment benefits and retraining and placements.  Open and ongoing communication will continue with all affected staff and labor organizations.  WARN ACT notices were mailed on August 2, 2013.

## X.    Medical Staff Services and Relocation

There are 343 members on IMC's medical staff, which includes 205 salaried physicians and 43 allied health practitioners.  While some of IMC's physicians and allied health practitioners are credentialed at other hospitals, should they so desire, IMC will offer them assistance in obtaining clinical privileges at neighboring hospitals.

IMC will maintain credentialing files and access to same for a period of time after closure to support credentialing activities at other hospitals.

## XI.    Medical Residents and Students

a.    Residents/Fellows

Notice to all residents and fellows have been notified about IMC's anticipated closure and initial steps have been taken to implement residency rescue activities with the Residency Program Director.   Residency rescue activities will be implemented in accordance with ACGME guidelines.

The Program Director is reviewing credentials and pre-qualifying IMC's residents and fellows. The Program Director has contacted area residency programs. The Brooklyn Hospital Center, Kingsbrook Medical Center, Brookdale Hospital Medical Center, Maimonides Medical Center and NYC Health and Hospitals Corporation have each expressed an interest in receiving a number of residents.  IMC and these providers are currently assessing the number of potential slots available and the impact of any capacity increase on the quality of the teaching program. The Program Director will circulate lists of potential slots to each resident, prompting an interview process and mutual selection for new placement.

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

Kingsbrook Medical Center has expressed an interest in accepting all of IMC's pulmonary fellows (4).

        b.    <u>Medical Students</u>

IMC has notified American University of Antigua College, NY Medical College, Saint Matthew's University and SABA University Medical Schools of IMC's anticipated closure. It is anticipated that these entities will take whatever action is necessary to arrange new placements for their students.

## XII.   Communications and Community Outreach Plan

In addition to communicating with IMC patients, physicians, nurses, and staff, IMC will collaborate with various community members, including the unions, elected officials, government officials, the media and the community advisory boards. In addition IMC will issue a press release to various media outlets upon approval of the Closure Plan by the NYS DOH and Bankruptcy Court.

## XIII.   Medical Records and Documentation Retention

Medical Record management after the closure date will ensure the confidentiality of medical records and future access by patients and subsequent treating providers. IMC has solicited bids for permanent storage of all records required for retention. IMC currently stores records with CitiStorage and Iron Mountain, a major vendor for document management, and has approached CitiStorage and Iron Mountain to develop and bid for retention of all IMC patient records required to be maintained in accordance with applicable law. IMC has also issued a Request for Proposal seeking alternate medical record storage providers.

IMC will transfer all medical records to the retained vendor pursuant to a written agreement. The agreement will provide for future access by patients, regulatory agencies, and physicians, as appropriate. IMC will maintain its main telephone number (718) 613-4000 and callers will be directed to contact the retained vendor directly for access to medical records.

IMC shall also arrange for the retention of, and access to, business and other records in accordance with applicable law and regulation.

## XIV.   Pharmacy

The management of pharmaceuticals upon closure will be conducted within State and Federal DEA guidelines. Within each respective care area, the nurse manager and/or pharmacist will coordinate the tabulation of final pharmaceutical inventories and transport remaining pharmaceuticals to IMC's central pharmacy. All medications shall then be returned to vendors. IMC will document all pharmaceutical dispositions. IMC will surrender all licenses and registrations to DEA, the Board of Pharmacy the Bureau of Narcotics Enforcement and other applicable agencies per regulatory requirements. IMC will maintain all records pertaining to prescription drugs as required by applicable law.

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

## XV.    Radiology/Laboratory

The management of radioactive materials and other chemicals and hazardous materials upon closure will be conducted within State and Federal guidelines.  Within each respective area, the Department supervisor will coordinate the inventory of all such materials which shall then either be disposed of in accordance with State and Federal guidelines, returned to vendors, or transferred to another provider as appropriate.  IMC will document all dispositions of such materials.  Film library will be stored in an off-site facility as part of the IMC document retention plan as required by applicable law.  Laboratory records will be maintained as part of the medical records as required by applicable law.  Once these services are no longer required, IMC will surrender all licenses and registrations to the Department of Health, local agencies, and other applicable agencies per regulatory requirements.  IMC has a contract with Radiac to manage decontamination of hot rooms at IMC.

## XVI.    Medical Waste and Infectious Materials

All medical waste and infectious materials will be disposed of through appropriate channels in full compliance with regulatory requirements.  IMC has a contract with Steri-cycle to manage the appropriate disposal of all such materials.

## XVII.    Equipment, Furniture, and Fixtures

Liquidation of equipment, furniture and fixtures will be done under the supervision of the Bankruptcy Court.  The plan is that IMC will hire an appropriate vendor to assist in liquidating its physical assets subject to a solicitation of bids.  Upon closing of floors, physical assets will be locked down and secured until disposed of.  It is anticipated that asset sales will occur after all patients are discharged.

## XVIII.    Supplies and Inventory

IMC will work with suppliers and vendors to ensure orderly closure and availability of necessary supplies until closure of IMC.  Vendors will be notified of the closure and the termination of supply agreements in a timely fashion as necessary in accordance with their contracts and bankruptcy procedures.  Unused supplies and inventory will be returned for refunds or donated to other not-for-profit facilities, as allowed by bankruptcy law.

## XIX.    Security Plan

Upon announcement of the closure, IMC plans to significantly increase security to provide a safe environment for patients and employees and to safeguard assets.  Units with valuable equipment, pharmaceuticals and medical supplies will be locked down.  Physical assets will not be removed from the building without appropriate approval.

## XX.    Administrative Office

The Administrative Office at 1545 Atlantic Avenue, Brooklyn, New York 11213 will remain open during the closure.  Staff will be retained to support necessary administrative functions

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

including, finance, IT, payroll, purchasing and A/P to meet all legal and financial reporting requirements.

