Alan J. Lipkin
Shaunna D. Jones
Anna C. Burns
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-48226 (CEC) |
| | : | |
| Debtor. | : | |

------------------------------------------------------x

## NOTICE OF HEARING ON DEBTOR'S MOTION FOR A FINAL ORDER: (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTIONS 105, 361, 362, 364, 503(b) AND 507(b) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL ON A FINAL BASIS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE PROTECTION PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE; (V) AUTHORIZING AND APPROVING A RELATED COMPROMISE AND SETTLEMENT PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019; AND (VI) PROVIDING RELATED RELIEF

PLEASE TAKE NOTICE that annexed hereto is the Debtor's Motion for a Final

Order:  (I) Authorizing the Debtor to Obtain Postpetition Secured Financing Pursuant to Sections

105, 361, 362, 364, 503(b) and 507(b) of the Bankruptcy Code; (II) Authorizing the Debtor to

Use Cash Collateral on a Final Basis Pursuant to Section 363 of the Bankruptcy Code;

(III) Providing Adequate Protection Pursuant to Sections 361, 362, and 363 of the Bankruptcy

Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code;

---

[1]     The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

(V) Authorizing and Approving a Related Compromise and Settlement Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019; and (VI) Providing Related Relief (the "**Motion**").  The proposed DIP Credit Agreement is attached to the Motion as <u>Exhibit A</u>, and the proposed DIP Order is attached to the Motion as <u>Exhibit B</u>.

PLEASE TAKE FURTHER NOTICE that a hearing (the "**Hearing**") on the Motion will be held on **September 11, 2013 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Carla E. Craig, United States Bankruptcy Judge in Courtroom 3529 of the United States Bankruptcy Court, 271 Cadman Plaza East – Suite 1595, Brooklyn, New York 11201-1800.

PLEASE TAKE FURTHER NOTICE that responses or objections, if any, to entry of the order requested in the Motion must be made in writing, state with particularity the grounds therefor, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of New York, be filed electronically in text searchable portable document format (PDF) with the Court by registered users of the Court's case filing system and by all other parties in interest (with a hard-copy delivered directly to the Judge's Chambers), and be served upon:  (i) Interfaith Medical Center, 1545 Atlantic Avenue, Brooklyn, NY 11213 (Attn: Patrick Sullivan  and Robert Mariani); (ii) counsel for the Debtor, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Alan J. Lipkin, Esq. and Shaunna D. Jones, Esq.); (iii) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, NY 11201 (Attn: William E. Curtin, Esq. and Susan D. Golden, Esq.); (iv) counsel to the Dormitory Authority of the State of New York, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166-4193 (Attn: David Neier, Esq. and Carey D. Schreiber, Esq.); and (v) counsel to the Official Committee of Unsecured Creditors, Alston & Bird LLP, 90

Park Avenue, New York, NY 10016 (Attn: Martin G. Bunin, Esq. and Craig Freeman, Esq.), **so as to be actually received on or before 11:59 p.m. (prevailing Eastern Time) on September 3, 2013.**[2]

PLEASE TAKE FURTHER NOTICE that if you wish to be heard with respect to any of the foregoing matters, you must attend the Hearing.  The Hearing may be adjourned from time to time in open court.

PLEASE TAKE FURTHER NOTICE that if you would like to receive copies of the Motion set forth above, (a) you may access such documents online from either the Bankruptcy Court's electronic case filing system located at http://www.nyeb.uscourts.gov/ or the website of the Debtor's claims agent at http://www.donlinrecano.com/interfaithmedical, or (b) you may contact Anna C. Burns, Esq., at Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, by telephone at (212) 728-8000 or by e-mail at aburns@willkie.com.

Dated: August 16, 2013

WILLKIE FARR & GALLAGHER LLP

By:   /s/ Alan J. Lipkin
   Alan J. Lipkin
   Shaunna D. Jones
   Anna C. Burns
   787 Seventh Avenue
   New York, New York 10019
   Tel:  (212) 728-8000
   Fax:  (212) 728-8111

*Attorneys for the Debtor and Debtor in Possession*

---

[2] The slightly earlier objection deadline is established due to the Rosh Hashanah holiday commencing on the evening of September 4, 2013.

Alan J. Lipkin
Shaunna D. Jones
Anna C. Burns
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel:  (212) 728-8000
Fax:  (212) 728-8111

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Interfaith Medical Center, Inc.,[1] | : | Case No. 12-48226 (CEC) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------x

# DEBTOR'S MOTION FOR A FINAL ORDER:
## (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTIONS 105, 361, 362, 364, 503(b) AND 507(b) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL ON A FINAL BASIS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE PROTECTION PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE; (V) AUTHORIZING AND APPROVING A RELATED COMPROMISE AND SETTLEMENT PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND <u>BANKRUPTCY RULE 9019; AND (VI) PROVIDING RELATED RELIEF</u>

Interfaith Medical Center, the debtor and debtor in possession in the above-captioned case (the "**<u>Debtor</u>**" or "**<u>IMC</u>**"), hereby submits this motion for entry of a final order, pursuant to sections 105(a), 361, 362, 363, 364, 503(b), and 507 of title 11 of the United States Code (the "**<u>Bankruptcy Code</u>**"), Rules 2002, 4001, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "**<u>Bankruptcy Rules</u>**"), and Rule 4001-5 of the Local Bankruptcy Rules for the Eastern District of New York (the "**<u>Local Rules</u>**"), granting the following relief:

---

[1]    The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

A.  Authorizing the Debtor to obtain a delayed-draw term loan (the "**DIP Facility**") under which borrowings may be made from time to time pursuant to the Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement, dated as of September [__], 2013, substantially in the form annexed hereto as <u>Exhibit A</u> (in its final form, together with all schedules and exhibits thereto, and as it may be amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time, the "**DIP Loan Documents**") by and among:  (i) the Debtor; and (ii) the Dormitory Authority of the State of New York (the "**Authority**", "**DASNY**", the "**DIP Lender**", or in its capacity as IMC's primary prepetition lender, the "**Prepetition Lender**") in respect of the obligations set forth in the DIP Budget, DIP Loan Documents, and the DIP Order (the "**DIP Obligations**");

B.  granting mortgages, security interests, liens and superpriority claims for the benefit of the DIP Lender in respect of the DIP Obligations as provided in the proposed DIP order (the "**DIP Order**"), annexed hereto as <u>Exhibit B</u>, and in the DIP Loan Documents;

C.  granting, on a final basis, the Debtor's continued use of Cash Collateral[2] in accordance with the authority granted in the Eighth Interim Order: (I) Authorizing the Debtor to Utilize Cash Collateral of Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105, 361 and 363; (II) Granting a Superpriority Claim; (III) Granting Adequate Protection; (IV) Providing Related Relief; and (V) Scheduling a Final Hearing [Docket No. 631], (the "**Eighth Interim Cash Collateral Order**");

D.  authorizing adequate protection (collectively, the "**Proposed Adequate Protection**") with respect to the Prepetition Indebtedness (as defined below) for the Prepetition Lender whose liens and security interests are being primed by the DIP Obligations, DIP Liens and DIP Superpriority Claim under the DIP Credit Agreement and other DIP Loan Documents, and whose Prepetition Collateral (as defined below) may be used, sold or leased by the Debtor, and granting the following as adequate protection of such interests with the same relative priority of the liens and claims owing to the Prepetition Lender:  (i) Adequate Protection Liens (as defined below), subject only to Permitted Prior Senior Liens, DIP Obligations, DIP Liens, DIP Superpriority Claim, and the Carve-Out, (ii) Section 507(b) Claims (as defined below), subject and subordinate only to the Carve-Out, Permitted Prior Senior Liens, Existing Obligations, Prepetition Liens, DIP

---

[2]  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Order or DIP Credit Agreement.

Obligations, DIP Liens, DIP Superpriority Claim; and (iii) Adequate Protection Payments (as defined below), all on the terms set forth herein;

E.    modifying the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Order and satisfy the Adequate Protection Obligations (as defined below);

F.    authorizing the funding of postpetition allowed fees and expenses of Retained Professionals (defined below) and the Carve-Out (defined below);

G.    authorizing and approving a compromise and settlement of the claims of the Authority as Prepetition Lender and DIP Lender; and

H.    granting related relief.

In support of this motion, the Debtor, by and through its undersigned counsel, respectfully represents:

## PRELIMINARY STATEMENT

1.    Partly in reliance on the agreement of DASNY and the New York State Department of Health ("**DOH**") to provide IMC with a DIP loan to fund an orderly closure and confirm a chapter 11 plan, IMC filed a motion [Docket No. 602] (the "**Closure Motion**") seeking authority to implement the closure plan IMC submitted to DOH (as it may be amended, the "**Closure Plan**").  Assuming the Closure Motion is approved, the Debtor will require continued use of its Cash Collateral and access to the proposed DIP Facility to help fund implementation of IMC's Closure Plan and payment of administrative expenses during the remainder of this case.  While IMC hoped to utilize a DIP loan to help fund IMC's reorganization, that alternative has not been made available to IMC.  Accordingly, IMC determined it has no choice other than pursuing implementation of the Closure Plan and resolution of this case through the Closure Motion and this motion for approval of DIP financing.

## JURISDICTION

2.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code.

## BACKGROUND

### A.     General Background

3.      On December 2, 2012 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its property and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      On December 13, the Office of the United States Trustee for the Eastern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in this case (the "**Committee**").

### B.     Summary Of IMC's Prepetition Indebtedness And Capital Structure

5.      Prior to the Petition Date, the Prepetition Lender made loans and extended other financial accommodations to IMC. In February 1998, the Prepetition Lender first issued its secured hospital revenue bonds relating to the Debtor (the "**1998 Bonds**") and loaned the proceeds to the Debtor to be used to fund construction projects and to satisfy other obligations. Thereafter, in connection with a Loan Agreement between the Prepetition Lender and IMC, dated as of January 24, 2007 (as amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Prepetition Loan Agreement**"), the Prepetition Lender issued its Secured Hospital Revenue Refunding Bonds, Interfaith Medical Center, Series 2007 (the "**Series 2007 Bonds**") in

the aggregate principal amount of $122,475,000. The proceeds from the Series 2007 Bonds were loaned by the Prepetition Lender to the Debtor pursuant to the Prepetition Loan Agreement. The Debtor used these loan proceeds to make payments to the Prepetition Lender for refunding the 1998 Bonds and to fund certain reserves.

6.    Pursuant to a Reimbursement Agreement between the Prepetition Lender and IMC, dated as of November 21, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Pool Loan Agreement**"), the Prepetition Lender loaned the Debtor $2,000,000 to fund working capital, which loan matured on January 1, 2013.

7.    To secure IMC's obligations under the Prepetition Loan Agreement, the Prepetition Lender was granted a lien on and security interest in the Debtor's gross receipts (including receipts, revenues, income and other moneys received by the Debtor or derived from the operation of the Debtor's facilities, <u>except</u> for restricted contributions, grants, gifts and bequests) and a first lien mortgage on, among other things, certain of the Debtor's real property located in Kings County, New York, NY (the "**Mortgaged Property**"), the Debtor's interest in various easements, licenses, permits, and rights related to the Mortgaged Property, the Debtor's equipment and personal property located on the Mortgaged Property, and proceeds of the foregoing (collectively, the "**Prepetition Loan Collateral**").[3] To secure the Debtor's obligations under the Pool Loan Agreement, the Prepetition Lender was granted a security

---

[3]    IMC's payments under the Prepetition Loan Agreement are to be used to make principal and interest payments on the Series 2007 Bonds. Also, the Authority and New York State (the "**State**") entered into a service contract to provide additional credit protection for the Series 2007 Bonds. Under the service contract, the New York Director of the Budget will request an appropriation from the State in an amount equal to the payments of principal and interest due on the Series 2007 Bonds within one year of the appropriation request to the extent all pledged and available funds for servicing the Series 2007 Bonds are inadequate to make such payments.

interest in certain State funds allocated to the Debtor from funding pools for bad debt and charity care (collectively, with the Prepetition Loan Collateral, the "**Prepetition Collateral**"). The Debtor is obligated to cause DOH to pay those funds directly to the Prepetition Lender.

        8.     As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Loan Agreement was not less than $117,312,276.30 and the aggregate principal amount outstanding under the Pool Loan Agreement was not less than $2,000,000.00, for a total of not less than $119,312,276.30 in respect of the prepetition secured obligations (the "**Prepetition Loan Obligations**").[4]

        9.     In addition, the Prepetition Lender made an unsecured, interest-free loan to IMC in the amount of $15,122,204 (the "**Fund B Loan**"), pursuant to that certain Reimbursement Agreement between DASNY and IMC, dated as of March 29, 2005 (as amended on June 14, 2011, and as further amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Fund B Loan Agreement**", and together with the Prepetition Loan Agreement, and the Pool Loan Agreement, the "**Prepetition Loan Documents**" and the obligations thereunder, the "**Existing Obligations**").  IMC was to use the proceeds from the Fund B Loan to satisfy certain amounts due to the DOH in connection with prior DOH distributions from certain bad debt and charity care funding pools.  Pursuant to the Fund B Loan Agreement, the Debtor commenced repayment of the Fund B Loan in May 2008.  On June 14, 2011, DASNY and the Debtor amended the Fund B Loan Agreement to, among other things, extend the final payment date of the Fund B Loan to April 1, 2024, and defer the twelve monthly installments originally

---

[4]     Certain of the Prepetition Loan Obligations may be subject to an original issue discount.  There is a reserve fund that currently contains approximately $6,634,955 held by the trustee for the Series 2007 Bonds.  Once applied, the Debtor's principal amount of debt would be reduced by the amount held in the reserve fund.

payable April 1, 2011 through March 1, 2012.  As of the Petition Date, the aggregate principal

amount outstanding under the Fund B Loan was approximately $12,181,775.25.

**C.      Events Leading To Commencement Of
         IMC's Chapter 11 Case, IMC's Post-Petition Restructuring
         Efforts, And Events Leading To Submission Of IMC's Closure Plan**

         10.    The events leading to IMC's chapter 11 filing, IMC's post petition

restructuring efforts, and IMC's Closure Plan are described in the Closure Motion.

**D.      IMC's Current Financing Needs**

         11.    Interruption of IMC's cash flow would severely impede the Debtor's

ability to maintain the value of its estate for the benefit of stakeholders and to confirm a chapter

11 plan.  In particular, IMC's use of DASNY's Cash Collateral and the Debtor's access to the

DIP Facility are necessary now:  (a) to assure third parties, such as the Debtor's vendors,

patients, and employees, regarding the Debtor's ability to meet its administrative liabilities;

(b) to provide the Debtor with additional liquidity as and when needed; and (c) to assist the

Debtor in implementing its Closure Plan.  Hence, the Debtor requires continued use of Cash

Collateral on a final basis along with access to the proposed DIP Facility.

         12.    Assuming this motion is granted, the Debtor's use of Cash Collateral and

access to the DIP Facility would be pursuant to a budget, in form and manner reasonably

acceptable to the Authority (the "**DIP Budget**").[5]  The DIP Budget would be subject to a

"basket" that would enable IMC to vary somewhat from the DIP Budget to address issues such

as timing of receipts and variations from the projected receipts and expenditures upon which the

DIP Budget is based.  Subject, inter alia, to the assumptions and limitations set forth in the DIP

---

[5]      A copy of the proposed DIP Budget is annexed to Exhibit B, the proposed DIP Order, and also was
         included as Exhibit 2 to the Second Supplement to the Closure Motion [Docket No. 627].

Budget (and, therefore, without absolute assurance the DIP budget projections will be achieved),

the Debtor believes the DIP Budget will be adequate to pay all administrative expenses due or

accruing in this case.

## **REQUIRED DISCLOSURE OF KEY DIP FACILITY PROVISIONS**

13.     Pursuant to Bankruptcy Rule 4001(c), Local Rule 4001-5, and

Administrative Order 558 of this Court adopting guidelines for financing motions (the

"**Administrative Order**"), the Debtor discloses below certain terms of the Debtor's DIP

Facility:[6]

| | |
|---|---|
| **Borrower**: | IMC (the "**Borrower**") as debtor-in-possession in a chapter 11 case in this Court (the "**Bankruptcy Court**"). |
| **DIP Lender**: | The Dormitory Authority of the State of New York, pursuant to section 2815 of the New York Public Health Law. |
| **DIP Facility:** | The DIP Lender shall lend $15 million to the Borrower consisting of a delayed-draw term loan. |
| **Closing Date**: | The DIP Facility will close upon entry by the Bankruptcy Court of the DIP Order (the "**DIP Closing Date**"), satisfactory in form and substance to the DIP Lender and the satisfaction of the other conditions precedent set forth below. |
| **Purpose**: | The proceeds from the DIP Facility will be used to: (1) fund working capital requirements and operating expenses of the Debtor in accordance with the DIP Order, the DIP Budget, and the DIP Loan Documents, including operating expenses and other expenses associated with implementation of the Closure Plan; (2) fund postpetition allowed fees and expenses incurred by the Debtor's Retained Professionals, the Committee and its Retained Professionals, and the Patient Care Ombudsman and its |

---

[6]     This summary is qualified in its entirety by the provisions of the DIP Loan Agreement and DIP Order, as applicable.

Retained Professionals, in accordance with the DIP Budget; (3) pay interest on the DIP Facility; (4) pay expenses of the DIP Lender related to the DIP Facility and this case; and (5) fund the other items covered by the DIP Budget, the DIP Order, and the DIP Loan Documents.

**Interest Rate**:

The DIP Obligations shall bear interest at the rate (subject to any applicable default rate after the occurrence of an Event of Default) of 1% per annum payable quarterly in arrears.

**Maturity**:

All amounts owing under the DIP Facility will be due and payable on the earliest to occur of the following unless such applicable date is modified in writing by the Authority in accordance with the terms of the proposed DIP Order:  (a) the DIP Transaction Deadline as it may be extended from time to time; (b) the earlier of (i) the date upon which the Eighth Interim Cash Collateral Order expires or (ii) thirty-five (35) days after the entry of the Eighth Interim Cash Collateral Order, in either case, if the DIP Order has not been entered prior to the expiration of such period; (c) if a chapter 11 plan for IMC has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the 30th day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrower; (e) the date of indefeasible prepayment in full by Borrower of all DIP Obligations under the DIP Credit Agreement in accordance with the terms thereof; or (f) upon acceleration of the DIP Obligations pursuant to the DIP Credit Agreement (the "**Loan Maturity Date**").

**Security / Superpriority Claim**:

The DIP Obligations under the DIP Credit Agreement and the other DIP Loan Documents shall be backed by the following:

1. an allowed superpriority administrative expense claim pursuant to section 364(c)(1) (the "**DIP Superpriority Claim**") with priority over any and all other administrative expense claims and unsecured claims against the Debtor and its estate (including the kinds specified in or arising or ordered pursuant to sections 105, 326, 328, 330,

331, 503(b), 506(c), 507(a), 507(b), or 726 thereof or otherwise), which DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor, and subject only to the Carve-Out: (I) except for: (a) Avoidance Actions and Avoidance Action Proceeds; (b) funds advanced by the I M Foundation, Inc.; or (c) any restricted contributions, grants, gifts and bequests held or received by IMC (in each case subject to the DIP Lender's rights being fully reserved to seek payment from each such asset); and (II) except for the Retained Professionals Fund (other than any Residual Interest);

2.  a first priority, priming security interest in and lien pursuant to section 364(d)(1) on all encumbered property of the Debtor and its estate (the "**Section 364(d)(1) Liens**"), which section 364(d)(1) Liens shall be senior to any existing liens or claims, subject only to: (i) the Carve-Out; and (ii) liens on property of the Debtor (including the proceeds of such property) that are in existence on the Petition Date, but only, subject to the terms of the DIP Order: (A) to the extent a lien on any property is valid, perfected, and not avoidable; and (B) the lien on such property (or the proceeds of such property, as applicable) on the Petition Date was senior in priority to the Prepetition Liens (each of the items referenced in the foregoing clause (ii) being referred to as a "**Permitted Prior Senior Lien**");

3.  subject to the Carve-Out, a first priority security interest and lien pursuant to section 364(c)(2) on all unencumbered property of the Debtor and the estate: (I) except for: (a) Avoidance Actions and Avoidance Action Proceeds; (b) funds advanced by the I M Foundation, Inc.; or (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject in each case to the right of the DIP Lender to seek inclusion of each such asset); and (II) except for the Retained Professionals Fund (other than any Residual Interest) (the "**Section 364(c)(2) Lien**");

4.  subject to the Carve-Out, a junior security interest

and lien pursuant to section 364(c)(3) on all property of the Debtor and its estate that is subject to a Permitted Prior Senior Lien (the "**Section 364(c)(3) Lien**", and collectively with the Section 364(d)(1) Lien and Section 364(c)(2) Lien, the "**DIP Liens**").

None of the DIP Obligations, DIP Liens or DIP Superpriority Claim shall be:  (a) subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the estate under section 551; (b) subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of the Debtor; (c) subject to sections 510, 549, or 550; or (d) in the future,  subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 or otherwise, except as expressly provided in the DIP Order.

**Carve-Outs**:

Fee and Expense Carve-Out:  Upon the occurrence of the Carve-Out Trigger Date,[7] the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, Section 507(b) Claim of the Prepetition Lender, and Prepetition Liens of the Prepetition Lender shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**") from proceeds of the DIP Facility being reserved by the Authority (and, for the avoidance of doubt not from either Cash Collateral or proceeds resulting from the liquidation of any DIP Collateral, Prepetition Collateral or collateral of any holder of a Prior Permitted Senior Lien):

1. (A) the reasonable fee and expense claims of the respective retained professionals of the Debtor, the Committee and the Patient Care Ombudsman, if any, that have been or in the future are approved by this Court during the chapter 11 case pursuant to sections

---

[7]    The term "**Carve-Out Trigger Date**" means the date on which the DIP Lender provides written notice to the Debtor, counsel to the Debtor, the U.S. Trustee, and counsel to the Committee that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an Event of Default under the DIP Loan Documents or upon the Loan Maturity Date.

327, 328, and 1103 of the Bankruptcy Code or otherwise (the retained professionals of the Debtor, the Committee and the Patient Care Ombudsman are collectively referred to as the "**Retained Professionals**"), (B) the reasonable expense claims of members of the Committee (the "**Committee Member Expenses**"), and (C) the reasonable fee and expense claims of the Patient Care Ombudsman, in each case, for unpaid fees and expenses which were incurred on and after the Petition Date and, in the case of any Retained Professional, remain outstanding after application of (i) any retainer held by such Retained Professional, (ii) any payments from the Retained Professionals Fund, and (iii) any payments to Retained Professionals from any other assets of the Debtor's estate including, without limitation, Avoidance Action Proceeds, funds advanced by the I M Foundation, Inc., and any restricted contributions, grants, gifts and bequests held or received by IMC, in an aggregate amount not exceeding $1,500,000 (the "**Carve-Out Amount**") for fees and expenses incurred after the Carve-Out Trigger Date for all Retained Professionals, Committee Member Expenses and Patient Care Ombudsman, which shall be fully reserved by the Authority from proceeds of the DIP Facility; provided that, in each case, such fees and expenses, as applicable, of the Retained Professionals, members of the Committee, and the Patient Care Ombudsman are in accordance with, and not in excess of the aggregate cumulative amounts set forth in, the DIP Budget (and prior cash collateral budgets), and in each case, such fees and expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under the DIP Order; and provided further, that (x) nothing in the DIP Order shall prevent the Bankruptcy Court from determining the allocation of the Carve-Out amongst the various Retained Professionals, members of the Committee and Patient Care Ombudsman so long as such allocation does not increase the Carve-Out; and (y) the Carve-Out shall not include any bonus, transaction, success or completion fees or any other fees of similar import for Retained Professionals without the prior written approval of the Prepetition Lender in its sole discretion; and

2. the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code and section 3717 of Title 31 of the United States Code.  There is no limitation on the obligations of the Debtor for such fees.

Reduction of $1,500,000 Carve-Out Amount.  Although the Carve-Out shall not be paid until payments to Retained Professionals are made as set forth above, the $1,500,000 fixed dollar amount available to be paid under the Carve-Out following the Carve-Out Trigger Date shall only be reduced, dollar-for-dollar, by the aggregate amount of payments made from collateral that is subject to the liens and claims of the DIP Lender to applicable Retained Professionals, members of the Committee and the Patient Care Ombudsman on and after the Carve-Out Trigger Date for fees and expenses incurred after the Carve-Out Trigger Date.  For the avoidance of doubt, the fixed dollar amount of the Carve-Out shall not be reduced by any payments from:  (a) Avoidance Action Proceeds, (b) funds advanced by the I M Foundation, Inc., or (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject in each case to the right of the DIP Lender to seek inclusion of each such asset) and except for the Retained Professionals Fund (except for any Residual Interest) or any payments from any retainers held by any Retained Professionals.

**Emergency Reserve:**

$250,000 for preservation and maintenance of the Prepetition Collateral shall be fully reserved by the Authority from proceeds of the DIP Facility unless and until unneeded.

**Conditions Precedent:**

The conditions to the closing of the DIP Facility will be those customarily found in loan agreements for similar financings and others appropriate to the specific transaction, which may be waived either individually or as a whole solely upon the express written consent of the DIP Lender, including the following:

1. The Borrower shall have obtained all authorizations, consents and approvals necessary, if any, from, and has made all filings and given all notices to, all federal, state and local governmental agencies,

- 13 -

authorities and instrumentalities required, if any, to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents, and except for entry of the DIP Order and except for approval from DOH, no action, consent or approval of, registration or filing with, permit from, notice to, or any other action by, any governmental authority is or will be required;

2. The DIP Loan Documents shall have been executed and delivered;

3. The Bankruptcy Court shall have entered the DIP Order in form and substance acceptable to the DIP Lender in its sole discretion;

4. The Borrower shall have delivered to the DIP Lender the consolidated balance sheets and related statements of income, fund balance and cash flows of the Borrower:  (a) for the fiscal years ended December 31, 2010 and December 21, 2011, in each case audited by and accompanied by the opinion of Ernst & Young, public accountants; and (ii) for the three-month periods ended March 31, 2012, June 30, 2012, September 30, 2012 and December 31, 2012, in each case certified by the Borrower's chief financial officer;

5. No material adverse change in the business, financial performance, operations, or in the condition of the assets of the Borrower shall have occurred unrelated to IMC's chapter 11 filing and the implementation of the Closure Plan and DIP Transaction (as defined below);

6. The transaction and the events contemplated in the DIP Loan Agreement shall have closed by the Closing Date, unless extended by the express written consent of the DIP Lender and the Debtor;

7. The DIP Budget shall have been delivered on or prior to the Closing Date;

8. The Borrower shall not have caused or permitted, or consented to any liens, mortgages or security interests

having, pursuant to section 364(d) of the Bankruptcy Code, priority that are equal or senior to the respective priorities of the prepetition liens or the postpetition liens to encumber any of the Collateral through and including the Closing Date; and

9.  With respect to matters affecting or pertaining to the DIP Collateral or the DIP Lender, the Debtor shall have complied in all material respects with the notice and other requirements of the Bankruptcy Code in a manner reasonably acceptable to the DIP Lender.

**Waiver of Automatic Stay**:

Upon the occurrence of an Event of Default or upon the Loan Maturity Date, upon seven (7) days written notice from the DIP Lender, the automatic stay shall be modified and vacated (at the DIP Lender's election), without any further application, motion or notice to, or order from the Bankruptcy Court, to permit the DIP Lender to exercise its remedies under the DIP Credit Agreement, without further application or motion to, or order from, the Bankruptcy Court, unless such notice is invalid or is withdrawn.

**Reporting:**

The Debtor shall deliver to the Authority such reports, data and other information required to be delivered pursuant to the Prepetition Loan Documents and DIP Loan Documents.  The Debtor shall deliver to counsel to the Committee such reports, data and other information required to be delivered pursuant to the Prepetition Loan Documents and DIP Loan Documents at the same time and in the same form delivered to the Authority. Notwithstanding the foregoing, the Debtor may take appropriate actions with respect to confidentiality of such reports, data and other information.

**Events of Default:**

The DIP Facility will be subject to the following Events of Default:

1.  the Debtor uses the Prepetition Collateral, including Cash Collateral, other than as set forth in the DIP Order and in the DIP Budget;

2.  the Debtor does not have in place the Restructuring/Wind-Down Advisors;

3.  except as otherwise permitted by the DIP Credit Agreement, without the written consent of the DIP Lender, the Debtor proposes any of the following that would not indefeasibly pay the DIP Obligations in full in cash:  (i) a sale, or transfer, of all or substantially all of the equity or assets of the Debtor; (ii) the Debtor is reorganized with another entity as its majority or sole member; or (iii) the Debtor's assets are transferred to a successor;

4.  without the written consent of the Prepetition Lender, the Debtor applies to the Court for an order:  (i) authorizing the use of the DIP Collateral, including Cash Collateral, or that seeks approval of a priming, senior or *pari passu* security interest in or lien upon Cash Collateral or the DIP Collateral; (ii) seeking to challenge the Prepetition Lender's liens upon the Cash Collateral or the Collateral or otherwise asserting rights, claims or causes of action against the Prepetition Lender with respect to the Prepetition Secured Obligations; (iii) seeking to sell or transfer all or substantially all of the equity or assets of the Debtor while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and completely satisfy same upon consummation of the transaction contemplated thereby; (iv) seeking to reorganize the Debtor with another entity as its controlling, majority or sole member while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and completely satisfy same upon consummation of the transaction contemplated thereby; or (v) seeking to transfer the Debtor's assets to a successor while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and completely satisfy same upon consummation of the transaction contemplated thereby;

5.  any other motion is filed by the Debtor for any relief directly or indirectly affecting the DIP Collateral in a material manner unless all DIP

Obligations have been indefeasibly paid in final, in full, in cash, and completely satisfied upon consummation of the transaction contemplated thereby;

6. the Debtor fails to comply with any of the material terms of the DIP Order, including the DIP Budget, or any stipulation, representation or covenant by the Debtor stated therein is materially false or misleading;

7. any of the relief listed in items 1-6 above is granted upon a motion of a party other than the Debtor; provided, however, for the avoidance of doubt, the mere filing (as opposed to granting) of a motion by a party other than the Debtor, including the Committee, for any of relief listed in items 1-6 above shall not be an Event of Default; and/or

8. if the Debtor fails to meet any of the following milestones (except to the extent such deadlines or milestones are extended in writing by the DIP Lender in its sole discretion):

   a. on or before August 26, 2013, the Debtor shall not have obtained approval of the Closure Plan; provided, however, that if the Court does not rule on the Debtor's Closure Motion for approval of the Closure Plan at the August 26, 2013 hearing on that motion, then such date shall be extended until the earlier of the date the Court so rules and August 27, 2013; and

   b. on or before October 31, 2013, the Debtor shall not have completed implementation of the Closure Plan so that the hospital ceases patient and healthcare operations by such date, except as permitted in writing by the Authority in consultation with DOH.

**Remedies:**                Upon the occurrence of an Event of Default, or upon the Loan Maturity Date, after providing not less than seven (7) days prior notice pursuant to the Notice Procedures Order, the DIP Lender shall be entitled to exercise all of its rights and remedies under the DIP Order, including, without limitation, to foreclose upon the DIP Collateral,

including Cash Collateral, or otherwise enforce the DIP Obligations, DIP Liens and DIP Superpriority Claim on any or all of the DIP Collateral, including Cash Collateral, and/or to exercise any other default-related remedies under the DIP Loan Documents, the DIP Order or applicable law in seeking to recover payment of the DIP Obligations.  For the avoidance of doubt, with respect to Permitted Prior Senior Liens, any exercise of such rights and remedies shall be in accordance with applicable non-bankruptcy law in respect of Permitted Prior Senior Liens.

During the not less than seven (7) day notice period, the Debtor, the Committee, or any other-party-in-interest may seek an order of the Court staying the DIP Lender's exercise of such remedies against the DIP Collateral, including with respect to Cash Collateral, and, if no such stay is obtained, then the DIP Lender may exercise any and all such rights and remedies without further order of the Court or notice to any party, and during the seven (7) day notice period, the Debtor shall be entitled to continue to use Cash Collateral in accordance with the DIP Budget.

| | |
|---|---|
| **Indemnification:** | The Debtor shall indemnify the DIP Lender and its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "**Indemnified Person**") against and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtor or any of its affiliates or shareholders) that relates to the DIP Facility or the DIP Order, including the financing contemplated thereby, the chapter 11 case, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. |
| **Governing Law and** | State of New York and the Bankruptcy Code. |

**Jurisdiction:**

## PROPOSED ADEQUATE PROTECTION FOR PREPETITION LENDER

14.    In partial exchange for the Authority's consent to the Debtor using Cash Collateral on a final basis and agreement to enter into the DIP Facility, the Debtor has agreed to grant DASNY the following as adequate protection of its interests in the Prepetition Collateral (the "**Proposed Adequate Protection**"):

A.    Perfected security interests and replacement liens (the "**Adequate Protection Liens**") on all property of the Debtor whether arising prepetition or postpetition of any nature whatsoever, wherever located, (x) except for: (i) Avoidance Actions or Avoidance Action Proceeds; (ii) funds advanced by the I M Foundation, Inc.; or (iii) any restricted contributions, grants, gifts and bequests held or received by IMC (in each case subject to the right of the Prepetition Lender to seek inclusion of each such asset); and (y) except for the Retained Professionals Fund (other than any Residual Interest) (collectively the "**Adequate Protection Obligations**") to secure the Prepetition Secured Obligations of, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral.  The Adequate Protection Liens would be subject and subordinate to: (i) the Carve-Out; (ii) the DIP Obligations, the DIP Liens and the DIP Superpriority Claim; and (iii) the Permitted Prior Senior Liens.

B.    As and to the extent that the Prepetition Lender holds claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code (each, a "**Section 507(b) Claim**"), with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, Permitted Prior Senior Liens, Existing Obligations, Prepetition Liens, the DIP Obligations, the DIP Liens and the DIP Superpriority Claim; provided, however, that such priority shall not apply to either (x): (i) Avoidance Action Proceeds; (ii) funds advanced by the I M Foundation, Inc.; or (iii) any restricted contributions, grants, gifts and bequests held or received by IMC (in each case subject to the right of the Prepetition Lender to seek inclusion of each such asset); or (y) the Retained Professionals Fund (other than any Residual Interest) after indefeasible payment in full in cash

of the DIP Obligations.

