WEISS, ZARETT, BROFMAN & SONNENKLAR, P.C.  
*Attorneys for The Committee of Interns and Residents/Service Employee International Union*  
3333 New Hyde Park Road, Suite 211  
New Hyde Park, New York 11042  
516.627.7000  
Michael D. Brofman, Esq.

Hearing Date and Time August 26, 2013 at 10:00 a.m.  
Objection Deadline is August 19, 2013 at 11:59 p.m.

UNITED STATES BANKRUPTCY COURT  
EASTERN DISTRICT OF NEW YORK  
------------------------------------------------------------x  
In re:

INTERFAITH MEDICAL CENTER, INC.

                 Debtor.

------------------------------------------------------------x

Chapter 11

Case No. 12-48226-cec

## OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A PLAN OF CLOSURE FOR THE DEBTOR'S HOSPITAL AND CERTAIN AFFILIATED OUTPATIENT CLINICS AND PRACTICES

    The Committee of Interns and Residents/Service Employees International Union ("CIR") by its attorneys Weiss, Zarett, Brofman & Sonnenklar, P.C., hereby submits the following in opposition to Debtor's Motion for entry of an Order Pursuant to Sections 105, 363 and 1108 of the Bankruptcy Code Authorizing the Debtor to Implement a Plan of Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics and Practices (the "Motion") and sets forth as follows:

### BACKGROUND

    1.    CIR is the collective bargaining representative for interns, residents and fellows contractually defined as House Staff Officers (hereinafter "HSOs"), employed by Interfaith Medical Center, Inc. ("IMC" or "Debtor") pursuant to a collective bargaining agreement effective for the period January 1, 2011 through December 31, 2013 (the "CIR-CBA").

1

G:\C\Committee of Interns & Residents\Interfaith Hospital\Closure Plan motion\Opposition\Opposition to Closure Motion.doc

2. Pursuant to the CIR-CBA, CIR is recognized by the Debtor as the exclusive collective bargaining representative for the HSOs. At present, CIR represents approximately 120 member HSOs in the collective bargaining unit. IMC has run a teaching hospital with a residency and fellowship program for many years. Thus, hundreds of HSOs have graduated from IMC's graduate medical programs over the past ten years.

3. CIR submits that paragraph "3" of the Motion best illustrates why it should not be granted, and why IMC, in some form, needs to continue operating:

> "The local Brooklyn community's need for IMC's services is critical. Accordingly, IMC fulfills a vital mission in the community IMC serves. Indeed, in his May 7, 2013 letter to HHS Secretary Kathleen Sebelius seeking an 1115 Medical waiver amendment, Governor Cuomo referred to IMC and other Brooklyn hospitals in danger of closing as "essential components of the health care services system in Brooklyn". Governor Cuomo also stated that "the outcome will be disastrous" if those hospitals close because among other things, "[a]ccess to care will be compromised and the remaining health care providers in the borough will be destabilized." In fact, as the Debtor is the primary acute care provider to its community, failure of IMC to survive likely will have serious consequences for the provision of healthcare in that community, the extent of the

**THE FAILURE OF THE DEBTOR TO ADEQUATELY PURSUE**
**<u>ALTERNATIVES TO PRECLUDE THE GRANT OF THE MOTION</u>**

4. The closing of the hospital and its clinics, which IMC acknowledges is necessary to the life of the community serves, should not be taken lightly. It is clearly the duty and obligation of a board of directors or trustees of any such not-for-profit institution to act in manner that is responsive to the needs of the community that is served. In fact, IMC's mission, as stated in its 2011 Form 990 is "to provide exceptional patient service through prevention, education and treatment in a safe environment." (*See* Page 2 of the 2011 Form 990, Exhibit "A" hereto).

5.      As stated in the Fourth Report of Eric M. Huebscher as Patient Care Ombudsman of the Debtor ("Ombudsman"), which was recently filed:

> "As previously mentioned in past PCO reports, IMC currently cares for a disproportionally high number of psychiatric patients. This contrasts significantly to virtually all other similarly situated hospitals in the borough. Others hospitals may only have a number of beds dedicated to this modality of care. Fifty-five percent of IMC'S licenses 287 beds are dedicated to either psychiatric, detox or drug rehabilitation services. Whiles some psychiatric patients enter the hospital via the Emergency Department much in the same way as medical and surgical patients, many psychiatric patients self-admit or are brought in by family members and friends. In addition, greater than 80% of all psychiatric patients historically admitted to IMC are from the Bedford Stuyvesant area. In our evaluation of the impact of the planned closure of IMC, we have given special attention to the potential impact on care. While the impact study performed on Brooklyn healthcare suggests that there is excess capacity in all levels of care, it is unclear as to whether the immediate and short term needs of this population will be appropriately served with the closure of IMC. In addition, during the meetings noted above, it was disclosed that the process of identifying a long term solution to the psychiatric patient placement may take six months or longer."

