LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Tel: 212-627-8100
Fax: 212-627-8182
Suzanne Hepner
Ryan J. Barbur

*Counsel for 1199SEIU United Healthcare Workers East*

THE LAW OFFICES OF AVRUM J. ROSEN, PLLC
38 New Street
Huntington, New York 11743
Tel: (631) 423-8527
Fax: (631) 423-4536
Avrum J. Rosen

*Counsel for New York State Nurses Association*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:

INTERFAITH MEDICAL CENTER, INC.,

                                        Debtor.

-------------------------------------------------------------------X

**OBJECTION**

Case No. 12-48226 (CEC)

**OBJECTION OF 1199SEIU UNITED HEALTHCARE WORKERS EAST AND
THE NEW YORK STATE NURSES ASSOCIATION TO THE DEBTOR'S
MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105, 363
AND 1108 OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO
IMPLEMENT, IN ACCORDANCE WITH NEW YORK STATE LAW, A PLAN
OF CLOSURE FOR THE DEBTOR'S HOSPITAL AND CERTAIN AFFILIATED
OUTPATIENT CLINICS**

    1199SEIU United Healthcare Workers East ("1199"), through its attorneys, Levy Ratner,

P.C., and the New York State Nurses Association ("NYSNA"), through its attorneys, the Law

Offices of Avrum J. Rosen, PLLC, (collectively, the "Unions") hereby submit this Objection to

the Debtor's Motion for Entry of an Order Pursuant to Sections 105, 363 and 1108 of the

Bankruptcy Code, Authorizing the Debtor to Implement, in Accordance with New York State

Law, a Plan of Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics ("Closure Motion") [Docket #602], and respectfully represent as follows:

## PRELIMINARY STATEMENT

Before the Court is the Debtor's motion to obtain permission to close the Interfaith Medical Center. The Debtor's motion asserts that this is done in the exercise of its business judgment. In response to this Court's Amended Scheduling Order, the Unions assert that, despite the New York State Department of Health's ("DOH") position that it does not direct that health care facilities close[1], that is exactly what has transpired here. The Unions assert that the DOH and the Dormitory Authority of the State of New York ("DASNY") have exceeded their statutory authority and have supplanted the Debtor's business judgment or made it impossible for the Debtor to exercise that judgment. The Unions further assert that the DOH and DASNY have engaged in a course of conduct that has intentionally harmed the Debtor and the Debtor's estate.[2] As a result, the Debtor's motion should not be granted at this time. As will be set forth below, the Debtor has sufficient funds to operate for several months. Given the massive WARN Act liability under the proposed closure plan, continued operations will not result in large losses to the Debtor's estate and will provide all parties with an opportunity to let the bankruptcy process work.

## BACKGROUND

1.      In November 2011, at the behest of the New York State Department of Health, the Brooklyn Health Systems Redesign Work Group published its report ("Brooklyn MRT

---

[1] Annexed hereto as Exhibit A is the Reply Brief of the DOH in the Long Island College Hospital State Court litigation, which sets forth its alleged policy in this regard.

[2] The Unions reserve their right to commence an action to equitably subordinate the DASNY claims and liens in this case based upon these actions.

Report") detailing and making recommendations to address the healthcare crisis in Brooklyn. Specifically, the Brooklyn MRT Report found that:

> In the face of high rates of chronic disease and a heavy reliance on hospitals for care, financial crises at three Brooklyn hospitals – Brookdale Hospital Medical Center, Interfaith Medical Center, and Wyckoff Heights Medical Center – are jeopardizing access to quality care for thousands of Brooklyn residents. Like most Brooklyn hospitals, these hospitals serve low-income communities where Medicaid is the predominant payer. After years of relying heavily on shrinking Medicaid dollars, along with excess borrowing, wasteful spending, and mismanagement, these three most troubled hospitals are no longer viable as stand-alone inpatient facilities.
>
> . . .
>
> There is an immediate need to deal with the problems of those troubled institutions, whether or not they will ultimately be or should be part of the next generation of health care delivery. To let them fail in free-fall bankruptcies would threaten access to health care for large numbers of people. The way to a healthy tomorrow is to avoid chaos today, to approach Brooklyn's problems with both a short-term and a longer-term prospectus, and to come up with the changes that are necessary first to stabilize and then to revitalize the way health care is delivered in the borough.
>
> While it is certain that there is excess inpatient bed capacity in Brooklyn, this report does not recommend the closure of any hospitals at this time.