## XXI.  Notifications

IMC will notify each current IMC in-patient and out-patient (and that person's next-of-kin and physician, where appropriate) of the impending closure of IMC.  Draft forms of notices to inpatients and outpatients are attached hereto as **Exhibit B** and **Exhibit D**.  IMC will also notify the following persons and entities of its impending closure:

- IMC employees
- Union representatives
- Office of the Mayor of the City of New York (pursuant to WARN Act)
- State Relocation Worker's Unit (pursuant to WARN Act)
- All IMC based private practices
- The Brooklyn Hospital Center
- New York Methodist Hospital
- SUNY Downstate
- Woodhull Medical and Mental Health Center
- Kingsbrook Medical Center
- Kings County Medical Center
- Brookdale Hospital Medical Center
- Hunter Ambulance
- First Response Ambulance
- NYS Department of Health
- NYC DOHMH
- ACGME
- OMH
- OASAS
- TJC
- CMS
- NYS AG, Charity Bureau

IMC will communicate with the community about closure, including release of a press release to local newspapers upon approval of the Closure Plan by the NYS DOH and Bankruptcy Court to be and placement of notices outside IMC.

## XXII.  Timing of Key Closure Activities

A proposed timeline for the closure is included in **Exhibit E**.

IMC is committed to an orderly closure that will prevent disruption of patient care and minimize inconvenience to patients and their families.  We ask that you direct any questions you may have concerning this Plan to the following:

Patrick Sullivan

***DRAFT***
***FOR DISCUSSION PURPOSES ONLY***

Interim Chief Executive Officer
Interfaith Medical Center
718-613-4120
PSullivan@interfaithmedical.org

Judith A. Eisen, Esq.
Garfunkel Wild, PC
516-393-2220
jeisen@garfunkelwild.com

Sincerely,


Patrick Sullivan
Interim Chief Executive Officer


cc:    Judith Eisen, Esq.

## <u>EXHIBIT A</u>

**Operating Certificate**



## **EXHIBIT B**

**Form of Patient Notice**



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO INPATIENTS]

_____, 2013

Dear Patient and Family:

As a patient to Interfaith Medical Center ("IMC"), we are saddened to tell you that, after more than 140 years of service to people of Central Brooklyn and the surrounding communities, IMC is closing.

We are committed to making your transition to a new healthcare provider as smooth as possible. IMC's staff will be visiting you to arrange for your discharge and follow up care, if your physician believes you are ready or for your transfer to another facility, if you need continued inpatient care and treatment. You have a choice about where to obtain your care. If you will be transferred to another facility, our staff members will work with you and your family to determine which provider will best be able to meet your treatment needs, and will make all the transfer arrangements. You will be provided with appropriate transportation and will be escorted by appropriate medical personnel. Copies of all of your relevant medical records will be sent with you to the next facility.

After IMC closes, your medical records will continue to be stored at IMC for a period of time. If you need a copy of your medical records or radiology or laboratory results, please call (718) 613-4000.

All of us at IMC appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____
Patrick Sullivan
Interim Chief Executive Officer

<u>**EXHIBIT C**</u>

**Form of Notice in event IMC Primary Care Designated HIV Treatment Center Closes**



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO INPATIENTS]

, 2013

Dear Patient;

Our records indicate that you have a been a patient at Interfaith Medical Center's Primary Care Designated HIV Treatment Center.  It is with regret that we inform you of the closure of the Interfaith Medical Center and the Treatment Center.  The last day that the Treatment Center will see patients is _____, 2013.

It is extremely important that you continue to seek medical care.  We are available to assist you in any way in this transition.

Attached you will find a listing of providers for continued care.  Our staff can assist you choosing a provider that is convenient for you.  Please contact _____ at _____ **Number**.

_____ of the medical records department will help you to obtain a copy of your medical record or send it to your next provider.  _____ can be reached at _____  There will be no charge for this service.  An authorization form is enclosed for your convenience. Forms are also available at the Treatment Center.

Please complete the form, sign it and either bring it to the Treatment Center or mail it to:

Contact

Address

All of us at Interfaith Medical Center appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____
Patrick Sullivan
Interim Chief Executive Officer

**EXHIBIT D**

**Forms of Out-Patient Notices**



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO OUTPATIENTS-TRANSFER OF OPERATION TO ANOTHER PROVIDER]

_____, 2013

Dear Patient:

As an outpatient of Interfaith Medical Center's _____ Clinic (the "Clinic"), we want to let you know that, as of _____, 2013, the operations of the Clinic will be transferred to _____.  It is the hospital's goal to provide stability and to maintain quality healthcare and vital services during this transition.

As always, our first priority is our patients.  [The clinical staffs who have cared for you at the Clinic will continue to provide you with the highest quality care.]  You should not experience any interruption of services.

You have a choice about where you receive your medical care, and we hope you will choose to continue your care with _____.  Should you seek treatment elsewhere, however, you may request that a copy of your medical records be sent to your new provider by calling (718) 613-4000.

_____ [name of new provider] is committed to providing high quality, compassionate care and services for its patients, their families and the communities we serve.  If you have any questions about your care or need other assistance, please call (718) 613-4000.

        Thank you for trusting us with your medical care, and for your support and understanding during this transition.

[INSERT LIST OF NAMES AND CONTACT INFORMATION]

Thank you for your patience with this change.

Sincerely,

_____
Patrick Sullivan
Interim Chief Executive Officer

[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO OUTPATIENTS - CLOSURE OF PROGRAM]

_____, 2013

Dear Patient and Family:

As an outpatient of Interfaith Medical Center's _____ Program (the "Program"), we are saddened to tell you that the Program will be closing as of _____, 2013. It is our goal to provide stability and to maintain quality healthcare and vital services during this transition.

You have a choice about where to obtain your care. The providers listed below are available to provide continuing care to patients of the Program. Please call the provider directly to arrange an appointment. If you need assistance or a referral, we will help you in locating another provider to continue your care. Please call _(718) 613-4000 for assistance. We will transfer your records to your new provider upon your written consent. If you have an appointment to see your doctor on _____ 2013 or after, please call (718) 613-4000 for assistance in arranging for alternative care.