    C. In accordance with the DIP Budget, promptly pay all reasonable fees and expenses incurred by the Prepetition Lender, whether incurred prior to or following the Petition Date (the "**Adequate Protection Payments**").

### IMC'S EFFORTS TO OBTAIN ALTERNATE FINANCING

    15.    Given the Debtor's continuing relationship with the Authority, the Authority's consent to the Debtor's use of Cash Collateral financing on an interim, and now final, basis, the Authority's senior prepetition (and post petition adequate protection) liens and mortgages on substantially all of the Debtor's assets, and the favorable economic terms to IMC of the Authority's proposed postpetition DIP financing, agreement to IMC's continued use of Cash Collateral, and resolution of the Prepetition Lender and Postpetition Lender's claims (as discussed below), the Debtor believes there would be little to gain from embarking on a futile search for a better postpetition financing alternative. That is particularly true given the fact IMC is seeking to implement its Closure Plan.  Thus, while the Debtor initially considered potential alternative financing sources, the Debtor respectfully submits that under the circumstances, the economic terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms' length, and the non-economic terms reflect the Authority's unique position in the case.  Accordingly, the Authority should be accorded the benefits of section 364(e) of the Bankruptcy Code respecting the DIP Credit Agreement.

### PROPOSED SETTLEMENT OF OTHER CLAIMS AND RELATED MATTERS BETWEEN THE DEBTOR AND THE AUTHORITY

    16.    As part of the consideration for the Authority providing DIP Financing to the Debtor and consenting to the Debtor's continued use of Cash Collateral, the Debtor and the Authority have agreed to resolve certain claims and issues between the Debtor and the Authority, including, without limitation, resolution of the Authority's prepetition and postpetition claims.

Under the proposed settlement, the Authority would release all of its claims against the Debtor as well as the related liens on substantially all of the Debtor's assets in exchange for only a portion of the Debtor's assets covered by such liens.  Hence, the proposed settlement would free up assets, rights, and interests worth not less than $35.7 million (and potentially much more) for the Debtor's estate, its creditors and all parties in interest.  As demonstrated by the DIP budget, those resources then should be sufficient to make the Debtor administratively solvent and enable the Debtor to confirm a chapter 11 plan.

    17.  Specifically, subject to Court approval, the Debtor and the Authority have agreed to the following settlement terms (the "**DIP Transaction**"):

    (a)  The Debtor would fully implement the Closure Plan;

    (b)  On or before the earlier of entry of an order confirming a chapter 11 plan for the Debtor consistent with the DIP Transaction (a "**Plan**") and December 31, 2013 (the "**DIP Transaction Deadline**"), unless the DIP Lender agrees in writing in its sole discretion to extend that deadline, the DIP Lender (and/or a subsidiary of the DIP Lender and/or another party or parties as designated by the DIP Lender) would receive:  (i) all real property owned by the Debtor, or, at the DIP Lender's option, designation rights ("**Designation Rights**") for all such property; (ii) Designation Rights or assignment of all of the Debtor's real property leases and executory contracts (related cure costs for any such assignments to be resolved between the DIP Lender and the Debtor); (iii) Designation Rights or transfer of all of the Debtor's clinic operations and assets; (iv) Designation Rights or transfer of all of the Debtor's inventory, furniture, fixtures, and equipment needed for clinic operations, real property and leases; and (v) $3.5 million of cash; provided, however, that if the DIP Transaction occurs after December 31, 2013, then such amount would be reduced by the aggregate amounts paid thereafter by IMC for the DIP Lender's professional fees and costs plus an amount agreed upon by the DIP Lender and the Debtor to reflect the post-December 31, 2013 carrying costs borne by the Debtor for the assets to be transferred to the DIP Lender as part of the DIP Transaction; and further provided, however, that to the extent, if any, any asset sale proceeds are paid to the DIP Lender pursuant to

the DIP Credit Agreement, such payments would result in a dollar for dollar decrease in such $3.5 million payment;[8]

(c)    On the DIP Transaction Deadline, subject only to confirmation of a Plan for the Debtor, if that has not already occurred, the Debtor would hold the remaining estate assets free and clear of any of the DIP/Prepetition Lender's liens, including, without limitation, the following:  (i) remaining cash on hand; (ii) accounts receivable; (iii) grant receivables; (iv) restricted cash; (v) any rights concerning the I M Foundation, Inc.; (vi) any interests in HealthFirst; (vii) inventory, furniture, fixtures, and equipment not designated by the DIP Lender; and (viii) Avoidance Actions and Avoidance Action Proceeds and other causes of action (collectively, the "**Retained Assets**");

(d)    If the Debtor does not otherwise have sufficient cash to pay the DIP Lender the $3.5 million cash payment due to the DIP Lender on the DIP Transaction Deadline, then such amount would be paid from the DIP Loan proceeds and/or from monetization of certain of the Debtor's Retained Assets, with the exact assets and procedure to be agreed upon between the Debtor and the DIP Lender;

(e)    On the DIP Transaction Deadline, the DIP Lender and Prepetition Lender on one hand, and the Debtor and its estate on the other hand, shall receive mutual releases from all claims and obligations (including, for the avoidance of doubt, (i) from any claims by the DIP Lender for repayment of the DIP Facility; (ii) from any Challenge with respect to any Prepetition Lien and Claim Matters; (iii) from any such claim on behalf of the Debtor's estate that could be asserted by any party-in-interest with standing and requisite authority on behalf of the Debtor's estate, including, without limitation, the Committee; and (iv) from any obligations of the Authority with respect to the DIP Financing, including the Carve-Out (i.e., including all amounts set forth in paragraph 15(a)(i)-(iii) in the DIP Order)); provided, however, nothing in this paragraph shall be deemed to release any claims, rights and causes of action to enforce the terms of the final DIP Order and the DIP Credit Agreement; and further provided, however, that if a Plan for the Debtor has not been confirmed on or before the DIP Transaction Deadline, then the DIP Transaction shall nevertheless be consummated, except that the DIP Lender shall retain an allowed

---

[8]    On August 12, 2013, the Debtor filed the Second Supplement to the Closure Motion [Docket No. 627], Exhibit 1 to which was the DIP Commitment Letter.  While the DIP Commitment Letter provided DASNY would be paid $5 million in cash as part of the DIP Transaction, the parties have now agreed to a reduced $3.5 million payment.

$25 million[9] secured prepetition claim and an allowed postpetition claim in accordance with the priority set forth in the final DIP Order for any amounts borrowed under the DIP Facility, in each case, without the need to seek further relief from this Court.  In the event that the DIP Transaction is not consummated, all parties-in-interest retain all of their rights;

(f)     Any chapter 11 Plan for IMC would incorporate the releases provided for in the immediately preceding paragraph (e);

(g)     After the DIP Transaction Deadline, the Debtor would have free use of and access to space in IMC's hospital building for records storage and administrative purposes until December 31, 2014: provided, however, that after reasonable notice, the DIP Lender or its designee would be able to move or evict the Debtor from any such space to the extent, if any, the DIP Lender or its designee is able to dispose of the relevant property or negotiate a new use that precludes the Debtor from continuing to use such space; and

(h)     The DIP Loan Documents would be binding on a subsequent chapter 7 trustee for Debtor in the event the Chapter 11 Case is converted to chapter 7.

18.     As discussed in more detail below, the Debtor believes the proposed settlement is the result of arm's-length bargaining between two sophisticated parties, is fair and reasonable, and falls well within the range of reasonableness.

## BASES FOR RELIEF REQUESTED

### A.     Authorization For Use Of Cash Collateral

19.     Section 363 governs the Debtor's use of property of its estate.[10]  Section 363(c)(1) provides that:

If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court

---

[9]     On August 12, 2013, the Debtor filed the Second Supplement to the Closure Motion [Docket No. 627], Exhibit 1, to which was the DIP Commitment Letter.  While the DIP Commitment Letter provided DASNY's retained claim would be $50 million, the parties now have agreed to the revised $25 million number.

[10]    Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).

> orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the
> ordinary course of business, without notice or a hearing,
> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

20.     Section 363(c)(2), however, provides an exception with respect to "cash

collateral" to the general grant of authority to use property of the estate in the ordinary course.

Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under

section 363(c)(1) unless:

> (A)     each entity that has an interest in such collateral
>         consents; or

> (B)     the court, after notice and a hearing, authorizes such
>         use, sale, or lease in accordance with the provisions
>         of [section 363].

11 U.S.C. § 363(c)(2).

21.     Under the circumstances here, the Debtor's request to use Cash Collateral

on a final basis should be approved.  The Authority has consented to the Debtor's use of Cash

Collateral, subject to the terms of the proposed  DIP Order.  In order for the Debtor to maintain

an adequate cash position during the remainder of this case, such final relief is required to

prevent immediate and irreparable harm to the Debtor's estate, creditors, and other parties in

interest.

B.     **Approval Of DIP Financing Pursuant To Section 364(c)**

22.     The Debtor seeks approval of financing under the proposed DIP Credit

Agreement and authority to provide security interests and liens as set forth above pursuant to

section 364(c).  The statutory requirement for obtaining postpetition credit under section 364(c)

is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit

allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c).  Courts

have articulated a three-part test to determine whether a debtor is entitled to financing under

section 364(c).  Specifically, courts look to whether:

> (a)    the debtor is unable to obtain unsecured credit under
>        section 364(b), i.e., by allowing a lender only an
>        administrative claim;
>
> (b)    the credit transaction is necessary to preserve the
>        assets of the estate; and
>
> (c)    the terms of the transaction are fair, reasonable, and
>        adequate, given the circumstances of the debtor-
>        borrower and the proposed lender.

See In re Ames Dep't Stores, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990).

23.    During the period leading to the Debtor's negotiation of the DIP Facility,

the Debtor attempted to identify other sources of postpetition financing to determine whether

IMC could obtain debtor in possession financing on better terms (if at all).  Notably, the Debtor

has no significant unencumbered assets that could serve as collateral for alternative financing.

Moreover, given the Debtor's relationship with the Authority, and the favorable economic terms

the Authority has offered in connection with the DIP Facility, the Debtor and its advisors

determined that soliciting interest from third party financing sources to provide debtor in

possession financing on a junior or unsecured basis would not be a prudent, economical, or

productive.  Rather, it was apparent that entry into the DIP Facility was the most advantageous

arrangement available to avoid significant deterioration of the value of the Debtor's assets and

immediate and irreparable harm to the Debtor's estate.

24.    Accordingly, the Debtor seeks approval of the postpetition financing from

the Authority in order to prevent significant impairment to the value of the Debtor's assets, to

maximize recoveries to the Debtor's creditors, to enable IMC to continue to compensate its

employees, and to allow the Debtor to implement the Closure Plan.  Additionally, the Debtor

believes the terms of the DIP Credit Agreement are fair and reasonable.

25.      A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by section 364(c).  See In re

Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc.,

137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  As stated above, the Debtor attempted to identify

alternative potential third party lenders who have historically been active in the debtor in

possession financing market, particular to hospital lending and reorganization.  As the Debtor

has no significant unencumbered assets that could serve as collateral for alternative financing,

and given the Debtor's longstanding relationship with the Authority, the Debtor determined that

the financing provided under the DIP Facility was the best and likely the only postpetition

financing available.  Thus, the Debtor submits that section 364(c)'s requirement that alternative

credit on more favorable terms be unavailable to the Debtor is satisfied here.

## C.      **Approval Of Adequate Protection**

26.      DASNY, as the Debtor's primary prepetition secured lender, is entitled to

receive adequate protection on a final basis to the extent of any diminution in value of DASNY's

interest in the Prepetition Collateral resulting from the Debtor's use of Cash Collateral, the

imposition of the automatic stay, and the Debtor's use, sale, or lease of Prepetition Collateral.

The Bankruptcy Code does not explicitly define "adequate protection."  Section 361 of the

Bankruptcy Code, however, provides three nonexclusive examples of what may constitute

"adequate protection" of an interest of an entity in property under sections 362, 363 or 364 of the

Bankruptcy Code:

(1)      requiring the trustee to make a cash payment or periodic cash payments to
such entity, to the extent that the . . . use . . . under section 363 of this title,

or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . or grant results in a decrease in the value of such entity's interest in such property; or

(3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

27.    Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under sections 362, 363, and 364.  Nonetheless, the Bankruptcy Code provides that a qualifying interest is entitled to protection only to the extent that the Debtor's use of the creditor's collateral would result in a decrease in "the value of such entity's interest in such property."  See 11 U.S.C. § 361.  Indeed, courts repeatedly have held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736).

28.    The proposed DIP Order would provide DASNY with adequate protection on a final basis, as described above, consisting of replacement liens, superpriority claims

pursuant to section 507(b) of the Bankruptcy Code, and the specified adequate protection

payments solely for the Prepetition Lender's attorney's fees and expenses.  The Debtor submits

that granting the proposed adequate protection on a final basis would sufficiently protect

DASNY's interest in the Prepetition Collateral.

D.    **The DIP Agreement Terms Are Fair,**
      **Reasonable, And Adequate Under The Circumstances**

29.    The proposed terms of the DIP Agreement are fair, reasonable, and

adequate given today's market and the facts of this case.  Among other things, the DIP

Agreement would charge only 1% interest per annum and no fees other than the DIP Lender's

professional fees.  Further, the purpose of the DIP Facility is to ensure the Debtor has sufficient

working liquidity to implement and complete the Closure Plan and resolve this case through

confirmation of a chapter 11 plan.  The proposed DIP budget demonstrates that result is

achievable through the proposed DIP financing.

30.    The proposed DIP Agreement provides that the security interests and

administrative expense claims granted to the Authority are subject to the Carve-Out.  In <u>In re</u>

<u>Ames Dep't Stores</u>, 115 B.R. 34, the court found that such "carve-outs" are not only reasonable,

but necessary to ensure that official committees and the debtor's estate receive assistance of

counsel.  <u>Id.</u> at 40.

31.    The proposed terms and conditions of the DIP Credit Agreement were

negotiated in good faith and at arms' length, as the economic terms are fair and reasonable under

the circumstances, and the non-economic terms reflect the Authority's unique position in the

case.  Accordingly, the Authority should be accorded the benefits of section 364(e) respecting

the DIP Credit Agreement.

E.    **Inclusion Of The Final Section 506(c)**
      **Waiver In The DIP Order Should Be Approved**

32.    This Court has already approved, under the eight interim consensual cash collateral orders, the Debtor's waiver of any right to surcharge the Prepetition Lender, its claims, or the Collateral pursuant to section 506(c).  The DIP Order approves this waiver on a final basis as to both the Prepetition Lender and DIP Lender.  Such waivers and provisions are relatively standard under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtor-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)."  In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000).  See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

33.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from DASNY by allowing the Debtor to continue to use Cash Collateral and the proceeds of collateral to fund the administration of the Debtor's estate in accordance with the DIP Budget, and by providing the DIP Facility to the Debtor.  See In re Lunan Family Restaurants Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary; (2) the amounts were reasonable; and (3) the secured creditor

- 29 -

was the party primarily benefited by the expenditure].") (citing <u>In re Flagstaff</u>, 739 F.2d 73, 77

(2d Cir. 1984) and <u>New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)</u>,

112 B.R. 811, 815 (E.D. La. 1990), <u>rev'd on other grounds sub nom.</u>, <u>In re Delta Towers</u>, 924

F.2d 74 (5th Cir. 1991).)

F.    **Modification of Automatic Stay**

      34.    Section 362 provides for an automatic stay upon the filing of a bankruptcy

petition.  The proposed DIP Credit Agreement and DIP Order provide for modification of the

automatic stay to the extent necessary to permit the Debtor and the Authority to take all actions

necessary to implement the DIP Credit Agreement and the DIP Loan Documents.  However,

pursuant to Administrative Order No. 558 of the Bankruptcy Court, the Authority will provide

seven (7) days' notice to the Debtor, the U. S. Trustee for the Eastern District of New York, and

the Committee after an event of default before enforcing remedies under the DIP Credit

Agreement and before terminating the Debtor's use of Cash Collateral.

      35.    Stay modification provisions of this type are customary components of

postpetition debtor-in-possession financing facilities and, in the Debtor's business judgment, are

reasonable under the circumstances.  Accordingly, the Debtor requests that the Court authorize

the modification of the automatic stay as set forth in the proposed DIP Order.

G.    **The Proposed Settlement Is Fair And Reasonable**

      36.    Under Bankruptcy Rule 9019(a), the Court has the authority to approve a

settlement if it is fair and equitable and in the best interests of the estate.  <u>See</u>, <u>e.g.</u>, <u>Protective</u>

<u>Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424

(1968); <u>In re Adelphia Commc'ns Corp.</u>, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) ("The

settlement need not be the best that the debtor could have obtained.  Rather, the settlement must

fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting <u>In re</u>

Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). Compromises are favored by bankruptcy courts. See In re Sassalos, 160 B.R. 646, 653 (D. Or. 1993) (stating that "compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove a compromise . . . rests in the sound discretion of the judge."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

37.    The central factor for evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." TMT Trailer Ferry, 390 U.S. at 425. In determining whether to approve a proposed settlement, however, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness." In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983); Purofied Down Prods., 150 B.R. at 522 ("the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation").

38.    Courts within this circuit have utilized the following factors to determine the reasonableness of settlements:

    a)    the probability of success in litigation;

    b)    the difficulties associated with collection;

    c)    the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

    d)    the paramount interests of the creditors.

See e.g., TMT Trailer Ferry, 390 U.S. at 424-25; In re Drexel Burnham Lambert Group, Inc.,

960 F.2d 285, 292 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 156 B.R. 414, 428 (S.D.N.Y.

1993).

39.    Here, the factors listed above overwhelmingly favor the proposed

settlement between the Authority and the Debtor, particularly as it also would result in the

Debtor obtaining critical use of cash collateral and $15 million of DIP financing.  The first

factor, the likelihood of success, favors settlement.  The Authority has over $125 million of

uncontested prepetition claims against the Debtor of which approximately $112.7 million (net of

a bond reserve fund) are secured and approximately $12.2 million are unsecured.  Additionally,

DASNY would hold additional postpetition secured claims for DASNY's adequate protection

claim under the eight interim cash collateral orders and for the $15 million DIP loan.  There is no

question DASNY's $112.7 prepetition secured loan is secured by substantially all of the Debtor's

assets.  While certain of IMC's assets would not be or might not be covered by DASNY's

prepetition liens, DASNY's adequate protection liens would cover such otherwise unliened

assets (except, subject to a reservation of rights by DASNY, Avoidance Actions, funds from I M

Foundation, Inc. and restricted funds) based on secured adequate protection claims arising from

what likely will be over $23 million of diminution in DASNY's cash collateral and accounts

receivable collateral projected to occur between the Petition Date and December 31, 2013, due to

IMC's use of such assets to fund IMC's postpetition operating losses and reorganization

expenses.  Regardless, any such assets not subject to prepetition liens also would secure

DASNY's $15 million DIP loan.  Moreover, while the precise value of DASNY's collateral

could be disputed, there should be no dispute that in the aggregate, DASNY is undersecured.

Thus, the Debtor's estate has no assurance (and little likelihood) of success in litigation to

challenge DASNY's claims and liens in a manner that could come close to yielding a better economic result for the Debtor's estate than the proposed settlement, particularly after the expense of litigation is factored in.

40. Thee second factor, the difficulties of collection, is irrelevant here.

41. The third factor for assessing reasonableness favors settlement, as any litigation stemming from disputes regarding the Authority's claims and liens would be expensive as well as cause inconvenience and delay at this critical time regarding the Debtor's immediate need for financing.

42. The fourth factor, the paramount interests of creditors, also would be served by the proposed settlement. The proposed settlement would provide the Debtor with the benefit of a prompt favorable resolution of DASNY's claims without the necessity, risk, or costs of litigation. The proposed settlement also would enable the Debtor to have unencumbered use of the Retained Assets, which value should exceed $35.7 million, comprised of the following[11]:

| | |
|---|---|
| Remaining Cash on Hand | $16,100[12] |
| Accounts Receivable | 6,200 |
| Grants Receivable | 300 |
| Interests in HealthFirst | 11,000 |
| Inventory, Furniture, Fixtures and Equipment Not Designated by DASNY | TBD |
| Free Use During 2014 of IMC Hospital Building for Records Storage and Administrative Offices | 1,000 |

---

[11] The amounts listed are estimates and exclude (000).

[12] The remaining cash includes the reserves for the $1,500,000 Carve-Out Amount and the $250,000 for preservation and maintenance of the Prepetition Collateral, which would both be released to IMC as part of the DIP Transaction settlement.

| | |
|---|---|
| Potential Causes of Action | TBD |
| Miscellaneous Assets | TBD |
| Avoidance Actions | TBD |
| Rights Concerning and Contributions from IM Foundation | TBD |
| Restricted Funds | 1,100. |

43.     Additionally, the proposed settlement provides for the release of the Debtor from all of the Authority's claims, including any claims by the Authority, as DIP Lender, for repayment of the $15 million DIP loan and a waiver of the Authority's prepetition deficiency and unsecured claims.[13]  In short, the value the Debtor would obtain through the proposed settlement is substantial and should enable the Debtor to confirm a chapter 11 plan and, pay all administrative expenses in full.

44.     The Debtor believes the proposed settlement is the result of arm's-length bargaining between two sophisticated parties, is fair and reasonable, and falls well within the range of reasonableness.  Accordingly, pursuant to Bankruptcy Rule 9019, the proposed settlement should be approved.

H.     **Notice**

45.     Notice of the requested relief will be given to:  (a) the U.S. Trustee; (b) counsel to the Authority; (c) all parties entitled to notice pursuant to the Case Management Order [Docket No. 35]; (d) counsel to the Committee; (e) any known holders of prepetition liens on the Prepetition Collateral; (f) the Internal Revenue Service; and (g) the United States Attorney for the Eastern District of New York.

---

[13]     Until a chapter 11 plan for the Debtor is confirmed, DASNY would retain a $25 million prepetition claim and the $15 million DIP loan claim as well as the related liens.

I.        **No Prior Request**

46.    Except regarding the interim cash collateral orders, no previous motion for the relief sought herein has been made to this or any other court.

## <u>CONCLUSION</u>

WHEREFORE the Debtor respectfully requests entry of an order substantially in the form annexed hereto as <u>Exhibit B</u>, and such other and further relief for the Debtor as may be just or proper.

Dated:  August 16, 2013

WILLKIE FARR & GALLAGHER LLP

By:  /s/ Alan J. Lipkin
     Alan J. Lipkin
     Shaunna D. Jones
     Anna C. Burns
     787 Seventh Avenue
     New York, New York 10019
     Tel:  (212) 728-8000
     Fax:  (212) 728-8111

*Attorneys for Debtor and Debtor in Possession*

# **EXHIBIT A**

DIP Credit Agreement

**Draft 8/16/13**

SENIOR SECURED PRIMING AND SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT,

dated as of September [__], 2013,

among

INTERFAITH MEDICAL CENTER, INC., as Borrower,

and

DORMITORY AUTHORITY OF THE STATE OF NEW YORK,
as DIP Lender

# TABLE OF CONTENTS

**Page**

ARTICLE 1 Definitions.................................................................................................2

   Section 1.01.  Defined Terms. ...............................................................2
   Section 1.02.  Terms Generally; Pro Forma Calculations. ....................16
   Section 1.03.  Pro Forma Calculations..................................................17

ARTICLE 2 The Credits.............................................................................................17

   Section 2.01.  Commitments. ................................................................17
   Section 2.02.  Loans. ............................................................................17
   Section 2.03.  Borrowing Procedure. ....................................................17
   Section 2.04.  Repayment of Loans; Evidence of Debt. ........................18
   Section 2.05.  [Reserved]......................................................................18
   Section 2.06.  Interest on Loans. ..........................................................18
   Section 2.07.  Default Interest...............................................................19
   Section 2.08.  [Reserved]......................................................................19
   Section 2.09.  Termination of Commitments. ........................................19
   Section 2.10.  [Reserved]......................................................................19
   Section 2.11.  Repayment of Borrowings. ............................................19
   Section 2.12.  Voluntary Prepayment. ..................................................19
   Section 2.13.  Mandatory Prepayments. ...............................................20
   Section 2.14.  [Reserved]......................................................................20
   Section 2.15.  [Reserved]......................................................................20
   Section 2.16.  Payments. ......................................................................20
   Section 2.17.  Taxes. ............................................................................21
   Section 2.18.  Superpriority Nature of Loans and DIP Lender's Liens......22
   Section 2.19.  No Discharge; Survival of Claims. .................................22
   Section 2.20.  Waiver of Priming Rights. ..............................................22
   Section 2.21.  Payment of DIP Obligations. .........................................22
   Section 2.22.  [Reserved]......................................................................22
   Section 2.23.  UCC Filings. ..................................................................22

ARTICLE 3 Representations and Warranties...............................................................23

   Section 3.01.  Organization; Powers. ...................................................23
   Section 3.02.  Authorization; No Conflicts............................................23
   Section 3.03.  Enforceability.................................................................24
   Section 3.04.  Governmental Approvals. ...............................................24
   Section 3.05.  Financial Statements. .....................................................24
   Section 3.06.  No Material Adverse Change...........................................24
   Section 3.07.  Title to Properties; Possession Under Leases. ................24
   Section 3.08.  Reserved. .......................................................................25
   Section 3.09.  Litigation; Compliance with Laws..................................25
   Section 3.10.  Agreements. ...................................................................25
   Section 3.11.  Use of Proceeds.............................................................26

# TABLE OF CONTENTS

**(continued)**

Section 3.12.  Tax Returns. ...................................................................................26
Section 3.13.  No Material Misstatements. ..............................................................27
Section 3.14.  Deposit Accounts and Other Accounts. ...........................................27
Section 3.15.  Environmental Matters. .....................................................................27
Section 3.16.  Insurance. ..........................................................................................28
Section 3.17.  Security. .............................................................................................28
Section 3.18.  Location of Real Property and Leased Premises. .............................28
Section 3.19.  Labor Matters. ...................................................................................28
Section 3.20.  Liens. .................................................................................................29
Section 3.21.  Intellectual Property. .........................................................................29
Section 3.22.  Permits. ..............................................................................................29
Section 3.23.  Reorganization Matters. ....................................................................29
Section 3.24.  Sanctioned Persons; USA PATRIOT Act ........................................30
Section 3.25.  HIPAA Compliance. ..........................................................................30
Section 3.26.  Certificate of Need. ...........................................................................31
Section 3.27.  Hill-Burton Act. ................................................................................31

ARTICLE 4 Conditions of Lending ...............................................................................31

Section 4.01.  All Credit Events. ..............................................................................31
Section 4.02.  First Credit Event. .............................................................................32
Section 4.03.  Subsequent Loans. ............................................................................33

ARTICLE 5 Affirmative Covenants .............................................................................33

Section 5.01.  Existence; Businesses and Properties. ..............................................33
Section 5.02.  Insurance. ...........................................................................................34
Section 5.03.  Obligations and Taxes. ......................................................................35
Section 5.04.  Financial Statements, Reports, etc. ...................................................35
Section 5.05.  Litigation and Other Notices. ............................................................37
Section 5.06.  Information Regarding DIP Collateral. .............................................37
Section 5.07.  Maintaining Records; Access to Properties and Inspections. ..........38
Section 5.08.  Use of Proceeds. ...............................................................................38
Section 5.09.  Compliance with Environmental Laws. ............................................39
Section 5.10.  Preparation of Environmental Reports. .............................................39
Section 5.11.  Additional DIP Collateral, Etc. .........................................................39
Section 5.12.  Further Assurances. ...........................................................................40
Section 5.13.  Certain Collateral Matters. ................................................................41
Section 5.14.  Licensure; Medicaid/Medicare Cost Reports. ..................................41
Section 5.15.  Certificates of Need. ..........................................................................42
Section 5.16.  Tax Issues. .........................................................................................42
Section 5.17.  Credit and Collection. .......................................................................42

ARTICLE 6 Negative Covenants ..................................................................................42

Section 6.01.  Indebtedness. .....................................................................................42
Section 6.02.  Liens. .................................................................................................43

# TABLE OF CONTENTS

Section 6.03.  Sale and Lease-Back Transactions. .................................................................45
Section 6.04.  Investments, Loans and Advances. ...............................................................45
Section 6.05.  Mergers, Consolidations, Sales of Assets and Acquisitions. ..............46
Section 6.06.  Restricted Payments; Restrictive Agreements. ...............................46
Section 6.07.  Transactions with Affiliates. .........................................................................47
Section 6.08.  Business of the Borrower; Limitation on Hedging Agreements......................48
Section 6.09.  Other Indebtedness and Agreements. .............................................48
Section 6.10.  Capital Expenditures. .......................................................................49
Section 6.11.  [Reserved]. ..........................................................................................49
Section 6.12.  [Reserved]. ..........................................................................................49
Section 6.13.  Cumulative Net Cash Flow. ...............................................................49
Section 6.14.  Fiscal Year. ..........................................................................................49
Section 6.15.  Prepayments of Other Indebtedness. .................................................49
Section 6.16.  Prepetition Indebtedness. ...................................................................49
Section 6.17.  Chapter 11 Claims. ...............................................................................49
Section 6.18.  Budget Compliance. ...........................................................................49
Section 6.19.  [Reserved]. ..........................................................................................50
Section 6.20.  Certain Equity Securities. ..................................................................50
Section 6.21.  Cash Management. ..............................................................................50

ARTICLE 7 Events of Default ...................................................................................50

Section 7.01.  Event of Default. ...............................................................................50

ARTICLE 8 [reserved] ................................................................................................55

ARTICLE 9 Miscellaneous...........................................................................................55

Section 9.01.  Notices; Electronic Communications. .............................................55
Section 9.02.  Survival of DIP Credit Agreement. ...................................................57
Section 9.03.  Binding Effect. ....................................................................................57
Section 9.04.  Successors and Assigns.......................................................................57
Section 9.05.  Expenses; Indemnity. .........................................................................59
Section 9.06.  Right of Setoff. ...................................................................................60
Section 9.07.  Applicable Law. ..................................................................................60
Section 9.08.  Waivers; Amendment. .......................................................................60
Section 9.09.  Interest Rate Limitation. ...................................................................61
Section 9.10.  Entire Agreement. ..............................................................................61
Section 9.11.  WAIVER OF JURY TRIAL. ..............................................................61
Section 9.12.  Severability. ........................................................................................62
Section 9.13.  Counterparts. ......................................................................................62
Section 9.14.  Headings. .............................................................................................62
Section 9.15.  Jurisdiction; Consent to Service of Process. ....................................62
Section 9.16.  Confidentiality. ...................................................................................63
Section 9.17.  [Reserved]. ..........................................................................................63
Section 9.18.  USA PATRIOT Act Notice. ...............................................................63

# TABLE OF CONTENTS

**(continued)**

Section 9.19.   Parties Including Trustees; Bankruptcy Court Proceedings. ...........................64

Section 9.20.   Prepetition Secured Loan Documents.............................................................64

ARTICLE 10 [Reserved] ...................................................................................................64

Exhibits and Schedules

Exhibit A            Form of Borrowing Request
Exhibit B            Initial Budget

Commitment Schedule
Schedule 1.01(a)     Mortgaged Properties
Schedule 3.09        Litigation
Schedule 3.16        Insurance
Schedule 3.18(a)     Location of Owned Real Property
Schedule 3.18(b)     Location of Leased Premises
Schedule 6.01        Existing Indebtedness
Schedule 6.02        Existing Liens
Schedule 6.04        Existing Investments

SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of September [__], 2013 (this "**DIP Credit Agreement**"), among INTERFAITH MEDICAL CENTER, INC., a New York not-for-profit corporation ("**IMC**" or the "**Borrower**") that operates Interfaith Medical Center (the "**Hospital**"), and the DORMITORY AUTHORITY OF THE STATE OF NEW YORK, a New York public benefit corporation organized pursuant to the provisions of Titles 4 and 4-B of Article 8 of the Public Authorities Law of the State of New York, as amended (in its capacity as lender hereunder, the "**Authority**" or the "**DIP Lender**").

WHEREAS, Borrower has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of New York, and Borrower has retained possession of its respective assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case, the Prepetition Lender made both secured and unsecured loans and advances and provided other financial or credit accommodations to Borrower pursuant to, *inter alia*, the Prepetition Secured Loan Documents;

WHEREAS, the Authority has established the health facility restructuring pool (the "**Restructuring Pool**") pursuant to Section 2815 of the Public Health Law of the State of New York (the "**Act**");

WHEREAS, the Authority, the Commissioner of Health (the "**Commissioner**") and the New York State Housing Finance Agency have entered into an agreement, for the purpose of administering funds in the Restructuring Pool (the "**Restructuring Pool MOU**");

WHEREAS, the Authority has informed IMC that, pursuant to the Act and the Restructuring Pool MOU, loans from the Restructuring Pool may, subject to the approval of the Department of Health, be made by the Authority pursuant to agreements with Participating General Hospitals (as defined in the Act), and the Department of Health has given such approval, subject to certain conditions;

WHEREAS, IMC is a not-for-profit corporation that operates the Hospital as a general hospital which has received written approval of the Commissioner to participate in the Health Facility Restructuring Program pursuant to the Act;

WHEREAS, the Bankruptcy Court has entered a DIP Order (as defined below) pursuant to which the Authority may make certain postpetition loans and advances, and provide other financial accommodations, to the Debtor secured by substantially all the assets and properties of Debtor as set forth in, as applicable, the DIP Order and this DIP Credit Agreement;

WHEREAS, the DIP Order provides that as a condition to the making of such postpetition loans, advances and other financial accommodations, the Debtor shall execute and deliver this DIP Credit Agreement;

WHEREAS, IMC desires to reaffirm its obligations to the Prepetition Lender pursuant to the Prepetition Secured Loan Documents and acknowledge its continuing liabilities to the

Prepetition Lender in order to induce the Authority to make such postpetition loans and advances and provide such other financial accommodations to the Debtor; and

WHEREAS, the Debtor has requested that the Authority make postpetition loans and advances and provide other financial or credit accommodations from the Restructuring Pool to Borrower, and the Authority is willing to do so, subject to the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Authority and the Borrower covenants, warrants and agrees as follows:

ARTICLE 1
DEFINITIONS

Section 1.01. Defined Terms.    As used in this DIP Credit Agreement, the following terms shall have the meanings specified below:

"**Accounts**" shall have the meaning given to such term in Section 5.13.