Thus, IMC is particularly critical to the community it serves, and the cessation of the medical care it provides could be a crushing blow to that community.

6.      Unfortunately, the attempts of the Debtor prior to the Motion in restructuring its business model were inadequate to convince the New York State Department of Health ("DOH") that IMC could accommodate the changing demographics in the community and improve its financial position sufficiently. As directed by DOH, the Debtor undertook to exclusively negotiate with The Brooklyn Hospital ("TBH"), and when that initial attempt failed, due in part to DOH's refusal to fund due diligence as requested by TBH, IMC's management was incapable of moving forward on an alternative that DOH found acceptable.

3

G:\C\Committee of Interns & Residents\Interfaith Hospital\Closure Plan motion\Opposition\Opposition to Closure Motion.doc

7. At no time was CIR consulted by the Debtor concerning potential alternatives to a "merger" or other combination with TBH. It was not until the IM Foundation, Inc. ("IMF") retained Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") was there any solicitation of the views of the responsible constituencies (which had been involved in multiple hospital bankruptcies) concerning an alternative to the closing of IMC. During a meeting with counsel for IMF and A&M, it became apparent to CIR's counsel that it was possible to preserve at least a portion of IMC as a medical facility.

8. Presently pending is IMF's motion to terminate exclusivity in order to file its own plan of reorganization. The plan it has outlined seeks to preserve some of the medical facilities and programs of IMC, by finding alternative operators. Although the IMF proposal is not detailed enough to allow CIR to fully evaluate whether or not to give it its unqualified support, it is clear that the IMF plan at least seeks to provide medical services to the community, preserve some jobs, and continue the existence of one or more teaching facilities for residents and fellows. Any similar plan that accomplishes those goals, would be far superior to the Closure Plan, reluctantly proposed by the Debtor's board under duress, essentially at the direction of DOH as detailed in the Motion. It would also be in keeping with IMC's mission.

9. While the "business judgment rule" generally supports the appropriately reached decisions of the board of a debtor, it is respectfully submitted that this Court should look at all of the circumstances surrounding IMC's actions in evaluating whether or not IMC's board acted truly independently, for the best interest of the Debtor and its mission, in determining to proceed with the Closure Plan. Clearly, from the Debtor's own pleadings in the Motion, its action in filing the Closure Plan with DOH was done under extreme duress. There are times when the circumstances surrounding the making of a decision by a Debtor should be questioned and a

4

G:\C\Committee of Interns & Residents\Interfaith Hospital\Closure Plan motion\Opposition\Opposition to Closure Motion.doc

court take into account the greater needs of a community in determining a motion under 11 U.S.C. § 363(b). This is one of those times; particularly given IMC's mission statement.

## THE CLOSURE PLAN PROVIDES FOR TOO LITTLE TIME AND TOO LITTLE DETAIL TO EFFECTUATE AN ORDERLY TERMINATION OF SERVICES

10. Clearly, when looking at the Ombudsman's Fourth Report, a minimum of six (6) months is required in order to close the mental health programs. Moreover, the fact that the Debtor made its decision to close after July 1, the start of the academic year for residents, creates severe difficulty for the HSOs. This is particularly true regarding foreign national HSOs with H-1B and J-1 status. Submitted with this Objection is the Declaration of Anita Eliot ("Eliot Declaration"), an attorney with CIR. The Eliot Declaration is submitted to provide the Court with information concerning the status of foreign nationals HSOs, and the potential difficulties that they could face.

11. It is requested that this Court take judicial notice of the H-1B and J-1 process, so as that the Court can better understand the basis of the objection by CIR to the speed by which the Debtor proposes to terminate programs pursuant to the Closure Plan.

12. The Declaration of Karen Master ("Master Declaration"), also submitted with this Opposition, supports CIR's objection to the Closure Plan and details errors and misstatements in the Closure Plan. CIR believes that such errors and misstatements show a lack of attention to detail by IMC's management in seeking to proceed with the Closure Plan, and points to the harm that could result to both the HSOs and the Debtor. Particularly, the Debtor's notion that it has provided adequate WARN Notice for the closing of IMC is belied by the fact that it appears that the shutdown will be almost immediate, thereby affording inadequate notice. As set forth in the Master Declaration, no specifics have been given to HSOs as to what will occur during the closing, no discussions have been had with them about "post closure placement", and at least one

5

major department at IMC is resisting the release of letters of reference for HSOs prior to the Closure Plan being approved, thereby jeopardizing their continued education.