See At the Brink of Transformation: Restructuring the Healthcare Delivery System in Brooklyn, pgs. 13-15, attached hereto as Exhibit B.

2.     Upon information and belief, the DOH has not developed a plan to respond to this well-articulated emergency.

3.     The Debtors allege that Interfaith cut approximately $30,000,000.00 of annual expenses from 2010 to 2012, which put them close to a break-even level on operational revenue and expenses. [Docket No. 602, ¶ 5]. The Debtors further allege that, even with

these cuts, Medicaid and other reimbursement cuts imposed in recent years made it impossible for the Debtor to fully address its legacy debt and other obligations. Id.

4.      In the Closure Motion, the Debtor states that, in February 2012, the Debtor and the Brooklyn Hospital Center ("Brooklyn Hospital") "developed and submitted an application for a HEAL 21 grant in order to fund the development and implementation of a partnership solution." [Docket No. 602, ¶ 6]. Although the Debtor and Brooklyn Hospital were awarded a HEAL 21 grant of $1,000,000.00 more than a year ago, the Debtor alleges that "no funds have come to IMC from any HEAL 21 grant." Id.; See HEAL 21 Grant Awards attached hereto as Exhibit C.

5.      In the Closure Motion, the Debtor alleges that the DOH vetoed an agreement in principle between Interfaith and Brooklyn Hospital because the deal did not allow Brooklyn Hospital to assume an active enough managerial role at Interfaith.  [Docket No. 602, ¶ 8]. Upon information and belief, Interfaith's officers and Board of Directors spent the next five months refusing to reach an agreement in principle with Brooklyn Hospital acceptable to the DOH in favor of protecting their own entrenched interests.  This was one of the reasons why the Unions opposed Kurron's retention in this case.

6.      On December 2, 2012 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), in order to, inter alia, "develop a plan to create a financially viable healthcare system to address the needs of IMC's community . . ." See Declaration of Luis A. Hernandez, President and Chief Executive Officer of Interfaith Medical Center, Inc., in Support of Chapter 11 Petition and First Day Pleadings ("First Day Declaration") [Docket No. 2, ¶ 23].  It did so based upon the determination that "reorganizing under chapter 11 was the best alternative available for IMC

4

to maximize its value for all stakeholders, continue to serve its community, preserve jobs, and effectuate any negotiated affiliation or other relationship with one or more other hospitals. Id. at ¶ 24.

7.    Despite the fact that its management services contract had not been approved by the DOH, the Debtor spent considerable time, effort and money in the first two months of this case seeking to retain Kurron's services over the objections of the Official Committee of Unsecured Creditors ("Creditors Committee") [Docket No. 100], the United States Trustee [Docket No. 102], 1199 [Docket No. 104] and NYSNA [Docket No. 106].    The principal reasons provided by the Debtors for doing so were that Kurron's more than 20 years of experience managing Interfaith made them uniquely qualified to handle day-to-day operations and guide the restructuring process, and that, replacing the long-term management team would be catastrophic given the time constraints and challenges of the restructuring process. [Docket Nos. 16 and 117].

8.    As stated in its Closure Motion, the Debtor has negotiated with DASNY and obtained approval of eight interim orders approving limited use of DASNY's cash collateral. Funds advanced to the Debtor by the IM Foundation, Inc., have been excluded from DASNY's cash collateral in each of those orders, subject to the DASNY's reservation of rights to seek a contrary determination from this court. [Docket Nos. 38, 149, 231, 344, 394, 475, 551, 631].