After the Program closes, your medical records will continue to be stored at the hospital for a period of time. If you need a copy of your medical records, radiology or laboratory results or any other questions, please call (718) 613-4000.

All of us at Interfaith Medical Center appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____
Patrick Sullivan
Interim Chief Executive Officer

**EXHIBIT E**

**Proposed Timeline**

Filing of Plan of Closure:  July 25, 2013

Closure initiates: [August 26, 2013]

Inpatient admissions cease: [August 26, 2013]

Emergency Department goes on permanent diversion and operates on a "treat and release or transfer" site: [August 26, 2013]

Two (2) ambulances(1 basic life support ambulance and 1 advanced life support ambulance) to be stationed at the Emergency Department until [September 25, 2013] or such time as may be agreed to by IMC and DOH

Closure of Emergency Department: [September 25, 2013]

Cessation of inpatient care services: [September 26, 2013]

Cessation of outpatient programs:  [October 26, 2013]

Cessation of HIV, detox and rehabilitation programs:  [November 25, 2013]

## <u>EXHIBIT 4</u>

**Redline Of The Updated Closure Plan
Against Closure Plan Version Filed August 2, 2013**

***FOR DISCUSSION PURPOSES ONLY***



~~July 25,~~August____, 2013

**VIA FACSIMILE AND REGULAR MAIL**

Karen S. Westervelt

Deputy Commissioner

Office of Health Systems Management

NYS Department of Health

Corning Tower

Empire State Plaza

Albany, New York, 12237

      Re:    Interfaith Medical Center

Dear Ms. Westervelt:

      The following is a draft of the Plan of Closure (the "Closure Plan") required by 10 NYCRR §401.3 for Interfaith Medical Center ("IMC") (Operating Certificate #7001046H).

      In summary, IMC's Emergency Department will go on permanent diversion status on [August ~~12, 2013.~~26, 2013].  IMC will cease accepting new inpatient admissions as of 12:01 a.m. on [August ~~12, 2013.~~26, 2013].  On [August ~~13,~~27, 2013] at 6 a.m., the Emergency Department will be transitioned to a "treat and release or transfer" site.  All in-patients will be discharged or transferred by [September ~~12,~~26, 2013]; all outpatients will be discharged or transferred by [October ~~12,~~26, 2013]; and all HIV, detox and rehabilitation patients will be discharged or transferred by [November ~~11, 2013.~~25, 2013].  IMC will cease all operations as of [November ~~11,~~25, 2013] ("closure date").  IMC will use its best efforts to work closely with ~~DOH~~New York State Department of Health ("NYS DOH") and other applicable regulatory agencies to identify and make arrangements with alternative providers for the continuance of all outpatient programs operated by IMC or, if such arrangements can not be made, the transfer of each then-current outpatient to an alternative provider for ongoing care.  Set forth below is a description of all elements of the Closure Plan.  This Closure Plan is subject to approval by the NYS DOH and the United States Bankruptcy Court of the Eastern District of New York (the "Bankruptcy Court").

2554120v.~~13~~15

## I.    Introduction

On July 24, 2013 the Board of Trustees of IMC directed management to develop and implement a plan for the closure of its inpatient care facilities, and to provide for the identification of alternative providers for the continuance of its outpatient programs, and the transfer of its outpatients to alternative providers if such arrangements cannot be made.  This decision was reached after concluding that we have exhausted all efforts to preserve IMC as an inpatient hospital and as a result of the directive set forth in that certain letter from Karen Westervelt, Deputy Commissioner, Office of Primary Care and Health Systems Management, dated July 19, 2013.  Without an approved reorganization plan and financing to maintain operations in bankruptcy, IMC expects changes may occur quickly as suppliers, staff, physicians, and others respond to initial communications regarding sale and closure of IMC.  While IMC will comply with all Federal and State employee notification requirements, IMC needs to avoid any situation that might represent a threat to patient health and will seek to reduce in-patient census as quickly as safely manageable.

## II.    IMC Overview

IMC's core business is anchored in Central Brooklyn.  The Community of Central Brooklyn faces serious health care access issues.  IMC is located in a primary medical care Health Professional Shortage Area as designated by the federal government.  The shortage of primary care providers combined with the social problems that plague low income, high poverty communities have led to serious health status consequences for its residents.

The services provided by IMC are reflected on its operating certificate attached as **Exhibit A**. These services include a broad spectrum of inpatient services with 287 beds.  IMC also has outpatient facilities including 3 clinics and 7 behavioral health sites.

The closure of IMC requires communication to employees, patients, families, providers, and the community at-large, transfer/removal of medical records, disposition of equipment, pharmaceuticals and inventory.  In anticipation of the closing of IMC and in preparation for the transition of the community and patients to alternative delivery sites, IMC management ~~will work~~is working with other area organizations and providers to plan for communication and transition.  IMC ~~will involve~~is involving other stakeholders in the closure process, including:

- IMC Medical Staff
- IMC Employees
- Collective Bargaining Units, including 1199/SEIU, NYSNA, CIR, Federation of Union Doctors
- Governor Andrew Cuomo
- Mayor Michael Bloomberg
- U.S. Senator Charles Schumer
- Brooklyn Borough President, Marty Markowitz
- Congressman Hakeem Jeffries
- State Senator Velmanatte Montgomery
- Assemblywoman Annette Robinson
- Assemblyman Walter Mosley

2

***FOR DISCUSSION PURPOSES ONLY***

- Councilman Albert Vann
- Local Fire, Police, and EMS Units
- NYC Office of Emergency Management
- Other Brooklyn-based health care providers
- NYC DOHMH
- NYS DOH
- ACGME
- NYS Office of Mental Health ("OMH")
- NYS Office of Alcoholism and Substance Abuse Services ("OASAS")
- The Joint Commission ("TJC")
- The Centers for Medicare and Medicaid Services ("CMS")
- NYS Attorney General's Office ("NYS AG")

## III. Board of Trustees Authorization

The Board of Trustees of IMC voted to approve the closure of IMC's inpatient services, and to provide for the transfer of all outpatient programs to alternative providers to continue the operation of each such program, or, if an alternative provider cannot be found, to close such program and transfer each then-current patient to an alternative provider for ongoing services and to approve the submission of this Plan to DOH, at its meeting on July 24, 2013.