"**Act**" shall have the meaning given to such term in the Recitals.

"**Acknowledgment**" shall have the meaning given to such term in Section 5.12.

"**Adequate Protection Lien**" shall have the meaning ascribed to such term in the DIP Order.

"**Adequate Protection Obligations**" shall have the meaning ascribed to such term in the DIP Order.

"**Adequate Protection Payments**" shall have the meaning ascribed to such term in the DIP Order.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in such form as may be supplied from time to time by the Authority.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided, however*, that, for purposes of the definition of the term "**Eligible Assignee**" and Section 6.07, the term "**Affiliate**" shall also include any Person that directly or indirectly owns 10% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.  No DIP Lender or Affiliate thereof shall be deemed to be an "**Affiliate**" of the Borrower.

"**Asset Transaction**" shall mean the sale, lease, sub-lease, sale and leaseback, assumption, assignment, conveyance, transfer, issuance or other disposition (by way of merger,

2

casualty, condemnation or otherwise) by the Borrower to any Person not in the ordinary course (other than any disposition of assets giving rise to a Recovery Event).

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by the DIP Lender and an Eligible Assignee, in such form as shall be approved by the Authority.

"**Authority**" shall have the meaning given to such term in the Recitals.

"**Avoidance Action Proceeds**" shall have the meaning ascribed to such term in the DIP Order.

"**Bankruptcy Code**" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, 11 U.S.C. §§101 *et seq.*, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Eastern District of New York.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"**Benefit Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Borrower**" shall have the meaning given to such term in the Recitals.

"**Borrowing**" shall mean a borrowing of Loans hereunder.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit A, or such other form as shall be approved by DIP Lender.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"**Capital Expenditures**" shall mean, for any period, with respect to any Person, the sum of (a) the additions to property, plant and equipment and other capital expenditures of such Person and its consolidated subsidiaries that are (or are required to be) set forth in a consolidated statement of cash flows of such Person for such period prepared in accordance with GAAP plus (b) Capital Lease Obligations incurred by such Person and its consolidated subsidiaries during such period; *provided* that the term "**Capital Expenditures**" shall not include (i) any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with insurance proceeds, condemnation awards or damage

3

recovery proceeds relating to any such damage, loss destruction or condemnation, or (ii) expenditures that are accounted for as capital expenditures of such Person and that are actually paid for by a Person other than the Borrower or any of Affiliate of the Borrower and for which the Borrower has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such other Person.

"**Capital Lease Obligations**" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Carve-Out**" shall have the meaning ascribed to such term in the DIP Order.

"**Cash Collateral**" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code.

"**Chapter 11 Case**" shall mean the Chapter 11 case of the Borrower which is being administered under the Bankruptcy Code and is pending in the Bankruptcy Court under Docket No. 12-48226 (CEC).

"**Charges**" shall have the meaning assigned to such term in <u>Section 9.09</u>.

"**Closing Date**" shall mean the date of the first Credit Event.

"**Closure Plan**" shall mean a closure plan that complies with existing regulations set forth in the New York Codes, Rules and Regulations, including 10 N.Y.C.R.R. §401.3 thereof, that is acceptable to DOH as such plan may be amended from time to time, submitted to the DOH relating, among other things, to the cessation by IMC of acceptance of admissions and at all times in form and substance satisfactory to the Authority.

"**CMS**" shall mean the Centers of Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Commissioner**" shall have the meaning given to such term in the Recitals.

"**Commitment Schedule**" shall mean the Schedule attached hereto identified as such.

"**Commitment(s)**" shall mean the aggregate amount of the DIP Lender's Initial Loan Commitment and Subsequent Loan Commitments as set forth on the Commitment Schedule, as applicable, as the same may be (a) reduced from time to time pursuant to <u>Section 2.09</u>, and (b) reduced or increased from time to time pursuant to assignments by or to the DIP Lender pursuant to <u>Section 9.04</u>.  The maximum aggregate amount of the Commitments on the Closing Date is $15,000,000 (including, without limitation, the Reserves).

"**Committee**" shall mean, collectively, the Official Committee of Unsecured Creditors and any other official committee appointed by the Office of the United States Trustee and approved by the Bankruptcy Court in the Chapter 11 Case.

"**Communications**" shall have the meaning assigned to such term in <u>Section 9.01</u>.

"**Contractual Obligation**" of any Person means any obligation, agreement, undertaking or similar provision of any Equity Interests issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a DIP Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its properties is subject.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Credit Event**" shall have the meaning assigned to such term in <u>Section 4.01</u>.

"**Debtor**" shall mean the Borrower who filed the Chapter 11 Case, as Debtor and Debtor-in-Possession.

"**Default**" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"**DIP Budget**" shall have the meaning ascribed to such term in the DIP Order.

"**DIP Collateral**" shall have the meaning ascribed to it in the DIP Order.

"**DIP Credit Agreement**" shall have the meaning assigned to such term in the preamble.

"**DIP Lender**" shall mean the Authority in its capacity as lender hereunder, together with its successors and assigns in such capacity.

"**DIP Liens**" shall have the meaning ascribed to such term in the DIP Order.

"**DIP Loan Documents**" shall have the meaning ascribed to such term in the DIP Order and shall, for the avoidance of doubt, include the DIP Order.

"**DIP Obligations**" shall have the meaning ascribed to such term in the DIP Order.

"**DIP Order**" shall mean any Interim Order or the Final Order, as applicable and in effect.

"**DIP Superpriority Claims**" shall have the meaning ascribed to such term in the DIP Order.

"**DIP Transaction**" shall have the meaning ascribed to such term in the DIP Order.

"**DIP Transaction Deadline**" shall have the meaning ascribed to such term in the DIP Order.

"**DOH**" shall mean the New York State Department of Health.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Eligible Assignee**" shall mean (a) DIP Lender, (b) an Affiliate of the DIP Lender, (c) an Eligible Financial Institution, or (d) any other Person (other than a natural person) approved (which approvals shall not be unreasonably withheld) by the Authority and, so long as no Default or Event of Default is continuing, the Borrower (and which approval shall be deemed to have been given by the Borrower unless an objection is delivered to the Authority within five (5) Business Days after notice of a proposed assignment is delivered to the Borrower); provided, that, notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any Affiliate of the Borrower.

"**Eligible Financial Institution**" means any (i) commercial bank, savings bank, saving and loan association or similar financial institution or (ii) insurance company or mutual fund which has at least $100,000,000 in total assets (in name or under management).

"**Environmental Laws**" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Environmental Release of, threatened Environmental Release, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Environmental Release  or threatened Environmental Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching, or migration into or through the environment or within or upon any building, structure, facility or fixture.

"**Equity Interests**" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person, or any obligations convertible into or exchangeable for, or giving any person a right, option or warrant to acquire, such equity interests or such convertible or exchangeable obligations.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Benefit Plan (other than an event for which the 30-day notice period is waived); (b) the failure to meet the minimum funding standards of Sections 412 or 430 of the Code; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Benefit Plan or Multiemployer Plan; (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice or its (i) serious consideration of an intent to or (ii) decision to terminate any Benefit Plan or Benefit Plans or the appointment of a trustee pursuant to Section 4042 of ERISA to administer any Benefit Plan; (f) the adoption of any amendment to a Benefit Plan that would require the provision of security pursuant to Section 436(f)(1) of the Code; (g) the receipt by the Borrower or any of its ERISA Affiliates of any notice of the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which the Borrower or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or could otherwise be liable; (i) the conditions exist for an imposition of a lien under Section 303(k) of ERISA; (j) the failure of a Benefit Plan and its trust to meet the requirements of Section 436 of the Code; or (k) any other event or condition with respect to a Benefit Plan or Multiemployer Plan that could result in liability of the Borrower or any ERISA Affiliate.

"**Event of Default**" shall have the meaning assigned to such term in Article 7 and shall include any additional "Event of Default" under the DIP Order.

"**Extraordinary Receipt**" means the aggregate amount of any cash received by or paid to or for the account of the Borrower in excess of $1,000,000 not in the ordinary course of business, including, without limitation, purchase price adjustments, tax refunds, judgments and litigation settlements, pension plan reversions, proceeds of insurance (excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and excluding proceeds of product liability insurance received by the Borrower for the benefit of a third party that is not an Affiliate), condemnation awards (and payments in lieu thereof) and indemnity payments, but excluding such cash received by or paid to or for the account of the Borrower with respect to a Recovery Event.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures

as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Authority in its sole discretion, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Authority, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens pursuant to this DIP Credit Agreement and the other DIP Loan Documents and authorizes the use of Cash Collateral.

"**Final Order Entry Date**" shall mean the date upon which the Final Order is entered by the Bankruptcy Court.

"**Financial Officer**" of any Person shall mean the chief financial officer, principal accounting officer, treasurer, controller or other similar officer of such Person.

"**GAAP**" shall mean United States generally accepted accounting principles applied on a basis consistent with the financial statements delivered pursuant to Section 5.04.

"**Governmental Authority**" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"**Government Receivables Account**" shall mean any deposit account into which a Governmental Authority directly deposits government health care program receivables or into which the Borrower deposits or directs the deposit of checks received from a Governmental Authority representing government health care receivables.

"**Guarantee**" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation, or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Hazardous Materials**" shall mean any petroleum (including crude oil or fraction thereof) or petroleum products or byproducts, or any pollutant, contaminant, chemical, compound, constituent, or hazardous, toxic or other substances, materials or wastes defined, or regulated as such by or pursuant to any Environmental Law, or requires removal, remediation or reporting under any Environmental Law, including asbestos, or asbestos containing material, radon or other radioactive material, polychlorinated biphenyls and urea formaldehyde insulation.

"**Healthcare Laws**" shall mean all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to the regulation of patient health care and the submission of claims for reimbursement including: (1) federal fraud and abuse laws and

regulations, including, the federal patient referral law, 42 U.S.C. §1395nn, commonly known as "**Stark II**", the federal anti-kickback law, 42 U.S.C. §1320a-7b, the federal civil monetary penalty statute 42 U.S.C. §1320a-7a, federal laws regarding the submission of false claims, false billing, false coding, and similar state laws and regulations; (2) federal and state laws applicable to reimbursement and reassignment; (3) HIPAA; (4) federal statutes and regulations affecting the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto; (5) statutes affecting the Tricare, CHAMPUS, Veterans, and black lung disease programs and any other health care program financed with United States government funds; (6) all federal statutes and regulations affecting the medical assistance program established by Titles V, XIX, XX, and XXI of the Social Security Act and any statutes succeeding thereto, and all state statutes and plans for medical assistance enacted in connection with the federal statutes and regulations; (7) the Emergency Medical Treatment and Labor Act, commonly known as "**EMTALA**"; and (8) any other federal or state law or regulation governing health care.

"**Hospital**" shall have the meaning given to such term in the Recitals.

"**IMC**" shall have the meaning given to such term in the Recitals.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all synthetic lease obligations of such Person, (i) net obligations of such Person under any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, (j) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (k) all obligations of such Person as an account party in respect of letters of credit, and (l) all obligations of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"**Indemnified Person**" shall have the meaning assigned to such term in Section 9.05(b).

"**Indemnified Taxes**" shall mean Taxes other than (a) Other Taxes and (b) with respect to the DIP Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, Taxes (including branch profits taxes) imposed on or measured by its overall net income or overall gross receipts (however denominated), and

franchise taxes imposed on it (in lieu of income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of the DIP Lender or participant, in which its lending office is located.

"**Information**" shall have the meaning assigned to such term in <u>Section 9.16</u>.

"**Initial Loan Commitment**" shall mean the commitment, if any, of the DIP Lender to make an Initial Loan hereunder as set forth on the Commitment Schedule.

"**Initial Loans**" shall mean the term loans made by the DIP Lender to the Borrower pursuant to <u>clause (a)</u> of <u>Section 2.01</u>.

"**Interest Payment Date**" shall mean the last Business Day of each calendar quarter.

"**Interim Order**" shall mean, collectively, any order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, which order shall be satisfactory in form and substance to the Authority in its sole discretion, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Authority, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens pursuant to this DIP Credit Agreement and the other DIP Loan Documents and authorizes the use of Cash Collateral.

"**Investments**" shall have the meaning assigned to such term in <u>Section 6.04</u>.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Maturity Date**" shall mean the date that is the earliest of the following (unless such date is modified in writing by the Authority in accordance with the DIP Order): (a) December 31, 2013; (b) the earlier of (i) the date upon which any Interim Order, if any, expires or (ii) thirty-five (35) days after the entry of any Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period; (c) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the 30th day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrower; (e) the date of indefeasible prepayment in full by Borrower of all DIP Obligations hereunder in accordance with the terms hereof; or (f) upon acceleration of the DIP Obligations hereunder.

"**Loans**" shall mean, collectively, the Initial Loans and the Subsequent Loans.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean (a) a materially adverse effect (other than as would reasonably be expected to result from the filing of the Chapter 11 Case and the filing and implementation of the Closure Plan and DIP Transaction and the rejection by the Department of Health of the Borrower's proposed restructuring plan) on the business, assets, liabilities, operations, condition (financial or otherwise) or operating results of the Borrower, (b) a material impairment of the ability of the Borrower to perform any of its obligations under any DIP Loan Document to which it is or will be a party, or (c) a material impairment of the rights and remedies of or benefits available to the DIP Lender on the DIP Collateral or under any DIP Loan Document or the priority of such Liens.

"**Material Indebtedness**" shall mean Indebtedness (other than the Loans and other than Indebtedness which is stayed by the filing of the Chapter 11 Case) of the Borrower in an aggregate principal amount exceeding $250,000.

"**Maximum Rate**" shall have the meaning assigned to such term in <u>Section 9.09</u>.

"**Medical Services**" shall mean medical and health care services provided to a patient, and includes, without limitation, inpatient hospital services, outpatient hospital services, physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided to a patient.

"**Mortgaged Properties**" shall mean, initially, each parcel of real property and the improvements thereto owned by the Borrower on <u>Schedule 1.01(a)</u>, and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to <u>Section 5.11</u> or <u>5.12</u>.

"**Mortgages**" shall mean any fee mortgages or deeds of trust, assignments of leases and rents and other Perfection Documents, including the DIP Order, granting a Lien on any Mortgaged Property to secure the DIP Obligations, in each case as may from time to time be requested by the Authority to be executed by the Borrower, in form and substance satisfactory to the Authority, with such changes as shall be advisable under the law of the jurisdiction in which such Mortgage is to be recorded and as are reasonably satisfactory to the Authority, as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this DIP Credit Agreement.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Net Cash Proceeds**" shall mean, (a) with respect to any Asset Transaction or Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds subsequently received (as and when received) in respect of non-cash consideration initially received), net of (i) selling expenses and out-of-pocket costs (including reasonable and customary broker's fees or commissions, legal fees, transfer and similar taxes incurred by the Borrower in connection therewith), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment

associated with such Asset Transaction (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Transaction and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset), and (iv) with respect to any Recovery Event, any amounts that are paid or payable to a third party that is not an Affiliate of the Borrower, by the Borrower pursuant to any applicable contract, lease or other legal obligation entered into with such third party in the ordinary course of the Borrower's business; and (b) with respect to any Extraordinary Receipt, the cash proceeds received by or paid to or for the account of the Borrower.

"**Obligations**" shall mean, in addition to the meaning ascribed to such term in the DIP Order, (a) all loans, advances and extensions of credit made or to be made by the Authority to the Borrower arising under any of the Prepetition Secured Loan Documents and DIP Loan Documents; and (b) any and all indebtedness and obligations which may at any time be owing by the Borrower to the Authority under any of the Prepetition Secured Loan Documents or DIP Loan Documents, whether now in existence or incurred by the Borrower from time to time hereafter; (i) whether principal, interest, fees, costs, expenses or otherwise; (ii) whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect; and (iii) whether the Borrower is liable to the Authority for such indebtedness as principal, surety, endorser, guarantor or otherwise. Obligations shall also include (1) indebtedness or obligations incurred by, or imposed on, the Authority as a result of environmental claims arising out of any of the Borrower's operations, premises or waste disposal practices or sites; (2) the Borrower's liability to the Authority as maker or endorser of any promissory note or other instrument for the payment of money under or in connection with this Agreement; (3) the Borrower's liability to the Authority under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which the Authority may make or issue to others for the Borrower's account, including under the Prepetition Secured Loan Documents and DIP Loan Documents.

"**Other Taxes**" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, interest, fines, penalties and additions to tax), in each case, arising from any payment made under any DIP Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any DIP Loan Document.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Protection Act of 2006, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Perfection Documents**" shall have the meaning ascribed to such term in the DIP Order.

"**Permits**" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required under any Requirement of Law.

"**Permitted Investments**" shall mean investments approved by the Final Order of the Bankruptcy Court Authorizing (A) Continued Use of the Debtor's Cash Management System and Procedures; (B) Maintenance and Continued Use of Existing Bank Accounts; (C) Waiver of Certain Operating Guidelines Relating to Bank Accounts; and (D) Interim Waiver of the Requirements of Section 345(b) of the Bankruptcy Code [Docket No. 148] and any modifications of such Order shall be acceptable to the Authority in its sole discretion.

"**Permitted Prior Senior Liens**" shall have the meaning ascribed to such term in the DIP Order.

"**Permitted Refinancing Indebtedness**" shall mean Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, renew or replace existing Indebtedness ("**Refinanced Indebtedness**"); *provided* that (a) the principal amount of such refinancing, refunding, extending, renewing or replacing Indebtedness is not greater than the principal amount of such Refinanced Indebtedness plus the amount of any premiums or penalties and accrued and unpaid interest paid thereon and reasonable fees and expenses, in each case associated with such refinancing, refunding, extension, renewal or replacement, (b) such refinancing, refunding, extending, renewing or replacing Indebtedness has a final maturity that is no sooner than, and a weighted average life to maturity that is no shorter than, such Refinanced Indebtedness, (c) if such Refinanced Indebtedness or any Guarantees thereof are subordinated to the DIP Obligations, such refinancing, refunding, extending, renewing or replacing Indebtedness and any Guarantees thereof remain so subordinated on terms no less favorable to the DIP Lender, (d) the obligors in respect of such Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing are the only obligors on such refinancing, refunding extending, renewing or replacing Indebtedness and (e) such refinancing, refunding, extending, renewing or replacing Indebtedness contains covenants and events of default and is benefited by guarantees, if any, which, taken as a whole, are determined in good faith by a Financial Officer of the Borrower to be no less favorable to the Borrower and the DIP Lender in any material respect than the covenants and events of default or Guarantees, if any, in respect of such Refinanced Indebtedness.

"**Person**" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Petition Date**" means December 2, 2012.

"**Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Multiemployer Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

**"Plan of Reorganization"** shall mean a plan of reorganization in form and substance reasonably satisfactory to the Authority confirmed by an order (in form and substance satisfactory to the Authority) of the Bankruptcy Court under the Chapter 11 Case (i) containing a provision for termination of the Commitments and repayment in full in cash of all of the Obligations on or before the effective date of such plan or providing the Authority with such other treatment as the Authority agrees to accept in writing in its sole and absolute discretion, (iii) containing a release in favor of the Authority and its respective affiliates, (iv) containing provisions with respect to the settlement or discharge of all claims and other debts and liabilities, and such Plan of Reorganization shall be in full force and effect and shall not have been modified, altered, amended or otherwise changed or supplemented without the prior written consent of the Authority, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Authority waives in writing such requirement) and (v) such other terms as the Authority may reasonably require.

**"Postpetition"** means the time period beginning immediately upon the Petition Date.

**"Prepetition"** means the time period ending immediately prior to the Petition Date.

**"Prepetition Indebtedness"** shall mean all Indebtedness of the Borrower outstanding immediately prior to the Petition Date other than Indebtedness under any one or more of the Prepetition Secured Loan Documents.

**"Prepetition Lender"** shall mean the Authority as party to the Prepetition Secured Loan Documents.

**"Prepetition Secured Loan Documents"** shall have the meaning ascribed to such term in the DIP Order.

**"Prepetition Loans"** shall mean the loans and other obligations and indebtedness, including reimbursement obligations, incurred under any one or more of the Prepetition Secured Loan Documents.

**"Prepetition Obligations"** shall mean all Obligations of the Borrower in respect of the Prepetition Secured Loan Documents.

**"Real Property"** shall mean all Mortgaged Property and all other real property owned or leased from time to time by the Borrower.

**"Recovery Event"** shall mean any settlement of or payment, in each case in excess of $250,000 of Net Cash Proceeds, in respect of any property or casualty insurance claim (excluding product liability insurance claims settled or paid for the benefit of a third party that is not an Affiliate of the Borrower) or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of the Borrower.

**"Register"** shall have the meaning assigned to such term in <u>Section 9.04(d)</u>.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, Authority and advisors of such Person and such Person's Affiliates.

"**Requirement of Law**" shall mean as to any Person, the governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Real Property or personal property or to which such Person or any of its property of any nature is subject.

"**Reserves**" shall mean the Carve-Out and the $250,000 for preservation and maintenance of the Prepetition Collateral referred to in the DIP Order.

"**Responsible Officer**" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this DIP Credit Agreement.

"**Restricted Indebtedness**" shall mean Indebtedness of the Borrower, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(b).

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower, or any option, warrant or other right to acquire any such Equity Interests in the Borrower.

"**Restructuring Pool**" shall have the meaning given to such term in the Recitals.

"**Retained Professional Fees**" shall have the meaning ascribed to such term in the DIP Order.

"**Subsequent Loan Commitments**" shall mean, the commitment, if any, of the DIP Lender to make Subsequent Loans hereunder as set forth on the Commitment Schedule, as the same may be reduced from time to time pursuant to Section 2.09.

"**Subsequent Loans**" shall mean the term loans made by the DIP Lender to the Borrower pursuant to clause (b) of Section 2.01.

"**subsidiary**" shall mean, with respect to any Person (herein referred to as the "**parent**"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority, including interest, penalties or additions to tax with respect to the foregoing.

"**Transactions**" shall mean, collectively, (a) the execution, delivery and performance by the Borrower of the DIP Loan Documents to which they are a party, (b) the borrowings hereunder and the use of proceeds of each of the foregoing, (c) the granting of Liens pursuant to the Perfection Documents, (d) any other transactions related to or entered into in connection with any of the foregoing, (e) the transaction contemplated by the Closure Plan, and (f) the transaction contemplated by the DIP Transaction.

"**UCC**" shall mean the Uniform Commercial Code.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  Terms Generally; Pro Forma Calculations.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" and words of similar import, shall not be limiting and shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all rights and interests in tangible and intangible assets and properties of any kind whatsoever, whether real, personal or mixed, including cash, securities, Equity Interests, accounts and contract rights.  The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this DIP Credit Agreement in its entirety and not to any particular provision of this DIP Credit Agreement unless the context shall otherwise require.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this DIP Credit Agreement unless the context shall otherwise require.  A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.  Except as otherwise expressly provided herein, (a) any definition of, or reference to, any DIP Loan Document or any other agreement, instrument or document in this DIP Credit Agreement shall mean such DIP Loan Document or other agreement, instrument or document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein) and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided, however*, that if the Borrower notifies the Authority that the Borrower wishes to amend any covenant in Article 6 or any related definition to eliminate the effect of any change in

GAAP occurring after the date of this DIP Credit Agreement on the operation of such covenant (or if the Authority notifies the Borrower that the DIP Lender wishes to amend Article 6 or any related definition for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the DIP Lender.

Section 1.03. Pro Forma Calculations. All *pro forma* calculations permitted or required to be made by the Borrower pursuant to this DIP Credit Agreement shall include only those adjustments that would be permitted or required by Regulation S-X under the Securities Act of 1933, as amended, together with those adjustments that (i) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions and (ii) are based on reasonably detailed written assumptions reasonably acceptable to the Authority.

## ARTICLE 2
## THE CREDITS

Section 2.01. Commitments. Subject to the terms and conditions hereof, and relying upon the representations and warranties set forth herein, the DIP Lender agrees to make: (a) an Initial Loan to the Borrower on the Closing Date in a principal amount not to exceed its Initial Loan Commitment; and (b) Subsequent Loans to the Borrower after the Final Order Entry Date, in multiple separate drawings in an aggregate principal amount which, together with the Initial Loan Commitment, shall not exceed the maximum aggregate amount of the Commitments. Amounts paid or prepaid in respect of Loans may not be reborrowed. Notwithstanding anything to the contrary in the DIP Loan Documents, the Authority shall establish the Reserves for payment of the Carve-Out and to pay for preservation and maintenance of the DIP Collateral and Prepetition Collateral. Such Reserves may not be borrowed by the Debtor without the prior written consent of the Authority in its sole discretion.

Section 2.02. Loans.

(a)      The Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $10,000 and not less than $10,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)      The DIP Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to an account in the name of the Borrower designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the DIP Lender.

Section 2.03. Borrowing Procedure. In order to request a Borrowing, the Borrower shall hand deliver or fax or email to the Authority a duly completed Borrowing Request, not later than 1:00 p.m., New York City time, two Business Days before a

proposed Borrowing.  Each Borrowing Request shall be irrevocable, shall be signed by or on behalf of the Borrower and shall specify the following information: (i) the date of such Borrowing (which shall be a Business Day); (ii) the number and location of the account to which funds are to be disbursed; (iii) the amount of such Borrowing; and (iv) the current need for funds as reflected in the  DIP Budget; *provided, however*, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in <u>Section 2.02</u>; and *provided further* that the Borrower may make a telephonic request for a Borrowing, provided that each such telephonic request is confirmed promptly by delivery to the DIP Lender of a written Borrowing Request.

Section 2.04.  Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the DIP Lender the then unpaid principal amount of each Loan of the DIP Lender made to the Borrower as provided in <u>Section 2.11</u>.

(b)    The DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the DIP Lender resulting from each Loan made by the DIP Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to the DIP Lender from time to time under this DIP Credit Agreement.

(c)    The entries made in the accounts maintained pursuant to <u>paragraph (b)</u> of this Section shall, absent manifest error, be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that the failure of the DIP Lender to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with the terms of this DIP Credit Agreement.

(d)    The DIP Lender may request that Loans made by it hereunder be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to the DIP Lender a promissory note payable to the DIP Lender and its registered assigns and in a form and substance reasonably acceptable to the Authority. Notwithstanding any other provision of this DIP Credit Agreement, in the event the DIP Lender shall request and receive such a promissory note, the interests represented by the note shall at all times (including after any assignment of all or part of such interests pursuant to <u>Section 9.04</u>) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

Section 2.05.  [Reserved].

Section 2.06.  Interest on Loans.  Subject to the provisions of <u>Section 2.07</u>, the Loans shall bear interest (computed on the basis of a year of 360 days, consisting of twelve months of 30 days each, calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a fixed rate per annum equal to one (1%) percent.  Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this DIP Credit Agreement, shall

be determined by the Authority, and such determination shall be conclusive absent manifest error.

Section 2.07.  Default Interest.  If (i) the Borrower shall default in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other DIP Loan Document, by acceleration or otherwise, or (ii) if any Event of Default under Article 7 has occurred and is continuing and the DIP Lender so elects, then, in the case of clause (i) above, until such defaulted amount shall have been paid in full or, in the case of clause (ii) above, from the date on which such Event of Default arose and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under this DIP Credit Agreement and the other DIP Loan Documents shall bear interest (after as well as before judgment), payable on demand, (a) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum and (b) in all other cases, at a rate per annum (computed on the basis of a year of 360 days, consisting of twelve months of 30 days each, calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) equal to the rate that would be applicable to such Loan plus 2.00% per annum.

Section 2.08.  [Reserved].

Section 2.09.  Termination of Commitments.  Unless previously terminated in accordance with the terms hereof, (a) the Borrower's right to borrow under the Initial Loan Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Closing Date and (b) the Borrower's right to borrow under Subsequent Loan Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Loan Maturity Date.  Notwithstanding the foregoing, all the Commitments shall automatically terminate at 5:00 p.m., New York City time, on November 1, 2013, if the initial Credit Event shall not have occurred by such time.  In addition, to the extent that any Subsequent Loan Commitments are available and undrawn, unless the Authority agrees otherwise in writing, the Borrower's right to borrow under Subsequent Loan Commitments shall automatically terminate if the Borrower is in Default or an Event of Default has occurred.

Section 2.10.  [Reserved].

Section 2.11.  Repayment of Borrowings.  To the extent not previously paid, all Loans shall be due and payable on the Loan Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

Section 2.12.  Voluntary Prepayment.

(a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon written or fax notice (or telephone notice promptly confirmed by written or fax notice) at least one Business Day prior to the date of prepayment.

(b)  Voluntary prepayments of Loans shall be applied to the principal due in respect of the Loans.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein.  All prepayments under this <u>Section 2.12</u> shall be without premium or penalty.  All prepayments under this <u>Section 2.12</u> shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

Section 2.13.  Mandatory Prepayments.

(a)    Concurrently with (i) the completion of any Asset Transaction in excess of $1,000,000 (other than an Asset Transaction permitted under <u>Section 6.05</u>), (ii) the occurrence of any Recovery Event, or (iii) the Borrower's receipt of any Extraordinary Receipt, the Borrower shall set aside in a segregated account maintained by the Borrower (the form of such account being acceptable to the Authority) for the benefit of the Authority 100% of the Net Cash Proceeds received with respect thereto.

(b)    Upon written direction of the Authority on not less than seven (7) days' notice, mandatory prepayments from funds segregated under paragraph (a) of this Section shall be applied:

(i)    *first*, to pay the outstanding Loans (and the corresponding accrued and unpaid interest on the principal amount of Loans so prepaid) or, in the sole discretion of the Authority, to direct payment to a holder of an allowed administrative expense claim against the Borrower;

(ii)    *second*, to the extent that such Net Cash Proceeds exceeds the Loans, to pay the Prepetition Obligations in accordance with the terms of the Prepetition Secured Loan Documents; and

(iii)    *third*, any remaining amounts to be retained by the Borrower, subject to the terms of the DIP Order.

Any mandatory prepayments to the Authority of the Loans shall cause a corresponding reduction in the Commitments.  For the avoidance of doubt, any funds held by the Borrower and segregated under paragraph (a) of this Section shall not cause a corresponding reduction in the Commitments.

Section 2.14.  [Reserved].

Section 2.15.  [Reserved].

Section 2.16.  Payments.

(a)    The Borrower shall make each payment (including principal of or interest on any Borrowing or other amounts) hereunder and under any other DIP Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim.  Each such payment shall be made to the Authority at its

offices as set forth in <u>Section 9.01</u> or at such other place as may be designated in writing by the Authority.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or other amounts) hereunder or under any other DIP Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest, if applicable.

Section 2.17.  Taxes.

(a)    Any and all payments by or on account of any obligation of the Borrower hereunder or under any other DIP Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if any Indemnified Taxes or Other Taxes are required to be withheld or deducted from such payments, then (i) the sum payable by the Borrower shall be increased as necessary so that after all required deductions or withholding (including deductions or withholdings applicable to additional sums payable under this Section) the DIP Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Borrower shall make such deductions or withholdings and (iii) the Borrower shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, for the avoidance of doubt, as the same may be modified by the Bankruptcy Code.

(c)    The Borrower shall indemnify the DIP Lender, within 10 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the DIP Lender, as the case may be, or any of their respective Affiliates, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other DIP Loan Document (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by the DIP Lender shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Authority the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Authority.

(e)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this <u>Section 2.17</u> shall survive the payment in full of all amounts due hereunder.

Section 2.18. Superpriority Nature of Loans and DIP Lender's Liens.  At all times during the Chapter 11 Case:

(a)     The DIP Liens shall have the priority and senior secured status as more fully set forth in the DIP Order and shall be subject and junior only to the Permitted Prior Senior Liens and the Carve Out.

(b)     All DIP Obligations shall constitute DIP Superiority Claims.  Except as set forth herein and in the DIP Order, no other claim or Lien having a priority superior or pari passu to that granted to the Authority by the DIP Order shall be granted or approved while any DIP Obligations or Commitments under this DIP Credit Agreement remain outstanding. Except for the Carve-Out, and subject to the terms of the DIP Order, no costs or expenses of administration shall be imposed against the DIP Lender or any of its DIP Collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the DIP Lender.

Section 2.19.  No Discharge; Survival of Claims.  The Borrower agrees that (a) the DIP Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and the Borrower hereby waives any such discharge pursuant to Section 1141(d)(4) of the Bankruptcy Code) and (b) the DIP Superpriority Claims and the DIP Liens shall not be affected, altered or limited in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

Section 2.20.  Waiver of Priming Rights.  On the date hereof, and on behalf of themselves and their estates, and for so long as any DIP Obligation or Commitment shall be outstanding under any DIP Loan Document, without limiting any terms or conditions of the DIP Order, the Borrower hereby irrevocably waives any right, (i) to grant or impose, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in the DIP Collateral that are of equal or greater priority than the DIP Liens, and/or (ii) to grant or impose, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, claims or expenses against the Borrower, which are equal or superior to the DIP Superpriority Claims.

Section 2.21.  Payment of DIP Obligations.  Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations, DIP Lender shall be entitled to immediate payment of such DIP Obligations and to enforce the remedies provided for hereunder or under applicable law, in accordance with provisions of the DIP Order.

Section 2.22.  [Reserved].

Section 2.23.  UCC Filings.   The Borrower hereby irrevocably appoints the Authority during the term hereof as its lawful attorney-in-fact to file (if so determined by

the Authority), on behalf of the Borrower, one or more financing statements or continuation statements thereof as to the security interests granted to the Authority in the DIP Collateral, and the rights to receive the same, pledged to the Authority hereunder and to file such financing statements and continuation statements therefore in any appropriate public office, which such financing statements may describe the DIP Collateral in any manner as the Authority may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the DIP Collateral granted herein, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired" or "all personal property, whether now owned or hereafter acquired". The Authority shall forward to Borrower, in due course, a copy of any such financing or continuation statement executed on behalf of the Borrower as provided herein.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to Authority and the DIP Lender that:

Section 3.01.  Organization; Powers.  IMC is a not-for-profit general hospital that has been approved for participation in the Health Facility Restructuring Pool program by the Commissioner,  constitutes a New York not-for-profit entity, the Borrower (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (b) has all requisite power and authority, and the legal right, to own and operate its property and assets, to lease the property it operates as lessee and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) has the power and authority, and the legal right, to execute, deliver and perform its obligations under this DIP Credit Agreement, each of the other DIP Loan Documents, and each other agreement or instrument contemplated hereby or thereby to which it is or will be a party, including, in the case of the Borrower, to borrow hereunder, and to grant the DIP Liens and the Liens contemplated to be granted by it under the Perfection Documents (if any).