13. A "gap" of employment for foreign national HSOs could critically, and potentially irrevocably, damage their ability to continue their medical training in the United States. As set forth in the Eliot Declaration, there could be a significant delay in HSOs receiving H-1B status with new employers, and that could mean the loss of at least part, if not all, of a residency year. Given that there is no evidence at this point of IMC working diligently to place HSOs in alternative programs, combined with the difficulty of doing so at the beginning of a residency year, makes it more likely that HSOs will suffer extreme hardships, potentially creating additional claims against the Debtor, which would add to its administrative expense claim burden.

14. Further, the Debtor has failed to specify in the Closure Plan, how it intends to deal with the tenancies of HSOs and their families, who reside in the apartment complex located at 753 Clawson Avenue in Brooklyn, which is a building currently owned by an affiliate of IMC. Again, the hardship suffered by these families in suddenly being required to relocate, with no indication as to when, is extremely troubling.

15. Should this Court be inclined to grant the Motion and allow the Debtor to implement a Closure Plan, it is respectfully submitted that the Court should do so only after these issues, and those proffered by other partines-in-interest, have been addressed by the Debtor. Before it can be approved by the Court, the Closure Plan needs to be modified to ensure for proper patient care for the members of the community surrounding IMC, and for the proper treatment of HSOs and the other employees of IMC.

16. Finally, CIR notes that there is nothing within the proposed DIP budget submitted by the Debtors in support of the Closure Plan that provides funds for pre-petition medical

6

G:\C\Committee of Interns & Residents\Interfaith Hospital\Closure Plan motion\Opposition\Opposition to Closure Motion.doc

malpractice claims or for the indemnification of HSOs or other medical personnel. A failure to include any such coverage as part of the Closure Plan, will leave significant constituencies of this Debtor unprotected and without any recourse, while its professionals are paid. CIR believes that such a possible result mandates the denial of the Motion.

WHEREFORE, for the reasons as set forth in this Opposition, and joining with other opposition to the Motion, CIR respectfully requests that the Motion be denied.

Dated: New Hyde Park, New York
August 19, 2013

> WEISS, ZARETT, BROFMAN & SONNENKLAR, P.C.
> *Attorneys for The Committee of Interns and*
> *Residents/Service Employee International Union*
>
> By: *s/ Michael D. Brofman*
> Michael D. Brofman, Esq.
> 3333 New Hyde Park Road, Suite 211
> New Hyde Park, NY 11042
> 516.627.7000

7

G:\C\Committee of Interns & Residents\Interfaith Hospital\Closure Plan motion\Opposition\Opposition to Closure Motion.doc

# EXHIBIT A

Form 990 (2011) Page **2**

### Part III  Statement of Program Service Accomplishments

Check if Schedule O contains a response to any question in this Part III  . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission

INTERFAITH MEDICAL CENTER'S MISSION IS TO PROVIDE EXCEPTIONAL PATIENT SERVICE THROUGH PREVENTION, EDUCATION AND TREATMENT IN A SAFE ENVIRONMENT

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these new services on Schedule O

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

If "Yes," describe these changes on Schedule O

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses Section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported

**4a** (Code _____ ) (Expenses $ 164,862,965 including grants of $ 0 ) (Revenue $ 196,396,828 )

INTERFAITH MEDICAL CENTER PROVIDES A WIDE RANGE OF COMPREHENSIVE INPATIENT AND OUTPATIENT MEDICAL, SURGICAL, GYNECOLOGICAL, PSYCHIATRIC AND PEDIATRIC CARE SERVICES THROUGHOUT THE CENTRAL BROOKLYN, NEW YORK AREA INTERFAITH MEDICAL CENTER ALSO PROVIDES TERTIARY HEALTHCARE SERVICES, INCLUDING RENAL DIALYSIS, MEDICAL ONCOLOGY SERVICES, NUCLEAR MEDICINE AND RADIATION ONCOLOGY AMBULATORY, PODIATRIC AND DENTAL SERVICES ARE ALSO AVAILABLE

**4b** (Code _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4c** (Code _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4d** Other program services (Describe in Schedule O )

(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e** **Total program service expenses▶$** 164,862,965

Form **990** (2011)