9.    On January 11, 2013, the Debtor filed a notice of its Revised Second Interim Cash Collateral Order. [Docket No. 122].    In the Second Interim Cash Collateral Order, DASNY explicitly conditioned the Debtor's continued use of cash collateral on the Debtor's entry into a memorandum of understanding ("MOU") with Brooklyn Hospital acceptable to DASNY

and the DOH by no later than February 1, 2013. Id. Thus, DASNY, acting at the behest of the DOH, determined the party that the Debtor was to merge its operations with.

10.    On or about February 3, 2013, the Debtor and Brooklyn Hospital entered into an MOU regarding general terms pursuant to which the parties would continue their negotiations and due diligence efforts concerning potential business integration. The MOU was generally non-binding, save for certain key enumerated provisions. Among these were the requirements that: (i) Interfaith appoint a new chief restructuring officer ("CRO"), approved by the DOH and DASNY, to replace Kurron's Corbett Price, and that the new CRO meet weekly with Brooklyn Hospital, the DOH and DASNY to discuss Interfaith's operations and the development of the restructuring plan, (ii) Interfaith refrain from soliciting alternative proposals, and (iii) the MOU could be terminated by, inter alia, the consent of the parties or the determination by either party that the funding or approval conditions of the MOU were not being met. [Docket No. 260]. Thus, the DOH and DASNY, selected the CRO of the Debtor and directed that the Debtor could not negotiate with anyone other than Brooklyn Hospital.

11.    On March 22, 2013, this Court approved the MOU under the condition that the no solicitation provision be allowed to expire unless Interfaith and Brooklyn Hospital entered into definitive agreements by April 19, 2013. [Docket No. 348]. However, the expiration date would be automatically extended by the same amount as any extension that DASNY granted the Debtor with respect to deadlines for filing a plan of reorganization and disclosure statement and the effective date of any plan of reorganization in future cash collateral orders. Id. By operation of this condition, the Fifth and Sixth Interim Cash Collateral Orders

extended the Debtor's prohibition against soliciting alternative proposals until June 18, 2013. [Docket Nos. 394, 475].

12.     The Debtor alleges that Brooklyn Hospital required, and was promised, $1,600,000.00 of State financing to fund due diligence, but that funding never materialized. [Docket No. 602, ¶ 11]. Thus, DASNY precluded the Debtor from negotiating with anyone else and then refused to fund the due diligence of its hand-picked merger partner.

13.     Although the Third Interim Cash Collateral Order required the Debtor to appoint a new CRO acceptable to DASNY by no later than March 4, 2013, this deadline was extended until March 31, 2013 in the Fourth Interim Cash Collateral Order.  [Docket Nos. 231, 344]. On April 5, 2013, John D. Leech, one of the CRO candidates selected by DASNY, was appointed as the new CRO, to provide services including, *inter alia*, developing and implementing restructuring plans in accordance with the MOU and advising on the formulation and execution of alternative restructuring opportunities.  [Docket Nos. 359 and 387].

14.     On February 15, 2013, Eric M. Huebscher, the duly appointed Patient Care Ombudsman for this case, filed his First Report for the period of January 10, 2013 through February 15, 2013 ("Ombudsman's Report") [Docket No. 241], detailing serious concerns about Interfaith related to: regulatory compliance, patient care, patient and employee safety, medical and operational management, staffing and workflow, malfunctioning equipment, risk management, medical malpractice coverage, oversight of physician credentialing, oversight of quality management, labor-management relations, access to information and a lack of engagement by the CRO.  In particular, the Ombudsman's Report raised concerns regarding the lack of security in the Debtor's psychiatric and emergency departments.  The Debtor

responded to the Ombudsman's Report with outright denials and blanket recitations of Interfaith's current practices – the very same practices that created the conditions cited as cause for concern in the Ombudsman's Report.  [Docket No. 242].  With respect to the Ombudsman's concerns about the lack of security in the psychiatric and emergency departments, the Debtor simply gave a brief description of the current practices and asserted that it had enough security officers on duty.  Id. at ¶ 21.