## IV. Operating Certificates

A copy of IMC's Operating Certificate is attached as **Exhibit A**.

## V. Services to Close or Transfer

A. In-Patient Services at IMC.

B. Outpatient Services/Hospital Extension Clinics.

1. ~~Behavioral Health Program (Adult) at 1038 Broadway~~
2. ~~Behavioral Health Alternative Housing Program at 1366 New York Avenue~~
3. ~~Methadone Maintenance Treatment Program at 882 Bergen Street~~
4. ~~Community Mental Health Center at 1545 Atlantic Avenue~~
5. ~~Chemical Dependency Outpatient Services at 1545 Atlantic Avenue~~
6. ~~Intensive Psychiatric Rehabilitation Treatment Program at 1545 Atlantic Avenue~~
1. ~~7. Mobile Crisis Unit~~IMC Primary Care Designated HIV Treatment Center at 880 Bergen Street, Brooklyn, NY 11238
2. ~~8.~~Bishop O.G. Walker Jr. Health Care Center at 528 Prospect Place, Brooklyn, NY 11238
3. ~~9.~~Dental Center at 1536 Bedford Avenue, Brooklyn, NY 11216
4. Behavioral Health Alternative Housing Program at 1366 East New York Avenue, Brooklyn, NY 11233

3

***FOR DISCUSSION PURPOSES ONLY***

5.      Behavioral Health Program Adult Clinic at 1038 Broadway, Brooklyn, NY 11238

6.      ~~10. IMC Primary Care~~Mobile Crisis Unit at 880 Bergen Street, Brooklyn, NY 11238

7.      Methadone Maintenance Treatment Program at 882 Bergen Street, Brooklyn, NY 11213

C.      Mental Health/Substance Abuse Programs at IMC's primary location, 1545 Atlantic Avenue, Brooklyn NY 11213

1.      Mental Health Clinic Treatment Program
2.      Partial Hospitalization Program
3.      Intensive Psychiatric Rehabilitation Treatment Program
4.      Polysubtance Detoxification Unit
5.      Intensive Psychiatric Rehabilitation Treatment Program
6.      Chemical Dependency Outpatient Services

D.      OPWDD services provided at various locations throughout Brooklyn at facilities neither owned or leased by IMC through a contract with Global Communication Services, Inc.

E.      Urgi-Center operated by Atlantic Urgent Care, P.C., a captive professional corporation of IMC, at 1545 Atlantic Avenue, Brooklyn, NY 11213.

F.      ~~C.~~ Graduate Medical Education/Undergraduate Medical Education:

IMC is the primary training site for 117 residents and fellows in the following specialties, through affiliation with State University of New York, Downstate.

| Internal Medicine | 91 Residents Sponsored by IMC |
| Dental | 9 Residents Sponsored by IMC |
| Podiatry | 7 Residents Sponsored by IMC |
| Ophthalmology | 6 Residents Sponsored by St. John's Episcopal Hospital |
| Gynecology | 4 Residents |
| ~~Fellows~~ | ~~9~~ Sponsored by The Brooklyn Hospital Center |
| APA Approved Psychology | 4 Residents Sponsored by New York Methodist Hospital |

Fellows      9 (4 Pulmonary, 3 Gastroenterology, 2 Cardiology)

In addition, IMC is a participating teaching site for ~~residents in the specialty of Pediatrics.~~medical students from NY Medical College (12), Saint Matthew's University (8) and SABA University Medical School (7).

4

***FOR DISCUSSION PURPOSES ONLY***

## VI.    Closure Impact

The primary service area for IMC includes Central Brooklyn.

Continuity of care for IMC's inpatient population will be provided by a number of providers, including:

- Brookdale Hospital Medical Center

- The Brooklyn Hospital Center

- Kings County Medical Center

- Kingsbrook Medical Center

- New York Methodist Hospital

- SUNY Downstate

- Woodhull Medical and Mental Health Center

- Wykoff Heights Medical Center

    IMC management has reached out to each of these facilites to advise them of the impending closure.  There will be significant impact on each of these facilities, as they will need to absorb IMC's emergency room volume, inpatient medical/surgical and inpatient psychiatric admissions.  IMC will work closely with each facility to ensure as smooth a transition as possible.  These facilities are accessible via public transportation and private automobile.  We are drafting notification letters to be given to inpatients, family members and visitors, indicating the intention of IMC to transfer its patients to alternative providers (subject to patient choice), the closure of IMC and how they may obtain a copy of their medical records.  Posters will be prominently displayed in high traffic areas such as: the emergency room, the lobby, waiting areas, and the cafeteria.

## VII.    Emergency Department Closure Process

IMC intends to coordinate with **FDNY**, concerning the plan for the closure of IMC, the Emergency Department and IMC's ambulance services.  When the closure planClosure Plan is approved by NYS DOH and Bankruptcy Court, IMC will send a letter to Commissioner Salvatore J. Cassano and Chief Robert Hannafey outlining the proposed closure and transition plan for the Emergency Department and IMC's 911 EMS ambulance routes.  The proposed closure and transition plan is as follows:

1.    Notify FDNY and area hospitals that the Emergency Room will go on permanent diversion status at 6 a.m. [August 13, 2013,26, 2013], for all services.