Section 3.02.  Authorization; No Conflicts.  The Transactions (a) have been duly authorized by all requisite corporate and, if required, member action and (b) will not (i) violate (A) any material provision of law, statute, rule or regulation, including any material Healthcare Laws, (B) any provision of the certificate or articles of incorporation or other constitutive documents or by-laws of the Borrower, (C) any material provision of any material order of any Governmental Authority or arbitrator or (D) subject to entry of the DIP Order, any provision of any indenture, agreement or other instrument to which the Borrower is a party or by which any of them or any of their property is or may be bound, (ii) subject to entry of the DIP Order, be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any material obligation under any material indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or

assets now owned or hereafter acquired by the Borrower (other than Liens created under the Perfection Documents).

Section 3.03. Enforceability. This DIP Credit Agreement has been duly executed and delivered by the Borrower and, subject to the entry of the DIP Order, constitutes, and each other DIP Loan Document when executed and delivered by the Borrower thereto will constitute, a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, subject to general principles of equity.

Section 3.04. Governmental Approvals. Except for the entry of the DIP Order and except for approval from DOH no action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with the Transactions.

Section 3.05. Financial Statements.

(a)    The Borrower has heretofore furnished to the Lender the consolidated balance sheets and related statements of income, fund balance and cash flows of the Borrower (i) for the fiscal years ended December 31, 2010 and December 31, 2011, in each case audited by and accompanied by the opinion of Ernst & Young, independent public accountants, (ii) for the three-month periods ended March 31, 2012, June 30, 2012, September 30, 2012 and December 31, 2012, and (iii) for the monthly periods from January to May 2013, in each case certified by the Borrower's chief financial officer. Such financial statements each present fairly in all material respects the financial condition and results of operations and cash flows of the Borrower as of such dates and for such periods. Such financial statements were prepared in accordance with GAAP applied on a consistent basis, subject in the case of unaudited financial statements, to year-end adjustments and the absence of footnotes.

(b)    The DIP Budget delivered on or prior to the Closing Date pursuant to Section 4.02(k) has been prepared on the basis of assumptions accompanying it believed by the Borrower to be reasonable at the time made (but subject to the listed risks and limitations, among others) and reflect as of the date thereof the Borrower's good faith projections, after reasonable analysis, of the matters set forth therein, based on such assumptions.

(c)    The DIP Budget delivered on or prior to the Closing Date and the updated  DIP Budgets delivered pursuant to Section 5.04 represent and will represent, as of the date thereof, the good faith estimate of the Borrower and its senior management concerning the probable outcome for the Borrower based on the assumptions and subject to risks and limitations identified in the DIP Budget.

Section 3.06. No Material Adverse Change. No event, change or condition has occurred since the Closing Date that has caused, or could reasonably be expected to cause, a Material Adverse Effect.

Section 3.07. Title to Properties; Possession Under Leases.

(a)    The Borrower has good and marketable title to, or valid leasehold interests in, all its material properties and assets (including all Mortgaged Property), except for minor defects in

title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes. All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by <u>Section 6.02</u>.

(b)      Except to the extent the Bankruptcy Code excuses Postpetition performance of obligations, the Borrower has complied in all material respects with all obligations under all material leases to which it is a party and all such leases are in full force and effect.  The Borrower enjoys peaceful and undisturbed possession under all such material leases.

(c)      During the period commencing on the Petition Date and ending on the Closing Date, the Borrower has not received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

Section 3.08.  Reserved.

Section 3.09.  Litigation; Compliance with Laws.

(a)      Except for the Chapter 11 Case and as set forth on <u>Schedule 3.09</u>, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any business, property or rights of the Borrower (i) that involve any DIP Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)      Since the date of this DIP Credit Agreement, there has been no change in the status of the matters disclosed on <u>Schedule 3.09</u> that, individually or in the aggregate, has resulted in a Material Adverse Effect.

(c)      Neither the Borrower nor any of its material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Properties, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

Section 3.10.  Agreements.

(a)      The Borrower is not a party to any agreement or instrument, or subject to any corporate restriction, that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)      Except for amounts owed under the DIP Loan Documents, the Borrower is not in default, after giving effect to any applicable protections provided by the Bankruptcy Code, in any manner under any provision of any indenture or other agreement or instrument evidencing

Postpetition Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Except for the filing of the Chapter 11 Case, and the Events of Default (as defined in the Prepetition Secured Loan Documents) that have occurred and that are continuing under the Prepetition Secured Loan Documents, no Default has occurred and is continuing.

Section 3.11. Use of Proceeds. The Borrower will use the proceeds of the Loans solely in accordance with the DIP Loan Documents, DIP Order and DIP Budget: (a) to fund working capital requirements of the Borrower, operating expenses of the Borrower, capital expenditures and other line items in accordance with the terms of the DIP Budget, including operating expenses and other expenses associated with the implementation of the Closure Plan and DIP Transaction and, to the extent permitted pursuant to the terms of the DIP Budget, other fees, costs and expenses associated with the Chapter 11 Case; (b) fund the payment of the Retained Professional Fees; (c) to fund the payment of interest payments with respect to the Loans; (d) to fund the payment of fees and expenses of the Authority, including, without limitation, attorneys' fees and fees of professional advisors; (e) to fund the payment of Adequate Protection Payments to the Prepetition Lender; and (f) subject to the entry of the Final Order, to fund the payment of the fees and expenses of the Prepetition Lender provided for in the Prepetition Secured Loan Documents. Neither the proceeds of the Loans nor the Prepetition Lender's Cash Collateral shall in any event directly or indirectly be transferred to, or used by or for the benefit of, any entity other than the Borrower for itself. Except as otherwise provided for in the DIP Order, no portion of the Loans, the Carve-Out, or any Cash Collateral of the Prepetition Lender or the Lender shall be used to assert any claim, cause of action or objection against the Authority, the Prepetition Lender, or their advisors, including, without limitation, to challenge any claim or lien of the Prepetition Lender or the validity or enforceability of the Prepetition Secured Loan Documents, and/or challenging any Prepetition payment to or transfer to the Prepetition Lender.

Section 3.12. Tax Returns. The Borrower has timely filed all material Postpetition Federal, state, local and foreign tax returns or materials required to have been filed by it and all such tax returns are correct and complete in all material respects. The Borrower has timely paid or timely caused to be paid all material Postpetition Taxes that were shown to be due on such tax returns, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower shall have set aside on its books adequate reserves in accordance with GAAP. Borrower has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. No Postpetition Lien in respect of Taxes has been filed, and to the knowledge of the Borrower, no claim is being asserted (other than proofs of claim filed under Rule 3001 of the Federal Rules of Bankruptcy Procedure asserting Prepetition claims), with respect to any Tax. The Borrower neither (a) intends to treat the Loans or any of the transactions contemplated by any DIP Loan Document as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4) nor (b) is aware of any facts or events that would result in such treatment.

Section 3.13. No Material Misstatements. No report, financial statement, exhibit, schedule or other written information furnished by or on behalf of the Borrower to the Lender for use in connection with the transactions contemplated by the DIP Loan Documents or in connection with the negotiation of any DIP Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; *provided* that to the extent any such report, financial statement, exhibit, schedule or other written information was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of the Borrower (and subject to year-end adjustments and the absence of footnotes), except where accounting principles are not applicable to information outside of a financial statement) and due care in the preparation of such information, report, financial statement, exhibit, schedule or other written information.

Section 3.14. Deposit Accounts and Other Accounts. Schedule 3.14 lists all banks and other financial institutions at which the Borrower maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

Section 3.15. Environmental Matters. *E*xcept with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, the Borrower: (i) has not failed to comply with any Environmental Law or to take, in a timely manner, all actions necessary to obtain, maintain, renew and comply with any Environmental Permit, and all such Environmental Permits are in full force and effect and not subject to any administrative or judicial appeal; (ii) has not become subject to any Environmental Liability; (iii) has not received notice of any claim with respect to any Environmental Liability; (iv) does not possess knowledge that any Mortgaged Property is subject to any Lien, restriction on ownership, occupancy, use or transferability imposed pursuant to Environmental Law or contains or previously contained Hazardous Materials of a form or type of in a quantity or location that could reasonably be expected to result in any Environmental Liability; (v) does not possess knowledge that there has been an Environmental Release or threat of Environmental Release of Hazardous Materials at or from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by the Borrower) in violation of, or in amounts or in a manner that could give rise to liability under, any Environmental Law; (vi) has not generated, treated, stored, transported, or allowed or suffered an Environmental Release of, Hazardous Materials from the Mortgaged Properties (or from any facilities or other properties formerly owned, leased or operated by any of Borrower) in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law; (vii) is not aware of any facts, circumstances, conditions or occurrences in respect of any of the facilities and properties owned, leased or operated that could form the basis of any action, suit, claim or other judicial or administrative proceeding relating to liability under or noncompliance with Environmental Law on the part of the Borrower or interfere with or prevent continued

compliance with Environmental Laws by any of Borrower; or (viii) knows of any basis for any Environmental Liability.

Section 3.16. Insurance.  <u>Schedule 3.16</u> sets forth a true, complete and correct description of all insurance maintained by the Borrower as of the date hereof and the Closing Date.  As of such date, such insurance is in full force and effect and all premiums have been duly paid.  The Borrower has insurance in such amounts and covering such risks and liabilities as are in accordance with normal and prudent industry practice.  The Borrower has not received notice from any insurer (or agent thereof) that substantial capital improvements or other substantial expenditures will have to be made in order to continue such insurance or has any reason to believe that it will not be able to, assuming Bankruptcy Court approval of the Debtor's first day motions related to insurance, renew its existing coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a substantially similar cost.

Section 3.17. Security.  Subject to the terms of the DIP Order, the DIP Order is effective to create in favor of the Authority, for the benefit of the Lender, a legal, valid and enforceable security interest in the DIP Collateral described therein and proceeds thereof and constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower in such DIP Collateral and the proceeds thereof, as security for the DIP Obligations, in each case prior and superior in right to any other Person (except for the Permitted Prior Senior Liens and the Carve-Out). At all times during the Chapter 11 Case, once the DIP Order is entered, all of the DIP Obligations of the Borrower under the DIP Loan Documents shall be secured by the DIP Liens, in favor of the Authority, for its benefit and for the benefit of the Lender, subject in priority only to Permitted Prior Senior Liens and the Carve-Out.

Section 3.18.  Location of Real Property and Leased Premises.

(a)    <u>Schedule 3.18(a)</u> lists completely and correctly as of the Closing Date all real property owned by the Borrower and the addresses thereof.  The Borrower own in fee or have valid leasehold interests in, as the case may be, all the Real Property set forth on <u>Schedules 3.18(a)</u> and (<u>b</u>) immediately prior to the Petition Date.

(b)    <u>Schedule 3.18(b)</u> lists completely and correctly as of the Closing Date all real property leased by the Borrower and the addresses thereof, and lists the landlord name, lease date and lease expiration date.  The Borrower has valid leases in all the real property set forth on <u>Schedule 3.18(b)</u>.

Section 3.19. Labor Matters.  As of the Closing Date, there are no material strikes, lockouts or slowdowns against the Borrower pending or, to the knowledge of the Borrower, threatened.  The hours worked by and payments made to employees of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from the Borrower, or for which any claim may be made against any the Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower.  The consummation of

the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower is bound.

Section 3.20.  Liens.  There are no Liens of any nature whatsoever on any of the properties or assets of any of Borrower (other than Liens expressly permitted by <u>Section 6.02</u>).

Section 3.21.  Intellectual Property.  The Borrower owns, is licensed or otherwise has the right to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Borrower does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.22.  Permits.  (a) Except as could not reasonably be expected to have a Material Adverse Effect, the Borrower has obtained and holds all Permits required in respect of all Real Property and for any other property otherwise operated by or on behalf of, or for the benefit of, such Person and for the operation of each of its businesses as presently conducted and as proposed to be conducted, (b) all such Permits are in full force and effect, and the Borrower has performed and observed all requirements of such Permits, (c) no event has occurred that allows or results in, or after notice or lapse of time would allow or result in, revocation or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit, (d) no such Permits contain any restrictions, either individually or in the aggregate, that are materially burdensome to the Borrower, or to the operation of any of its businesses or any property owned, leased or otherwise operated by such Person, (e) the Borrower reasonably believes that each of its Permits will be timely renewed and complied with, without material expense, and that any additional Permits that may be required of such Person will be timely obtained and complied with, without material expense and (f) no Borrower has any knowledge or reason to believe that any Governmental Authority is considering limiting, suspending, revoking or renewing on materially burdensome terms any such Permit.

Section 3.23.  Reorganization Matters.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the DIP Loan Documents and the DIP Order, and (y) the hearing(s) for the approval of the DIP Order, will be given.  Borrower shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(b)     After the entry of the DIP Order, and pursuant to and to the extent permitted in the DIP Order, the DIP Obligations will constitute allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of

the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(c)    After the entry of the DIP Order and pursuant to and to the extent provided in the DIP Order, the DIP Obligations will be secured by a valid and perfected first priority Lien on all of the DIP Collateral, subject, as to priority only, to the Carve-Out and the Permitted Prior Senior Liens.

(d)    The DIP Order is in full force and effect has not been reversed, stayed, modified or amended without the Authority's consent.

Section 3.24.  Sanctioned Persons; USA PATRIOT Act.  The Borrower, and, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of the Borrower is not currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC"); and the Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.  The Borrower and each of its Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the USA PATRIOT Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

Section 3.25.  HIPAA Compliance.  To the extent that and for so long as any of Borrower is a "covered entity" within the meaning of HIPAA, such party (i) has undertaken all reasonable steps, including surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations to be in compliance with HIPAA except to the extent such non-compliance would not constitute a Material Adverse Effect; (ii) has developed a compliance plan (a "**HIPAA Compliance Plan**") for being HIPAA Compliant; and (iii) has implemented those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that Borrower is HIPAA Compliant.  For purposes hereof, "**HIPAA Compliant**" shall mean that the Borrower (x) is or will be in compliance in all material respects with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "**HIPAA Compliance Date**") except to the extent failure to be so compliant could not reasonably be expected to have a Material Adverse Effect and (y) is not and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or

other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity and other than minor or insignificant matters) that could reasonably be expected to materially and adversely affect the Borrower's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by the Borrower of the then effective provisions of HIPAA.

Section 3.26.  Certificate of Need.  The Borrower is the lawful owner of any certificate of need or other required license for the ownership and operation of the Hospital.

Section 3.27.  Hill-Burton Act.  To the Borrower's knowledge, no facility is, as of the Closing Date, subject to any material obligations as a result of any funding for such facility under the federal Hill-Burton Act.

ARTICLE 4
CONDITIONS OF LENDING

The obligations of the Lender to make Loans hereunder are subject to the satisfaction (or waiver in accordance with Section 9.08) of the following conditions:

Section 4.01.  All Credit Events.  On the date of each Borrowing (each such event being called a "**Credit Event**"):

(a)     The Authority shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03).

(b)     The representations and warranties set forth in each DIP Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(c)     At the time of and after giving effect to such Credit Event, no Event of Default or Default shall have occurred and be continuing.

(d)     Such Credit Event shall not cause the aggregate outstanding amount of the Loans to exceed the amount then authorized by the DIP Order, or any order modifying, reversing, staying or vacating either such order shall have been entered.

(e)     The DIP Order shall not have been vacated, stayed, reversed, modified or amended without the Authority's consent or shall not otherwise not be in full force and effect; no appeal of either such order shall have been timely filed and no such order shall be subject to a stay pending appeal.

Each Credit Event shall be deemed to be a representation and warranty by the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

Section 4.02.  First Credit Event.  On the Closing Date:

(a)    The Authority shall have received any and all fees and other amounts due and payable to the Authority in connection with this DIP Credit Agreement on or prior to the Closing Date.

(b)    The Authority shall have received for the Borrower (i) a copy of its current certificate or articles of incorporation, including all amendments thereto, certified as of a recent date by the Secretary of State of the state of its organization, and a good standing certificate as of a recent date, from such Secretary of State; (ii) a certificate of a Financial Officer of the Borrower or other authorized Person dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of (1) its by-laws (or other governing documents) and certificate or articles of incorporation as in effect on the Closing Date and at all times since the date of the resolutions described in clause (B) below, (2) resolutions duly adopted by its Board of Directors (or other governing body) authorizing the execution, delivery and performance of the DIP Loan Documents to which such Person is a party, the borrowings hereunder, the granting of the Liens contemplated to be granted by it, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, and (B) as to the incumbency and specimen signature of each officer executing any DIP Loan Document or any other document delivered in connection herewith on behalf of the Borrower; (iii) a certificate of another officer as to the incumbency and specimen signature of the Chairman of the Board executing the certificate pursuant to (ii) above; and (iv) such other documents as the Authority may reasonably request.

(c)    The Authority shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming (i) compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01; and (ii) no event or circumstance has occurred since the Petition Date that could reasonably be expected to result in a Material Adverse Effect.

(d)    The Authority shall have received (i) this DIP Credit Agreement, executed and delivered by a duly authorized officer of the Borrower, (ii) if requested by the Authority, a promissory note or notes conforming to the requirements of Section 2.04 and executed and delivered by a duly authorized officer of Borrower and (iii) the Authority shall have received a copy of, or a certificate as to coverage under, the insurance required by Section 5.02 and the applicable provisions of the Perfection Documents (if any) each of which shall name the Authority as additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to the Authority.

(e)    The Authority shall have been granted on the Closing Date first priority perfected Liens on the DIP Collateral (subject only to Liens expressly and to the extent permitted by Section 6.02) and shall have received such other reports, documents and agreements as the Authority shall reasonably request and which are customarily delivered in connection with security interests in real property assets.

(f)    The Authority shall have received the financial statements described in Section 3.05.

(g)    All governmental and third party consents and approvals with respect to the Transactions and the other transactions contemplated hereby to the extent required by the Authority shall have been obtained, all applicable appeal periods shall have expired and there shall be no litigation, governmental, administrative or judicial action, actual or threatened, if successful, that could reasonably be expected to restrain, prevent or impose materially burdensome conditions on the Transactions or the other transactions contemplated hereby.

(h)    If requested by the Authority, the Authority shall have received a HIPAA Business Associate Agreement satisfactory to the Authority.

(i)    The Authority shall have received the DIP Budget, which shall be in form and substance satisfactory to the Authority.

(j)    All legal matters incident to this DIP Credit Agreement, the Borrowings and the other DIP Loan Documents shall be satisfactory to the Authority.

(k)    The Authority shall have received the approval of the Bankruptcy Court with respect to the DIP Order, in form and substance satisfactory to Authority.

Section 4.03.  Subsequent Loans.  In addition to the conditions set forth in the preceding Sections 4.01 and 4.02, on or prior to the date of the Borrowing of the Subsequent Loans:

(a)    The Authority shall have received the approval of the Bankruptcy Court with respect to the Final Order in form and substance satisfactory to Authority.

(b)    The Borrower shall not be in Default of any DIP Loan Document, including, without limitation, the DIP Order.

(c)    The Loan Maturity Date shall not have occurred.

ARTICLE 5
AFFIRMATIVE COVENANTS

The Borrower covenants and agrees with the Lender that so long as this DIP Credit Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any DIP Loan Document shall have been paid in full, the Borrower shall:

Section 5.01.  Existence; Businesses and Properties.

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as occasioned by the Chapter 11 Case, and as otherwise expressly permitted under Section 6.05 or contemplated by the Closure Plan and DIP Transaction.

(b)    (i) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents,

copyrights, trademarks and trade names material to the conduct of its business, except as otherwise contemplated by the Closure Plan and DIP Transaction; (ii) maintain and operate such business in substantially the manner in which it is presently conducted and operated, except as otherwise contemplated by the Closure Plan and DIP Transaction or if the failure to do implement the Closure Plan and DIP Transaction could not reasonably be expected to have a Material Adverse Effect; (iii) except for obligations with respect to which the Bankruptcy Code prohibits the Borrower from complying, comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, including all Healthcare Laws, whether now in effect or hereafter enacted; and (iv) at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition, ordinary wear and tear excepted, and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times except as otherwise contemplated by the Closure Plan and DIP Transaction.

Section 5.02.  Insurance.

(a)    Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions, and exclusions), including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the DIP Orders or the Perfection Documents (if any) (and comply with all covenants in the Perfection Documents with respect thereto).

(b)    Cause all such policies covering any DIP Collateral to be endorsed or otherwise amended to include a customary lender's loss payable endorsement, in form and substance satisfactory to the Authority, which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Authority of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower under such policies directly to the Authority; cause all such policies to provide that neither the Borrower, the Authority nor any other party shall be a coinsurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Authority may reasonably require from time to time to protect their interests; deliver original or certified copies of all such policies to the Authority; cause each such policy to provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Authority (giving the Authority the right to cure defaults in the payment of premiums) or (ii) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Authority; deliver to the Authority, prior to the cancellation, modification or nonrenewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Authority) together with evidence satisfactory to the Authority of payment of the premium therefor.

(c)     If at any time the area in which the Borrower's properties are located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Authority may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Authority may from time to time require.

(d)     With respect to any Mortgaged Property, carry and maintain comprehensive general liability insurance including the "broad form CGL endorsement" and coverage on an occurrence basis against claims made for personal injury (including bodily injury, death and property damage) and umbrella liability insurance against any and all claims, in no event for a combined single limit of less than that which is customary for companies in the same or similar businesses operating in the same or similar locations, naming the Authority as an additional insured, on forms satisfactory to the Authority.

(e)     Notify the Authority promptly whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.02 is taken out by the Borrower; and promptly deliver to the Authority a duplicate original copy of such policy or policies.

Section 5.03.  Obligations and Taxes.   Pay its material Indebtedness and other obligations which are not subject to the automatic stay, promptly and in accordance with their terms and pay and discharge promptly when due (unless subject to the automatic stay) all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; *provided, however*, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, assessment or charge and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property.

Section 5.04.  Financial Statements, Reports, etc.   In the case of the Borrower, furnish to the Lender:

(a)     within 120 days after the end of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' equity and cash flows showing the financial condition of the Borrower as of the close of such fiscal year and the results of its operations during such year, together with comparative figures for the immediately preceding fiscal year, certified by one of its Financial Officers to the effect that such consolidated financial statements fairly present in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(b)    within 30 days after the end of each month, its consolidated balance sheet and related statements of income and cash flows showing the financial condition of the Borrower during such fiscal month, each certified by one of its Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of the Financial Officer certifying such statements (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail satisfactory to the Authority demonstrating compliance with the terms of Section 6.13;

(d)    within 90 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flows as of the end of and for such following fiscal year and setting forth the assumptions used for purposes of preparing such budget);

(e)    [Reserved];

(f)    if and to the extent requested by the Authority from time to time, a duly executed Perfection Certificate, and the Authority shall have received the results of a recent Lien and judgment search in each relevant jurisdiction with respect to the Borrower and such search shall reveal no Liens on any of the assets of the Borrower except for Liens expressly permitted by Section 6.02 and except for Liens to be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Authority;

(g)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any DIP Loan Document, as the Authority may reasonably request;

(h)    (A) on the Closing Date, Borrower shall comply with the DIP Order with respect to the DIP Budget and, in addition, deliver the initial DIP Budget; (B) together with each Subsequent Loan request, Borrower shall deliver an update to the most recently delivered DIP Budget or supplemental DIP Budget, as the case may be;  (C) no later than 8 days prior to the commencement of any subsequent relevant 13 week period, Borrower shall deliver an updated cumulative DIP Budget for the succeeding 13 week period; (D) on the last Business Day of each month, Borrower shall deliver a monthly update to the most recently delivered DIP Budget. Within four (4) Business Days following the end of each customary reporting period of the Borrower, Borrower shall also deliver a variance report, in form and substance reasonably satisfactory to the Authority (which variance report will include the Borrower's calculation of cumulative disbursements for the applicable period certified by the Financial Officer), for the preceding customary reporting period and on a cumulative basis from the Petition Date to the report date comparing actual cash receipts and disbursements to amounts projected in the  DIP Budget;

(i)      copies of all monthly reports, projections, or other information respecting the Borrower's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of any of Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee; and

(j)      monthly at reasonable times upon the request of the Authority, confirmation of availability for, and arrange for, the chief executive officer and chief financial officer and other members of management of the Borrower to participate in a call with the Authority to discuss matters relating to the Borrower.

Section 5.05.  Litigation and Other Notices.  Furnish to the Authority prompt written notice of any of the following, but in any event no later than five (5) Business Days after knowledge of the existence of any of the following:

(a)      any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against any of Borrower or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect;

(c)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower in an aggregate amount exceeding $250,000; and

(d)      any development (individually or in the aggregate with other developments) that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

Section 5.06.  Information Regarding DIP Collateral.

(a)      Furnish to the Authority prompt written notice of any change (i) in the Borrower's corporate name, (ii) in the jurisdiction of organization or formation of the Borrower, (iii) in the Borrower's identity or corporate structure or (iv) in the Borrower's Federal Taxpayer Identification Number.  The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise and all other actions have been taken that are required in order for the Authority to continue at all times following such change to have a valid, legal and perfected security interest in all the DIP Collateral.  The Borrower also agrees promptly to notify the Authority if any material portion of the DIP Collateral is damaged or destroyed.

(b)      In the case of the Borrower, each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 5.04(a), deliver to the Authority a certificate of a Financial Officer confirming that there has been no change in

information relating to the Borrower's names and location of assets and properties of the Borrower since the date of the most recent certificate delivered pursuant to this <u>Section 5.06</u>.

Section 5.07.  Maintaining Records; Access to Properties and Inspections.

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities.  The Borrower will permit any representatives designated by the Authority to visit and inspect the financial records and the properties of such Person at reasonable times during normal business hours and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the to discuss the affairs, finances and condition the Borrower.

(b)    At its election, the Authority may, at the Borrower's cost and expense, retain an independent engineer or environmental consultant to conduct an environmental assessment of any Mortgaged Property or facility of the Borrower.  The Borrower shall cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Authority to have full access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment.  Environmental assessments conducted under this paragraph shall be limited to visual inspections of the Mortgaged Property or facility, interviews with representatives of the Borrower or facility personnel, and review of applicable records and documents pertaining to the property or facility.

(c)    In the event that the Authority shall have reason to believe that Hazardous Materials have been Released or are threatened to be Released on or from any Mortgaged Property or other facility of the Borrower or that any such property or facility is not being operated in compliance with applicable Environmental Law, the Authority may, at its election and at its own cost and expense and after reasonable notice to the Borrower, retain an independent engineer or other qualified environmental consultant to evaluate whether Hazardous Materials are present in the soil, groundwater, or surface water at such Mortgaged Property or facility or whether the facilities or properties are being operated and maintained in compliance with applicable Environmental Laws.  Such environmental assessments may include detailed visual inspections of the Mortgaged Property or facility, including any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and groundwater samples as well as such other reasonable investigations or analyses as are necessary.  The scope of any such environmental assessments under this paragraph shall be determined in the reasonable discretion of the Authority after consultation with the Borrower.  The Borrower shall cooperate in the performance of any such environmental assessment and permit any such engineer or consultant designated by the Authority to have full access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment.

Section 5.08. Use of Proceeds.  Use the proceeds of the Loans only for the purposes set forth in <u>Section 3.11</u>.

Section 5.09. Compliance with Environmental Laws.  Comply, and cause all lessees and other Person occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material environmental permits necessary for its operations and properties; and conduct any remedial action in accordance with Environmental Laws; *provided*, *however*, that Borrower shall not be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10. Preparation of Environmental Reports.  If a Default caused by reason of a breach of <u>Section 3.15</u> or <u>Section 5.9</u> shall have occurred and be continuing for more than 20 days without the Borrower commencing activities reasonably likely to cure such Default, at the written request of the Authority, provide to the Authority within 45 days after such request, at the expense of the Borrower, an environmental site assessment report regarding the matters which are the subject of such Default prepared by an environmental consulting firm reasonably acceptable to the Authority and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Default.

Section 5.11.  Additional DIP Collateral, Etc.

(a)    Except as otherwise provided pursuant to <u>Section 5.11(b)</u>, with respect to any DIP Collateral acquired  after the Closing Date or, in the case of inventory or equipment (other than inventory or equipment in transit), any material DIP Collateral moved after the Closing Date by the Borrower (other than any DIP Collateral described in <u>paragraphs (b)</u>, <u>(c)</u> or <u>(d)</u> of this Section) as to which the Authority does not have a first priority (subject to Liens permitted under this DIP Credit Agreement) perfected security interest, promptly (and, in any event, within 10 days following the date of such acquisition or move or such longer period as agreed by the Authority) (i) execute and deliver to the Authority such documents, including a Collateral Agreement and/or such amendments to the Collateral Agreement or such other Perfection Documents as the Authority deems necessary or advisable to grant to the Authority a security interest in such DIP Collateral and (ii) take all actions necessary or advisable to grant to, or continue on behalf of, the Authority, for the benefit of the Lender, a perfected first priority (subject to Permitted Prior Senior Liens) security interest in such DIP Collateral, including the filing of UCC financing statements in such jurisdictions as may be required by the Collateral Agreement or by law or as may be reasonably requested by the Authority.

(b)    With respect to any fee interest in any DIP Collateral consisting of Real Property having a fair market value in excess of $50,000 owned by the Borrower on the Closing Date or acquired after the Closing Date by the Borrower, promptly notify the Authority of such Real Property and, if requested by the Authority, promptly (and, in any event, within 5 days or such longer period as agreed by the Authority following the date of such acquisition) (i) execute and deliver a first priority (subject to Liens permitted under this DIP Credit Agreement) Lien (including, if requested by the Authority, a Mortgage) in favor of the Authority, for the benefit of the DIP Lender, covering such real property and complying with the provisions in this DIP Credit Agreement, the Final Order and in the Perfection Documents (if any), (ii) provide the

Lender with title and extended coverage insurance in an amount reasonably acceptable to the Authority (not to exceed the purchase price of such Real Property, surveys, and if applicable, flood insurance, lease estoppel certificates, memoranda or amendments, (iii) deliver to the Authority legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Authority and (iv) deliver to the Authority a notice identifying, and upon the Authority's request, provide a copy of, the consultant's reports, environmental site assessments or other material documents, if any, relied upon by the Borrower to determine that any such real property included in such DIP Collateral does not contain Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in a material Environmental Liability.  As reasonably requested by the Authority and to the extent not otherwise addressed to the Authority's reasonable satisfaction in the Final Order, the Borrower shall use reasonable efforts to obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, from the lessor of each leased property, mortgagee of owned property or bailee with respect to any warehouse, processor or converter facility or other location where DIP Collateral is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the DIP Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to Authority. After the Closing Date, no real property or warehouse space shall be leased by the Borrower (excluding renewals of existing leases and arrangements) without the prior written consent of the Authority, unless and until a satisfactory landlord agreement or bailee letter, as appropriate, shall first have been obtained with respect to such location.

(c)      [Reserved].

Section 5.12. Further Assurances.  Execute promptly upon request by the Authority any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust, including a Mortgage on the Mortgaged Properties) that may be required under applicable law, or that the Authority may reasonably request, in order to effectuate the transactions contemplated by the DIP Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Prior Senior Liens, if any) of the security interests created or intended to be created by the Perfection Documents.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the DIP Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to such of its assets and properties as the Authority shall designate (it being understood that it is the intent of the parties that the DIP Obligations shall be secured by substantially all the assets of the Borrower (including real and other properties acquired subsequent to the Closing Date).  Such security interests and Liens will be created under the Perfection Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Authority, and the Borrower shall deliver or cause to be delivered to the Lender all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Authority shall reasonably request to evidence compliance with this Section.  The Borrower agrees to provide such evidence as the Authority shall reasonably request as to the perfection and priority status of each such security interest and Lien and the Authority

shall have the right to record a duly executed acknowledgment of a court-certified copy of the DIP Orders (the "**Acknowledgment**") on any real property on which the Authority may take a Lien.  In furtherance of the foregoing, the Borrower will give prompt notice to the Authority of the acquisition by the Borrower of any real property (or any interest in real property) having a value in excess of $50,000.

Section 5.13.  Certain Collateral Matters.

(a)      At all times, to the extent permitted by law, defend, preserve and protect the security interest and lien in and on the DIP Collateral and all rights of the Lender hereunder against all claims and demands of all persons whatsoever.

(b)      Use commercially reasonable efforts to cause to be collected from its account debtors, when due, all amounts owing under its accounts (as defined in the UCC and including without limitation healthcare insurance receivables ("**Accounts**") (including delinquent Accounts, which will be collected in accordance with lawful collection procedures) and will apply all amounts collected thereon, forthwith upon receipt thereof, to the outstanding balances of such Accounts.

(c)      Upon the occurrence and continuance of an Event of Default, the Authority may in the Authority's own name, in the name of a nominee of the Authority or in the name of the Borrower communicate (by mail, telephone, facsimile or otherwise) with any account debtor other than government payors, parties to contracts of the Borrower, and obligors in respect of instruments or chattel paper or payment intangibles of the Borrower to verify with such Persons, to the Authority's reasonable satisfaction, the existence, amount and terms of, and any other matter relating to, Accounts, instruments, chattel paper or payment intangibles.