15.    On February 21, 2013, 1199, the Creditors Committee and NYSNA objected to Kurron's fees based largely upon the Ombudsman's Report [Docket Nos. 250, 251, 252].  Both the Debtor and Kurron responded briefly to these objections by essentially asserting that Corbett Price had been fully engaged at Interfaith.  [Docket Nos. 308, 311].  Although not addressed by Kurron, the Debtor also brushed aside the substantive elements of 1199's objection by simply reiterating its belief that many of the Ombudsman's concerns were "either mistaken or misplaced."  [Docket No. 311, ¶ 9]

16.    Despite the Debtor's downplaying of the concerns cited in the Ombudsman's Report, including security concerns, a psychiatric patient at Interfaith was beaten to death by another patient on March 19, 2013.  This incident led the New York State Office of Mental Health to close down the psychiatric unit located in Interfaith's 8 East wing, which never reopened.  According to the Fourth Report of Eric M. Huebscher as Patient Care Ombudsman of the Debtor for the Period from June 14, 2013 to August 14, 2013 [Docket No. 632, ¶ 11],

> The Debtor received authority from OMH to re-open the psychiatric unit previously closed as a result of the homicide in March of this year.  However, given the uncertainty surrounding the possible overall facility closure, management decided not to re-hire and/or staff this unit.  I am told that should circumstances change, management is prepared to bring

> the number of psychiatric beds to pre-closure levels for this
> unit. Management has told me that this would bring substantial
> cash flow improvement to the hospital . . .

Upon information and belief, this closure has cost the Debtor in excess of $600,000.00 per month.

17.    In a letter dated January 30, 2013, the DOH informed Interfaith that Kurron's management contract was not compliant with state regulatory requirements and could not be approved. [Docket No. 194]. The Debtor submitted two separate plans of correction in an attempt to cure the deficiencies in the Kurron contract, which the DOH similarly rejected in letters dated March 15, 2013 and April 25, 2013. [Docket Nos. 328 and 432].

18.    The Seventh Interim Cash Collateral Order conditioned the Debtor's continued use of DASNY's cash collateral on, *inter alia*, the Debtor's submission of a closure plan by no later than June 26, 2013. [Docket No. 551].

19.    The Debtor alleges that although the DOH had agreed to provide it with debtor in possession financing through DASNY to continue operations while developing an alternate restructuring plan, that commitment was later withdrawn. [Docket No. 602, ¶ 18].

20.    On June 25, 2013, representatives of the Debtor, DASNY and the DOH met in Albany to discuss Interfaith's future. [Docket No. 602, ¶ 19]. According to the Debtor's Closure Motion, the "DOH only would consider a restructuring plan for IMC that was submitted to DOH by July 9, 2013, and that would enable IMC to operate outside of chapter 11 without future State funding." Id.

21.    In a letter dated July 19, 2013, the DOH rejected the Debtor's alternate restructuring proposal, the principal reason for so doing being the Debtor's failure to identify and develop partnerships with other health care providers. This was asserted despite the fact

that the DOH and DASNY had precluded any such efforts until June 18, 2013.  Thus, the

DOH and DASNY left the Debtor with three weeks to submit an alternative plan.

22.     The DOH and DASNY then used the threat of withholding DIP financing for the

confirmation of the plan and to fund the closure expenses as a club to force the Debtor to

make the present motion.

23.     It is questionable whether the proposed DIP financing is sufficient.  The proposed

DIP Budget attached as Exhibit 2 to the Second Supplement to the Closure Motion ("DIP

Budget") [Docket No. 627] contemplates the availability of $33,237,000.00 to pay an

estimated $22,708,000.00 to $75,808,000.00 of administrative and priority claims, potentially

leaving the Debtor administratively insolvent.  The proposed DIP Budget estimates severance

and accrued benefit claims at $4,093,000.00 and $2,457,000.00, respectively.  Id.  The

proposed DIP Budget also contemplates potential WARN Act claims of $22,000,000.00.  Id.

Of course, every day that the Debtor remains open reduces that obligation.

## ARGUMENT

## I.     THE CLOSURE MOTION REPRESENTS A COMPLETE ABDICATION OF RESPONSIBLE BUSINESS JUDGMENT BY THE DEBTOR TO THE DOH AND DASNY.