5

***FOR DISCUSSION PURPOSES ONLY***

2.    Notify all facilities with active transfer agreements that the Emergency Department is on diversion status and their patients should be directed to other facilities for care;

3.    Send a DOH- and Bankruptcy Court approved press release to local newspapers;

4.    Post signs in English, Spanish, and French Creole at the Emergency Department entrance and other locations in the hospitals and off-site clinics, informing the public of our plan to close the Emergency Department on [August 5,19, 2013];

5.    On [August 12, 2013,27, 2013], IMC will cease admitting Emergency Department patients to the hospital. All patients treated in the Emergency Department after that date will be treated and released or transferred to other facilities, as necessary;

6.    Two (2) non-911 ambulances will be stationed at the entrance to the Emergency Department 24/7 to assist with transfers until September 11, 2013.

6.    7. Remove or cover all signs at the hospital identifying it as an Emergency Receiving Hospital;

7.    8. Notify New York Department of Transportation that all blue hospital signs need to be removed;

8.    9. The Emergency Department will cease operations on [September 11,25, 2013] at 6 a.m. The hospital will maintain two (2) non-911 ambulances (1 basic life support ambulance and 1 advanced life support ambulance) to be stationed at the Emergency Department until [September 11, 2013 at 6 a.m.25, 2013] or such time as may be agreed to by IMC and DOH to facilitate any necessary transfers (this will be assessed at the time of closing);

9.    10. A security department staff member will remain in the Emergency Department for a thirty (30) day period following the closure to provide information to persons who may arrive at the Emergency Department seeking care;

10.    11. Post closure of the Emergency Department Signs in English, Spanish, French Creole will be placed at the Emergency Department entrance providing emergency 911 contacts and directing patients to the nearest Emergency Department; such signs shall remain in place as long as may be feasible;

11.    12. Summary of 9-1-1 Receiving Hospital and Ambulance Services

    a.    IMC intends to collaborate with the Acting Director of NYSDOH Bureau of EmergencyMedical Services, and FDNY EMS Chief regarding the impact of the proposed closure on the EMS system.

6

## VIII.    Plans for Continuity of Care

A.    <u>Inpatient Services</u> – It is anticipated that all general acute care hospital beds will close by [September 12, 2013 26, 2013]. IMC will cease accepting new admissions as of 12:01 a.m. on [August 12, 2013 26, 2013]. All inpatients at IMC will be discharged or transferred by [September 12, 2013 26, 2013]. It is anticipated that the majority of these patients will be discharged with the remaining patients requiring transfers to other hospitals or placement in long-term care or specialty facilities. Subject to patient choice, IMC will transfer those patients requiring continued hospitalization to other area hospitals after obtaining appropriate patient consent. All medical records will be maintained and stored per section XIII below. It is assumed that the acute care volume normally treated at IMC will be absorbed by other hospitals in the vicinity including Brookdale Hospital Medical Center, The Brooklyn Hospital Center, Kings County Medical Center, Kingsbrook Medical Center, New York Methodist Hospital, SUNY Downstate, Woodhull Medical and Mental Health Center, and Wyckoff Heights Medical Center The chief executive officer of each of these hospitals will be notified of the impending closure.

The following inpatient services, and all other inpatient services necessary to support patient care for remaining patients, will be continued until all patients are transferred or discharged on or before [September 2, 2013 16, 2013].

    (a)    radiology (diagnostic) services;
    (b)    nuclear medicine (diagnostic) services;
    (c)    pharmaceutical services; and
    (d)    laboratory services.

B.    <u>Surgical Services</u> – Elective surgeries will be discontinued as of [August 19, 2013 26, 2013]. All surgeries scheduled after that date will be cancelled or transferred. Physicians utilizing hospital surgical services will be notified in writing of the projected date of closure of the service.

C.    Primary Care Designated HIV Treatment Center – IMC will work with DOH to provide for the transfer of the Primary Care Designated HIV Treatment Center (the "Center") to or with alternative providers to continue the operation of the Center. If, however, alternative providers cannot be found by a date to be determined in consultation with DOH, the Center will cease operations as of November 11, 2013. All patients will be notified of the transfer or closure, as the case may be, and will be transferred or referred to other area clinics for continued care and treatment, subject to patient choice. All active patient records will be transferred to the relevant other clinics, unless a patient directs IMC to forward them to another practitioner. The clinics to which referrals will be made include:

- Brookdale Hospital Medical Center
- The Brooklyn Hospital Center
- Kings County Medical Center
- Kingsbrook Medical Center
- New York Methodist Hospital
- SUNY Downstate

7

***FOR DISCUSSION PURPOSES ONLY***

- Woodhull Medical and Mental Health Center
- Wyckoff Heights Medical Center

IMC will contact Deborah Dewey, MUP, Statewide Coordinator, Designated AIDS Center Program, for a closure plan template, closure plan tracking form and additional guidance. We will employ the draft patient letter sample provided in making notice to patients attached hereto as **Exhibit B** regarding program changes.

C. ~~D.~~ Outpatient Services/Hospital Extension Clinics – IMC ~~will work~~is working with DOH to provide for the transfer of IMC's clinics to or with alternative providers to continue the operation of the clinics. If, however, alternative providers cannot be found by a date to be determined in consultation with DOH, the clinics will cease operations. All patients will be notified of the transfer or closure, as the case may be, of each of clinic and will be transferred or referred to other area clinics for continued care and treatment, subject to patient choice. All patient records will be stored and will be forwarded to other clinics or practitioners as and when directed by the patient. The clinics ~~to which referrals will be made include:~~ and specific information relating to each is set forth below:

- 

    1. IMC Primary Care Designated HIV Treatment Center at 880 Bergen Street, Brooklyn, NY 11238.

    IMC is currently in discussions with Brookdale Hospital Medical Center
- The Brooklyn Hospital Center
- Kings County Medical Center
- , The Brooklyn Hospital Center and Kingsbrook Medical Center
- New York Methodist Hospital
- SUNY Downstate
- Woodhull Medical and Mental Health Center
- Wyckoff Heights Medical Center to either assume operations of this clinic or accept patients from this clinic.