(d)      Subject to any applicable Medicare/Medicaid laws, rules and regulations, on the Closing Date, the Borrower shall at the request of the Authority execute and deliver to the Authority a power of attorney (the "**Power of Attorney**") in form and substance satisfactory to the Authority in all respects.  The power of attorney granted pursuant to the Power of Attorney is a power coupled with an interest and shall be irrevocable until all DIP Obligations shall have been paid indefeasibly in full.  The powers conferred on the Authority under the Power of Attorney are solely to protect the Authority's interests in the DIP Collateral and shall not impose any duty upon the Authority to exercise any such powers.  NONE OF THE AUTHORITY NOR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL BE RESPONSIBLE TO ANY LOAN PARTY FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, NOR FOR ANY PUNITIVE EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

Section 5.14.  Licensure; Medicaid/Medicare Cost Reports.  Except as consistent with the Closure Plan and DIP Transaction, the Borrower will maintain all certificates of need, provider numbers and licenses necessary to conduct its business as currently conducted, and take any steps required to comply with any new or additional applicable

requirements that may be imposed on providers of medical products and Medical Services, except in each case where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  If required, all Medicaid/Medicare cost reports will be properly filed.

Section 5.15. Certificates of Need.  Except to the extent consistent with the Closure Plan and DIP Transaction, the Borrower will not (a) apply for a certificate of need to amend or change in any materially adverse way, or suspend or terminate or make provisional in any material way its operating certificate; or (b) change in any materially adverse way, or suspend or terminate its Medicare or Medicaid provider agreement or any participation agreement, without the prior written consent of the Authority, which consent shall not be unreasonably withheld.  The Borrower shall immediately notify the Authority in writing if (x) the State of New York, without application by the Borrower, makes any amendment or change in any materially adverse way or suspends or terminates or makes provisional the Borrower's operating certificates (as applicable); or (y) CMS or the New York State Medicaid agency or a commercial third-party payor (as applicable), without the request of any of Borrower, changes in any materially adverse way, or suspends or terminates the Borrower's Medicare or Medicaid provider agreement or any participation agreement.

Section 5.16.  Tax Issues.

(a)    The Borrower shall not perform any act or enter into any agreement which shall adversely affect its federal income tax status as a Section 501(c)(3) public charity organization, and each shall conduct its operations in the manner which will conform in all material respects to the standards necessary to retain its status as a Section 501(c)(3) public charity organization.

(b)    The Borrower shall immediately advise the Authority in the event that the Borrower shall have received a letter or other notification from the IRS indicating that their status as a Section 501(c)(3) public charity organization has been modified, limited or revoked, or adversely implicating their status as a "foundation".

Section 5.17. Credit and Collection.  The Borrower shall not amend, waive or otherwise permit or agree to any deviation from the terms or conditions of any Account, except in accordance in all material respects with the  credit and collection policy as in effect on the Petition Date.  The Borrower shall not make any material change in such credit and collection policy without the prior written consent of the Authority.

## ARTICLE 6
## NEGATIVE COVENANTS

The Borrower covenants and agrees with the Lender that, so long as this DIP Credit Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any DIP Loan Document have been paid in full, the Borrower will not:

Section 6.01. Indebtedness.    Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness existing on the date hereof and set forth in Schedule 6.01, and any Permitted Refinancing Indebtedness in respect of any such Indebtedness;

(b)     Indebtedness created hereunder and under the other DIP Loan Documents;

(c)     Capital Lease Obligations and synthetic lease obligations in an aggregate principal amount, when combined with the aggregate principal amount of all Indebtedness incurred pursuant to Section 6.01(d) not exceeding $50,000 at any time outstanding;

(d)     Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(e)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is promptly covered by the Borrower;

(f)     [Reserved];

(g)     Customary indemnification obligations incurred by Borrower in connection with a disposition of assets permitted under this DIP Credit Agreement;

(h)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business consistent with past practice, in an aggregate principal amount not exceeding $200,000 at any time outstanding;

(i)     the Adequate Protection Obligations and the Prepetition Loans;

(j)     other Indebtedness of the Borrower in an aggregate principal amount not exceeding $200,000 at any time outstanding, of which no amounts may be secured except with the approval of the Authority in writing; and

Notwithstanding the foregoing, no Indebtedness permitted under Section 6.01 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of the Authority as set forth herein and in the DIP Order.

Section 6.02. Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except any of the following Liens, subject to the priorities provided in the DIP Order:

(a)     Liens on property or assets of the Borrower existing on the date hereof and set forth in Schedule 6.02; *provided* that such Liens shall secure only those obligations which they secure on the date hereof and refinancings, extensions, renewals and replacements thereof permitted hereunder;

(b)     any Lien created under the DIP Loan Documents;

(c)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower; *provided* that (i) such Lien is not created in contemplation of or in connection with such acquisition, (ii) such Lien does not apply to any other property or assets of the Borrower, other than accessions thereto and products and proceeds thereof, and (iii) such Lien does not materially interfere with the use, occupancy and operation of any Mortgaged Property;

(d)     Liens for taxes or assessments or other governmental charges not yet due or which are being contested in compliance with <u>Section 5.03</u> or to the extent that the Borrower does not take any action (including, without limitation, by way of motion or application to the Bankruptcy Court) to pay, and are permitted under the Bankruptcy Code to not pay such charges;

(e)     (i) carriers', warehousemen's, suppliers, materialmen's, repairmen's or other like Liens arising after the Petition Date in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, so long as such Liens attached only to inventory; (ii) inchoate and unperfected workers', mechanics' or similar Liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures and/or real estate;

(f)     pledges and deposits made after the Petition Date in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations (excluding Liens under ERISA);

(g)     deposits made after the Petition Date to secure the performance of bids, trade contracts (other than for Indebtedness), leases to the extent expressly approved in writing by the Authority in the exercise of its sole discretion (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)     zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances arising after the Petition Date and incurred in the ordinary course of business which, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower or the ability of the Borrower to utilize such property for its intended purpose;

(i)     purchase money security interests arising after the Petition Date in real property, improvements thereto or other fixed or capital assets hereafter acquired (or, in the case of improvements, constructed) by the Borrower to the extent expressly approved in writing by the Authority in the exercise of its sole discretion; *provided* that in any event (i) such security interests secure Indebtedness permitted by <u>Section 6.01(d)</u>, (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction) and (iii) such security interests do not apply to any other property or assets of the Borrower other than accessions thereto and products and proceeds thereof;

(j)     judgment Liens arising after the Petition Date and securing judgments not constituting an Event of Default under <u>Article 7</u>;

(k)     [Reserved];

(l)    Liens after the Petition Date on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens, if any;

(m)    Liens on the DIP Collateral securing obligations under the Prepetition Secured Loan Documents; *provided* that all such Liens are subordinated to the Liens securing the DIP Obligations in accordance with, and otherwise pursuant to the DIP Order;

(n)    leases, licenses, subleases or sublicenses granted after the Petition Date to others in the ordinary course of business to the extent expressly approved in writing by the Authority in the exercise of its sole discretion that do not (i) interfere in any material respect with the business of the Borrower or (ii) secure any Indebtedness;

(o)    the Adequate Protection Liens; and

(p)    valid, perfected, enforceable and otherwise not avoidable Liens existing on the Petition Date whether or not referred to in the  DIP Budget.

The prohibition provided for in this Section 6.02 specifically includes, without limitation, any effort by any of Borrower, any Committee, or any other party-in-interest in any Chapter 11 Case to create any Liens that prime, or are pari passu to, any claims, Liens or interests of the Authority (other than for the Carve-Out and the Permitted Prior Senior Liens) irrespective of whether such claims, Liens or interests may be "adequately protected".

Section 6.03.  Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and in connection with such sale or transfer, thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred unless (a) the sale of such property is first approved by the Authority in writing and (b) any Capital Lease Obligations or Liens arising in connection therewith are permitted by Sections 6.01 and 6.02 respectively.

Section 6.04.  Investments, Loans and Advances.  Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other Person (all of the foregoing, "**Investments**"), except for the following:

(a)    to the extent approved in writing by the Authority in the exercise of its sole discretion, Investments by the Borrower;

(b)    Permitted Investments;

(c)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)    [Reserved];

(e)    [Reserved];

(f)    extensions of trade credit in the ordinary course of business;

(g)    Investments made as a result of the receipt of non-cash consideration from a sale, transfer or other disposition of any asset in compliance with Section 6.05;

(h)    promissory notes and other non-cash consideration received in connection with Asset Transactions permitted under Section 6.05;

(i)    Guarantees constituting Indebtedness permitted under Section 6.01; and

(j)    other Investments approved in writing by the Authority.

Without limiting the generality of the foregoing and for purposes of clarification notwithstanding any implication to the contrary contained in this Agreement, in no event shall proceeds of the Loans directly or indirectly be used by, or advanced, distributed or in any way transferred directly or indirectly to or for the benefit of, any entity other than the Borrower.

Section 6.05.  Mergers, Consolidations, Sales of Assets and Acquisitions.

(a)    Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or sell, transfer, lease, issue or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, except, if all of the following conditions shall have been satisfied: (i) the Authority shall have first approved such transaction in writing; and (ii) at the time thereof and immediately after giving effect thereto no Event of Default or Default shall have occurred and be continuing, (x) the merger or consolidation of the Borrower in a transaction in which the Borrower is the surviving corporation.

(b)    Engage in any Asset Transaction not covered by paragraph (a) above unless consistent with the terms of the Closure Plan and DIP Transaction and in any event upon terms and conditions (to the extent not expressly set forth in the Closure Plan and DIP Transaction as set forth in the DIP Order) approved in writing by the Authority in the exercise of its reasonable discretion.

Section 6.06.  Restricted Payments; Restrictive Agreements.

(a)    Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so; except that the Borrower may make Restricted Payments that are Investments permitted under Section 6.04 or Indebtedness permitted under Section 6.01.

(b)     Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any of Borrower to create, incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any of the Borrower to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower; *provided* that, if the Authority has first approved such agreement or arrangement in writing, then (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any DIP Loan Document or the Prepetition Secured Loan Documents as in effect on the date hereof (or as amended as permitted hereunder) or related documents (or any agreement relating to any refinancing of the Prepetition Secured Loan Documents that is permitted hereunder), (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to any asset transaction, pending such sale, *provided* such restrictions and conditions apply only to the other assets that are to be sold and such sale is permitted under this DIP Credit Agreement, (C) the foregoing shall not apply to (1) customary restrictions on leases, subleases, licenses or Asset Transaction agreements otherwise permitted hereby so long as such restrictions may relate to the assets subject thereto, (2) customary provisions restricting subletting or assignment of any lease governing a leasehold interest, (3) customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (4) customary restrictions in joint venture agreements permitted hereby, (D) <u>clause (i)</u> of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this DIP Credit Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (E) <u>clause (i)</u> of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof;

(c)     make any payment on account of, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value any Prepetition Indebtedness other than, prior to the occurrence and during the continuance of an Event of Default, payment, in an amount not to exceed the amounts permitted therefor (if any) in the DIP Budget, of (i) Prepetition employee wages, benefits and related employee taxes, (ii) Prepetition sales, use and real property taxes, (iii) Prepetition amounts due in respect of insurance financings, (iv) amounts approved in writing by the Authority and approved by the Bankruptcy Court, and (v) cure amounts satisfactory to the Authority under assumed leases and executory contracts.

Without limiting the generality of the foregoing and for purposes of clarification notwithstanding any implication to the contrary contained in this Agreement, in no event shall proceeds of the Loans directly or indirectly be used by, or advanced, distributed or in any way transferred directly or indirectly to or for the benefit of, any entity other than the Borrower.

Section 6.07.  Transactions with Affiliates.  Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates; except (a) if the Authority first approves such transactions in writing, any of Borrower may engage in any of the foregoing transactions at prices and on terms and conditions not less favorable to Borrower than could be obtained on an arm's-length basis from unrelated third parties, (b) Restricted Payments may be made to the extent permitted under <u>Section 6.06</u>, (c) payment of reasonable compensation to officers and employees of the Borrower for actual services rendered to the Borrower in the ordinary course of business consistent with past practice on terms in

effect on the Petition Date, and (d) the Borrower may make payments in respect of customary reimbursable out-of-pocket expenses to directors, of the Borrower to attend board meetings after the Petition Date in the ordinary course of business.

Without limiting the generality of the foregoing and for purposes of clarification notwithstanding any implication to the contrary contained in this Agreement, in no event shall proceeds of the Loans directly or indirectly be used by, or advanced, distributed or in any way transferred directly or indirectly to or for the benefit of, any entity other than the Borrower.

Section 6.08.  Business of the Borrower; Limitation on Hedging Agreements.

(a)     With respect to the Borrower, engage at any time in any business or business activity other than: (i) the business conducted by it as of the date hereof and business activities reasonably related or incidental thereto or that constitute a reasonable extension thereof, in each case consistent with the terms of the Closure Plan and DIP Transaction, or fail or omit to take actions or to cooperate with the Authority in order to effectuate actions on a timely basis consistent with the terms of the Closure Plan and DIP Transaction, and (ii) the Chapter 11 Case (including, without limitation, the implementation of a plan of reorganization) and activities incidental thereto.

(b)     Enter into any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement other than, to the extent first approved by the Authority in writing and not exceeding such amounts permitted therefor (if any) in the  DIP Budget, (i) any such agreement or arrangement entered into in the ordinary course of business and consistent with prudent business practice to hedge or mitigate risks to which the Borrower is exposed in the conduct of its business or the management of its liabilities or (ii) any such agreement entered into to hedge against fluctuations in interest rates or currency incurred in the ordinary course of business and consistent with prudent business practice; *provided* that in each case such agreements or arrangements shall not have been entered into for speculation purposes.

Section 6.09.  Other Indebtedness and Agreements.

(a)     Except in each case for changes to the Prepetition Secured Loan Documents that are consented to in writing by the Authority, permit any waiver, supplement, modification, amendment, termination or release of any Prepetition Secured Loan Document.

(b)     (i) Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or offer or commit to pay, or directly or indirectly (including pursuant to any synthetic purchase agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness, except (A) the payment of the Indebtedness created or permitted hereunder, (B) refinancings of Indebtedness permitted by Section 6.01 and (C) the payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, *provided* that such sale or transfer is first approved by the Authority, or (ii) pay in cash any amount in respect of any Indebtedness or Equity Interests that may at the obligor's option be paid in kind or in other securities.

(c)    Permit any waiver, supplement, modification, amendment, termination or release of any terms of the Closure Plan and DIP Transaction except in each case for any of the foregoing approved in advance in writing by the Authority.

Section 6.10.  Capital Expenditures.   Permit the aggregate amount of Capital Expenditures made by the Borrower in any calendar month to exceed the amount permitted therefor (if any) in the DIP Budget.

Section 6.11.  [Reserved].

Section 6.12.  [Reserved].

Section 6.13.  Cumulative Net Cash Flow.  Permit either (a) disbursements of the Borrower to be more than the permitted variances set forth in the DIP Order and DIP Budget as of the end of any week after the Closing Date and continuing thereafter; or (b) cash receipts by the Borrower to be less than the permitted variances set forth in the DIP Order and Dip Budget on or after the Closing Date.

Section 6.14.  Fiscal Year.   With respect to the Borrower, change its fiscal year-end to a date other than December 31 without the prior written consent of the Authority (which consent shall not be unreasonably withheld).

Section 6.15.  Prepayments of Other Indebtedness.   Except pursuant to a confirmed Plan of Reorganization or except as specifically permitted hereunder, without the express prior written consent of the Authority, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising immediately prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

Section 6.16.  Prepetition Indebtedness.   Except as otherwise authorized by the Bankruptcy Court in the Final Order Pursuant to Sections 105(a) and 363(b) of Bankruptcy Code Authorizing Debtor to pay Prepetition Claims of Critical Vendors entered on December 28, 2012 [Docket No. 83] or as otherwise subsequently consented to in writing by the Authority and provided for in the DIP Budget, enter into any agreement to return any of its inventory to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise.

Section 6.17.  Chapter 11 Claims.  Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claims of the Authority against the Borrower, except as set forth in the DIP Order.

Section 6.18.  Budget Compliance.  Fail to comply with the following terms and conditions:  Borrower shall remain obligated to pay any and all DIP Obligations in accordance with the terms of the DIP Loan Documents, the DIP Order, it being

acknowledged that the Authority (A) may assume that the Borrower will comply with the DIP Budget, (B) shall have no duty to monitor such compliance, (C) other than with respect to the Carve-Out, shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget and (D) the line items in the DIP Budget for payment of interest, expenses and other amounts to the Authority are estimates only.

Section 6.19.  [Reserved].

Section 6.20.  Certain Equity Securities.  Issue any Equity Interest.

Section 6.21.  Cash Management.  Fail, at all times, to maintain cash management arrangements satisfactory to the Authority; and shall not establish any new bank accounts without prior written notice to the Authority.

ARTICLE 7
EVENTS OF DEFAULT

Section 7.01.  Event of Default.  Except for defaults occasioned by the filing of the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Court prohibits the Borrower from complying or permits the Borrower not to comply, in case of the happening of any of the following events (each an "**Event of Default**"):

(a)    any representation or warranty made or deemed made in or in connection with any DIP Loan Document or the Borrowings, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any DIP Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in (b) above) due under any DIP Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)    default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in Section 5.01(a), 5.02 (other than any default under Section 5.02 that in the reasonable judgment of the DIP Lender is immaterial and could not reasonably be expected to have an adverse impact on the DIP Lender's rights or remedies or ability to realize on the benefits of insurance relating to any of the DIP Collateral), 5.04 (which remains uncured for a period of 5 days), 5.05 or 5.08 or in Article 6;

(e)    default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in any DIP Loan Document (other than those

specified in <u>clauses (b)</u>, <u>(c)</u> or <u>(d)</u> above) and such default shall continue unremedied for a period of 15 days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the DIP Lender, in any event after giving effect to the protections provided by Bankruptcy Code Section 362;

(f)     one or more judgments for the payment of money in an aggregate amount in excess of $100,000 or other judgments that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (other than any judgment described in this clause (g) as to which, and only to the extent, a reputable insurance company has expressly accepted actual liability for payment and is not disputing or disclaiming its payment responsibility) shall be rendered against the Borrower or any combination thereof and the same shall remain undischarged for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower to enforce any such judgment and such action is not stayed within 45 days;

(g)     any Lien purported to be created pursuant to a DIP Order or under any Perfection Document shall cease to be, or shall be asserted by Borrower not to be, a valid, perfected and, with respect to the DIP Lender, first priority (except for Permitted Prior Senior Liens, if any, expressly provided in this DIP Credit Agreement or such Perfection Document) Lien on any material DIP Collateral covered thereby;

(h)     Any Government Receivables Account depositary agreement, or other depositary agreement or cash sweep instructions between the Borrower and any bank or other financial institution, whether pursuant to the cash management systems established pursuant to this DIP Credit Agreement and the other DIP Loan Documents or otherwise, is terminated or materially modified for any reason by the Borrower without the Authority's prior written consent;

(i)     The Borrower (i) breaches any material provision of or terminates the HIPAA Business Associate Agreement, or (ii) except as required by applicable Healthcare Laws in effect from time to time, the Borrower agrees to be bound by restrictions on use and/or disclosure of PHI (as defined in the HIPAA Business Associate Agreement) that in the credit judgment of the Authority unreasonably limits the Authority's access to the DIP Collateral or information about the DIP Collateral;

(j)     the Borrower's failure to develop and implement the Closure Plan on terms acceptable to the Authority and DOH no later than the date set forth in the DIP Order;

(k)     the Borrower's failure to consummate the DIP Transaction no later than the DIP Transaction Deadline;

(l)     there shall have occurred any of the following in any Chapter 11 Case:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, in each case, by the Borrower in the Chapter 11 Case, or the entry of any order by the Bankruptcy Court in the Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy

Code not otherwise permitted pursuant to this DIP Credit Agreement; (x) to grant any Lien other than Liens expressly permitted under <u>Section 6.02</u> of this DIP Credit Agreement upon or affecting any DIP Collateral; (y) except as provided in the Interim or Final Order, as the case may be, to use Cash Collateral of the Authority under Section 363(c) of the Bankruptcy Code without the prior written consent of the Authority; or (z) that (in the case of the Borrower) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by the Borrower) approves or provides authority to take any other action or actions adverse to the Authority or its rights and remedies hereunder or their interest in the DIP Collateral;

(ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Borrower which does not provide for the repayment of all DIP Obligations under this DIP Credit Agreement in full in cash on the Effective Date of such plan and to which the Authority does not consent or otherwise agree to the treatment of its claims or the loss by the Borrower of the exclusive right to file and solicit acceptances of a plan of reorganization;

(iii)    the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the DIP Obligations under this DIP Credit Agreement on or before the effective date of such plan;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Documents or the DIP Order without the prior written consent of the Authority;

(v)    the Final Order is not entered within thirty-five (35) days (or such other period as Authority may agree to in writing) following the entry of the Interim Order;

(vi)    the payment of, or application by the Borrower for authority to pay, any Prepetition Indebtedness without the Authority's prior written consent other than as provided for in Final Order Pursuant to Sections 105(a) and 363(b) of Bankruptcy Code Authorizing Debtor to pay Prepetition Claims of Critical Vendors entered on December 28, 2012 [Docket No. 83] or as otherwise subsequently consented to in writing by the Authority and provided for in the DIP Budget;

(vii)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the Authority or against agent or lenders under the Prepetition Secured Loan Documents; or the sale without the Authority's consent, of all or substantially all of the Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the

Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the DIP Obligations and termination of the Commitments;

(viii)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(ix)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, or (y) with respect to any Lien of or the granting of any Lien on any DIP Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(x)    the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under this DIP Credit Agreement or the other DIP Loan Documents;

(xi)    the failure of the Borrower to perform any of its obligations under the DIP Order or any violation of any of the terms of the DIP Order;

(xii)    the challenge by the Borrower to the validity, extent, perfection or priority of any liens granted under the Prepetition Secured Loan Documents;

(xiii)    the remittance, use or application of the proceeds of DIP Collateral other than in accordance with cash management procedures and agreements acceptable to the Authority;

(xiv)    the use of Cash Collateral of the Prepetition Lender for any purpose other than to pay expenditures set forth in the DIP Budget or as otherwise permitted by the DIP Order or the Authority;

(xv)    the entry of an order in the Chapter 11 Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the Authority, without the consent in writing of the Authority;

(xvi)    other than with respect to the appointment of an ombudsman appointed by the U.S. Trustee, the appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower;

(xvii)    the filing of a motion by the Borrower requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the DIP Lender's claims or with the claims of the Prepetition Lender under the Prepetition Secured Loan Documents;

(xviii)    the entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying the DIP Order;

(xix)    the obtaining of additional financing or the granting of Liens not expressly permitted hereunder;

(xx)    the use of Cash Collateral without the consent of the Authority;

(xxi)    any attempt by the Borrower to reduce, set off or subordinate the DIP Obligations or the Liens securing such DIP Obligations to any other Indebtedness;

(xxii)    the reversal, vacation or stay of the effectiveness of either the DIP Order;

(xxiii)    the payment of or granting adequate protection (except for Adequate Protection Payments) with respect to any Prepetition Indebtedness; or

(xxiv)    the cessation of Liens or super-priority claims granted with respect to this DIP Credit Agreement to be valid, perfected and enforceable in all respects.

(m)    a change in the condition of the assets of the Borrower shall have occurred that would reasonably be expected to have a Material Adverse Effect on the Authority's interest in the DIP Collateral;

(n)    a petition to dissolve the Borrower shall be filed by the Borrower with the Secretary of State of the State of New York, the legislature of the State or any other governmental authority having jurisdiction over the Borrower; or

(o)    an order of dissolution of the Borrower shall be made by the State of New York, the legislature of the State or any other governmental authority having jurisdiction over the Borrower which order shall remain undismissed or unstayed for an aggregate of thirty (30) days;

then, and in every such event, and at any time thereafter during the continuance of such event each or any of the following actions may be taken on seven (7) days' notice: the Authority may (i) terminate the Subsequent Loan Commitments, (ii) terminate the Debtor's use of Cash Collateral on seven (7) days' notice and (iii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other DIP Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other DIP Loan Document to the contrary notwithstanding, and the Authority shall have the right (exercisable upon seven days' prior written notice to the Borrower and other parties required under Local Rule 4001-2) to take all or any actions and exercise any remedies available to a secured party under the Perfection Documents or applicable law or in equity, or as otherwise provided for in the DIP Order.  If any Event of Default has occurred and is continuing, the Authority may, subject to and in accordance with the terms of the DIP Order, (i) terminate the Commitments with respect to further Borrowings; (ii) reduce the Commitments from time to time; (iii) declare all or any portion of the DIP Obligations, including all or any portion of any Loan to be forthwith due and payable, in accordance with the terms of the DIP Order; or (iv) exercise any rights and remedies provided to the Authority under the DIP Loan Documents, the DIP Order or at law or equity.  The sole issue as to which the Borrower may seek Bankruptcy

Court intervention at any hearing seeking to delay or prevent the DIP Lender from exercising remedies shall be whether an Event of Default has, in fact, occurred and is continuing.

ARTICLE 8
[RESERVED]


ARTICLE 9
MISCELLANEOUS

Section 9.01. Notices; Electronic Communications. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)     If to Borrower or any Debtor, to the Borrower at:

> Interfaith Medical Center
> 1545 Atlantic Avenue
> Brooklyn, New York 11213
> Attention:  Robert Mariani
> Tel:  (718) 613-4003
> Fax:  [_____]
>
> With a copy to:
>
> Alan J. Lipkin, Esq.
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Tel:  (212) 728-8240
> Fax:  (212) 728-9240

(b)    If to the Authority, to:

> Dormitory Authority
> of the State of New York
> 515 Broadway
> Albany, New York 12207
> Attention: Managing Director for Public Finance and
> Portfolio Monitoring
> Tel:  (518) 257-3160
> Fax: (518) 257-3100
> With a copy to its General Counsel (at the same
> address) and to its outside counsel:
>
> David Neier, Esq.
> Winston & Strawn LLP
> 200 Park Avenue
> New York, New York 10166
> Tel:  (212) 294-6700
> Fax: (212) 294-4700

All notices and other communications given to any party hereto in accordance with the provisions of this DIP Credit Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As may be agreed to in writing among the Borrower, the Authority from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Authority or unless the electronic mail address referred to below has not been provided by the Authority to the Borrower, that the Borrower will provide to the Authority all information, documents and other materials that it is obligated to furnish to the Authority pursuant to the DIP Loan Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Borrowing Request, (ii) relates to the payment of any principal or other amount due under this DIP Credit Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this DIP Credit Agreement or any other DIP Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this DIP Credit Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Authority to an electronic mail address as directed by the Authority.  In addition, the Borrower shall continue to provide the Communications to the Authority, as the case may be, in the manner specified in the DIP Loan Documents but only to the extent requested by the Authority.

IN NO EVENT SHALL THE AUTHORITY OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, THE DIP LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE AUTHORITY'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

Nothing herein shall prejudice the right of the DIP Lender to give any notice or other communication pursuant to any DIP Loan Document in any other manner specified in such DIP Loan Document.

Section 9.02.  Survival of DIP Credit Agreement.   All covenants, agreements, representations and warranties made by the Borrower in the DIP Loan Documents and in the certificates or other documents delivered in connection with or pursuant to this DIP Credit Agreement or any other DIP Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the DIP Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any such other party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any other amount payable under this DIP Credit Agreement or any other DIP Loan Document is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.17 and 9.05 shall survive and remain operative and in full force and effect regardless of the expiration or termination of this DIP Credit Agreement (or any provisions hereof), the consummation of the transactions contemplated hereby, the repayment of any Loan, the expiration or termination of the Commitments, the invalidity or unenforceability of any provision of this DIP Credit Agreement or any other DIP Loan Document or any investigation made by or on behalf of the Authority.

Section 9.03.  Binding Effect.  This DIP Credit Agreement shall become effective when it shall have been executed by each of the parties hereto and when the Authority shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

Section 9.04.  Successors and Assigns.

(a)     Whenever in this DIP Credit Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower or the DIP Lender that are contained in this DIP Credit Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)     The DIP Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this DIP Credit Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided*, *however*, that (i) the parties to each assignment shall execute and deliver to the Authority an Assignment and Acceptance, and (ii) the assignee, if it shall not be the DIP Lender, shall deliver to the Authority an Administrative Questionnaire in form and substance acceptable to the Authority.   Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of the DIP Lender under this DIP Credit Agreement and (B) the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this DIP Credit Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of the assigning DIP Lender's rights and obligations under this DIP Credit Agreement, the DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.17 and 9.05, as well as to any fees accrued for its account and not yet paid).

(c)     [Reserved].

(d)     The Authority, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in the City of Albany, New York, a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the name and address of the DIP Lender, and the Commitment of, and principal amount of the Loans owing to, the DIP Lender pursuant to the terms hereof from time to time (the "**Register**").   The entries in the Register shall, absent manifest error, be conclusive and the Borrower and the Authority may treat each Person whose name is recorded in the Register pursuant to the terms hereof as the DIP Lender hereunder for all purposes of this DIP Credit Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and the DIP Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by the assigning DIP Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be the DIP Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable and the written consent of the Authority and any applicable tax forms, the Authority shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register.   No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)     The DIP Lender may without the consent of the Borrower sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this DIP Credit Agreement (including all or a portion of its Commitment and the Loans owing to it) upon terms and conditions acceptable to the Authority.  No lender that is organized outside of the laws of the United States of America or a state thereof shall be permitted to become the DIP Lender hereunder without the consent of the Authority. The DIP Lender granting any participation shall maintain a register comparable to and in accordance with the principles set forth in Section

9.04(d) in which there is recorded in each case any grant of a participation to a participant. Each such participant shall be entitled to a complete exemption from withholding tax.

(g)    The DIP Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to the DIP Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the DIP Lender pursuant to Section 9.16.

(h)    The DIP Lender may at any time assign all or any portion of its rights under this DIP Credit Agreement to secure extensions of credit to the DIP Lender or in support of obligations owed by the DIP Lender; *provided* that no such assignment shall release the DIP Lender from any of its obligations hereunder or substitute any such assignee for the DIP Lender as a party hereto.

(i)    No Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Authority, and any attempted assignment without such consent shall be null and void.

Section 9.05.  Expenses; Indemnity.

(a)    The Borrower agrees to pay all out-of-pocket expenses incurred by the Authority in connection with the preparation and administration of this DIP Credit Agreement and the other DIP Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Authority in connection with the enforcement or protection of its rights in connection with this DIP Credit Agreement and the other DIP Loan Documents or in connection with the Loans made hereunder, including the fees, charges and disbursements of Winston & Strawn LLP, counsel for the Authority.

(b)    The Borrower agrees to indemnify the DIP Lender and each Related Party thereof (each such Person being called an "**Indemnified Person**") against, and to hold each Indemnified Person harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements, incurred by or asserted against any Indemnified Person arising out of, in any way connected with, or as a result of (i) the execution or delivery of this DIP Credit Agreement or any other DIP Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby, (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Person is a party thereto, (and regardless of whether such matter is initiated by a third party or by the Borrower or any of its respective Affiliates), or (iv) any actual or alleged presence or Environmental Release of Hazardous Materials on any property currently or

formerly owned or operated by the Borrower any Environmental Liability related in any way to the Borrower; *provided* that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person.

(c)     [Reserved].

(d)     To the extent permitted by applicable law, no Borrower shall assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this DIP Credit Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     The provisions of this <u>Section 9.05</u> shall remain operative and in full force and effect regardless of the expiration of the term of this DIP Credit Agreement, the consummation of the Transactions or the other transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this DIP Credit Agreement or any other DIP Loan Document, or any investigation made by or on behalf of the DIP Lender.  All amounts due under this <u>Section 9.05</u> shall be payable on written demand therefor.

Section 9.06.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, the DIP Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the DIP Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this DIP Credit Agreement and other DIP Loan Documents held by the DIP Lender, irrespective of whether or not the DIP Lender has made any demand under this DIP Credit Agreement or such other DIP Loan Document and although such obligations may be unmatured.  The rights of the DIP Lender under this <u>Section 9.06</u> are in addition to other rights and remedies (including other rights of setoff) which the DIP Lender may have.

Section 9.07.  Applicable Law.  THIS DIP CREDIT AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER DIP LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 9.08.  Waivers; Amendment.

(a)     No failure or delay of the Authority in exercising any power or right hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Authority hereunder and under the

other DIP Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this DIP Credit Agreement or any other DIP Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)      Neither this DIP Credit Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Authority.

Section 9.09.  Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the DIP Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to the DIP Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds effective rate to the date of repayment, shall have been received by the DIP Lender.

Section 9.10.  Entire Agreement.  This DIP Credit Agreement and the other DIP Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this DIP Credit Agreement and the other DIP Loan Documents.  Nothing in this DIP Credit Agreement or in the other DIP Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of the DIP Lender) any rights, remedies, obligations or liabilities under or by reason of this DIP Credit Agreement or the other DIP Loan Documents.

Section 9.11.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS DIP CREDIT AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS.      EACH  PARTY  HERETO  (A)  CERTIFIES  THAT  NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD  NOT,  IN  THE  EVENT  OF  LITIGATION,  SEEK  TO  ENFORCE  THE

FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS DIP CREDIT AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.11</u>.

Section 9.12. Severability.  In the event any one or more of the provisions contained in this DIP Credit Agreement or in any other DIP Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13. Counterparts.  This DIP Credit Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 9.03</u>.  Delivery of an executed signature page to this DIP Credit Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this DIP Credit Agreement.

Section 9.14. Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this DIP Credit Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this DIP Credit Agreement.

Section 9.15.  Jurisdiction; Consent to Service of Process.

(a)    The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this DIP Credit Agreement shall affect any right that the Authority may otherwise have to bring any action or proceeding relating to this DIP Credit Agreement or the other DIP Loan Documents against the Borrower or its properties in the courts of any jurisdiction.

(b)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this DIP Credit Agreement or the other DIP Loan Documents in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court.

(c)    Each party to this DIP Credit Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>.    Nothing in this DIP Credit Agreement will affect the right of any party to this DIP Credit Agreement to serve process in any other manner permitted by law.