24.     The Closure Motion must be denied because it represents an ill-considered

attempt by the DOH and DASNY to arrogate to themselves the Debtor's independent

business judgment in relation to the immediate implementation of a closure plan.

Additionally, even if the substitution of the DOH and DASNY's business judgment for the

Debtor's were proper, which it is not, there is no good business reason to approve immediate

implementation of the relief requested in the Closure Motion.

25.     In determining whether to approve a debtor's use of assets outside of the ordinary course of business pursuant to Section 363(b) of the Bankruptcy Code, a judge must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." Comm. of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). The Lionel court found that a debtor seeking approval for the use of property of the estate outside the ordinary course of business must articulate some business reason other than the appeasement of major creditors, cautioning that "[i]n fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." Id. at 1071-1071.

26.     The Closure Motion does not merely seek the type of major-creditor driven relief that the Lionel court cautioned against – in fact, the conditions that the Debtor articulates as the business reason for immediate implementation of the closure plan are a direct result of blindly following the hue and cry of the DOH and DASNY throughout this case.  Consider the series of events that led to the DOH and DASNY's current push for immediate implementation of a closure plan:

a. The DOH refused to accept the July 2012 agreement in principle between Interfaith and Brooklyn Hospital because the agreement did not provide Brooklyn Hospital with enough managerial control over Interfaith. From July 2012 to December 2012, Interfaith failed to enter into an agreement in principle with Brooklyn Hospital – presumably as a result of Interfaith's unwillingness to relinquish control of management functions.

11

b. Despite the fact that the DOH must have been aware that control issues were delaying the MOU, the DOH and DASNY failed to object to Kurron's retention during the first few months of this case – even though the DOH had been aware that Interfaith and Kurron had been operating under an unapproved management services contract since at least December 17, 2012. [Docket No. 107]. Furthermore, having already witnessed nearly a year of Interfaith's delay in signing an MOU, DASNY waited for three months after the Petition Date to condition the Debtor's continuing use of its cash collateral upon entry into an acceptable MOU with Brooklyn Hospital. [Docket Nos. 122, 149].

c. The MOU, and the Third Interim Cash Collateral Order, required the appointment of a new CRO, approved by DASNY and the DOH, by early March 2013. [Docket Nos. 231, 260]. However, John D. Leech was not appointed as CRO until April 5, 2013. [Docket No.  Once again, the DOH and DASNY must have been aware at the beginning of this case that appointment of a new CRO was critical to the advancement of a legitimate restructuring plan, yet they failed to act for four months.

d. Although John D. Leech was appointed as CRO to develop and implement restructuring plans, he was precluded under the MOU from seeking out and developing partnerships with other health care providers by the MOU's no solicitation provisions. [Docket Nos. 260, 359 and 387]. He apparently had little or no input into the plans submitted to the DOH. The Unions specifically designate his involvement in this process pursuant to his appointment as an evidentiary matter and require his testimony at the hearing.

e.  The DOH failed to provide Brooklyn Hospital with the HEAL 21 grant and additional funding necessary to conduct due diligence and develop a restructuring plan with the Debtor. [Docket No. 602, ¶s 6, 11].  The DOH also reneged on its commitment to provide Interfaith with debtor in possession financing through DASNY to continue operations while developing an alternate restructuring plan. [Docket No. 602, ¶ 18].  The Unions designate this issue as a disputed factual issue and will examine representatives of the DOH and DASNY on this funding and the other decisions and actions of those agencies in this matter.

f.  Despite the urgency created by the DOH's refusal to provide necessary financing, the MOU's no solicitation provisions continued to limit the CRO's ability to seek out and develop partnerships with other health care providers until June 18, 2013. This left the CRO with only 21 days (13 business days) to put together an alternate restructuring plan in advance of the DOH's newly-imposed deadline of July 9, 2013.

g.  Ultimately, the DOH rejected the Debtor's alternate restructuring plan, and DASNY conditioned its consent to continued use of cash collateral upon immediate implementation of the closure plan, based upon the Debtor's failure to identify and develop partnerships with other health care providers – which it had been largely prevented from doing as a consequence of the DOH and DASNY's prior actions.