    IMC has contacted Deborah Dewey, MUP, Statewide Coordinator, Designated AIDS Center Program, for a Closure Plan template, Closure Plan tracking form and additional guidance. We will employ the draft patient letter samples provided in making notice to patients attached hereto as **Exhibit B** regarding program changes and **Exhibit C** in the event the clinic closes.

    2. Bishop O.G. Walker Jr. Health Care Center at 528 Prospect Place, Brooklyn, NY 11238

    IMC is currently in discussions with Brookdale Hospital Medical Center, The Brooklyn Hospital Center and Kingsbrook Medical Center to assume operations of this clinic.

8

***FOR DISCUSSION PURPOSES ONLY***

3.    Dental Center at 1536 Bedford Avenue, Brooklyn, NY 11216

IMC is currently in discussions with Brookdale Hospital Medical Center, The Brooklyn Hospital Center and Kingsbrook Medical Center to assume the operations of this clinic.

4.    Behavioral Health Alternative Housing Program at 1366 East New York Avenue, Brooklyn, NY 11233

IMC is currently in discussions with Service for the UnderServed to assume the services of this program.

5.    Behavioral Health Program Adult Clinic at 1038 Broadway, Brooklyn, NY 11238

On August 7, 2013, OMH issued a Request for Interest seeking Brooklyn based OMH licensed mental health clinic providers who are interested in assuming the operations of this clinic. Interested parties are requested to respond by August 16, 2013.

6.    Mobile Crisis Unit at 880 Bergen Street, Brooklyn, NY 11238

The Mobile Crisis Unit will cease operations. The NYS DOH is working with the appropriate entities to direct referrals elsewhere, primarily in Kings County.

7.    Methadone Maintenance Treatment Program at 882 Bergen Street, Brooklyn, NY 11213

IMC is currently in discussions with Addiction Research & Treatment Corporation to assume the operations of this clinic at its current location.

D.    Mental Health/Substance Abuse Programs at IMC's primary location, 1545 Atlantic Avenue, Brooklyn NY 11213

1.    Mental Health Clinic Treatment Program

On August 7, 2013, OMH issued a Request for Interest seeking Brooklyn based OMH licensed mental health clinic providers who are interested in assuming operations of this program. Interested parties are requested to respond by August 16, 2013.

2.    Partial Hospitalization Program

3.    Intensive Psychiatric Rehabilitation Treatment Program

9

***FOR DISCUSSION PURPOSES ONLY***

    4.      Polysubtance Detoxification Unit

    5.      Intensive Psychiatric Rehabilitation Treatment Program

    6.      Chemical Dependency Outpatient Services

         IMC is currently in discussions with Addiction Research & Treatment Corporation to assume the operations of this clinic at another location.

E.      OPWDD services provided at various locations throughout Brooklyn at facilities neither owned or leased by IMC through a contract with Global Communication Services, Inc.

         IMC is working with Global Communication Services, Inc. to transition the services historically provided by IMC. FEGS, Inc. and Terence Cardinal Cooke Health Care Center have both expressed interest in assuming such services.

F.      Urgi-Center operated by Atlantic Urgent Care, P.C., a captive professional corporation of IMC, at 1545 Atlantic Avenue, Brooklyn, NY 11213.

         IMC is currently in discussions with Brookdale Hospital Medical Center and Kingsbrook Medical Center to assume the operations of the Urgi-Center.

## IX.    Human Resource Services and Employee Relocation

IMC employs approximately 1,500 FTE employees.

IMC ~~will be~~is coordinating efforts to assist IMC's staff in receiving supplemental unemployment benefits and retraining and placements. Open and ongoing communication will continue with all affected staff and labor organizations. ~~The date upon which~~ WARN ACT notices ~~will be mailed will be determined following consultation with counsel.~~were mailed on August 2, 2013.

## X.    Medical Staff Services and Relocation

There are 343 members on IMC's medical staff, which includes 205 salaried physicians and 43 allied health practitioners. While some of IMC's physicians and allied health practitioners are credentialed at other hospitals, should they so desire, IMC will offer them assistance in obtaining clinical privileges at neighboring hospitals.

IMC will maintain credentialing files and access to same for a period of time after closure to support credentialing activities at other hospitals.

## XI.    Medical Residents and Students

    a.      Residents/Fellows

Notice to ~~117~~all residents ~~has been provided through conference call~~and fellows have been notified about IMC's anticipated closure and initial steps have been taken to implement residency rescue activities with the Residency Program Director.  Residency rescue activities will be implemented in accordance with ACGME guidelines.

The Program Director ~~will review~~is reviewing credentials and pre-~~qualify~~qualifying IMC's residents and fellows.  The Program Director ~~will contact area residency programs to ascertain programs that will accept IMC residents, and will assess~~has contacted area residency programs. The Brooklyn Hospital Center, Kingsbrook Medical Center, Brookdale Hospital Medical Center, Maimonides Medical Center and NYC Health and Hospitals Corporation have each expressed an interest in receiving a number of residents.  IMC and these providers are currently assessing the number of potential slots available and the impact of any capacity increase on the quality of the teaching program.  The Program Director will circulate lists of potential slots to each resident, prompting an interview process and mutual selection for new placement.

Kingsbrook Medical Center has expressed an interest in accepting all of IMC's pulmonary fellows (4).

b.    Medical Students

IMC has notified American University of Antigua College~~ and others of the~~, NY Medical College, Saint Matthew's University and SABA University Medical Schools of IMC's anticipated closure~~ by conference call~~.  It is anticipated that ~~American University of Antigua College and others~~these entities will take whatever action is necessary to arrange new placements for their students.

## XII.    Communications and Community Outreach Plan

In addition to communicating with IMC patients, physicians, nurses, and staff, IMC will collaborate with various community members, including the unions, elected officials, government officials, the media and the community advisory boards.  In addition IMC will issue a press release to various media outlets upon approval of the Closure Plan by the NYS DOH and Bankruptcy Court.