Section 9.16. Confidentiality.    The DIP Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and Authority, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other DIP Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this <u>Section 9.16</u>, to (i) any actual or prospective assignee of or participant in (or its advisors) any of its rights or obligations under this DIP Credit Agreement and the other DIP Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower; provided, however, that such counterparty shall be informed of the confidentiality of such Information and that they are bound to maintain such confidentiality, (f) with the consent of the Borrower, (g) to the extent such Information becomes publicly available other than as a result of a breach of this <u>Section 9.16</u>, (h) to (i) any bank or financial institution and (ii) S&P, Moody's, Fitch Ratings and/or other ratings agency, as the DIP Lender reasonably deems necessary or appropriate in connection with the DIP Lender's obtaining financing; <u>provided</u>, <u>however</u>, that such financial institution or ratings agency shall be informed of the confidentiality of such Information and that they are bound to maintain such confidentiality, or (i) making such disclosures to its investors or potential investors as the DIP Lender reasonably deems necessary or appropriate; <u>provided</u>, <u>however</u>, that such investors or potential investors shall be informed of the confidentiality of such Information and that they are bound to maintain such confidentiality.  For the purposes of this Section, "**Information**" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the DIP Lender on a non-confidential basis prior to its disclosure by the Borrower or such information that the Borrower identifies as non-confidential.    Any Person required to maintain the confidentiality of Information as provided in this <u>Section 9.16</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

Section 9.17.  [Reserved].

Section 9.18. USA PATRIOT Act Notice.    The Authority hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information

includes the name and address of the Borrower and other information that will allow the DIP Lender or the Authority, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

Section 9.19. Parties Including Trustees; Bankruptcy Court Proceedings. This DIP Credit Agreement, the other DIP Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other DIP Loan Document shall be binding upon the Borrower, the estate of the Borrower, and any trustee, other estate representative or any successor in interest of the Borrower in any Chapter 11 Case or any subsequent case commenced under chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This DIP Credit Agreement and the other DIP Loan Documents shall be binding upon, and inure to the benefit of, the successors of the DIP Lender and its respective assigns, transferees and endorsees. The Liens created by this DIP Credit Agreement and the other DIP Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of the Borrower to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Authority file financing statements or otherwise perfect its Liens under applicable law. The Borrower shall not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other DIP Loan Documents without the prior express written consent of the Authority. Any such purported assignment, transfer, hypothecation or other conveyance by the Borrower without the prior express written consent of the Authority shall be void. The terms and provisions of this DIP Credit Agreement are for the purpose of defining the relative rights and obligations of the Borrower and the DIP Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this DIP Credit Agreement or any of the other DIP Loan Documents.

Section 9.20. Prepetition Secured Loan Documents. Borrower hereby agrees that (i) this DIP Credit Agreement is separate and distinct from the Prepetition Secured Loan Documents and (ii) each Prepetition Secured Loan Document is in full force and effect. The Borrower further agrees that by entering into this DIP Credit Agreement (but subject to the DIP Order), DIP Lender does not waive any Default or Event of Default under the Prepetition Secured Loan Documents or any of its liens, claims, priorities, rights and remedies thereunder.

ARTICLE 10
[RESERVED]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this DIP Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

INTERFAITH MEDICAL CENTER, INC.,
as Borrower

By: _____
          Name:
          Title:

**THE DORMITORY AUTHORITY OF
THE STATE OF NEW YORK**

By: _____

Name:

Title:

COMMITMENT SCHEDULE

<u>Initial Loan Commitment</u>

$[_____]

<u>Subsequent Loan Commitments</u>

$[_____]

## FORM OF BORROWING REQUEST

[Date]

Dormitory Authority
of the State of New York
515 Broadway
Albany, New York 12207
Attention: Managing Director for Public Finance and Portfolio
Monitoring

Ladies and Gentlemen:

   The undersigned, Interfaith Medical Center, a New York not-for-profit general hospital corporation (the **"Borrower"**) refers to the Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement dated as of February [__], 2013 (the **"DIP Credit Agreement"**), among IMC, as the Borrower and the Dormitory Authority of New York, as DIP Lender.  Terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the DIP Credit Agreement.  Borrower hereby gives you notice pursuant to Section 2.03 of the DIP Credit Agreement that it requests a Borrowing, under the DIP Credit Agreement, and in that connection sets forth below the terms on which such Borrowing is requested to be made:

(A)  Date of Borrowing
    (which is a
    Business Day)       _____

(B)  Principal Amount of Borrowing
    _____

(C)  Funds are requested to be disbursed to the Borrower's account with
_____ (Account No.   _____).

The Borrower hereby represents and warrants to the DIP Lender that, on the date of this Borrowing Request and on the date of the related Borrowing, the conditions to lending specified in Section 4.01 and [Section 4.02] [Section 4.03] of the DIP Credit Agreement have been satisfied.

INTERFAITH MEDICAL CENTER, INC.

By:_____
    Name:
    Title

## **EXHIBIT B**

Proposed DIP Order

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

In re                                                    :    Chapter 11
                                                         :
Interfaith Medical Center, Inc.,[1]                      :    Case No. 12-48226 (CEC)
                                                         :
                                         Debtor.   :    Re:  Docket Nos. 7, 38, 149, 231, 344, 394,
                                                         :          475, 551 and 631

--------------------------------------------------------- x

**FINAL ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN
POSTPETITION SECURED FINANCING PURSUANT TO SECTIONS 105,
361, 362, 364, 503(b) AND 507(b) OF THE BANKRUPTCY CODE;
(II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE;
(III) PROVIDING ADEQUATE PROTECTION PURSUANT TO
SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE;
(IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO
SECTION 362(d) OF THE BANKRUPTCY CODE; (V) AUTHORIZING
AND APPROVING A RELATED COMPROMISE AND SETTLEMENT
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 9019; AND (VI) PROVIDING RELATED RELIEF**

THIS MATTER came before the Court on September 11, 2013, on the motion (the

"**Motion**") of Interfaith Medical Center, a New York not-for-profit corporation, as chapter 11

debtor and debtor in possession ("**IMC**" or the "**Debtor**") in the above-captioned chapter 11 case

(the "**Chapter 11 Case**"), for the entry of this Final Order (this "**Final Order**") authorizing the

Debtor, pursuant to title 11 of the United States Code (the "**Bankruptcy Code**"), including

sections 105(a), 361, 362, 363, 364, 503(b) and 507(b) thereof, the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), including Rules 2002, 4001, 9014, and 9019, and Rule

4001-5 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New

York (the "**Local Rules**"), to: (i) obtain postpetition financing (the "**DIP Facility**") and enter

into a senior secured priming and superpriority debtor in possession credit agreement (together

---

[1]        The last four digits of the Debtor's federal tax identification number are 6155.  The Debtor's mailing
           address is 1545 Atlantic Avenue, Brooklyn, New York 11213.

with all schedules and exhibits thereto, the "**DIP Credit Agreement**," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time, the "**DIP Loan Documents**"),[2] substantially in the form annexed to the Motion as <u>Exhibit A</u>, by and among the Debtor and the Dormitory Authority of the State of New York (the "**Authority**" and, in such capacity, the "**DIP Lender**"), all in respect of the obligations set forth in the DIP Loan Documents and herein (the "**DIP Obligations**"); (ii) grant mortgages, security interests, liens and superpriority claims for the benefit of the DIP Lender in respect of the DIP Obligations as provided herein and in the DIP Loan Documents; (iii) continue to use Cash Collateral (defined below); (iv) provide Adequate Protection (defined below) to the Authority (in such capacity, the "**Prepetition Lender**"); (v) provide Adequate Protection Payments (defined below) to the Prepetition Lender; (vi) modify the automatic stay pursuant to section 362 of the Bankruptcy Code; (vii) fund postpetition allowed fees and expenses of Retained Professionals (defined below) ("**Retained Professional Fees**") and the Carve-Out (defined below); and (viii) grant related relief, including, without limitation, a compromise and settlement of the claims of the Authority as Prepetition Lender and DIP Lender; and, upon all of the pleadings filed with the Court; and the Court, having considered the Motion and the exhibits attached thereto, including the DIP Credit Agreement; and in accordance with Bankruptcy Rule 4001, due and proper notice of the Motion having been given; and a final hearing to consider approval of the DIP Facility having been held and concluded (the "**Hearing**") and evidence presented in support of the Motion; and the Court having noted the appearances of parties in interest at the Hearing on the record; and all of the proceedings held before the Court; and any objections to the

---

[2] Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Motion and DIP Loan Documents, as applicable.

Motion having been resolved or overruled by the Court; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate (the "**Estate**"), its community, and its creditors; and after due deliberation and consideration, and sufficient cause appearing therefor;

THE COURT HEREBY FINDS:[3]

A.    <u>Notice and Hearing</u>.    Due and appropriate notice of the Motion, the relief requested therein and the Hearing has been given and served by the Debtor on the parties (collectively, the "**Notice Parties**") pursuant to the *Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates*, dated as of December 4, 2012 [Docket No. 35] (the "**Notice Procedures Order**"), and all applicable rules and guidelines, including section 102(1) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and Local Rule 2002-2, and such notice was appropriate under the circumstances and sufficient for all purposes under the Bankruptcy Code, Bankruptcy Rules and Local Rules.

B.    <u>Chapter 11 Filed</u>.    The Debtor filed its petition under chapter 11 of the Bankruptcy Code on December 2, 2012 (the "**Petition Date**"), and is presently operating as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On December 13, 2012, an Official Committee of Unsecured Creditors was appointed in the Chapter 11 Case (the "**Committee**").

C.    <u>Prepetition Loans</u>.    Subject to Challenge (as defined below) as set forth in Paragraph 19 of this Final Order, pursuant to the following agreements, the Prepetition Lender made loans and extended other financial accommodations to IMC prior to the Petition Date and loaned the proceeds thereof to IMC (the "**Prepetition Loans**"):

---

[3]    Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

(1)    that certain secured Loan Agreement by and between the Prepetition Lender and IMC, dated as of January 24, 2007 (as amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Prepetition Loan Agreement**"), relating to the Secured Hospital Revenue Refunding Bonds, Interfaith Medical Center, Series 2007 (the "**Series 2007 Bonds**");

(2)    that certain unsecured Reimbursement Agreement between the Authority and IMC, dated as of March 29, 2005, (as amended on June 14, 2011, and as further amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Fund B Loan Agreement**"); and

(3)    that certain secured Reimbursement Agreement between the Authority and IMC, dated as of November 21, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with all agreements, documents, notes and instruments in respect thereof, the "**Pool Loan Agreement**" and together with the Prepetition Loan Agreement, the Fund B Loan Agreement and all security, pledge, guaranty, and other lien and loan agreements and documents in connection therewith, each as may be amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Secured Loan Documents**" and such obligations thereunder the "**Prepetition Secured Obligations**").  One or more Events of Default under the Prepetition Secured Loan Documents and the Fund B Loan Agreement has occurred and is continuing, has not been waived by the Authority, and the Authority expressly reserves all of its rights and remedies under the Prepetition Secured Loan Documents and the Fund B Loan Agreement with respect thereto.

D.    <u>Necessity and Best Interest</u>.

(1)    Good cause has been shown for the entry of this Final Order.

(2)    The Debtor does not have sufficient Cash Collateral, unencumbered cash or other available sources of working capital and financing to implement the Closure Plan (as defined below) while, among other things, continuing to provide proper care to its patients in advance of their transfer to other facilities, and, pending the shut-down of the hospital, finance the ordinary costs of its operations, maintain business relationships with vendors, suppliers and customers, pay certain salaries and claims of its employees, utilities, and other short-term costs, and to otherwise pay the costs attendant to the Chapter 11 Case.  Accordingly, the Debtor needs access to the DIP Facility and use of the Cash Collateral.

(3)    The priming of certain liens on the Prepetition Collateral (as defined below) will enable the Debtor to obtain the DIP Facility and continue to operate its business for the benefit of its Estate, its community, and its creditors.  The Debtor is unable to obtain adequate required funds:  (i) in the forms of (w) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (x) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (y) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code or (z) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code; or (ii) on terms more favorable than those offered by the DIP Lender under the DIP Budget (defined below), the other DIP Loan Documents and this Final Order, unless granted pursuant to sections 364(c)(1), (2), (3) and (4) of the Bankruptcy Code.

(4)    The Debtor has requested that, pursuant to the terms of the DIP Loan Documents, the DIP Lender make loans and advances and provide other financial accommodations to the Debtor.  The ability of the Debtor to implement the Closure Plan (as

defined in Paragraph 23 hereof) (without premature closure, which could jeopardize patients remaining at the hospital) and, pending shut-down of the hospital, operate its business, including to care for its patients and serve its community, while also preserving and maximizing the value of its Estate for the benefit of all creditors, the community served by IMC and other parties in interest, depends upon the Debtor obtaining such financing.  The DIP Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, pursuant to the terms and conditions of the DIP Loan Documents.  Accordingly, the relief requested in the Motion is necessary, essential and appropriate and is in the best interests of the Debtor, its Estate, all creditors and other parties in interest.

(5)    The DIP Facility, the provisions of this Final Order and the DIP Loan Documents have been negotiated at arm's-length and in "good faith," as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and are in the best interests of the Debtor, its Estate and creditors.  The DIP Lender is extending financing to the Debtor in good faith and in express reliance upon the protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code and the DIP Lender is entitled to the benefits of the provisions of sections 363(m) and 364(e) of the Bankruptcy Code.

(6)    The Debtor (in consultation with its advisors) has determined, subject, *inter alia*, to the assumptions and limitations identified in the DIP Budget (as defined in Paragraph 4(a) below), that (i) the DIP Budget is reasonable and should allow the Debtor to operate in the Chapter 11 Case without the accrual of unpaid allowed administrative expenses, except in the ordinary course, and (ii) the DIP Budget includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the DIP Budget in connection with

6

the closure of the hospital pursuant to the Closure Plan during the pendency of the Chapter 11 Case.

(7)     The Debtor has requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b), 4001(c) and 4001(d).  Absent entry of this Final Order, the Debtor's Estate will be immediately and irreparably harmed.

(8)     The Debtor and the Authority also have agreed to resolve certain other claims and issues between the Debtor and the Authority, including, without limitation, resolution of the Authority's prepetition and postpetition claims as part of the consideration for the Authority providing DIP financing to the Debtor.  The negotiation and settlement of such claims and issues is fair and equitable to the Debtor and in the best interests of the Debtor's Estate.

(9)     It is in the best interests of the Debtor, its creditors, patients, Estate, community, and other parties in interest that the Debtor be allowed to finance its operations and the Closure Plan under the terms and conditions set forth herein.  The relief requested by the Motion is necessary to avoid harm to the Debtor's creditors, patients, Estate, community, and other parties in interest while the Closure Plan is being implemented, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the entry of this Final Order.  The terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

The Court, having determined that good cause exists for the relief requested in the Motion,

IT IS HEREBY ORDERED as follows:

1.     <u>Jurisdiction</u>.  This Court has core jurisdiction over the Chapter 11 Case, the

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and Administrative Order No. 264, titled "The Referral of Matters to the Bankruptcy Judges, incorporating Referral Order of August 28, 1986," by the District Court of the Eastern District of New York (Weinstein, C.J.).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    <u>Notice</u>.  Under the circumstances, notice of the Motion and the Hearing pursuant to the Notice Procedures Order constitutes due and sufficient notice thereof and complies with all applicable Bankruptcy Rules, including Rules 2002, 4001(b), (c) and (d), 5003(e) and 9014 and the local rules of this Court, including Local Rule 4001-5, and no other notice need be given.

3.    <u>Approval of Motion</u>.  The Motion is approved on the terms and conditions set forth in this Final Order.  This Final Order shall become effective immediately upon its entry.

4.    <u>The DIP Budget</u>.

(a)    The amount of the DIP Facility and Cash Collateral authorized to be used hereby shall not exceed the amounts reflected in the budget prepared by the Debtor (as amended, supplemented, extended or otherwise modified from time to time in accordance with Paragraph 4(c) below, the "**<u>DIP Budget</u>**"), a copy of which is annexed hereto as <u>Exhibit 1</u> (provided that the Debtor may take appropriate actions with respect to confidentiality of any portion of the DIP Budget), which DIP Budget shall:

(i)    include a separate line reflecting the reserves by the Authority as set forth herein;

(ii)    be supplemented by the fourth business day of each week with a variance report showing the variances between the projected amounts and the actual amounts for the preceding weekly period for each line item (except for Retained Professionals (as defined below) and the Patient Care Ombudsman (as defined below)), together with an updated projection for the following weekly period;

8

(iii)    with respect to Retained Professionals and the Patient Care Ombudsman, be supplemented the fourth business day following the twentieth (20th) day of each month with a variance report showing the variances between the fees and expenses projected for the preceding month and the actual fees and expenses requested to be paid pursuant to the Monthly Fee Statement prepared by each Retained Professional and the Patient Care Ombudsman pursuant to the Administrative Order, Pursuant to Sections 105(A) and 331 of Bankruptcy Code and Local Bankruptcy Rule 2016-1, Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 150]; and

(iv)    include variances permitted by the Authority, which shall in no event be less than, from the date of this Final Order, (w) a ten (10%) percent aggregate variance for all line items (except for the fees and expenses of Retained Professionals and the Patient Care Ombudsman) in the aggregate measured weekly on a weekly basis; (x) the sum of receipts and disbursements shall be subject to a five (5%) percent variance measured weekly on a cumulative basis; and (y) a five (5%) percent aggregate variance for all line items (except for the fees and expenses of Retained Professionals and the Patient Care Ombudsman) in the aggregate measured on a cumulative basis.

(b)    No payments are permitted (and it shall be an Event of Default if any payments are made) other than as expressly set forth in the DIP Budget and permitted variances, including if the permitted variances are exceeded; provided, however, for the avoidance of doubt, it shall not be an Event of Default if Retained Professional and Patient Care Ombudsman fees and expenses exceed the disbursement variances set forth above.  With respect to payments for Retained Professional and Patient Care Ombudsman fees and expenses, no payments are permitted (and it shall be an Event of Default if any payments are made) in excess of those permitted under the cumulative DIP Budget.

(c)    The DIP Budget may be amended, supplemented, extended or otherwise modified from time to time in any manner as to which the Debtor and the DIP Lender mutually agree without further order of this Court or advance notice to any Person; provided, however, the Committee shall have five (5) business days to object from the date that counsel for the

Committee receives notice from the Debtor of any modification to the DIP Budget.  The Debtor shall promptly provide any modified DIP Budget to the Office of the United States Trustee (the "**U.S. Trustee**") and counsel for the Committee, and the Debtor shall promptly file any modified DIP Budget with the Court; provided that the Debtor may take appropriate actions with respect to confidentiality of any portion of the DIP Budget.  If the Committee objects to any modification to the DIP Budget, the Committee shall seek an expedited hearing before this Court to resolve the objection, and until the hearing on that objection, the Debtor shall be permitted to operate under the DIP Budget as modified only to the extent necessary.

(d)     With respect to certain items in the DIP Budget that are defined in the DIP Budget as "Restructuring Items" that require approval by this Court prior to payment, the Debtor shall provide the DIP Lender notice at the same time and in the same fashion as the Committee.

(e)     The Debtor shall not make any capital expenditures that are in excess of $10,000 per week from the date of this Final Order unless the Authority approves such capital expenditures in writing.

(f)     The amounts set forth in the DIP Budget annexed hereto as <u>Exhibit 1</u> for the line item entitled "Restructuring fees" shall be placed in a reserve or escrow account (the "**Retained Professionals Fund**") established by the Debtor for the fees and expenses of the Retained Professionals (as defined below).  Funds may only be disbursed by the Debtor from the Retained Professionals Fund pursuant to an order of this Court, including, without limitation, any order entered with respect to the Debtor's Application For Administrative Order, Pursuant To Sections 105(A) And 331 of Bankruptcy Code And Local Bankruptcy Rule 2016-1, Establishing Procedures For The Interim Compensation And Reimbursement of Expenses of Professionals dated December 10, 2012 [Docket No. 55].  No other funds other than funds from the Retained

Professionals Fund shall be used to compensate Retained Professionals unless otherwise ordered by this Court.  The funds in the Retained Professionals Fund shall not constitute loan proceeds of the DIP Facility or Cash Collateral; _provided, however_, the DIP Lender shall have a residual security interest in any funds remaining in the Retained Professionals Fund after payment of all Retained Professionals pursuant to an order of this Court (the "**Residual Interest**"), and any amounts in excess of all invoices and accrued but unbilled amounts for Retained Professionals in the Retained Professionals Fund shall on the Carve-Out Trigger Date (defined below) be used to fund in whole or in part the Carve-Out.  For the avoidance of doubt, nothing in this Final Order waives any Retained Professional's right to assert and seek payment of an administrative expense claim for any allowed fees and expenses that are not paid from the Retained Professionals Fund,and the rights of the Debtor, the Authority and other parties-in-interest to object to such relief are fully preserved.

5.    Reports.    The Debtor shall deliver to the Authority such reports (including variance reports), data and other information required to be delivered pursuant to the Prepetition Secured Loan Documents, the Fund B Loan Agreement and the DIP Loan Documents.  Among such reports shall be a report which includes a separate line item for the fees and expenses for each Retained Professional and the Patient Care Ombudsman showing the amount that is expected to accrue each week (without any deduction for any holdback) pursuant to the DIP Budget.  The Debtor shall deliver to counsel to the Committee such reports, data and other information required to be delivered pursuant to the Prepetition Secured Loan Documents, the Fund B Loan Agreement and the DIP Loan Documents at the same time and in the same form delivered to the Authority.  Notwithstanding the foregoing, the Debtor may take appropriate actions with respect to confidentiality of such reports, data and other information.

6.      <u>Authorization to Use Cash Collateral and the Prepetition Collateral</u>.  The Debtor is authorized to use Cash Collateral and the Prepetition Collateral to fund working capital requirements, operating expenses and capital expenditures of the Debtor during the Chapter 11 Case and other line items, subject to and as set forth in this Final Order, the DIP Budget, and the DIP Loan Documents.  For purposes of this Final Order, the term "**Cash Collateral**" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code.  Without limiting the generality of the foregoing, Cash Collateral shall specifically include all of the cash proceeds of Prepetition Collateral in which the Prepetition Lender has an interest, whether such interest existed as of the Petition Date or arises thereafter pursuant to this Final Order, any other order of this Court, applicable law or otherwise; <u>provided</u>, <u>however</u>, Cash Collateral of the Prepetition Lender shall not include: (a) Avoidance Action Proceeds[4] (subject to the right of the Authority to seek inclusion of same); (b) funds advanced to the Debtor by the I M Foundation, Inc. (subject to the right of the Authority to seek inclusion of same); (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the Authority to seek inclusion of same); and (d) the Retained Professionals Fund (except for any Residual Interest).  In no event shall the Debtor be authorized to use Cash Collateral and Prepetition Collateral for any purpose or under any terms other than those set forth in the DIP Budget, the Eighth Interim Order (I) Authorizing the Debtor to Utilize Cash Collateral of Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105, 361 and 363, (II) Granting a Superpriority Claim, (III) Granting Adequate Protection, (IV) Providing Related Relief and

---

[4]      "**Avoidance Actions**" means all claims and causes of actions under chapter 5 of the Bankruptcy Code, including, without limitation, those under sections 502(d), 544, 545, 547, 548, 549, 550, 552(b) and 553, and state laws of similar import.  "**Avoidance Action Proceeds**" means the proceeds of all Avoidance Actions.

12

(V) Scheduling a Final Hearing [Docket No. 631] (or any prior interim cash collateral order of the Court), this Final Order or the DIP Loan Documents.

7.     <u>Borrowing Authorization under DIP Facility</u>.

(a)     The Debtor is authorized to enter into and perform the transactions contemplated in this Final Order and the DIP Loan Documents and to borrow under the DIP Credit Agreement on a final basis, subject to the terms and conditions of the DIP Budget, this Final Order and the DIP Loan Documents.  The DIP Credit Agreement and the other DIP Loan Documents shall constitute and are hereby deemed to be the legal, valid and binding obligations of the Debtor and its Estate, enforceable against the Debtor and its Estate in accordance with the terms hereof and the DIP Loan Documents and any successor of the Debtor or any representative of the Estate (including a trustee, responsible person, or examiner with expanded powers).  The Debtor is authorized to obtain financial accommodations pursuant to the terms of the DIP Budget, this Final Order, the DIP Credit Agreement, and the other DIP Loan Documents; and

(b)     The Debtor is authorized and directed to use the DIP Facility and Cash Collateral to fund working capital requirements and operating expenses of the Debtor during the Chapter 11 Case and other line items subject to and in accordance with the terms of this Final Order, the DIP Budget, and the DIP Loan Documents, including among other things, to implement the Closure Plan.

8.     <u>Due Authorization</u>.  The Debtor acknowledges, represents, stipulates and agrees, and the Court hereby finds and orders, that:

(a)     subject to the entry of this Final Order, the Debtor has obtained all authorizations, consents and approvals necessary, if any, from, and has made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and

instrumentalities required, if any, to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents;

(b)    in entering into the DIP Loan Documents and obtaining the use of Cash Collateral, and as consideration therefor and for the other accommodations and agreements of the DIP Lender reflected herein and in the DIP Loan Documents, the Debtor hereby agrees that until such time as all of the DIP Obligations are indefeasibly paid in full, in cash,[5] and the DIP Credit Agreement and other DIP Loan Documents are terminated in accordance with the terms thereof, the Debtor shall not in any way prime or seek to prime the DIP Obligations, the DIP Liens or the DIP Superpriority Claim provided to the DIP Lender under this Final Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or administrative expense pursuant to sections 105(a), 326, 328, 330, 331, 364(c), 364(d), 503, 506, 507, 546(c), 552(b), 726 or 1114 of the Bankruptcy Code or otherwise or acquiescing thereto; and

(c)    in no event shall the DIP Lender be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" or a person in "control" with respect to the governance, operation or management of the Debtor or its businesses, so long as the actions of the DIP Lender do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by the Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Comprehensive Environmental

---

[5]    A reference herein to payment "in final," "in full," or "indefeasibly," or use of words of similar import shall include the cash collateralization of, at a minimum, 102% of the amount of any DIP Obligations or Prepetition Secured Obligations that are contingent obligations, including any contingent indemnification obligations, and the establishment of any reserves in the discretion of the DIP Lender or the Prepetition Lender, as applicable, including, without limitation, for attorneys' fees and expenses. This section shall not be in limitation of any rights or remedies of the DIP Lender under the DIP Loan Documents with respect to contingent DIP Obligations or of the Prepetition Lender under the Prepetition Secured Loan Documents with respect to contingent Prepetition Secured Obligations.

Response, Compensation and Liability Act, sections 9601 et seq. of Title 42, United States Code, as may be amended from time to time, or any similar federal or state statute, at law), in equity or otherwise.

9.    <u>DIP Facility Interest, Fees, and Expenses</u>.

(a)    The DIP Obligations shall bear interest at the applicable rate (including any applicable default rate after the occurrence of an Event of Default) set forth in the DIP Loan Documents, and be due and payable in accordance with this Final Order and the DIP Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court.

(b)    The Debtor shall pay the reasonable fees and expenses of the attorneys and advisors for the DIP Lender on the Closing Date and thereafter as provided under the DIP Budget, whether or not incurred prepetition or postpetition.  Invoices supporting such fees and expenses shall be submitted to counsel for the Debtor, with copies to the U.S. Trustee and counsel for the Committee (invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine).  No attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. The U.S. Trustee, the Debtor, and the Committee shall have ten (10) business days in which to raise an objection to the fees and expenses of such attorneys and advisors.  In the event any such payment would be required to be repaid to the Debtor as a result of application of section 506(b) of the Bankruptcy Code or otherwise, any such amounts shall not be repaid and instead shall be

applied as follows: first, to the DIP Obligations until such indebtedness is indefeasibly paid in full, in cash; second, to the Prepetition Secured Obligations until such indebtedness is indefeasibly paid in full, in cash; and third, to the Debtor and its Estate.

10.    <u>Authorization to Act</u>.  The Debtor is expressly authorized and empowered to perform, and the automatic stay under section 362 of the Bankruptcy Code is hereby modified to permit the Debtor to perform under, make, execute and deliver all instruments and documents (including the execution of security agreements, mortgages, financing statements and other DIP Loan Documents), take such other actions and to pay all fees and expenses, which may be reasonably required or necessary for the Debtor's performance under and compliance with the terms of the DIP Loan Documents and this Final Order, including, <u>inter</u> <u>alia</u>: to (i) enter into and deliver the DIP Loan Documents; (ii) perform all of its obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents or as provided for in this Final Order; (iii) pay the fees and expenses set forth in the DIP Loan Documents or this Final Order, including the reasonable fees and expenses of attorneys and other professionals as provided for in the DIP Loan Documents and this Final Order; and (iv) to perform all other acts that may be required in connection with the DIP Loan Documents and this Final Order.  In addition, the automatic stay, to the extent applicable, is modified to permit the Indenture Trustee and the Authority to take any action authorized in the Bond Resolutions with respect to the Series 2007 Bonds, including, without limitation, the use of funds held by the Indenture Trustee for payment of the Series 2007 Bonds.

11.    <u>Continuation of Prepetition Liens</u>.  Except as set forth in Paragraphs 19 and 36 of this Final Order, until the indefeasible payment in full, in cash, by the Debtor of all the Prepetition Secured Obligations and termination of the Prepetition Secured Obligations by the

Prepetition Lender under the Prepetition Secured Loan Documents, all liens and security interests of the Prepetition Lender (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable and with the same continuing priority as described herein and in the Prepetition Secured Loan Documents.   Except as set forth in Paragraphs 19 and 36 of this Final Order, and notwithstanding any payment of all or any portion of the Prepetition Secured Obligations, the Prepetition Liens (as defined below) shall continue in full force and effect and shall be deemed to secure the full and timely indefeasible payment in cash of the Prepetition Secured Obligations (separate from and in addition to the liens granted pursuant to this Final Order).

12.    <u>Amendments</u>.   The Debtor is expressly authorized and empowered to enter into amendments or other modifications of the DIP Credit Agreement or any other DIP Loan Documents without further order of the Court, in each case, in such form as the DIP Lender may agree with the Debtor in writing; <u>provided</u>, that notice of any modification or amendment shall be provided to the U.S. Trustee, counsel to the Committee and any affected holder of a Permitted Prior Senior Lien (as defined below) and/or counsel to any affected holder of a Permitted Prior Senior Lien, which parties may object to such modification or amendment, in writing, within three (3) business days from the date of the transmittal of such notice (which, to the extent such contact information for such parties is known to the Debtor, shall be transmitted by fax or e-mail, and, if not known, by overnight mail); <u>further provided</u>, that, notwithstanding the foregoing, any material modification of the DIP Loan Documents that materially increases the burden on the Debtor shall require Court approval (for purposes of this proviso, a material increase of the burden on the Debtor shall be deemed to refer to an increase in the obligations of the Debtor exceeding $500,000); and <u>further provided</u>, that if such objection is timely provided, then such

modification or amendment shall be permitted only pursuant to an order of the Court, the entry of which may be sought on an expedited basis.

13.    <u>Superpriority Claims and DIP Liens</u>.  In respect of the DIP Obligations under the DIP Credit Agreement, the other DIP Loan Documents and this Final Order, the DIP Lender is granted the following with respect to the Debtor, its Estate and all DIP Collateral:

(a)    subject only to the Carve-Out, an allowed administrative claim pursuant to section 364(b) of the Bankruptcy Code and an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (collectively, the "**DIP Superpriority Claim**") with priority over any and all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provisions of the Bankruptcy Code and of any kind or nature whatsoever, which DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor except for (a) Avoidance Actions and Avoidance Action Proceeds (subject to the DIP Lender's rights being fully reserved to seek payment from and recourse to same), (b) funds advanced by the I M Foundation, Inc. (subject to the right of the DIP Lender to seek inclusion of same), (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the DIP Lender to seek inclusion of same), and (d) the Retained Professionals Fund (except for any Residual Interest). Other than payments described below in Paragraph 15 below, no cost or expense of administration under sections 105, 503(b) or 507(b) of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of the Chapter

18

11 Case under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the Superpriority Claim granted hereunder.

(b)    a first priority, priming security interest in and lien pursuant to section 364(d)(1) of the Bankruptcy Code on all encumbered property of the Debtor and its Estate (the "**Section 364(d)(1) Liens**"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, subject only to (i) the Carve-Out, and (ii) liens on property of a Debtor (including the proceeds of such property) that are in existence on the Petition Date, but only, subject to Paragraph 22 of this Final Order, (A) to the extent a lien on any property is valid, perfected, and not avoidable, and (B) the lien on such property (or the proceeds of such property, as applicable) on the Petition Date was senior in priority to the Prepetition Liens (each of the items referenced in the foregoing clause (ii) being referred to as a "**Permitted Prior Senior Lien**");

(c)    subject only to the Carve-Out, a first priority security interest and lien pursuant to section 364(c)(2) of the Bankruptcy Code on all unencumbered property of the Debtor and the Estate except for (i) Avoidance Actions and Avoidance Action Proceeds (subject to the DIP Lender's rights being fully reserved to seek payment from and recourse to same), (ii) funds advanced by the I M Foundation, Inc. (subject to the right of the DIP Lender to seek inclusion of same), (iii) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the DIP Lender to seek inclusion of same), and (iv) the Retained Professionals Fund (except for any Residual Interest) (the "**Section 364(c)(2) Lien**"); and

(d)    subject only to the Carve-Out a junior security interest and lien pursuant to section 364(c)(3) of the Bankruptcy Code on all property of the Debtor and the Estate that is subject to a Permitted Prior Senior Lien (the "**Section 364(c)(3) Lien**" and, collectively with the Section 364(d)(1) Lien and Section 364(c)(2) Lien, the "**DIP Liens**").

14.    <u>DIP Collateral</u>.  The DIP Liens of the DIP Lender under the DIP Loan Documents and as approved and perfected by this Final Order include, <u>inter alia</u>, liens upon and security interests in (i) all of those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code, (ii) all of those items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority (if appropriate), any leasehold or other real property interests, and commercial tort claims of the Debtor, (iii) any and all other DIP Collateral of any nature or form, and (iv) the products, rents, offspring, profits, and proceeds of any of the foregoing; <u>provided</u>, <u>however</u>, that the DIP Liens shall not attach to and the DIP Superpriority Claim and the DIP Obligations shall not be payable from (i) Avoidance Actions and Avoidance Action Proceeds (subject to the DIP Lender's rights being full reserved to seek payment from and recourse to same), (ii) funds advanced by the I M Foundation, Inc. (subject to the right of the DIP Lender to seek inclusion of same), (iii) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the DIP Lender to seek inclusion of same), and (iv) the Retained Professionals Fund (except for the any Residual Interest).  None of the DIP Obligations, DIP Liens or DIP Superpriority Claim shall (a) be subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Estate under section 551 of the Bankruptcy Code, (b) be subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of the Debtor, (c) be subject to sections 510, 549, or 550 of the Bankruptcy Code, or (d) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 of the Bankruptcy Code or otherwise, except as expressly provided in this Final Order.