27.    Although the Debtor claims that it is exercising its independent business judgment in seeking immediate implementation of the closure plan, it is evident from the Closure Motion that the Debtor is simply complying with the DOH and DASNY's demands.  For

example, in relation to its efforts to develop a restructuring alternative to a transaction with

Brooklyn Hospital, the Debtor states that:

> Further, by the time Mr. Leech and his colleagues from Gordian Dynamis Solutions LLC got up to speed regarding IMC, DOH withdrew its approval of the debtor in possession bridge financing for IMC that previously had been approved to help fund IMC's development of an path to confirmation of a chapter 11 plan.  That loss of needed financing left little time for Mr. Leech, as CRO, and his colleagues to help develop the restructuring plan for which they had been retained.

> . . . IMC promptly advised DOH of certain errors in DOH's July 19 letter regarding the bases DOH stated for rejecting IMC's restructuring plan, clarified various other points raised by DOH, confirmed IMC's restructuring plan was a discussion document subject to revision, and requested to meet with DOH immediately to work together to agree on an acceptable restructuring plan.

> Although this was the first time DOH had required a restructuring plan for IMC to exclude any future State funding, DOH gave IMC only two weeks to submit the Plan.

> IMC believes it presented DOH with a viable business restructuring plan on July 9 that would not require post-chapter 11 State funding for IMC.  IMC also believes that other aspects of IMC's operations such as Behavioral Health could continue without the requirement for greater State funding for IMC than likely would be required from the State when those operations necessarily are transferred to other operators who also would require State funding.  Moreover, throughout its chapter 11 case, IMC has complied with its cash collateral orders, has operated better than the cash collateral budgets approved by DASNY, and has sought to comply with and follow the multiple directives of DOH and its sister agencies as well as DASNY.

[Docket No. 602, ¶s 18, 19, 22, 24].  The clear implication is that the Debtor believes it

would be in the best interest of the estate and its creditors if it were given enough time to

develop an alternate restructuring plan without being hamstrung by crippling restrictions,

shifting requirements and impossible deadlines.

28.    In the alternative, if this court finds that the DOH and DASNY can simply substitute their business judgment for the Debtor's by virtue of threatening to cut off the use of DASNY's cash collateral, they should be required to demonstrate that their business judgment in seeking immediate implementation is reasonable. In this case, limited delay in implementing the closure plan is actually beneficial to the estate because:

    a.    Immediate implementation of the closure plan jeopardizes the Debtor's ability to use the assets of the IM Foundation, Inc. ("IM Foundation") to pay its creditors, whereas a short-term delay will not significant diminish DASNY's cash collateral; and

    b.    Delaying implementation of the closure plan will reduce the likelihood of administrative insolvency.

**A. IMMEDIATE IMPLEMENTATION OF THE CLOSURE PLAN JEOPARDIZES THE DEBTOR'S ABILITY TO USE ASSETS OF THE IM FOUNDATION TO PAY CREDITORS, BUT DELAYING THE IMPLEMENTATION OF THE CLOSURE PLAN WILL NOT DIMINISH DASNY'S CASH COLLATERAL.**

29.    The cessation of hospital operations may impair the Debtor's ability to use money advanced by the IM Foundation to pay its creditors. In bankruptcy, the existence of an interest in property is generally determined by state law. See In re Rodgers, 333 F.3d 64 (2d Cir. 2003). Section 8, Part 1.1 of New York Estates, Powers and Trusts Law ("EPTL") codifies the doctrine of *cy pres*. Pursuant to EPTL Section 8-1.1(c)(1):

> . . . [W]henever it appears to [the] court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purpose as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may . . . make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes,

15

free from any specific restriction, limitation or direction contained therein . . .