## XIII.    Medical Records and Documentation Retention

Medical Record management after the closure date will ensure the confidentiality of medical records and future access by patients and subsequent treating providers.  IMC ~~will solicit~~has solicited bids for permanent storage of all records required for retention.  IMC currently stores records with CitiStorage and Iron Mountain, a major vendor for document management, and ~~will approach~~has approached CitiStorage and Iron Mountain to develop and bid for retention of all IMC patient records required to be maintained in accordance with applicable law.  IMC has also issued a Request for Proposal seeking alternate medical record storage providers.

IMC will transfer all medical records to the retained vendor pursuant to a written agreement. The agreement will provide for future access by patients, regulatory agencies, and physicians, as appropriate.  IMC will maintain its main telephone number (718) 613-4000 and callers will be directed to contact the retained vendor directly for access to medical records.

***FOR DISCUSSION PURPOSES ONLY***

IMC shall also arrange for the retention of, and access to, business and other records in accordance with applicable law and regulation.

## XIV.  Pharmacy

The management of pharmaceuticals upon closure will be conducted within State and Federal DEA guidelines.  Within each respective care area, the nurse manager and/or pharmacist will coordinate the tabulation of final pharmaceutical inventories and transport remaining pharmaceuticals to IMC's central pharmacy.  All medications shall then be returned to vendors. IMC will document all pharmaceutical dispositions.  IMC will surrender all licenses and registrations to DEA, the Board of Pharmacy the Bureau of Narcotics Enforcement and other applicable agencies per regulatory requirements.  IMC will maintain all records pertaining to prescription drugs as required by applicable law.

## XV.  Radiology/Laboratory

The management of radioactive materials and other chemicals and hazardous materials upon closure will be conducted within State and Federal guidelines.  Within each respective area, the Department supervisor will coordinate the inventory of all such materials which shall then either be disposed of in accordance with State and Federal guidelines, returned to vendors, or transferred to another provider as appropriate.  IMC will document all dispositions of such materials.  Film library will be stored in an off-site facility as part of the IMC document retention plan as required by applicable law.  Laboratory records will be maintained as part of the medical records as required by applicable law.  Once these services are no longer required, IMC will surrender all licenses and registrations to the Department of Health, local agencies, and other applicable agencies per regulatory requirements.  IMC has a contract with Radiac to manage decontamination of hot rooms at IMC.

## XVI.  Medical Waste and Infectious Materials

All medical waste and infectious materials will be disposed of through appropriate channels in full compliance with regulatory requirements.  IMC has a contract with Steri-cycle to manage the appropriate disposal of all such materials.

## XVII.  Equipment, Furniture, and Fixtures

Liquidation of equipment, furniture and fixtures will be done under the supervision of the bankruptcy courtBankruptcy Court.  The plan is that IMC will hire an appropriate vendor to assist in liquidating its physical assets subject to a solicitation of bids.  Upon closing of floors, physical assets will be locked down and secured until disposed of.  It is anticipated that asset sales will occur after all patients are discharged.

## XVIII. Supplies and Inventory

IMC will work with suppliers and vendors to ensure orderly closure and availability of necessary supplies until closure of IMC.  Vendors will be notified of the closure and the termination of supply agreements in a timely fashion as necessary in accordance with their contracts and

bankruptcy procedures.  Unused supplies and inventory will be returned for refunds or donated to other not-for-profit facilities, as allowed by bankruptcy law.

## XIX.   Security Plan

Upon announcement of the closure, IMC plans to significantly increase security to provide a safe environment for patients and employees and to safeguard assets.  Units with valuable equipment, pharmaceuticals and medical supplies will be locked down.  Physical assets will not be removed from the building without appropriate approval.

## XX.   Administrative Office

The Administrative Office at 1545 Atlantic Avenue, Brooklyn, New York 11213 will remain open during the closure.  Staff will be retained to support necessary administrative functions including, finance, IT, payroll, purchasing and A/P to meet all legal and financial reporting requirements.

## XXI.   Notifications

IMC will notify each current IMC in-patient and out-patient (and that person's next-of-kin and physician, where appropriate) of the impending closure of IMC.  Draft forms of notices to inpatients and outpatients are attached hereto as **Exhibit B and Exhibit D**.  IMC will also notify the following persons and entities of its impending closure:

- IMC employees
- Union representatives
- Office of the Mayor of the City of New York (pursuant to WARN Act)
- State Relocation Worker's Unit (pursuant to WARN Act)
- All IMC based private practices
- The Brooklyn Hospital Center
- New York Methodist Hospital
- SUNY Downstate
- Woodhull Medical and Mental Health Center
- Kingsbrook Medical Center
- Kings County Medical Center
- Brookdale Hospital Medical Center
- Hunter Ambulance
- First Response Ambulance
- NYS Department of Health
- NYC DOHMH
- ACGME
- OMH
- OASAS
- TJC
- CMS
- NYS AG, Charity Bureau

IMC will communicate with the community about closure, including release of a press release to local newspapers upon approval of the Closure Plan by the NYS DOH and Bankruptcy Court to be and placement of notices outside IMC.

## XXII.  Timing of Key Closure Activities

A proposed timeline for the closure is included in **Exhibit CE**.

IMC is committed to an orderly closure that will prevent disruption of patient care and minimize inconvenience to patients and their families.  We ask that you direct any questions you may have concerning this Plan to the following:

Patrick Sullivan
Interim Chief Executive Officer
Interfaith Medical Center
718-613-4120
PSullivan@interfaithmedical.org

Judith A. Eisen, Esq.
Garfunkel Wild, PC
516-393-2220
jeisen@garfunkelwild.com

Sincerely,


Patrick Sullivan
Interim Chief Executive Officer


cc:      Judith Eisen, Esq.

14

**<u>EXHIBIT A</u>**

**Operating Certificate**



# <u>EXHIBIT B</u>

### ~~Forms~~<span style="color:blue;text-decoration:underline">Form</span> of Patient ~~Notices~~<span style="color:blue;text-decoration:underline">Notice</span>



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO INPATIENTS]

_____, 2013

Dear Patient and Family:

As a patient to Interfaith Medical Center ("IMC"), we are saddened to tell you that, after more than 140 years of service to people of Central Brooklyn and the surrounding communities, IMC is closing.