15.     <u>Carve-Out</u>.

(a)     <u>Generally</u>.    Upon the occurrence of the Carve-Out Trigger Date (as defined below), the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens (as defined below), the Section 507(b) Claim of the Prepetition Lender (as defined below), and the Prepetition Liens of the Prepetition Lender shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**") from proceeds of the DIP Facility being reserved by the Authority (and, for the avoidance of doubt, not from either Cash Collateral or proceeds resulting from the liquidation of any DIP Collateral, Prepetition Collateral or collateral of any holder of a Prior Permitted Senior Lien):

(i)     (A) the reasonable fee and expense claims of the respective retained professionals of the Debtor, the Committee, and any appointed ombudsman (the **"Patient Care Ombudsman"**) that have been approved by this Court during the Chapter 11 Case pursuant to sections 327, 328, and/or 1103 of the Bankruptcy Code or otherwise (the retained professionals of the Debtor, the Committee and the Patient Care Ombudsman are collectively referred to as the "**Retained Professionals**"), (B) the reasonable expense claims of members of the Committee, and (C) the reasonable fee and expense claims of the Patient Care Ombudsman, in each case, for unpaid fees and expenses, as applicable, which were incurred on and after the Petition Date and, in the case of any Retained Professional, which remain outstanding after application of (i) any retainer held by such Retained Professional, (ii) any payments from the Retained Professionals Fund, and (iii) any payments to Retained Professionals from any other assets of the Debtor's Estate including, without limitation, Avoidance Action Proceeds, funds advanced by the I M Foundation, Inc., and any restricted

contributions, grants, gifts and bequests held or received by IMC, in an aggregate amount not exceeding $1,500,000 for fees and expenses incurred after the Carve-Out Trigger Date for all Retained Professionals, expenses of members of the Committee and the Patient Care Ombudsman, which shall be fully reserved by the Authority from proceeds of the DIP Facility; provided that, in each case, such fees and expenses, as applicable of the Retained Professionals, members of the Committee and Patient Care Ombudsman are in accordance with, and not in excess of the amounts set forth in, the DIP Budget, and in each case, such fees and expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under Paragraph 20 of this Final Order (nothing herein shall waive the right of any party to object to the allowance of any such fees and expenses); and further provided, that (x) nothing herein shall prevent the Bankruptcy Court from determining the allocation of the Carve-Out amongst the fees and expenses of the various Retained Professionals, members of the Committee and the Patient Care Ombudsman so long as such allocation does not increase the Carve-Out, and (y) the Carve-Out shall not include any bonus, transaction, success or completion fees or any other fees of similar import for Retained Professionals without the prior written approval of the DIP Lender in its sole discretion;

(ii)    $250,000 (which, for the avoidance of doubt, is in addition to the $1,500,000 referred to in sub-paragraph (i) above) for preservation and maintenance of the Prepetition Collateral, which shall be fully reserved by the Authority from proceeds of the DIP Facility; and

(iii)    the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code and section

22

3717 of Title 31 of the United States Code. For the avoidance of doubt, notwithstanding subparagraph (c) of this Paragraph, there is no limitation on the obligations of the Debtor and its Estate with respect to unpaid fees payable to the U. S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.

(b)     Carve-Out Trigger Date. As used herein, the term "**Carve-Out Trigger Date**" means the date on which the DIP Lender provides written notice to the Debtor, the U.S. Trustee and counsel to the Committee that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an Event of Default under the DIP Loan Documents or upon the Loan Maturity Date.

(c)     Reduction of Amounts. Although the Carve-Out shall not be paid until payments to Retained Professionals are made in accordance with subsection (a) of this Paragraph, the fixed dollar amount available to be paid under the Carve-Out following the Carve-Out Trigger Date shall only be reduced, dollar-for-dollar, by the aggregate amount of payments made from collateral that is subject to the liens and claims of the DIP Lender to applicable Retained Professionals, members of the Committee and the Patient Care Ombudsman on and after the Carve-Out Trigger Date for fees and expenses incurred after the Carve-Out Trigger Date, but, for the avoidance of doubt, the fixed dollar amount of the Carve-Out shall not be reduced by any payments from:  (a) Avoidance Action Proceeds (subject to the right of the Authority to seek inclusion of same); (b) funds advanced by the I M Foundation, Inc. (subject to the right of the Authority to seek inclusion of same); (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the Authority's right to seek inclusion of all of such excluded amounts); (d) the Retained Professionals Fund (except for any Residual Interest); or (e) any payments from any retainers held by any Retained Professionals.

(d)    Reservation of Rights.    Allowed fees and expenses of Retained Professionals, members of the Committee, and the Patient Care Ombudsman incurred in excess of the amounts provided therefor under the DIP Budget, including after the occurrence of the Carve-Out Trigger Date, shall, subject to approval of the Court, constitute allowed administrative expenses of the Debtor's Estate pursuant to, inter alia, sections 328, 330(a), 331, and 503(b) of the Bankruptcy Code; provided, however, the Carve-Out shall be limited to the amount set forth in Paragraph 15(a) of this Final Order, and the Authority reserves its right to object to the allowance of any fees and expenses, including any fees and expenses sought that are not provided for in the DIP Budget.    The payment of any fees or expenses of the Retained Professionals, expenses of members of the Committee and the Patient Care Ombudsman pursuant to the Carve-Out shall not, and shall not be deemed to (i) reduce the Debtor's obligations owed to the DIP Lender, the Prepetition Lender or to any holder of a Permitted Prior Senior Lien, or (ii) modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or the Prepetition Collateral (or their respective claims against the Debtor).    The DIP Lender and the Prepetition Lender shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Retained Professionals, members of the Committee, the Patient Care Ombudsman, or any fees of the U. S. Trustee or Clerk of the Bankruptcy Court (or of any other entity) incurred in connection with the Chapter 11 Case or any successor case, and nothing in this Final Order or otherwise shall be construed to obligate such parties in any way to pay such compensation to or to reimburse such expenses.

16.    Waiver of Right to Surcharge.    In light of the consent of the DIP Lender to the current payment of administrative expenses of the Debtor's Estate in accordance with the DIP Budget and (i) the agreement of the DIP Lender to subordinate its DIP Superpriority Claim to the

Carve-Out, (ii) the agreement of the DIP Lender to subordinate its DIP Liens to the Carve-Out and Permitted Prior Senior Liens, and (iii) the agreement of the DIP Lender and the Prepetition Lender to permit the Debtor to use Cash Collateral, the DIP Lender and the Prepetition Lender are each entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code and (b) any "equities of the case" claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code.  Accordingly, subject to the entry of this Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the DIP Budget) by the Debtor or any other person or entity shall be imposed or charged against any or all of the DIP Collateral, the DIP Lender, the Prepetition Collateral, or the Prepetition Lender or their respective claims under the Bankruptcy Code, including sections 105(a), 506(c), 552(b) thereof, or otherwise, and the Debtor, on behalf of its Estate, waives any such rights.  It is expressly understood by all parties that in making all such undertakings and proceeding in compliance with the DIP Budget, this Final Order and the DIP Loan Documents, the DIP Lender and the Prepetition Lender have each relied on the foregoing provisions of this Paragraph.  Notwithstanding any approval of or consent to the DIP Budget, nothing in this Final Order shall constitute or be deemed to constitute the consent by any of the DIP Lender or Prepetition Lender to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the DIP Budget) against such party, its claims or its collateral under sections 105(a), 506(c) or 552(b) of the Bankruptcy Code or otherwise and no such consent shall be implied from any other action or inaction by such parties.

   17. <u>Automatic Perfection</u>.

(a)    The (i) DIP Liens granted to the DIP Lender pursuant to this Final Order and the DIP Loan Documents, and (ii) the Adequate Protection Liens granted pursuant to this Final Order to the Prepetition Lender, shall not be subject to challenge and shall attach and become valid, enforceable, and perfected by operation of law upon entry of this Final Order by the Court as of the Petition Date without any further action by any party.  The DIP Lender in respect of the DIP Liens, and the Prepetition Lender in respect of the Adequate Protection Liens, shall each not be required to enter into or to obtain any control agreements, landlord waivers, mortgagee waivers, bailee waivers or warehouseman waivers or to give, file or record any UCC-1 financing statements, mortgages, deeds of trust, leasehold mortgages, notices to account debtors or other third parties, notices of lien or similar instruments in any jurisdiction (including filings with the United States Patent and Trademark Office, the United States Copyright Office or any similar agency in respect of trademarks, copyrights, trade names or patents with respect to intellectual property) (collectively, the "**Perfection Documents**"), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens granted under the DIP Loan Documents and this Final Order and the Adequate Protection Liens granted under this Final Order and approved hereby, all of which are automatically perfected by the entry of this Final Order.  If the DIP Lender and/or Prepetition Lender, independently or collectively, in each of their sole discretion respectively, chooses to obtain, enter into, give, record or file any Perfection Documents, (x) all such Perfection Documents shall be deemed to have been obtained, entered into, given, recorded or filed, as the case may be, as of the Petition Date, (y) no defect in any such act shall affect or impair the validity, perfection, priority or enforceability of the DIP Liens and Adequate Protection Liens, and (z) such liens shall have the relative priority set forth herein notwithstanding the timing of

26

filing of any such Perfection Documents.   In lieu of recording or filing any Perfection

Documents, the DIP Lender and the Prepetition Lender may, in each of their sole discretion,

choose to record or file a true and complete copy of this Final Order in any place that any

Perfection Document would or could be recorded or filed (which may include a description of

the collateral appropriate to be indicated in a recording or filing at such place of recording or

filing), and such recording or filing by the DIP Lender or the Prepetition Lender shall have the

same effect as if such Perfection Document had been filed or recorded as of the Petition Date.

(b)     Until the indefeasible payment in full, in cash, of the DIP Obligations,

with respect to DIP Collateral and Perfection Documents evidencing liens subordinate to the DIP

Liens in the possession, custody or control of the Prepetition Lender (or in the possession,

custody or control of agents or bailees of the Prepetition Lender), the Prepetition Lender (and

any agents or bailees of the Prepetition Lender) shall be deemed to be an agent or bailee, as the

case may be, on behalf of and for the benefit of the DIP Lender for the purposes of perfecting the

security interests granted in such DIP Collateral.  Upon an Event of Default and the request of

the DIP Lender, the Prepetition Lender (or its agents or bailees, as applicable) shall transfer,

assign and otherwise convey, as applicable, any DIP Collateral and Perfection Documents in its

possession, custody or control to the DIP Lender for the enforcement of rights and remedies

under the DIP Loan Documents, and, upon the indefeasible payment in full, in cash, of all DIP

Obligations, the DIP Lender (or its agents or bailees, as applicable) shall transfer, assign and

otherwise convey any Prepetition Collateral and Perfection Documents to the Prepetition Lender.

For the avoidance of doubt, the grant, perfection, scope and vesting of the DIP Liens, DIP

Superpriority Claim and DIP Obligations are fully effectuated by this Final Order and any

security agreements, collateral agreements or other Perfection Documents executed as part of the

DIP Loan Documents shall supplement the grant, perfection, scope and vesting set forth herein as well as the powers and protections accorded to the DIP Lender, but in no event shall any such security agreement, collateral agreement or other Perfection Document be interpreted as a limitation of such provisions of this Final Order.

18.    <u>Stipulations and Waivers</u>.    After consultation with its attorneys and financial advisors, subject to and without prejudice to the rights of the Committee and any other party-in-interest as set forth in Paragraph 19 of this Final Order, the Debtor admits, stipulates and agrees to the following, and makes the releases and waivers set forth below, on and as of the Petition Date:

(a)    <u>Prepetition Secured Loan Documents</u>.    Prior to the Petition Date, the Debtor entered into the Prepetition Loan Agreement and other Prepetition Secured Loan Documents with the Prepetition Lender, as set forth more fully above and in the DIP Credit Agreement.    Pursuant to the Prepetition Secured Loan Documents, the Prepetition Lender was granted liens on, and security interests in (the "**<u>Prepetition Liens</u>**"), certain property and assets of IMC under the Prepetition Secured Loan Documents (all as more fully set forth in the Prepetition Secured Loan Documents, the "**<u>Prepetition Collateral</u>**"); and

(b)    <u>Prepetition Loans</u>.

(i)    As of the Petition Date, the Debtor was indebted and liable to the Prepetition Lender under the Prepetition Secured Loan Documents, without defense, counterclaim or offset of any kind, in the approximate aggregate principal amount of not less than $117,784,158.32 in respect of the Prepetition Loan Agreement, not less than $2,000,000.00 in respect of the Pool Loan Agreement (for a total of not less than $119,784,158.32 in respect of the Prepetition Secured Obligations) and not less than $12,181,775.25 in respect of the unsecured

Fund B Loan Agreement (for a total of not less than $131,508,051.55 in respect of the Prepetition Loans), plus accrued but unpaid interest thereon and other fees, expenses and other obligations incurred in connection therewith as provided in the Prepetition Secured Loan Documents and the Fund B Loan Agreement;

(ii)    To the extent set forth in the Prepetition Secured Loan Documents, the Prepetition Liens are (x) valid, binding, perfected, enforceable, first priority liens on and security interests in the Prepetition Collateral, (y) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) subject only to (A) after giving effect to this Final Order, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, and the Carve-Out, and (B) Permitted Prior Senior Liens;

(iii)    The Prepetition Secured Obligations constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code) and no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, disgorgement, recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)    The Debtor does not have, and hereby forever releases and waives, any claims, objections, challenges, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Lender, or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time (and for the avoidance of doubt, as set forth above, all such releases are expressly subject to Challenge under Paragraph 19 of this Final Order);

(v)     All of the Debtor's cash existing as of the Petition Date, except for proceeds of the DIP Facility, including without limitation, all cash and other amounts on deposit or maintained by the Debtor in any account or accounts with the Prepetition Lender, but excluding (a) funds advanced by the I M Foundation, Inc. and (b) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the Prepetition Lender's right to seek inclusion of (a) and (b)), constitutes Cash Collateral of the Prepetition Lender; and

(vi)    The Debtor is in default with respect to its Prepetition Secured Obligations and one or more Events of Default has occurred under the Prepetition Secured Loan Documents and the Fund B Loan Agreement.

19.     Effect of Stipulations on Third Parties.

(a)     Generally.    The admissions, stipulations, agreements, releases, and waivers set forth in Paragraph 18 of this Final Order (collectively, the "**Prepetition Lien and Claim Matters**") are and shall be binding on the Debtor, any subsequent trustee, responsible person, examiner with expanded powers, any other Estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, unless, and solely to the extent that, the Committee or another party-in-interest with standing and requisite authority, has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Paragraph 19 and Paragraph 20 of this Final Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**") by (w) no later than September 30, 2013, (x) as such date may be extended in writing from time to time in the

sole discretion of the Prepetition Lender without the need for any further order of this Court, (y) as such date may be extended by this Court for good cause shown pursuant to an application filed by the Committee or any other party-in-interest prior to the expiration of such period, or (z) upon conversion of a chapter 11 case to chapter 7 in which case to the extent that any relevant Challenge period has not expired such period shall be automatically extended for 75 days from the date a chapter 7 trustee is appointed, as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Lender without the need for any further order of this Court or by this Court for good cause shown pursuant to an application filed by the Committee or any other party-in-interest prior to the expiration of such period (collectively, the "**Challenge Deadline**").  The Challenge Deadline shall not expire if this Court rules in favor of the plaintiff or movant in any timely and properly commenced Challenge proceeding and any such ruling is not reversed on appeal by an order or judgment that is not subject to further review or appeal.

(b)     <u>Binding Effect</u>.   To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable order or judgment of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion or application to, order of, or hearing before, this Court and without the need or requirement of the Prepetition Lender to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Final Order, become binding, conclusive and final on the Committee and any other person, entity or party-in-interest in the Chapter 11 Case, and their successors and assigns, and in any successor case for all purposes and shall not be subject to challenge or objection by any party-in-interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers or other

representative of the Estate.   Notwithstanding anything to the contrary herein, if any such

Challenge is properly and timely commenced, the Prepetition Lien and Claim Matters shall

nonetheless remain binding on all parties-in-interest and preclusive as provided in sub-paragraph

(a) above except to the extent that each of such Prepetition Lien and Claim Matters is expressly

the subject of a timely and properly filed Challenge.   To the extent any such Challenge

proceeding is timely and properly commenced, the Prepetition Lender shall be entitled to include

the related costs and expenses in its Prepetition Secured Obligations, including but not limited to

reasonable attorneys' fees, incurred in defending itself in any such proceeding pursuant to, and to

the extent permitted by, the Prepetition Secured Loan Documents and section 506(b) of the

Bankruptcy Code.

(c)     Standing.   The Committee is hereby granted standing to assert any

Challenge on behalf of the Debtor or its Estate with respect to any Prepetition Lien and Claim

Matters.  Nothing in this Final Order confers or vests standing on any other party-in-interest to

assert any claim on behalf of the Debtor or its Estate, or relieves any other party-in-interest from

any requirement under the Bankruptcy Code or otherwise to obtain authorization and standing

from the Court prior to asserting any claim on behalf of the Debtor or its Estate.

20.     Limitation on Use of Proceeds.  Notwithstanding anything in this Final Order to

the contrary, no portion or proceeds of the DIP Facility, the DIP Collateral, the Prepetition

Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP

Budget shall be used for the payment of professional fees, disbursements, costs or expenses

incurred in connection with: (a) objecting, contesting or raising any defense to the validity,

perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or

the Prepetition Secured Loan Documents or any security interests, liens or claims granted under

this Final Order, the DIP Loan Documents, or the Prepetition Secured Loan Documents to secure such amounts; (b) asserting any Challenges, claims, actions or causes of action against any of the DIP Lender or the Prepetition Lender or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the DIP Collateral or the Prepetition Collateral; or (d) seeking to amend or modify any of the rights granted to the DIP Lender or the Prepetition Lender under this Final Order, the DIP Loan Documents or the Prepetition Secured Loan Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; provided, however, that no more than $60,000 in the aggregate of the proceeds of the DIP Facility, Cash Collateral and the Carve-Out may be used by the Committee to investigate (but not prosecute or Challenge) Prepetition Lien and Claim Matters.

21.    Avoidance Action Proceeds.  Notwithstanding anything in this Final Order or any other DIP Loan Document to the contrary, Avoidance Action Proceeds shall not be DIP Collateral or Cash Collateral and shall not be subject to the DIP Liens, DIP Superpriority Claim, the Adequate Protection Liens and the Section 507(b) Claim of the Prepetition Lender; provided, however, the Authority reserves its right to seek such relief hereafter.

22.    Adequate Protection.  This Court finds that the Adequate Protection provided in this Final Order, including, without limitation, in this Paragraph, is reasonable and sufficient to protect the interests of the Prepetition Lender.  Notwithstanding any other provision hereof, the grant of Adequate Protection to the Prepetition Lender pursuant hereto is without prejudice to the right of the Prepetition Lender, or any other party-in-interest, to seek adequate protection or to seek modification of a grant of Adequate Protection provided in this Final Order so as to provide

different or additional adequate protection, and without prejudice to the right of the Debtor or any other party-in-interest to contest any such modification.

(a)    Adequate Protection Liens.   As adequate protection of the Prepetition Liens of the Prepetition Lender under the applicable Prepetition Secured Loan Documents, in accordance with sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Lender shall be granted valid, binding, enforceable and perfected security interests and replacement liens (the "**Adequate Protection Liens**") upon all property of the Debtor whether arising prepetition or postpetition of any nature whatsoever, wherever located, except for (a) Avoidance Actions and Avoidance Action Proceeds (subject to the right of the Prepetition Lender to seek inclusion of same), (b) funds advanced by the I M Foundation, Inc. (subject to the right of the Prepetition Lender to seek inclusion of same), (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the Prepetition Lender to seek inclusion of same), and (d) the Retained Professionals Fund (except for any Residual Interest) (the "**Adequate Protection Obligations**") in each case to secure the Prepetition Secured Obligations of, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral by: (i) the reduction in Prepetition Collateral available to satisfy Prepetition Secured Obligations as a consequence of the priming of the Prepetition Secured Obligations by the DIP Obligations; (ii) depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral; and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral which is applied in payment of the DIP Obligations or any other obligations or expenses of the Debtor other than Prepetition Secured Obligations, but only to the extent of any decrease in the value of the Prepetition Collateral on account of subsections (i), (ii) and (iii) above.  The Adequate Protection

Liens are subject and subordinate to (A) the Carve-Out, (B) the DIP Obligations, the DIP Liens and the DIP Superpriority Claim, and (C) the Permitted Prior Senior Liens. None of the Adequate Protection Liens or Adequate Protection Obligations shall (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Estate under section 551 of the Bankruptcy Code, (y) be subject to any intercompany claim, whether secured or unsecured, of the Debtor or any domestic or foreign subsidiary or affiliate of the Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 of the Bankruptcy Code or otherwise except as expressly provided in this Final Order and the DIP Loan Documents, including, without limitation, with respect to the Carve-Out, the Permitted Prior Senior Liens, the DIP Obligations, the DIP Liens and the DIP Superpriority Claim.

(b)     Section 507(b) Claim. To the extent that the Prepetition Lender holds claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of Adequate Protection hereunder, the Prepetition Lender is hereby granted an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code (each, a "**Section 507(b) Claim**") with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, Permitted Prior Senior Liens, Existing Obligations, Prepetition Liens, the DIP Obligations, the DIP Liens and the DIP Superpriority Claim; provided, however, that such priority shall not apply to (a) Avoidance Action Proceeds (subject to the right of the Prepetition Lender to seek inclusion of same), (b) funds advanced by the I M Foundation, Inc. (subject to the right of the Prepetition Lender to seek inclusion of same), (c) any restricted contributions, grants, gifts and bequests held or received by IMC (subject to the right of the Prepetition Lender to seek inclusion of same), and (d) the Retained Professionals Fund

(except for any Residual Interest after indefeasible payment in full, in cash, of the DIP Obligations).

(c)    <u>Adequate Protection Payments</u>.    Subject to Section 506(b) of the Bankruptcy Code, the Debtor shall, in accordance with the DIP Budget, with respect to the Prepetition Lender promptly pay all reasonable fees and expenses under the Prepetition Secured Loan Documents incurred by the Prepetition Lender whether incurred prior to or following the Petition Date.    The payments under this Paragraph shall be referred to collectively as the "**<u>Adequate Protection Payments</u>**."    Invoices supporting fees and expenses being charged to the Debtor shall be submitted to counsel for the Debtor, with copies to the U.S. Trustee, counsel for the Prepetition Lender and counsel for the Committee (invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine).    No attorney or advisor to the Prepetition Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.    The U.S. Trustee, the Debtor, and Committee shall have ten (10) business days in which to raise an objection to the payment of any fees and expenses of such attorneys and advisors.    In the event any Adequate Protection Payment would be required to be repaid to the Debtor as a result of application of section 506(b) of the Bankruptcy Code or otherwise, any such amounts shall not be repaid and instead shall be applied as follows:    first, to the DIP Obligations until such obligations are indefeasibly paid in full, in cash; second, to the Prepetition Secured Obligations until such obligations are indefeasibly paid in full, in cash; and third, to the Debtor and its Estate.

23.   <u>Restructuring/Wind-Down Advisors; Closure Plan</u>.   It is a condition of the Debtor's access to the DIP Facility and Authority's consent to use of the Cash Collateral that (i) the Debtor shall continue to employ John D. Leech as its chief restructuring officer (the "**CRO**") and Gordian-Dynamis Solutions LLC as its restructuring consultant ("**Gordian-Dynamis**"), or in each case such other chief restructuring officer, other restructuring consultant(s) or other wind-down officer that is/are acceptable to the Authority on terms acceptable to the Authority (collectively, together with the CRO and Gordian-Dynamis, the "**Restructuring/Wind-Down Advisors**"), (ii) the Restructuring/Wind-Down Advisors shall continue to provide assistance to the Debtor on that certain closure plan submitted to the New York State Department of Health ("**DOH**") by the Debtor in accordance with existing regulations set forth in the New York Codes, Rules and Regulations, including 10 N.Y.C.R.R. §401.3 thereof  (the "**Closure Plan**"), including identifying programs of great community need, assisting in identifying potential partners to carry on those programs who is/are acceptable to DOH and the Authority and who would operate on terms acceptable to DOH and the Authority, and identifying and implementing strategies and methods for repurposing of the Debtor's facilities, (iii) the Debtor and the Restructuring/Wind-Down Advisors shall continue to work with DOH and its sister agencies the Office of Mental Health (OMH) and the Office of Alcoholism and Substance Abuse Services (OASAS), as well as the Authority, with respect to obtaining approval of the Closure Plan, and (iv) the Debtor shall continue to cooperate with DOH and the Authority as same may request in their sole discretion with respect to the Closure Plan, including, without limitation, (a) by providing reasonable access to (x) the Debtor's facilities as well as all reasonably available records pertaining thereto, and (y) the Debtor's financial books and records, and (z) the Restructuring/Wind-Down Advisors to report to DOH

and the Authority on the Debtor's operations, the Closure Plan and any other facet of their engagement with the Debtor, at such times and in such form as DOH and the Authority shall reasonably request, and (b) by working with DOH and the Authority to identify programs of great community need, assist in identifying potential partners to carry on those programs who is/are acceptable to DOH and the Authority and who would operate on terms acceptable to DOH and the Authority, and by working with DOH and the Authority to identify and implement strategies and methods for repurposing of the Debtor's facilities.

24.     [Reserved]

25.     <u>Indemnification</u>.  The Debtor shall indemnify the DIP Lender and its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "**<u>Indemnified Person</u>**") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtor or any of its affiliates or shareholders) that relates to the DIP Facility or this Final Order, including the financing contemplated hereby, the Chapter 11 Case, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct.  Nothing herein is meant to limit the scope of, or otherwise affect, any indemnification rights or obligations provided for the benefit of the Prepetition

Lender under the Prepetition Secured Loan Documents and the DIP Lender in the DIP Loan Documents.

26.    <u>Remedies</u>.    Upon the occurrence of an Event of Default or upon the Loan Maturity Date, after providing not less than seven (7) days prior notice pursuant to the Notice Procedures Order, the DIP Lender shall be entitled to exercise all of its rights and remedies under this Final Order, including, without limitation, foreclose upon the DIP Collateral, including Cash Collateral, or otherwise enforce the DIP Obligations, DIP Liens and DIP Superpriority Claim on any or all of the DIP Collateral, including Cash Collateral, and/or to exercise any other default-related remedies under the DIP Loan Documents, this Final Order or applicable law in seeking to recover payment of the DIP Obligations.  For the avoidance of doubt, with respect to Permitted Prior Senior Liens, any exercise of such rights and remedies shall be in accordance with applicable non-bankruptcy law in respect of Permitted Prior Senior Liens.  During the not less than seven (7) day notice period, the Debtor, the Committee or any other party-in-interest may seek an order of the Court staying the DIP Lender's exercise of such remedies against the DIP Collateral, including with respect to Cash Collateral, and, if no such stay is obtained, then the DIP Lender may exercise any and all such rights and remedies without further order of the Court or notice to any party, and during the seven (7) day notice period, the Debtor shall be entitled to continue to use Cash Collateral in accordance with the DIP Budget.  In addition to the foregoing remedies set forth in this Paragraph, if the Debtor fails to comply with Paragraph 23 of this Final Order, the Authority may file a motion for an order of this Court directing the appointment of a Restructuring/Wind-Down Officer to implement the Closure Plan and/or directing the U.S. Trustee to appoint a chapter 11 trustee pursuant to section 1104 of the Bankruptcy Code, and the Court shall schedule an expedited hearing on the matter, and the Debtor and any other party-in-

interest reserves all rights to oppose such a motion.

27.    <u>Access to DIP Collateral</u>.    Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Lender contained in this Final Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon written notice to the landlord of any leased premises that an Event of Default or the Loan Maturity Date has occurred and is continuing under the DIP Loan Documents, and repayment under the DIP Loan Document is immediately due and payable in full, the DIP Lender may, subject to the applicable notice provisions, if any, in this Final Order and any separate agreement by and between such landlord and the DIP Lender, enter upon any leased premises of the Debtor or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from the landlords thereunder, <u>provided</u> <u>that</u> the DIP Lender shall only be obligated to pay rent of the Debtor that first accrues after the DIP Lender's written notice referenced above and that is payable during the period of such occupancy by the DIP Lender, calculated daily on a per diem basis.    Nothing herein shall require the DIP Lender to assume any lease as a condition to the rights afforded to the DIP Lender in this Paragraph.    Furthermore, any landlord's lien, right of distraint or levy, security interest or other interest that any landlord, warehousemen or landlord's mortgagee may have in any DIP Collateral of the Debtor located on such leased premises, to the extent the same is not void under section 545 of the Bankruptcy Code, is hereby subordinated to the DIP Obligations, DIP Liens, and DIP Superpriority Claim.

28.    <u>Insurance Policies</u>.  Effective as of entry of this Final Order, the DIP Lender and the Prepetition Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtor that in any way relates to DIP Collateral or Prepetition Collateral, as applicable.

29.    <u>Successors and Assigns</u>.  This Final Order, the DIP Credit Agreement and the other DIP Loan Documents shall be binding upon all parties in interest in the Chapter 11 Case, including any subsequently appointed trustee, responsible individual, examiner with expanded powers, or other Estate representative.

30.    <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any subsequent order, and the rights, remedies, powers, privileges, liens and priorities of the DIP Lender and the Prepetition Lender provided for in this Final Order and in any DIP Loan Document shall not be modified, altered or impaired in any manner by any order, including any order (i) confirming any plan of reorganization or liquidation in the Chapter 11 Case (and, to the extent not indefeasibly paid in full, in cash, the DIP Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor having hereby waived such discharge), (ii) converting the Chapter 11 Case to a Chapter 7 case, (iii) dismissing the Chapter 11 Case, or (iv) any superseding case(s) under the Bankruptcy Code.  The terms and provisions of this Final Order as well as the DIP Obligations, DIP Liens, DIP Superpriority Claim, DIP Loan Documents, and Adequate Protection Liens shall continue in full force and effect notwithstanding the entry of any such order, and such rights, claims and liens shall maintain their priority as provided by this Final Order and the DIP Loan Documents to the maximum extent permitted by law until all of the DIP Obligations are indefeasibly paid in full, in cash.

31.     <u>Good Faith</u>.  The DIP Facility, the use of Cash Collateral, and the other provisions of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtor, the DIP Lender and the Prepetition Lender, and the extension of the financial accommodations to the Debtor by the DIP Lender and the Prepetition Lender pursuant to this Final Order and the DIP Loan Documents have been and are deemed to be extended in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  The DIP Lender and the Prepetition Lender are entitled to, and are hereby granted, the full protections of sections 363(m) and 364(e) of the Bankruptcy Code.

32.     <u>Subsequent Reversal or Modification</u>.  Subject to Paragraph 19 of this Final Order, if any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability under this Final Order and the DIP Loan Documents by the Debtor prior to the date of receipt of written notice to the DIP Lender and the Prepetition Lender of the effective date of such action; or (ii) the validity and enforceability of any lien, administrative expense, right, or priority authorized or created hereby or pursuant to this Final Order and the DIP Loan Documents, including, without limitation, the DIP Obligations, the DIP Liens and the DIP Superpriority Claim, the Prepetition Secured Obligations, the Adequate Protection Obligations, the Adequate Protection Liens, the Adequate Protection Payments and the Section 507(b) Claim. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtor to the DIP Lender and the Prepetition Lender prior to written notice to the DIP Lender and the Prepetition Lender of the effective date of such action, shall be governed in all respects by the original provisions of this Final Order and the DIP

Loan Documents, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted pursuant to this Final Order and the DIP Loan Documents.

33.    <u>No Waiver</u>.  This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender or Prepetition Lender may have to bring or be heard on any matter brought before the Court.  Any consent, modification, declaration of default, or exercise of remedies under or in connection with this Final Order or the DIP Loan Documents shall require the approval of the DIP Lender and any non-exercise of remedies under or in connection with the DIP Facility and/or this Final Order, shall not be deemed a waiver or relinquishment of any of the rights of the DIP Lender.  Nothing contained in this Final Order (including without limitation, the authorization to use any Cash Collateral) shall impair, prejudice or modify any rights, claims or defenses available in law or equity to the DIP Lender or the Prepetition Lender, including, without limitation, the right to (a) request conversion of the Chapter 11 Case to chapter 7 (to the extent applicable for charitable entities), (b) seek to terminate the exclusive rights of the Debtor to file, and solicit acceptances of, a plan of reorganization under section 1121 of the Bankruptcy Code or propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, (c) object to the fees and expenses of any Retained Professionals, and (d) seek relief from the automatic stay.  All such rights, claims and defenses, and the rights, objections and defenses of all parties in connection therewith, are hereby reserved.  In the event that the DIP Lender and/or the Prepetition Lender in the future seek relief from this Court to encumber or otherwise have the claims of the DIP Lender and/or the Prepetition Lender payable from Avoidance Actions, Avoidance Action Proceeds, funds advanced to the Debtor by the I M Foundation, Inc. and/or any restricted contributions, grants, gifts and bequests held or received by IMC, the rights of the Debtor and

other parties-in-interest to object to such relief are fully preserved.