30.    In In Matter of Lally, 954 N.Y.S.2d 411 (Surr. Ct. NY 2012), the petitioner requested the Surrogate's Court of New York for Schenectady County to apply EPTL § 8-1.1 to trusts and wills benefitting the St. Clare's Hospital of Schenectady, NY Foundation, Inc. ("St. Clare's Foundation"), a not-for-profit corporation that assisted St. Clare's Hospital in expanding and developing its services to the community.  Although St. Clare's Hospital still existed as a corporate entity, it had relinquished its operating license and its main activities included the collection of receivables, payment of payables and the administration of its debts.  In deciding to apply EPTL § 8-1.1, the Surrogate's Court found that:

> . . . the courts have uniformly held that the intention of a testator in making a general gift to a charitable corporation was the furtherance of the charitable purpose for which the entity was formed as set forth in its charter.  In the case of hospital corporations, such purpose is deemed to be the actual and continued provision of acute patient care services rather than the satisfaction of creditors' claims . . .

> . . . general gifts to a hospital are intended to fund hospital activities, and when the designated hospital's functions have ceased, even if its formal corporate existence continues, the doctrine requires that such gifts be redirected to an active, charitable hospital.

Id. at 418-19 (internal citations omitted).  See also In re Estate of Kraetzer, 462 N.Y.S.2d 1009 (Surr. Ct. NY 1983); Matter of Hummel, 805 N.Y.S.2d 236 (N.Y. Sup. Ct. 2005).

31.    Much like St. Clare's Foundation, the Debtor describes the IM Foundation as a "non-profit organization separate from IMC, [that] supports the charitable, educational, and scientific purposes of IMC." [Docket No. 2, ¶ 10].  To the extent that the IM Foundation is also funded by charitable bequests, the IM Foundation's assets, including the $4,300,000.00 already advanced to the estate, could be redirected toward other charitable purposes if

16

Interfaith ceases to provide patient care services. Given the finances of this case, it would be unreasonable for the Debtor to run the risk of leaving any money on the table. However, the only way to be completely certain that the $4,300,000.00 advanced to Interfaith by the IM Foundation is available to pay the Debtor's creditors is to use it while the hospital continues to operate.

32.    As DASNY has not asserted any claim to the money advanced by the IM Foundation as its cash collateral, using the IM Foundation money to fund operations rather than holding it in abeyance actually preserves DASNY's cash collateral. Considering that the Debtor experiences an average monthly cash burn of approximately $2,100,000.00, the $4,300,000.00 advanced by the IM Foundation could allow the Debtor to continue operating for approximately two months without diminishing DASNY's cash collateral – during which time the CRO could continue to develop an alternate restructuring plan.

**B.  DELAYING THE IMPLEMENTATION OF THE CLOSURE PLAN WILL REDUCE THE LIKELIHOOD OF ADMINISTRATIVE INSOLVENCY.**

33.    The Debtor recently filed a proposed DIP Budget that contemplates the availability of $33,237,000.00 to pay an estimated $22,708,000.00 to $75,808,000.00 of administrative and priority claims. [Docket No. 627]. Among the administrative claims listed by the Debtor are $22,000,000.00 in potential NY WARN Act liability, $4,093,000.00 in severance liability and $2,457,000.00 in liability for accrued but unused paid time off.

34.    The New York State Worker Adjustment and Retraining Notification Act ("NY WARN Act") New York Labor Law ("NYLL") §§ 860 et seq. requires an employer to give its employees at least ninety days' notice of a mass layoff. Id. An employer that fails to provide the required notice is liable to each employee for wages and benefits for each day of the violation. Id.

17

35.     Interfaith sent out NY WARN Act notices on July 30, 2013. The Debtor is confident that it should have no NY WARN Act liability by virtue of the unforeseen business circumstances and faltering business defenses available under the NY WARN Act, but its confidence may well be misplaced. To qualify for the unforeseen business circumstances defense, an employer must establish that a layoff "was caused by business circumstances that were not reasonably foreseeable when the 90-day notice would have been required." 12 NYCRR § 921-6.3. Thus, the Debtor's liability would hinge on whether closure was reasonable foreseeable in late May or early June 2013, at which point the sixth cash collateral order already required the Debtor to submit a closure plan by June 10, 2013. To qualify for the faltering business defense, an employer must, *inter alia*, "be able to objectively demonstrate that a potential customer or financing source would have been unwilling to provide the new business or capital if notice were given." NYCRR § 921-6.2(a)(4). This is likely to be a difficult hurdle considering the publicity surrounding this case and the Debtor's likely sources of financing. On a final note, The NY WARN Act requires that, even if Debtor could successfully raise one of these defenses, it may still incur some liability due to the fact that the NY WARN Act requires that an employer must provide as much notice as practicable. See NYLL § 860-c(2), 12 NYCRR § 921-6.6.