We are committed to making your transition to a new healthcare provider as smooth as possible. IMC's staff will be visiting you to arrange for your discharge and follow up care, if your physician believes you are ready or for your transfer to another facility, if you need continued inpatient care and treatment. You have a choice about where to obtain your care. If you will be transferred to another facility, our staff members will work with you and your family to determine which provider will best be able to meet your treatment needs, and will make all the transfer arrangements. You will be provided with appropriate transportation and will be escorted by appropriate medical personnel. Copies of all of your relevant medical records will be sent with you to the next facility.

After IMC closes, your medical records will continue to be stored at IMC for a period of time. If you need a copy of your medical records, please call _____, at _____. For or radiology and/or laboratory results, call _____. We have instituted a hot line for those of you who might have other questions or concerns. That number is _____ please call (718) 613-4000.

All of us at IMC appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____

Patrick Sullivan
Interim Chief Executive Officer

2554120v.1315

**EXHIBIT C**

**Form of Notice in event IMC Primary Care Designated HIV Treatment Center Closes**



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO INPATIENTS]

_____, 2013

Dear Patient:

Our records indicate that you have a been a patient at Interfaith Medical Center's Primary Care Designated HIV Treatment Center.  It is with regret that we inform you of the closure of the Interfaith Medical Center and the Treatment Center.  The last day that the Treatment Center will see patients is _____, 2013.

It is extremely important that you continue to seek medical care.  We are available to assist you in any way in this transition.

Attached you will find a listing of providers for continued care.  Our staff can assist you choosing a provider that is convenient for you.  Please contact _____ at **Number.**

_____ of the medical records department will help you to obtain a copy of your medical record or send it to your next provider. _____ can be reached at _____  There will be no charge for this service.  An authorization form is enclosed for your convenience. Forms are also available at the Treatment Center.

Please complete the form, sign it and either bring it to the Treatment Center or mail it to:

Contact

Address

All of us at Interfaith Medical Center appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____

Patrick Sullivan
Interim Chief Executive Officer

2554120v.1315

**EXHIBIT D**

**Forms of Out-Patient Notices**



[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO OUTPATIENTS-TRANSFER OF OPERATION TO ANOTHER PROVIDER]

_____, 2013

Dear Patient:

As an outpatient of Interfaith Medical Center's _____ Clinic (the "Clinic"), we want to let you know that, as of _____, 2013, the operations of the Clinic will be transferred to _____.  It is the hospital's goal to provide stability and to maintain quality healthcare and vital services during this transition.

As always, our first priority is our patients.  [The clinical staffs who have cared for you at the Clinic will continue to provide you with the highest quality care.]  You should not experience any interruption of services.

You have a choice about where you receive your medical care, and we hope you will choose to continue your care with _____.  Should you seek treatment elsewhere, however, you may request that a copy of your medical records be sent to your new provider by calling ~~_____, at _____~~ (718) 613-4000.

_____ [name of new provider] is committed to providing high quality, compassionate care and services for its patients, their families and the communities we serve.  If you have any questions about your care or need other assistance, please call (718) 613-4000.

~~at _____.~~ Thank you for trusting us with your medical care, and for your support and understanding during this transition.

[INSERT LIST OF NAMES AND CONTACT INFORMATION]

Thank you for your patience with this change.

Sincerely,

_____

Patrick Sullivan
Interim Chief Executive Officer

[INTERFAITH MEDICAL CENTER LETTERHEAD]

[NOTICE TO OUTPATIENTS - CLOSURE OF PROGRAM]

_____, 2013

Dear Patient and Family:

As an outpatient of Interfaith Medical Center's _____ Program  (the  "Program"), we are saddened to tell you that the Program will be closing as of _____, 2013.   It is our goal to provide stability and to maintain quality healthcare and vital services during this transition.

You have a choice about where to obtain your care.  The providers listed below are available to provide continuing care to patients of the Program.  Please call the provider directly to arrange an appointment.   If you need assistance or a referral, we will help you in locating another provider to continue your care.  Please call  (718) 613-4000  for assistance.   We will transfer your records to your new provider upon your written consent.  If you have an appointment to see your doctor on _____ 2013 or after, please call ___ (718) 613-4000  for assistance in arranging for alternative care.

After the Program closes, your medical records will continue to be stored at the hospital for a period of time.  If you need a copy of your medical records, ~~please call~~ _____, ~~at ___ _____. For~~ radiology ~~and~~or laboratory results, ~~call~~ _____. ~~We have instituted a hot line for those of you who might have~~ or any other questions ~~or concerns.  That number is ___ _____~~, please call (718) 613-4000.

All of us at Interfaith Medical Center appreciate the trust you have placed in us over the years and thank you for your understanding.

Sincerely,

_____
Patrick Sullivan
Interim Chief Executive Officer

2554120v.~~13~~15

## EXHIBIT ~~C~~E

### Proposed Timeline

Filing of Plan of Closure:  July 25, 2013

Closure initiates: [August ~~12,~~26, 2013]

Inpatient admissions cease: [August ~~12,~~26, 2013]

Emergency Department goes on permanent diversion and operates on a "treat and release or transfer" site: [August ~~12,~~26, 2013]

Two (2) ambulances (1 basic life support ambulance and 1 advanced life support ambulance) to be stationed at the Emergency Department ~~through~~ until [September ~~11, 2013~~25, 2013] or such time as may be agreed to by IMC and DOH

Closure of Emergency Department: [September 25, 2013]

Cessation of inpatient care services: [September ~~12,~~26, 2013 ]

Cessation of outpatient programs:  [October ~~12,~~26, 2013]

Cessation of HIV, detox and rehabilitation programs:  [November ~~11,~~25, 2013]

~~Closure of Emergency Department: September 11, 2013~~