      34.   <u>Additional Defaults</u>.  In addition, and without limitation of the Events of Default set forth in and defined in the DIP Loan Documents or this Final Order, it shall be a default hereunder (and constitute an "Event of Default" under the DIP Loan Documents) if

      (a)   the Debtor uses the Prepetition Collateral, including Cash Collateral, other than as set forth herein and in the DIP Budget,

      (b)   the Debtor shall not have in place the Restructuring/Wind-Down Advisors,

      (c)   except as otherwise permitted by the DIP Credit Agreement, without the written consent of the DIP Lender, the Debtor proposes any of the following that would not indefeasibly pay the DIP Obligations in full, in cash:  (i) a sale, or transfer, of all or substantially all of the equity or assets of the Debtor; (ii) the Debtor is reorganized with another entity as its majority or sole member; or (iii) the Debtor's assets are transferred to a successor,

      (d)   without the written consent of the Prepetition Lender, the Debtor applies to the Court for an order:

          (i)   authorizing the use of the DIP Collateral, including Cash Collateral or that seeks approval of a priming, senior or *pari passu* security interest in or lien upon Cash Collateral or the DIP Collateral;

          (ii)   seeking to challenge the Prepetition Lender's liens upon the Cash Collateral or the Collateral or otherwise asserting rights, claims or causes of action against the Prepetition Lender with respect to the Prepetition Secured Obligations;

          (iii)   seeking to sell or transfer all or substantially all of the equity or assets of the Debtor while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and completely satisfy same upon consummation of the transaction contemplated thereby;

          (iv)   seeking to reorganize the Debtor with another entity as its controlling, majority or sole member while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and completely satisfy same upon consummation of the transaction contemplated thereby; or

          (v)   seeking to transfer the Debtor's assets to a successor while not agreeing to, at the same time, indefeasibly pay the DIP Obligations and Prepetition Secured Obligations in full, in cash, and

completely satisfy same upon consummation of the transaction contemplated thereby.

(e)    any other motion is filed by the Debtor for any relief directly or indirectly affecting the DIP Collateral in a material manner unless all DIP Obligations have been indefeasibly paid in full, in cash, and completely satisfied upon consummation of the transaction contemplated thereby,

(f)    the Debtor fails to comply with any of the material terms of this Final Order, including the DIP Budget, or any stipulation, representation or covenant by the Debtor stated herein is materially false or misleading,

(g)    any of relief listed above in this Paragraph (a-f) is granted upon a motion of a party other than the Debtor; provided, however, for the avoidance of doubt, the mere filing (as opposed to granting) of a motion by a party other than the Debtor, including the Committee, for any of relief listed in this Paragraph shall not be an Event of Default, and/or

(h)    the Debtor fails to meet any of the following milestones (except to the extent such deadlines or milestones are extended in writing by the Authority in its sole discretion):

(i)    on August 26, 2013, not obtain approval of the Closure Plan; provided, however, that if the Court does not rule on the Debtor's motion for approval of the Closure Plan at the August 26, 2013 hearing on that motion, then such date shall be extended until the earlier of the date the Court so rules and August 27, 2013; and

(ii)    on or before October 31, 2013, complete implementation of the Closure Plan so that the hospital ceases patient and healthcare operations by such date, except as otherwise permitted in writing by the Authority in consultation with DOH.

35.    Effect of Dismissal or Conversion.  Any order for dismissal or conversion shall be automatically deemed to preserve the rights of the DIP Lender and Prepetition Lender under this Final Order and shall preserve the Carve-Out.  Unless the Authority agrees in writing otherwise, no order providing for the sale of substantially all of the assets of the Debtor under section 363 of the Bankruptcy Code shall be entered by the Court unless, upon the closing of such transaction, all liens securing the DIP Obligations and Prepetition Secured Obligations (in their respective priority) are transferred to the proceeds of such sale and such proceeds (but solely to the extent

such proceeds are DIP Collateral or Prepetition Collateral and not the collateral of any other holder of a Permitted Prior Senior Lien) are applied to permanently and indefeasibly repay the DIP Obligations or Prepetition Secured Obligations, as applicable, in full, in cash.  If an order dismissing the Chapter 11 Case under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall be deemed to provide that the DIP Liens and the DIP Superpriority Claim granted to the DIP Lender hereunder and in the DIP Loan Documents, as the case may be, and the Carve-Out shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Final Order until all DIP Obligations and indebtedness owing to the DIP Lender under the DIP Loan Documents shall have been indefeasibly paid in full, in cash and the DIP Lender's obligations and commitments under the DIP Loan Documents shall have been terminated, and the Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Payment and 507(b) Claims.

36.    <u>Settlement of Claims and Related Matters Between the Debtor and the Authority</u>. As a condition of the Debtor's access to the DIP Facility and the Authority's consent to use of Cash Collateral, the following resolutions of prepetition and postpetition claims and related matters between the Debtor and the Authority are hereby authorized and approved (collectively, the "<u>DIP Transaction</u>"):

(a)    The Debtor shall fully implement the Closure Plan;

(b)    On or before the earlier of entry of an order confirming a chapter 11 plan for the Debtor consistent with the DIP Transaction (a "<u>Plan</u>") and December 31, 2013 (the "<u>DIP Transaction Deadline</u>"), unless the DIP Lender agrees in writing in its sole discretion to extend that deadline, the DIP Lender (and/or a subsidiary of the DIP Lender and/or another party or parties as designated by the DIP Lender) shall receive, without the need to

seek further relief from the Court, at the DIP Lender's option:  (i) all real property owned by the Debtor, or designation rights ("Designation Rights") for all such property; (ii) Designation Rights or assignment of all of the Debtor's real property leases and executory contracts (any related cure costs for such assignments to be resolved between the DIP Lender and the Debtor); (iii) Designation Rights or transfer of all of the Debtor's clinic operations and assets; (iv) Designation Rights or transfer of all of the Debtor's inventory, furniture, fixtures, and equipment needed for future services at clinic operations, real property and leases; and (v) $3.5 million of cash; provided, however, that if the DIP Transaction occurs after December 31, 2013, then such amount shall be reduced by the aggregate amounts paid thereafter by IMC for the DIP Lender's professional fees and costs plus an amount agreed upon by the DIP Lender and the Debtor to reflect the post-December 31, 2013 carrying costs borne by the Debtor for the assets to be transferred to the DIP Lender under this paragraph; and further provided, however, that to the extent, if any, any asset sale proceeds are paid to the DIP Lender pursuant to the DIP Credit Agreement, such payments shall result in a dollar for dollar decrease in such $3.5 million payment;

(c)     On the DIP Transaction Deadline, if a Plan for the Debtor has not been confirmed, then, subject to the rights of the DIP Lender set forth in the preceding sub-paragraph (b) and sub-paragraph (e) below, the Debtor shall hold any Estate assets that are not being transferred to the DIP Lender (or its designee) and are no longer subject to the Designation Rights free and clear of any of the DIP/Prepetition Lender's liens, including, without limitation, the following:  (i) remaining cash on hand; (ii) accounts receivable; (iii) grant receivables; (iv) restricted cash; (v) any rights concerning the I M Foundation, Inc.; (vi) any interests in HealthFirst; (vii) inventory, furniture, fixtures, and equipment not designated by the DIP Lender; and (viii) Avoidance Actions and Avoidance Action Proceeds and other causes of action (collectively, the "Retained Assets");

(d)     If the Debtor does not otherwise have sufficient cash to pay the DIP Lender the $3.5 million cash payment due to the DIP Lender on the DIP Transaction Deadline, then such amount shall be paid from the DIP Loan proceeds and/or from monetization of certain of the Debtor's Retained Assets, with the exact assets and procedure to be agreed upon between the Debtor and the DIP Lender;

(e)     On the DIP Transaction Deadline, the DIP Lender and Prepetition Lender on one hand and the Debtor and its estate, on the other hand, shall receive mutual releases from all claims and obligations (including, for the avoidance of doubt, (i) from any claims by the DIP Lender for repayment of the DIP Facility; (ii) from any Challenge with respect to any Prepetition Lien and Claim Matters); (iii) from any such claim on behalf of the

47

Debtor's estate that could be asserted by any party-in-interest with standing and requisite authority on behalf of the Debtor's estate, including, without limitation, the Committee; and (iv) from any obligations of the Authority with respect to the DIP Financing, including the Carve-Out (i.e., including all amounts set forth in paragraph 15(a)(i)-(iii) above)); provided, however, nothing in this paragraph 36 shall be deemed to release any claims, rights and causes of action to enforce the terms of this Final DIP Order and the DIP Credit Agreement; and further provided, however, that if a Plan for the Debtor has not been confirmed on or before the DIP Transaction Deadline, then the DIP Transaction shall nevertheless be consummated, except that the DIP Lender shall retain an allowed $25 million secured prepetition claim and an allowed postpetition claim in accordance with the priority set forth in this Final Order for any amounts borrowed under the DIP Facility, in each case, without the need to seek further relief from this Court.  In the event that the DIP Transaction is not consummated, all parties-in-interest retain all of their rights;

(f)    Any Plan shall incorporate the releases provided for in the immediately preceding sub-paragraph (e);

(g)    After the DIP Transaction Deadline, the Debtor shall have free use of and access to space in IMC's hospital building for records storage and administrative purposes until December 31, 2014: provided, however, that after reasonable notice, the DIP Lender or its designee shall be able to move or evict the Debtor from any such space to the extent, if any, the DIP Lender or its designee is able to dispose of the relevant property or negotiate a new use that precludes the Debtor from continuing to use such space; and

(h)    The DIP Loan Documents and this Final Order shall be binding on a subsequent chapter 7 trustee for Debtor in the event the Chapter 11 Case is converted to chapter 7.

37.    Order Governs.  In the event of any conflict between the provisions of this Final Order, the DIP Loan Documents and any other agreement, the provisions of this Final Order shall control and govern to the extent of such conflict.

38.    Right to Credit Bid.  Pursuant to section 363(k) of the Bankruptcy Code, (i) the DIP Lender shall have the exclusive right to use the DIP Obligations, the DIP Liens and the DIP Superpriority Claim to credit bid with respect to any bulk or piecemeal sale of all or any portion of the DIP Collateral; and (ii) subject to the indefeasible payment in full, in cash of the DIP

Obligations, the Prepetition Lender shall have the exclusive right to use the Prepetition Secured Obligations, the Adequate Protection Obligations, the Adequate Protection Liens and the Section 507(b) Claim of the Prepetition Lender to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Prepetition Collateral.  For the avoidance of doubt, the rights of the DIP Lender and the Prepetition Lender to credit bid with respect to their collateral do not permit the DIP Lender and the Prepetition Lender to credit bid collateral of any holder of a Prior Permitted Senior Lien.

39.    <u>No Marshaling</u>.  None of the DIP Lender, DIP Collateral, Prepetition Lender, or Prepetition Collateral shall be subject to the doctrine of marshaling.

40.    <u>United States Departments and Agencies</u>.  As to the United States, its agencies, departments or agents, nothing in this Final Order or the DIP Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

41.    <u>28 U.S.C. §959(b)</u>.  Nothing in this Final Order or the DIP Documents shall permit the Debtor to violate 28 U.S.C. §959(b).

42.    <u>Headings</u>.  The headings in this Final Order are for reference purposes only and will not in any way affect the meaning and interpretation of the terms of this Final Order.

43.    <u>Immediate Docketing and Effect of Order</u>.  The Clerk of the Court is hereby directed to forthwith enter this Final Order on the docket of this Court maintained in regard to the Chapter 11 Case.  This Final Order shall take effect immediately upon execution hereof, and, notwithstanding anything to the contrary contained in Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3), there shall be no stay of execution of effectiveness of this Final Order.  All objections to the entry of this Final Order have been withdrawn or overruled and the Motion is approved on a final basis on the terms and conditions set forth herein.

44.    <u>Notice of Entry</u>.  The Debtor shall promptly mail copies of this Final Order to the Notice parties.

**<u>EXHIBIT 1</u>**

**DIP Budget**

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**


These Projections (as defined below) were prepared by Interfaith Medical Center, Inc.'s (the "Hospital" or the "Debtor") management, with the assistance of CohnReznick, the Hospital's financial advisor.  The Projections present to the best of the Debtor's management's knowledge, information and belief, the expected cash flows of the Hospital for the period August 31, 2013 through June 30, 2014. Accordingly, these Projections, including the assumptions thereto, reflect Management's reasonable judgment and estimation as of the date of this Closure Plan, of expected future cash requirements arising from closure and business decisions, which are subject to change. The assumptions disclosed herein are those the Hospital believes are significant to the Projections.


**THE DEBTOR CAUTIONS THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION CONTAINED HEREIN (THE "<u>PROJECTIONS</u>") OR THE DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. ALTHOUGH THE DEBTOR AND ITS ADVISORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES, NO ASSURANCE CAN BE GIVEN THAT THE ASSUMPTIONS WILL PROVE TO BE ACCURATE. MANY OF THE ASSUMPTIONS UPON WHICH THESE PROJECTIONS ARE BASED ARE NOT DIRECTLY DERIVED FROM HISTORICAL RESULTS AND ARE SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES. IT IS LIKELY THAT SOME ASSUMPTIONS WILL NOT MATERIALIZE BECAUSE OF UNANTICIPATED EVENTS AND CIRCUMSTANCES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD ARE LIKELY TO VARY FROM THE PROJECTED RESULTS. THOSE VARIATIONS MIGHT BE MATERIAL AND ADVERSE.**


**THE FOLLOWING ARE SOME OF THE SIGNIFICANT RISKS ASSOCIATED WITH THE ASSUMPTIONS OUTLINED BELOW: (1) THERE WILL BE A CLOSURE DELAY IF THE DEBTOR IS UNABLE TO FIND APPROPRIATE FACILITIES FOR ITS BEHAVIORAL HEALTH PATIENTS IN A TIMELY MANNER, (2) THERE WILL BE A CLOSURE DELAY IF THE DEBTOR IS UNABLE TO TRANSFER HIGH RISK PATIENTS IN A TIMELY MANNER, (3) THIRD PARTY PAYORS MIGHT SETOFF, RESULTING IN DECREASED ACCOUNTS RECEIVABLE COLLECTIONS, (4) COLLECTION OF PATIENT REVENUES DURING THE CLOSURE PERIOD WILL BE SUBJECT TO INCREASED UNCERTAINTY, (5) VARIABLE AND FIXED COSTS REDUCTIONS MIGHT NOT BE MANAGED EFFECTIVELY DURING THE CLOSURE PERIOD, AND (6) A CHAPTER 11 PLAN MIGHT NOT BE CONFIRMED AND CONSUMMATED BY DECEMBER 31, 2013 AND JUNE 30, 2014, RESPECTIVELY.**

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**

**General**

1)  The Projections assume the Hospital continues to operate in the ordinary course through August 30, 2013 and the Closure Plan commences on August 31, 2013. (Such commencement might start a few days earlier if the Bankruptcy Court grants the closure motion currently set for hearing on August 26, 2013.)

2)  The notes detailed below describe the  assumptions utilized in the closure of hospital operations. The Projections assume the Debtor will cease admitting patients starting August 31, 2013, and complete the wind-down of inpatient services by September 30, 2013. Outpatient services are projected to begin winding down August 31st and are assumed to be completely wound down by November 30, 2013. Specifically, outpatient services related to Psych services are assumed to be closed within 60 days and all other outpatient services (ER, Rehab, Detox and HIV clinics) are assumed to be closed within 90 days. Based on recent length of stay statistics, the Projections assume inpatient census and its associated revenue decreases during the 30 day closure period of 40% in week 1 after commencement of the closure, an additional 35% in week 2 after commencement of the closure and the balance by Day 30 after commencement of the closure.

3)  The Projections assume that by July 31, 2013, the Debtor will inform its employees of the closure, commencing the notice period for WARN Act and applicable state law purposes. In fact, such notices were sent on July 30, 2013.

4)  The Projections assume all leased property is vacated by the Debtor by December 31, 2013. For the period January 1, 2014 through June 30, 2014, the projections assume the Debtor will have free use of a portion of the hospital building for records storage and administrative office space.

5)  The Projections assume confirmation and consummation of a Chapter 11 Plan by December 31, 2013 and June 30, 2014, respectively.

6)  The Projections assume that other than payroll and utilities, all expenses will be paid with COD terms. In addition, for contract vendors with stated contractual terms, it is assumed the Debtor has already taken advantage of such terms, resulting in immediate payments as services are rendered in the future.

7)  The Projections calculate revenues based on historical revenue per patient day by service line. As the census and visits decline, the revenues decline accordingly. Following is the historical revenue per patient day by service line:

| Inpatient | | | Outpatient | | |
|---|---|---|---|---|---|
| Med Surg | $ | 2,482 | Medical Clinic | $ | 172 |
| Ped | | 2,632 | Ref Amb | | 95 |
| Psych | | 783 | Behavioral Health Clinic | | 113 |
| Detox | | 710 | ER | | 285 |
| Rehab | | 568 | Amb Surg | | 1,031 |
| | | | Dental | | 180 |

Above revenue information per day includes the CMS passthrough for GME.

8)  Variable costs are projected based on actual historical costs per patient day. As the census declines, the associated variable costs decline accordingly. In addition, timing of payroll  cost reductions is assumed to be lagged to the corresponding 1 week of revenue decline.  Following is the variable cost per patient day by service line:

| | **Med/Surg** | **Peds** | **Psych** | **Detox** | **Rehab** | **Medical** | **Ref Amb** | **Behavior** | **ER** | **Amb** | **Dental** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll and benefits | $  1,886 | $  736 | $  601 | $  486 | $  479 | $  145 | $  - | $  134 | $  462 | $  277 | $  295 |
| Physicians and temp. help | 41 | 66 | 20 | 11 | 12 | 0 | - | 0 | 8 | - | - |
| Medical supplies | 179 | 72 | 24 | 29 | 20 | 3 | - | 4 | 28 | 36 | 12 |

9)  Fixed costs such as purchased services (excluding patient account collections and food service, see assumption number 20 below), building rent, insurance, utilities and other costs are projected to decline as the closure plan is implemented. The Projections assume the Debtor maintains its property, liability and  umbrella insurance policies through December 31, 2013.

10)  Grant revenue is assumed to cease immediately upon the commencement of the closure process (Day 1).

11)   The Projections assume severance and vacation pay accruals are paid during the closure period and at Plan consummation (See assumption number 16 below) . Any WARN and other accrued employee related liabilities are assumed to be paid pursuant to a Chapter 11 Plan and are reflected in the Projections as Chapter 11 exit costs paid upon consummation of a Chapter 11 Plan.

12)  Certain personnel (administrative, medical records and accounting) are assumed to enter into consulting agreements with the Debtor at an aggregate cost of $165K per month through December 31, 2013, with such consulting arrangements to continue for the period January 1, 2014 through June 30, 2014, but at reduced levels.

**INTERFAITH MEDICAL CENTER**
**Assumptions for Closure Plan and DIP Loan Projections**

**Cash Flow**

13) Patient receipts excluding PIP are projected as follows:

    A)   Medicaid revenues are assumed to be collected through the period of Plan consummation.

    B)   Medicare, commercial insurance and self-pay, net of reserves, are assumed to be collected and in full by Plan consummation.

    C)   **THE PROJECTIONS ASSUME THIRD PARTY PAYORS DO NOT APPLY THEIR RECOUPMENT RIGHTS AGAINST PAYMENTS.**

14) PIP and PIP recoupments are projected to continue through Day 45 of the commencement of the implementation of the Closure Plan.

15) Grant receipts for current programs are assumed to cease at the commencement of the closure. However, grant receivables for completed programs are assumed to be collected over time, aggregating approximately $1 million.

16) Salaries and benefits decrease in direct relation to the declining census, during the closure period. $1.6 million of PTO is assumed to be paid on the employee termination dates. $1 million of severance is assumed to be paid during the closure period, with the remaining $4 million to be paid as part of Chapter 11 exit costs to the extent required by applicable agreement or policies. $2.3 million of vacation liabilities is assumed to be paid during the closure period with the remaining $2.5 million to be paid as part of the Chapter 11 exit costs to the extent required by applicable agreements or policies. Certain personnel related to wind-down and administrative functions are assumed to be retained by the Debtor as independent contractors, at an aggregate cost of approximately $165K per month through December 31, 2013 and thereafter at reduced levels.

17) The Debtor, with the assistance of its professionals, reviewed recent Court filings relating to document retention costs in other hospital closures. Total costs ranged from approximately $400K to $1.5 million. The Projections assume document retention costs will be $1 million, paid in October 2013. The Hospital is awaiting bids from potential vendors to manage the medical records process post closure.

18) Temporary labor and medical supplies decrease in direct relation to the declining census.

19) Other expenses include building and equipment rent, repairs and maintenance, and patient transportation. Following are the assumptions associated with these expenditures:

    Building rent of $110K per month and lease of the East Building of $25K per month are assumed to be paid through December 31, 2013.

    Repairs and maintenance expenditures are assumed to decline by 75% by Day 30 and remain at that level (approximately $10K per month) until December 31, 2013.

    Patient Transportation of $300K is projected to be incurred in months one and two during closure to transport patients to other facilities.

20) Purchased services include patient account collections, consulting and service contracts, food service, mental health clinic and quality assurance global communications and security. Following are the assumptions associated with these expenses:

    Patient accounts collections is projected to decline in direct relation to patient revenues.
    Consulting and service contracts are projected to decline by 75% by Day 60 and an additional 25% by Day 90.
    Food services (Sodexho) expenditures decline in direct relation to patient census.
    Mental health clinic expenses are assumed to be eliminated by the end of Day 60 of the Closure Plan as outpatient operations are assumed to be wound down.
    Security expenses decline by 75% by Day 60 (from $350K per month to $90K), and remains at that level ($90K per month) through confirmation.

21) Utilities are projected to decline by 50% by Day 60 (from $300K per month to $150K) another 50% by Day 90, and remain at that level until the building is vacated (December 31, 2013).

22) Insurance expenditures are projected at $4K per month through December 31, 2013, in line with an insurance schedule received from the Debtor's insurance broker. The projections assume the Debtor maintains it insurance coverage for property, liability, umbrella and other insurance coverages through December 31, 2013.

23) The projections assume there are no capital expenditures during the closure period.

24) The projections assume restructuring fees are paid to professionals or funded to the professional fee escrow account as in the Debtor's Court approved Cash Collateral Budgets through December 31, 2013. The Projections reflect professional fee estimates from the respective professionals for illustrative purposes. Professional fees post confirmation are estimated primarily for administrative and priority claims resolution work.

25) The projections assume $300K in KERP payments is disbursed to employees at consummation. Accordingly, the KERP payments are reflected as part of the Chapter 11 exit costs.

26) WARN Act penalties, if any, are projected to be paid in pursuant to and upon consummation of a Chapter 11 Plan.

**Interfaith Medical Center, Inc.**
**Weekly Cash Flow Projections**

($ in thousands)

| Week Ending | 9/6/13 | 9/13/13 | 9/20/13 | 9/27/13 | 10/4/13 | 10/11/13 | 10/18/13 | 10/25/13 | 11/1/13 | 11/8/13 | 11/15/13 | 11/22/13 | 11/29/13 | 12/6/13 | 12/13/13 | 12/20/13 | 12/27/13 | 1/3/14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | | | | | | | | | | |
| Medicaid Receipts | $1,038 | $1,038 | $1,038 | $1,038 | $701 | $701 | $501 | $501 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $52 | $7,069 |
| Other patient receipts | 932 | 1,152 | 1,152 | 2,009 | 880 | 880 | 880 | 1,109 | 193 | 193 | 193 | 193 | 370 | 177 | 177 | 177 | 137 | 137 | 10,940 |
| Total Patient receipts (excl. PIP) | 1,970 | 2,190 | 2,190 | 3,047 | 1,580 | 1,580 | 1,380 | 1,610 | 245 | 245 | 245 | 245 | 422 | 228 | 228 | 228 | 188 | 188 | 18,009 |
| PIP | 1,270 | 0 | 1,270 | 0 | 1,270 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,810 |
| Less: PIP recoupments | 0 | 0 | 0 | 0 | -330 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -330 |
| Grants | 0 | 0 | 0 | 0 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 55 | 777 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Cash Receipts** | 3,240 | 2,190 | 3,460 | 3,047 | 2,576 | 1,636 | 1,436 | 1,665 | 300 | 300 | 300 | 300 | 478 | 284 | 284 | 284 | 244 | 244 | 22,266 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | |
| Salaries and taxes | 1,883 | 1,832 | 1,103 | 1,240 | 528 | 430 | 219 | 292 | 177 | 170 | 155 | 168 | 36 | 36 | 36 | 36 | 36 | 36 | 8,415 |
| PTO | 0 | 0 | 1,192 | 718 | 807 | 343 | 280 | 143 | 190 | 115 | 111 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,900 |
| Union benefits | 1,500 | 0 | 0 | 0 | 1,500 | 0 | 0 | 0 | 705 | 0 | 0 | 0 | 233 | 0 | 0 | 0 | 0 | 0 | 3,938 |
| Other benefits - unemployment | 0 | 105 | 0 | 0 | 0 | 102 | 0 | 0 | 0 | 0 | 105 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 312 |
| Other benefits - other | 0 | 208 | 0 | 0 | 0 | 181 | 0 | 0 | 0 | 0 | 70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 460 |
| Document retention | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 |
| Temporary labor | 18 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 |
| Medical supplies | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50 |
| Building Maintenance | 6 | 6 | 6 | 6 | 5 | 5 | 5 | 5 | 5 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 62 |
| Other | 234 | 74 | 74 | 74 | 157 | 13 | 13 | 13 | 150 | 4 | 4 | 4 | 4 | 29 | 4 | 4 | 4 | 4 | 866 |
| Purchased services - security | 70 | 70 | 70 | 70 | 70 | 70 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 637 |
| Purchased services - other | 194 | 194 | 194 | 194 | 107 | 107 | 89 | 71 | 53 | 7 | 7 | 7 | 7 | 2 | 2 | 2 | 2 | 2 | 1,240 |
| Utilities | 0 | 0 | 315 | 0 | 0 | 0 | 179 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 651 |
| Insurance | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 15 |
| Physicians | 19 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 |
| Capital expenditures | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Operating Disbursements** | 3,928 | 2,526 | 3,004 | 2,302 | 4,174 | 1,255 | 803 | 542 | 1,299 | 319 | 550 | 199 | 300 | 91 | 141 | 62 | 62 | 62 | 21,619 |
| **Cash Flow from Operations** | **-688** | **-336** | **456** | **745** | **-1,598** | **381** | **633** | **1,124** | **-999** | **-19** | **-250** | **101** | **178** | **193** | **143** | **222** | **182** | **182** | **647** |
| Restructuring fees * | 206 | 206 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 164 | 164 | 164 | 164 | 164 | 3,130 |
| **Net Cash Flow** | -893 | -542 | 283 | 572 | -1,771 | 209 | 460 | 951 | -1,171 | -192 | -423 | -72 | 5 | 29 | -21 | 58 | 18 | 18 | -2,482 |
| Cash, beginning | 3,599 | 2,706 | 2,164 | 2,447 | 3,019 | 1,248 | 1,457 | 1,917 | 2,868 | 1,697 | 1,505 | 1,082 | 1,011 | 1,016 | 1,045 | 1,024 | 1,082 | 1,100 | 3,599 |
| **Cash, ending before proposed DIP loan** | $2,706 | $2,164 | $2,447 | $3,019 | $1,248 | $1,457 | $1,917 | $2,868 | $1,697 | $1,505 | $1,082 | $1,011 | $1,016 | $1,045 | $1,024 | $1,082 | $1,100 | $1,118 | $1,118 |
| Proposed DIP loan | | | | | | | | | | | | | | | | | | 15,000 | 15,000 |
| **Cash Ending** | | | | | | | | | | | | | | | | | | $16,118 | $16,118 |

* Represents monies paid into a professional fee escrow account, which will only be disbursed to professionals pursuant to the Interim Compensation Order or other applicable Court Order.

## INTERFAITH MEDICAL CENTER
## MONTHLY CASH FLOW
### January 1, 2014 through June 30, 2014 (Post Confirmation Through Plan Consummation)

*($ in thousands)*

| | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|
| | | | | 2014 | | | |
| **Cash Receipts:** | | | | | | | |
| Accounts receivable | $699 | $893 | $699 | $699 | $893 | $699 | $4,584 |
| Grants receivable | 0 | 0 | 0 | 0 | 0 | 284 | $284 |
| Health First pools | 1,600 | 0 | 0 | 0 | 0 | 0 | 1,600 |
| Health First membership interests **(A)** | 0 | 0 | 0 | 0 | 0 | 11,000 | 11,000 |
| Net proceeds from sale of equipment **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| Avoidance actions **(C)** | 0 | 0 | 0 | 0 | 0 | 1,540 | 1,540 |
| IM Foundation **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| Release of restricted funds **(D)** | 0 | 0 | 0 | 0 | 0 | 1,109 | 1,109 |
| Miscellaneous assets **(B)** | 0 | 0 | 0 | 0 | 0 | 0 | TBD |
| **Total Cash Receipts** | 2,299 | 893 | 699 | 699 | 893 | 14,633 | 20,117 |
| **Cash Disbursements:** | | | | | | | |
| Salaries and taxes | 163 | 163 | 163 | 130 | 104 | 83 | 807 |
| Other | 10 | 10 | 10 | 10 | 10 | 10 | 60 |
| **Total Operating Disbursements (E)** | 173 | 173 | 173 | 140 | 114 | 93 | 867 |
| **Cash Flow from Operations** | 2,126 | 720 | 526 | 559 | 779 | 14,539 | 19,250 |
| Restructuring fees | 345 | 345 | 375 | 345 | 345 | 375 | 2,130 |
| **Net Cash Flow** | 1,781 | 375 | 151 | 214 | 434 | 14,164 | 17,120 |
| Cash, beginning | 16,118 | 17,899 | 18,274 | 18,425 | 18,639 | 19,073 | 16,118 |
| Cash, available to fund Administrative and Priority Claims **(F)** | $17,899 | $18,274 | $18,425 | $18,639 | $19,073 | $33,237 | $33,237 |

**(A)** The receipt included for the price to be paid for the Health First stock is based on the purchase price formula in the Second Amended and Restated Operating Agreement of HF Management Services, LLC and does not reflect a discount for the fact that the purchase price formula provides for payment over time. In addition, the listed amount of receipts includes IMC's retained capital in Health First. No assurance can be given that such retained value can be monetized in the near future.

**(B)** Assumes that the aggregate value (not the purpose) of any equipment that is not retained by DASNY, any contributions from the IM Foundation, and other miscellaneous assets would aggregate not less than the $5 million needed to pay DASNY pursuant to the DIP Loan Agreement Order.

**(C)** Net proceeds from avoidance actions are estimated at 10% of total payments, other than to professionals, made by IMC during the 90 days preceding IMC's petition date.

**(D)** Might require further legal analysis.

**(E)** Assumes free use of certain hospital space for record storage and offices.

**(F)** See schedule of Administrative and Priority Claims (page 6).

**INTERFAITH MEDICAL CENTER**

**SCHEDULE OF POTENTIAL RANGE OF ADMINISTRATIVE AND PRIORITY CLAIMS, SUBJECT TO REVISION**

*($ in thousands)*

|  | Low | High |
|---|---|---|
| Priority Claims | $3,500 | $14,600 **A** |
| WARN | 0 | 22,000 **B** |
| Severance | 4,093 | 4,093 **C** |
| Accrued PTO | 2,457 | 2,457 |
| KERP | 300 | 300 |
| Accounts Payable | 3,950 | 3,950 **D** |
| Accrued Expenses (Nursing, Medical Supplies, Purchased Services, Utilities, etc.) | 5,109 | 5,109 **D** |
| Accrued Malpractice Claims (Post-Petition) | 0 | 2,200 **E** |
| Due to IM Foundation (Post-Petition) | 0 | 0 **F** |
| Pension Obligations (Post-Petition) | 2,798 | 2,798 **G** |
| 503(b)(9) and Reclamation Claims | 500 | 500 |
| Meditech Lease | 0 | 520 |
| East Building Lease | 0 | 1,280 **H** |
| NYS Unemployment Insurance Claims | 0 | 16,000 **I** |
|  | $22,708 | $75,808 |

**A**  The estimated priority claims are based on the total amount in the claims register as of August 8, 2013 of $14.6 million except for duplicate and other obviously misfiled claims. Of the $14.6 million, claims relating to pensions aggregate approximately $13 million. Aggregate priority pension claims however, should be limited to at most $2.6 million, resulting from the statutory cap on priority claims for liabilities accrued during the 180 days preceding IMC's chapter 11 filing. The $900 balance of the low estimate (of $3,500) is for tax claims which are yet to be vetted.

**B**  No amount for potential WARN Act liability is included in the budget.  IMC's maximum potential WARN Act liability is approximately $22 million.  Nonetheless, IMC believes it should have no liability related to the WARN Act because under applicable law, no such liability exists if the hospital's closure is due to unforeseeable business circumstances, such as the government ordered closing that occurred for IMC, or due to the faltering business exception also applicable to WARN Act claims.  Further, even if IMC had any WARN Act liability, the aggregate amount would be substantially reduced due to resignations of some employees and due to wages and benefits paid to IMC employees for working during any period of an asserted violation of the WARN notice requirement.

**C**  Severance includes 1 week's salary for each year employed, capped at 4 weeks. It does not include contractual severance liabilities.

**D**  Represents balance per IMC's books and records as of June 30, 2013.

**E**  Represents approximate actuarial computed post-petition liability, less $400 held in a restricted indemnity account. To date, no post-petition medical malpractice claims have been asserted against IMC. The $400 held in a restricted account is incremental to both the low and high claims estimates.

**F**  Although the IM Foundation might assert an administrative claim against IMC for $4.3 million based on an alleged post petition unsecured loan to IMC, no amount is included in the budget for any such liability.  Due to a variety of factors, IMC does not expect that any such claim will be allowed.  First, any such alleged loan liability to the IM Foundation could be recharacterized as a contribution to IMC. Second, the IM Foundation could be liable to IMC for an at least an equal amount based on an avoidance action.   The IM Foundation, however, has neither been consulted on nor agreed to disallowance of any such claim.

**G**  Pension Obligations include amounts due during the post-petition period through July 31, 2013 (less the quarterly payment made in April 2013). This analysis assumes contract rejections as of July 31, 2013.

**H**  East Building lease expense assumes rejection (to the extent, if any, the applicable agreement is a lease) or termination of the "lease" effective December 31, 2013,with (x) the minimum payment $0 per month paid pursuant to a stipulation and (y) the maximum based on post petition payments to that date accrued at the contractual rate, less the aggregate amounts already paid during the post petition period pursuant to the Court approved interim stipulation.

**I**  IMC's maximum theoretical liability for New York State unemployment related  claims is approximately $16 million.   That amount is unrealistic, however, because some IMC employees will resign rather than be laid off and most  IMC employees are anticipated to be able to obtain new jobs immediately or soon after any such lay offs. IMC intends to seek a negotiated resolution of any unemployment insurance related claims.