36.     The only certain method for the Debtor to avoid liability under the NY WARN Act, and the protracted litigation that it would necessarily entail, is to continue operating for roughly two more months until to allow the legally mandated notice period to pass. This additional time could also be used to develop an alternate restructuring plan, which would hopefully allow the Debtor to capitalize on the hospital's enterprise value. Upon information

and belief, the reopening of the closed psychiatric unit could further reduce the Debtor's cash drain by over $600,000.00 per month.

## II.    THE DEPARTMENT OF HEALTH MAY LACK THE REGULATORY AUTHORITY TO APPROVE INTERFAITH'S CLOSURE PLAN.

37.    Even if this court determines that the DOH and DASNY usurpation of the Debtor's business judgment with respect to the decision to immediately implement the closure plan was both proper and reasonable, the relief sought in the Closure Motion should be denied because DOH may lack the regulatory authority to approve the closure plan.

38.    On April 1, 2013, the Unions filed a hybrid declaratory action and Article 78 proceeding in the Supreme Court of the State of New York for Kings County against the DOH, the Commissioner of the DOH, and various State University of New York Downstate Medical Center ("SUNY Downstate") defendants seeking, *inter alia*, declaratory, injunctive and other relief to prevent the DOH and the Commissioner from acting to determine whether to close Long Island College Hospital ("LICH") based on the applicable provisions of 10 NYCRR § 401.3 ("Closure Regulations") because they are vague and subjective in violation of the Due Process clauses of the New York State and United States Constitutions and because application of these vague and subjective provisions by the DOH and the Commissioner of the DOH constitute the impermissible arrogation of legislative power in violation of the separation of powers provisions of the New York State Constitution establishing the legislative and executive branches of state government. See Verified Complaint and Petition and Memorandum of Law ("LICH Complaint"), attached hereto as Exhibit D.

39.    Pending a final determination on the injunctive relief requested by the Unions, the Supreme Court temporarily restrained the DOH, the Commissioner of the DOH, and the

SUNY Downstate defendants from taking any action in furtherance of the closure plan for Long Island College Hospital and are directed them to maintain adequate staffing levels. See Temporary Restraining Order, attached hereto as Exhibit E. A hearing on the Defendants' motion to dismiss concluded on August 12, 2013, and the Supreme Court issued an order has issued an order delaying its decision while essentially maintaining the status quo as required by the temporary restraining order to allow the parties time to attempt to negotiate a settlement. See Standstill Order, attached hereto as Exhibit F.

40.    It is in the best interest of the estate to deny the Closure Motion until such time as the Supreme Court issues a final decision on the LICH Complaint. In the event that the Supreme Court determines that the Closure Regulations are constitutionally deficient and the DOH cannot legally approve a closure plan, it will be much more costly to the estate and its creditors for the Debtor to resume operations once the wind-down process has begun than to continue operations.

## CONCLUSION

For all the foregoing reasons, the Unions urge this Court to deny the Debtors' Closure Motion.

Respectfully submitted,

/s/ Suzanne Hepner
LEVY RATNER, P.C.
Suzanne Hepner
Ryan J. Barbur
Attorneys for 1199SEIU United Healthcare
Workers East
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Phone: (212) 627-8100
Facsimile: (212) 627-8182

20

/s/ Avrum J. Rosen
THE LAW OFFICES OF AVRUM J.
ROSEN, PLLC
Avrum J. Rosen
Attorneys for New York State Nurses
Association
38 New Street
Huntington, NY 11743
Phone: (631) 423-8527
Facsimile: (631) 423-4536

Date: August 19, 2013