Hearing Date and Time:
Objection Deadline:

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

*Attorneys for IM Foundation, Inc.,*
  *Creditor and Plan Proponent*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                          :
In re:                                    :
                                          :     Chapter 11 Case
INTERFAITH MEDICAL CENTER, INC.,          :     No. 12-48226 (CEC)
                                          :
                    Debtor.               :
                                          :
------------------------------------------------------------x
```

**DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE
<u>FOR CHAPTER 11 PLAN OF LIQUIDATION</u>**

**WINDELS MARX LANE & MITTENDORF, LLP**156
156 West 56th Street
New York, New York 10019
(212) 237-1000

*Attorneys for IM Foundation, Inc.,*
  *Creditor and Plan Proponent*

# <u>TABLE OF CONTENTS</u>

**Page**

ARTICLE I.       INTRODUCTION ............................................................................ 1

ARTICLE II.      VOTING ...................................................................................... 3

                A.    Voting ................................................................ 3
                B.    Requirements for Confirmation of the Plan ...................... 5
                C.    Contents of the Disclosure Statement ............................ 6

ARTICLE III.     IMPAIRED CLASSES ....................................................................... 7

ARTICLE IV.      GENERAL INFORMATION ABOUT THE DEBTORS ............... 8

                A.    Description and History of Debtors' Business .................. 8
                B.    The Debtors' Prepetition Financial Arrangements .......... 14
                C.    Events Leading to Commencement of the Chapter 11
                        Cases Undercapitalization and the Need for
                        State Intervention ...................................................... 20
                D.    Prepetition Third Party Proposals ................................ 24
                E.    Plan of Closure .......................................................... 28

ARTICLE V.      SIGNIFICANT EVENTS DURING THE DEBTORS'
                CHAPTER 11 CASES ...................................................... 30

ARTICLE VI.     THE PLAN FORMULATION PROCESS ………………………………32

                A.    The Debtors' Perspective ............................................ 32
                B.    The Premise and Summary of the Plan .......................... 34
                C.    Substantive Consolidation for Voting and
                      Distribution Purposes ................................................. 35
                D.    Effective Date ........................................................... 35

ARTICLE VII.    SUMMARY OF THE PLAN ............................................................ 35

                (A)    Administration and Priority Claims ............................. 36
                (B)    Class 1 – Secured Claims ........................................... 36
                (C)    Class 2 – Priority Tax Claims ...................................... 39
                (D)    Class 3 – General Unsecured Claims ............................ 39
                (E)    Class 4 – Membership Interests .................................. 39

ARTICLE VIII.   THE FAIR AND EQUITABLE STANDARD .............................. 40

ARTICLE IX.     ALTERNATIVES TO THE PLAN ................................................ 40

                A.    Continuation of the Case ............................................ 40
                B.    Alternative Plan of Reorganization ............................. 40
                C.    Liquidation Under Chapter 7 ...................................... 41

**ARTICLE X.**      **MEANS OF EXECUTION OF THE PLAN** ................................ 41

**ARTICLE XI.**      **MISCELLANEOUS** ........................................................................ 42

    A.   Retention of Jurisdiction ................................................................ 42
    B.   Rejection of Executory Contracts ................................................. 43
    C.   Payment of Defaults ...................................................................... 44
    D.   Disallowance of Contribution Claims .......................................... 44
    E.   Rights of Subordination ................................................................ 44
    F.   Exclusions of Liability, Injunction and Releases ......................... 44
    G.   Transfer Taxes .............................................................................. 46
    H.   Amendment, Modification, Revocation or Withdrawal .............. 47
    I.   Headings ........................................................................................ 47
    J.   Construction .................................................................................. 47
    K.   Governing Law .............................................................................. 47
    L.   Successors and Assigns ................................................................. 47

    **CONCLUSION** ...................................................................... 48

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

*Attorneys for IM Foundation, Inc.,*
    *Creditor and Plan Proponent*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                        :
In re:                      :
                      :     Chapter 11 Case
INTERFAITH MEDICAL CENTER, INC.,  :     No. 12-48226 (CEC)
                      :
              Debtor.    :
                      :
-------------------------------------------------------------x

## DISCLOSURE STATEMENT

## I.  INTRODUCTION

On December 2, 2012 (the "Petition Date"), Interfaith Medical Center, Inc. ("IMC" or "Debtor")[1] filed its petition in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") instituting a case under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), bearing Chapter 11 Case No. 12-48226 (CEC) (the "Chapter 11 Case").  The Chapter 11 case has been assigned to Honorable Carla E. Craig, Chief United States Bankruptcy Judge ("Judge Craig").

### Retention of Professionals

By Order, dated January 17, 2013, the Bankruptcy Court authorized the Debtor to retain Wilkie Farr & Gallagher, LLP as their Counsel.  By Order, dated January 18, 2013, the Bankruptcy Court granted the Debtor's Application to retain Cohn Reznick, LLP as Financial Adviser to the Debtor.  By Order, dated January 17, 2013 the Bankruptcy Court granted the Debtor's Application to retain Nixon Peabody LLP as Special Corporate and Healthcare Counsel to the Debtor.  By Order, dated December 4, 2012, the Bankruptcy Court authorized the Debtor to retain Donlin, Recano & Company as the Debtor's Claims and Noticing agent.  By Order, dated January 25, 2013, the Bankruptcy Court authorized the Debtor to retain Kurron Shares of America Inc., as Manager, and Kurron Per Sonnel, as the Debtor's Senior Management.  By

---

[1]   Capitalized terms, not defined herein, are defined in Article 1 of the Plan.

Order, dated March 22, 2013 the Debtor was authorized to retain Ernst & Young, LLP as their Bankruptcy Court appointed Independent Auditor.  By Order, dated May 20, 2013, the Bankruptcy Court authorized the Debtor to retain Charles A. Barragato & Co. LLP as Tax Accountants for the Debtor, *Nunc Pro Tunc* to May 6, 2013.  By Order, dated April 5, 2013, the Debtor was authorized to retain John D. Leech as New Chief Restructuring Officer and Gordian-Dynamis Solutions LLC, as Restructuring Consultant.

On December 13, 2012, the Office of the Unites States Trustee for the Eastern District of New York (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") consisting of the following entities:

1. Health Services Retirement Plan
2. Medline Industries, Inc.
3. Jasmine Samuel
4. Ellen L. Flowers, Esq.
5. New York State Nurses Association
6. Sodexho Operations, LLC
7. 1199 SEIU National Benefit Fund and
    1199 SEIU Healthcare Industry Pension Fund

The Bankruptcy Court approved the Committee's retention of Alston & Bird, LLP as their counsel by Order, dated February 13, 2013, and authorized the Committee's retention of CBIZ Accounting, Tax & Advisory of New York, LLC as the Committee's Financial Advisors. By Order, dated December 27, 2012, the Bankruptcy Court directed the appointment of a Patient Care Ombudsman pursuant to Section 333 of the Bankruptcy Code and on January 10, 2013, the U.S. Trustee appointed Eric M. Huebscher the Patient Care Ombudsman.  By Order, dated March 15, 2013, the Patient Care Ombudsman was authorized to retain Diconza Traurig, LLP as his counsel.

## II.    VOTING

On _____, the Plan Proponent filed and served their Disclosure Statement (the "Disclosure Statement") and Plan of Reorganization (Liquidation) (the "Plan") in order to provide each creditor with "adequate information" as such term is defined in Section 1125 of the Bankruptcy Code, to enable such creditor to make a reasonably informed judgment in exercising his, her or its right to vote to accept or reject the Debtor's Plan. (A copy of the proposed Plan is annexed to this Disclosure Statement as Exhibit "A".)

### A.    Voting

This Disclosure Statement is provided to all known holders of Claims against the Debtor and its assets who have a right to vote on the Plan, as well as any party-in-interest who or which has requested to be provided with a copy of same in accordance with Sections 1125(a), 1126(b)(2) and 1129(a)(2) of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. NO STATEMENT OR INFORMATION CONCERNING THE DEBTORS OR ANY OF THEIR ASSETS HAS BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Subsequent to notice and a hearing, the Plan Proponent will request that the Bankruptcy Court enter an Order approving this Disclosure Statement as containing information, of a kind and in sufficient detail, as is reasonably practicable in light of the nature and history of the Debtor's books and records, to enable holders of a Claim(s) against the Debtor to make an informed judgment with respect to acceptance or rejection of the Proponent's Plan.

**THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION DOES NOT CONSTITUTE A RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN OR GUARANTY THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

The Bankruptcy Court established _____ at _____ p.m. (prevailing Eastern Time) as the general deadline for filing proofs of claim in this Chapter 11 Case (the "General Bar Date"), and _____ at _____ p.m. as the deadline for filing a proof of claim by any Governmental Unit (the "Governmental Unit Bar Date") (as defined by section 101(27) of the Bankruptcy Code), with two (2) exceptions: (i) in the event that the Debtor amends its Schedules of Assets and Liabilities, the Debtor must give notice of such amendment to the Claimholder and the Plan Proponent, and the affected Claimholder shall have the later of the General Bar Date or thirty (30) days from the date on which notice of such amendment was given to file a proof of claim; and (ii) except as otherwise set forth in any Order authorizing the rejection of an Executory Contract, in the event that a Claim arises with respect to the Debtor's rejection of an Executory Contract, the Claimholder shall have the later of the General Bar Date or thirty (30) days after the date any Order is entered authorizing the rejection of such Executory Contract. These deadlines and related procedures for filing proofs of claim are described in the General Bar Date Order, which was approved by the Bankruptcy Court on _____ (the "Bar Date Order"). A copy of the Bar Date Order may be obtained from the Administrative Agent's website at _____ or by contacting the Debtor's Administrative Agent:

Donlin, Recano & Company, Inc.

New York, NY 10017

Ballots have been delivered to holders of Claims in each Class that is entitled to vote with respect to the Debtor's chapter 11 case. The Plan **(a) does not provide for payment in full to all creditors and (b) the Debtors' assets on liquidation are not sufficient to pay all creditors in full and, therefore, there are Impaired Claims which holders thereof are entitled to vote on the Plan**. A Claim to which an objection has been filed and remains unresolved is a Disputed Claim. Holders of Disputed Claims are not entitled to vote unless the Bankruptcy Court temporarily allows such Disputed Claim in an amount which it deems proper solely for the purpose of voting on the Plan. To ascertain whether or not your Claim is Impaired you are

directed to consult Article III of this Disclosure Statement which defines the term "impaired" in accordance with Section 1124 of the Bankruptcy Code.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received not later than [_____], 2013 at 5:00 p.m. prevailing Eastern Time (the "Voting Deadline"), at the following address:

> Donlin, Recano & Company, Inc.
>
> New York, NY 10017

Except as otherwise set forth below, for the Plan to be confirmed, it must be accepted by each class of Allowed Claims whose rights are impaired by the Plan. Under the Bankruptcy Code, a class of Claims is deemed to have accepted the Plan if the Plan is accepted by creditors of such Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such class that have voted on the Plan.

The Debtor, in accordance with Section 1129(b) of the Bankruptcy Code, intends to request the Bankruptcy Court to confirm the Plan provided that the Bankruptcy Court finds that the Plan does not discriminate unfairly and accords fair and equitable treatment with respect to each class of Claims or Interests that is impaired under, and has not accepted the Plan.

The Bankruptcy Court has fixed _____, at 10:00 a.m. at the Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 10004, as the date, time and place for the hearing on approval of this Disclosure Statement, and has fixed February 15, 2011, at 10:00 a.m. as the hearing date for confirmation of the Plan (the "Confirmation Hearing"). Any objection to approval of the Disclosure Statement or any objection to confirmation of the Plan must be in writing and must be filed and served on Windels Marx Lane & Mittendorf, LLP, attorneys for the Plan Proponent, with a copy to Alston & Bird, LLP, counsel to the Committee, by _____, in accordance with the procedure described below.

## B.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in Section 1129(a) of the Bankruptcy Code, the Bankruptcy Court shall confirm a Plan only if the following requirements are met:

(1)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(2)    The Debtors have complied with the applicable provisions of the Bankruptcy Code;

(3)     The Plan has been proposed in good faith and not by any means forbidden by law;

(4)     Any payment made by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable;

(5)(a)(i) the Debtors has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in the Plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and,

(A)     the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider;

(6)     Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(7)     With respect to each Impaired Class of Claims –

(A)     each holder of a Claim of such class:

(i)     has accepted the Plan; or,

(ii)    will receive under the Plan on account of such Claim property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date; or,

(B)     if Section 1111(b)(2) of the Bankruptcy Code applies to the Claims of such class, each holder of a Claim of such class will receive or retain under the Plan on account of such Claim property of a value, as of the effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such Claim;

(8)     With respect to each class of Claim:

(A)     such class has accepted the Plan; or,

(B)     such class is not Impaired under the Plan.

(9)     Except to the extent that the holder of a Particular Claim has agreed to a different treatment of such Claim, the Plan provides that

(A)     with respect to a Claim of a kind specified in Section 507(a) of the Bankruptcy Code - on the effective date of the Plan, the holder of such Claim will receive on account of such Claim, in cash, an amount equal to the allowed amount of such Claim;

(10)    If a class of Claims is Impaired under the Plan at least one class of Claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by an insider;

(11)    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan;

(12)    All fees payable to Office of the U.S. Trustee under Section 1930 of Title 28 and to professionals under Section 330 of the Bankruptcy Code, as determined by the Court at the hearing to consider the final allowance of fees, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan or as otherwise agreed to among the parties; and,

(13)    The Plan does not provide for the continuation, after the Effective Date, of payment of any retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code.

The Plan Proponent believes that the Plan satisfies all of the applicable statutory requirements of Chapter 11 of the Bankruptcy Code, that it has complied, or will have complied, with all of the requirements of Chapter 11 of the Bankruptcy Code, and that the proposal of the Plan is made in good faith.

The Plan Proponent believes that the holders of all Claims under the Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code.

At the Confirmation Hearing, the Bankruptcy Court will determine with respect to the Debtor, whether holders of Claims will receive distributions under the Plan of not less than the amount they would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

C.      **Contents of the Disclosure Statement**

NO REPRESENTATIONS CONCERNING THE DEBTORS, ITS BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY OR ASSETS HAS BEEN AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM. UNAUTHORIZED INFORMATION, REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE PLAN PROPONENT OR ITS COUNSEL WHO SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM APPROPRIATE.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS AND CERTAIN FINANCIAL INFORMATION. WHILE THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE IN ALL MATERIAL RESPECTS AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN SUBJECT TO AN AUDIT. THE PLAN PROPONENT HAS MADE EVERY EFFORT TO BE ACCURATE IN ALL MATERIAL RESPECTS AND THE PLAN PROPONENT DOES NOT BELIEVE THAT THE INFORMATION CONTAINED HEREIN CONTAINS ANY MATERIAL INACCURACIES.

## III.      IMPAIRED CLASSES

Under Section 1124 of the Bankruptcy Code, a class of Claims is Impaired under a Plan unless, with respect to each Claim of such class, the Plan:

     (1)    Leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim; or

     (2)    Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

          (A)    Cures any such default that occurred before or after the commencement of the Case;

          (B)    Reinstates the maturity of such Claim as such maturity existed before such default;

(C)     Compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and,

(D)     Does not otherwise alter the legal, equitable, or contractual rights to which such Claim entitles the holder of such Claim.

**NOTWITHSTANDING THE PLAN PROPONENT'S EFFORTS, THE PLAN PROPONENT IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF SUCH INFORMATION IS ACCURATE OR COMPLETE ALTHOUGH THE PLAN PROPONENT BELIEVES THAT ALL INFORMATION CONTAINED HEREIN IS ACCURATE AND COMPLETE.  NEITHER THE BANKRUPTCY COURT NOR ANY PARTY TO THE DEBTOR'S CHAPTER 11 CASE HAS PASSED UPON THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

The Plan Proponent has expended considerable time and effort in examining the Debtor's current and anticipated future financial condition and in developing the Plan, which it believes can provide the best return to Creditor.  Therefore, in the Plan Proponent's judgment, the Plan represents the best possibility for all of the Debtor's creditors to obtain the minimum payment of the Allowed amounts of their Claims.

**NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO ANY MATTER COVERED BY THIS DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAS BEEN AUTHORIZED BY THE DEBTOR.  REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE WHICH ARE OTHER THAN OR INCONSISTENT WITH THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT YOUR DECISION.**

**THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  WHILE THE PLAN PROPONENT BELIEVES THESE SUMMARIES ARE FAIR, ACCURATE AND ADEQUATE STATEMENTS OF SUCH DOCUMENTS, SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY THE ORIGINAL DOCUMENTS.**

## IV.     GENERAL INFORMATION ABOUT THE DEBTORS

### A.     Description and History of Debtors' Business

#### Background

IMC operates a hospital at 1545 Atlantic Avenue, Brooklyn, New York (the "Hospital") and eight (8) medical and mental health outpatient clinics (the "Clinics") with approximately three hundred thousand (300,000) inpatient and out-patient visits annually.  IMC is located in Central Brooklyn (Bedford Stuyvesant), within a 22.2 square mile cluster of fifteen (15) contiguous zip codes and is home to approximately 1.5 million persons.  Central Brooklyn is a densely populated African-American, Caribbean and Hispanic populated urban market with

some of the poorest health indicators and prevalence of chronic disease, with a shortage of accessible primary care providers. Residents are 31% below the Federal poverty level; 21% of whom are uninsured; and, 29% of whom are without a primary healthcare provider. A large part of Central Brooklyn has been designated by the Federal government as a Health Professional Shortage Area.

## Acute Care

On the Petition Date, IMC operated a 287-bed short stay acute care hospital. The 287 beds are distributed among six (6) healthcare areas as follows:

| BED TYPE | NUMBER (#) |
|----------|------------|
| Chemical Dependence/Rehab | 20 |
| Chemical Dependence/Detox | 20 |
| Intensive Care | 13 |
| Med/Surg | 104 |
| Pediatric | 10 |
| Psychiatric | 120 |
| Total Beds | 287 |

IMC also maintains a broad range of community based healthcare programs and services. Many of the programs are regulated or monitored by the NYS Office of Mental Health or the NYS Office of Alcohol and Substance Abuse Services. These programs consist of the following:

1. Behavioral Health Program – Child and Adolescent Clinic
2. Center for Mental Health
3. Chemical Dependence Outpatient Services
4. Intensive Psychiatric Rehabilitation Therapy Program
5. Mobile Crisis Team
6. Partial Hospital Program

## Emergency Department

In addition to the 287-bed acute care hospital and community based programs and services mentioned above, IMC provides emergency services through its Emergency Department (the "ED") to approximately 50,000 visits per year. Most of the aforesaid visits are "treat and release" patients emanating from IMC's immediately surrounding zip codes (11233, 11213, 11216, 11221 and 11238). However, the IMC ED is the locus for ambulatory community care and the triage of behavioral health diagnoses in Bedford Stuyvesant. Approximately 13% of patients from IMC's primary service area seek emergency care in the IMC ED; IMC happens to be the only hospital in their service area.

## Psychiatric Department

It is also important to note that IMC's 120 Psychiatric beds represent 13% of the Psychiatric beds available in the Borough of Brooklyn. And, on any given day, 95.7% of IMC's

Psychiatric beds are occupied, leaving excess capacity of only 5.1 beds on the average day. Taking into consideration solely those hospitals closest to IMC in Bedford Stuyvesant (Kingsbrook Jewish Medical Center, Lutheran Medical Center and Long Island College Hospital), the excess capacity with respect to the 227 psychiatric beds at these facilities, 52% of which are at IMC, excess capacity is 5.5 psychiatric beds for Central Brooklyn and 73.1 beds for the remainder of Brooklyn. IMC's daily census of 114.9 Psychiatric beds occupied daily represents approximately 14% of the Psychiatric beds occupied in the Borough. The chart set forth below provides a broader picture of the psychiatric beds available in Brooklyn and their occupancy rates, numbers, location and excess capacity:

|  | 2011 AVG Daily CENSUS | BEDS | OCCUPANCY | EXCESS CAPACITY |
|---|---|---|---|---|
| Brookdale Hospital Medial Center | 62.6 | 67 | 93.4% | 4.4 |
| Kingsbrook Jewish Medical Center | 31.7 | 33 | 96.1% | 1.3 |
| Lutheran Medical Center | 35.0 | 35 | 100.0% | 0.0 |
| Maimonides Medical Center | 60.5 | 70 | 86.5% | 9.5 |
| Coney Island Hospital | 56.6 | 64 | 88.4% | 7.4 |
| Kings County Hospital Center | 195.8 | 205 | 95.5% | 9.2 |
| Woodhull Medical & Mental Health Center | 124.8 | 133 | 93.8% | 8.2 |
| New York Methodist Hospital | 42.7 | 50 | 85.3% | 7.3 |
| University Hospital of Brooklyn | 45.9 | 73 | 62.9% | 27.1 |
| Long Island College Hospital | 39.9 | 39 | 102.2% | (0.9) |
| **Interfaith Medical Center** | **114.9** | **120** | **95.7%** | **5.1** |
| Total Kings County | 810.4 | 889 | 91.2% | 78.6 |

As stated in the August 15, 2013 "Fourth Report of Eric M. Huebscher as Patient Care Ombudsman of the Debtor for the Period from June 14, 2013 to August 14, 2013" (the "PCO Report"), "IMC currently cares for a disproportionately high number of psychiatric patients." And, "greater than 80% of all psychiatric patients historically admitted to IMC are from the Bedford Stuyvesant area". The closure of IMC will result in an immediate undersupply of approximately 41.4 beds in Brooklyn, which will be exacerbated by the imminent closing of Long Island College Hospital, notwithstanding a recent State Supreme Court order restoring services to their July 19, 2013 level. And, based on the Patient Care Ombudsman's Report, "it is unclear as to whether the immediate and short-term needs of this population will be appropriately served with the closure of IMC." The closing of IMC will result in a psychiatric bed shortage of approximately 81 beds in Kings County.

**Chemical Dependence**

IMC maintains forty (40) beds for chemical dependent patients.  These 40 Chemical Dependence beds represent 33 1/3% of the Chemical Dependence bed capacity in Kings County. The average daily census of Chemical Dependence beds through the first half of 2013 was 29.4 patients per day.  The allocation of Chemical Dependence beds among hospitals in Brooklyn is set forth below:

**INPATIENT CHEMICAL DEPENDENCE BEDS**

| | DETOX | REHAB |
|---|---|---|
| Brooklyn Hospital | 10 | - |
| Coney Island | 15 | - |
| Kings County | 30 | - |
| Lutheran | 8 | - |
| Woodhull | 21 | - |
| **IMC** | **20** | **20** |
| Total Chemical Dependence | 104 | 20 |

**Behavior Health**

IMC also maintains a Behavioral Health Program.  In 2012, in addition to inpatient visits, IMC experienced approximately 94,000 visits to its Behavioral Health clinics.  The 94,000 clinic visits break down as follows:

**BEHAVIORAL HEALTH CLINIC VISITS**

| | 2011 | 2012 |
|---|---|---|
| Chemical Dependence OP Services | 6,377 | 4,865 |
| Center for Mental Health | 24,609 | 24,569 |
| Crisis Outreach Response System | 10,701 | 8,578 |
| Mentally-Ill Chemical Abuser | 4,576 | 4,598 |
| Intensive Psych Rehab Therapy | 2,431 | 2,100 |
| Partial Hospital Program | 3,780 | 2,870 |
| Behavioral Health Program - Adult | 9,501 | 5,502 |
| Behavioral Health Program - Child & Adolescent | 2 | 0 |
| Continuing Day Treatment Program | 20,165 | 18,850 |
| Methadone Maintenance Treatment Program | 0 | 22,072 |
| Total Behavioral Health Clinics | 82,142 | 94,004 |

## IM FOUNDATION, INC.

IMF is a New York not-for-profit corporation, exempt from federal taxation in accordance with §501(c)(3) of the Internal Revenue Code.  In accordance with its Mission Statement, IMF's charitable purpose and mission is as follows:

"The objects and purposes of IM Foundation, Inc. (the "Corporation") shall be exclusively charitable within the meaning of Section 501(c)(3) of the United States Internal Revenue Code of 1954, as the name may be amended from time to time, and without limiting the generality of the foregoing, shall include the following objects and purposes:

(1)     To promote the healthy well being of the Brooklyn community;

(2)     to collect, exchange and disseminate research and information concerning the promotion of the healthy well being of the Brooklyn community;

(3)     to conduct public programs concerning the promotion of the healthy well being of the Brooklyn community;

(4)     to give, convey or assign any of its property outright, or upon lawful terms regarding the use thereof, to other organizations which, in the judgment of the Board of Directors of the Corporation, are engaged in the foregoing purposes;

(5)     to receive, accept, hold, invest, reinvest and administer any funds, gifts, bequests, devises, contributions and property of any sort, whether real, personal, tangible or intangible, without limitation as to amount or value, and to use, disburse or donate the income or principal thereof for exclusively charitable purposes, in such manner as, in the judgment of the Board of Directors  of the Corporation, shall best promote the purposes of the Corporation without limitation, except such limitations as may be contained in the instrument under which such property is received, the Certificate of Incorporation  of the Corporation or any laws applicable thereto;

(6)     to publicly solicit funds in furtherance of the foregoing purposes; and

(7)     to do any other lawful thing incidental to, connected with or useful, suitable or proper for the furtherance of accomplishment of the foregoing purposes.

## Governance

On the Petition Date, IMC and IMF were each governed by a separate Board of Trustees, although Canon Diane Porter, the President and Chief Executive Officer of IMF, is also a member of the IMC Board of Trustees.

On the Petition Date, the Debtor's Board of Trustees consisted of the following individuals:

**Canon Diane Porter,** Chairperson
**Rev. Dr. Howard Williams,** Vice Chairperson
**Bishop Orvis Walker, Jr.,** Secretary
**Jonathon P. Nelson,** Trustee
**Roland R. Purcell, M.D.,** Trustee
**Debra Harmon-Hines,** Trustee

## IMC

**Nathan Barotz, Esq.,** Chairman
**Canon Diane Porter,** Vice Chairperson
**Charles Grannum, DDM,** Secretary
**James Phillips, IV,** Trustee
**Albert Wiltshire,** Trustee
**Brenda Bennett, M.D.,** Trustee

## Catchment Area

IMC is located in the poor and working class community of Bedford Stuyvesant, which is situated in the Central part of Brooklyn, and which covers several zip codes.

Despite recent efforts to revitalize Bedford Stuyvesant, as evidenced by greater investment in the area, the patients served by IMC are largely made up of underserved populations. The population living around IMC consists primarily of groups with lower levels of education and living at higher levels of poverty when compared to the population of New York City as a whole. In fact, the standard of living in Bedford Stuyvesant is relatively low, adult and infant mortality rates are relatively high, and the unemployment rate is significantly higher in Bedford Stuyvesant than in surrounding areas.

## IMC's Employees

On the Petition Date, IMC had a total of approximately fifteen (15) employees. These employees were for the most part, residents of four (4) of the five (5) boroughs in New York City, Yonkers and other locations that are farther afield.

The majority of IMC's employees are members of 1199/SEIU United Healthcare Workers East ("1199/SEIU"). NGH is a party to three (3) separate collective bargaining agreements with (i) 1199/SEIU, covering healthcare workers and (ii) Nurses and (iii) The Committee of Interns and Residents/SEIU ("CIR"), covering interns and residents at the Hospital.

Pursuant to a collective bargaining agreement ("CBA") between IMC and CIR, NGH was to maintain the same level of malpractice insurance as existed in February 1988. CIR has filed a proof of claim asserting the breach of the CBA by IMC for its failure to maintain such malpractice insurance. CIR has also asserted claims on behalf of its bargaining unit against IMC

and its Board of Trustees for breach of their fiduciary duty for failure to maintain insurance coverage or a properly funded self-insurance fund.  In addition, each individual resident executed an employment agreement with IMC which required IMC to indemnify the resident for all claims of professional misconduct done within the scope of their employment, including medical malpractice claims.

In consideration for the release of all of the above Claims by CIR and the individual Interns and Residents, the Plan provides for an injunction in favor of Interns and Residents for as yet unasserted claims for medical malpractice by third parties.

### Debtor's Assets

As of the Petition Date, the Debtor's assets consisted of real property, subject to "use restrictions" under the Internal Revenue Code; personal property; reimbursements from Medicare/Medicaid; payments from the Indigent Care Pool; and accounts receivable.  All of the Debtors' real properties are subject to mortgages and/or liens primarily in favor of the New York City Water Board (the "Water Board"), the Dormitory Authority of the State of New York ("DASNY"), and statutory liens claimed by the Pension Benefit Guaranty Corporation (the "PBGC") as described below.

The Debtor's real property (the "Real Property") consists of (i) 1545 Atlantic  Avenue, the Main Hospital Building, to which IMC holds fee simple title and which is valued by a an appraisal at $50-70,000, with furniture, fixtures and equipment ("FF&E") in place.

On the Petition Date, the Debtor's personal property consisted of (i) cash on deposit in various accounts, (ii) security deposits with Con Edison, Sodexho, Inc., (iii) machinery and equipment, (iv) inventory, consisting of medical supplies on hand, , and (v) accounts receivable from the NYS Bad Debt Charity Care Pools, Supportive AIDS Housing and patient accounts.

In accordance with the Debtor's _____ financial statement, the approximate total value of the Debtor's assets on the Petition Date was $_____, which includes $_____ of IMC non-current assets held by Trustee for the bondholders of the Series 2003 Bonds, whose use is limited.

### B.    The Debtors' Prepetition Financial Arrangements

As of the Petition Date, the Debtor's aggregate long-term indebtedness from borrowed money was approximately $_____.  This indebtedness primarily consists of (i) approximately $_____ evidenced by a mortgage loan from DASNY; (ii)approximately $_____ from the DASNY Restructuring Pool loans; and (iii) approximately $_____ in accrued interest.

**C.    Events Leading to Commencement of the Chapter 11 Cases,
       Undercapitalization and the Need for State Intervention**

**(i)    Operational Issues**

IMC operates its hospital and clinics in an increasingly hostile, stressful and challenging environment.    While IMC relies substantially on Medicaid reimbursement, Medicaid reimbursement rates for community "safety-net" hospitals such as IMC have repeatedly been cut, including cuts of approximately 40% during the period 2010 to 2012.   Also, as stated above, 21% of IMC's adult patients are uninsured, particularly undocumented aliens who make up a substantial segment of the Bedford Stuyvesant population.   Meanwhile, as the costs of providing medical care by IMC and other similarly situated hospitals has continued to increase significantly, the Medicaid reimbursement rates for the healthcare services rendered by IMC has fallen in a number of areas, such as behavioral and mental health, to where the reimbursement is less than the cost of rendering the healthcare service.

**(ii)    Change in Medicaid and Medicare Reimbursement Rates and Lack of
        Revenue-Generating Programs and Services**

Between 1979 and 1983, profound changes took place in the Medicare and Medicaid hospital reimbursement rates and policies.   The Medicare/Medicaid reimbursement system, once based on "cost-based" reimbursement, was terminated and a fixed price or Diagnosis Related Group-based ("DRG") payment system for inpatient hospital services was instituted.   Since that legislation was passed in 1982, and the beginning of the DRG era in 1983, some 1,200 American hospitals have closed, leaving about 5,000 acute inpatient general care hospitals.   This change in the reimbursement system resulted in a continuing reduction in the Medicare and Medicaid payments IMC received, and contributed dramatically to IMC's financial situation, adversely affecting IMC's financial stability.

In addition, because IMC is an independent hospital and not a member of a healthcare network system, IMC was unable to benefit from the more favorable managed care rates provided to the larger health care network systems.   Further, IMC was forced to pay higher prices for supplies because it was smaller than many of its competitors. Also, patient care volumes in profitable areas continued to decline as the competition from other healthcare network systems increased.   IMC lacked the resources to offer amenities necessary to attract new physicians.

To combat certain of the aforementioned negatives, NGH implemented a number of specialty programs in an attempt to bring in more patients and attract new physicians.   These programs, however, were, on the whole, unsuccessful, and despite NGH's operational expense improvements, investment in clinical leadership, programs and equipment and growth of top-line revenue-generating services, NGH still faced severe liquidity issues.   NGH was never able to achieve financial stability or increase its market share.   Together these factors eliminated any possibility for NGH to thrive or even survive as an independent institution.

### (iii)    Reduction in Expense

IMC, both prior to the institution of this Chapter 11 case and to date has taken steps to address the enormous financial issues set forth above caused by reimbursement rate reduction. For example, from 2010 to 2012, IMC cut approximately $30 million of its annual expenses, allowing it to approach the breakeven point in operational revenue and expenses. However, Medicaid and other reimbursement rate cuts at both the State and Federal level imposed subsequently have made it impossible for IMC to service, not its debt, but the legacy debt service it inherited upon birth from Brooklyn Jewish Hospital and St. John's Episcopal Hospital, IMC's predecessors.

### (iv)    Search for Mergers, Affiliations and Collaboration

Having reduced expenses as much as possible to still operate as a hospital, IMC embarked on a new business strategy, imposed somewhat by DOH, to merge, affiliate or collaborate with one or more other hospitals in Central Brooklyn to form a healthcare network which would improve the delivery of healthcare in its catchment area and remain as a hospital facility. As a result, in February 2012, IMC in Bedford Stuyvesant and The Brooklyn Hospital Center ("TBHC") in Fort Greene, Brooklyn jointly submitted an application to DOH for a HEAL 21 grant to fund the development and implementation of a cohesive healthcare system for Central Brooklyn. However, notwithstanding all of DOH's pronouncements, no Heal 21 grant funds have come to IMC.

In a second effort to create a sustainable healthcare system, in July 2012, IMC and TBHC reached an agreement in principle on the terms of a business combination. However, once apprised of the agreement, DOH vetoed this second attempt based upon criteria which IMC and TBHC had not previously been apprised of by DOH, including, among other things, the requirement that TBHC play a much more active parent managerial role than was contemplated by the agreement in principle.

### The Berger Commission

In 2005, in recognition of the serious and systemic problems facing all hospitals in the State, then-Governor George Pataki and legislative officials formed the Commission on Health Care Facilities in the 21st Century (the "Berger Commission"), to undertake an extensive review of all hospitals. In December 2006, the Berger Commission issued its Final Report.

The Berger Commission noted that IMC was a safety net provider, with Medicaid-covered and uninsured patients representing approximately 65% of its inpatient cases, and that its inpatients were living in federally-designated medically underserved area. Furthermore, IMC was plagued by inadequate Medicaid reimbursement, problems collecting from third-party payers, and an inability to draw enough insured patients, causing it to slip steadily further into debt.

## Attempts to Remission the Facility

In a third attempt to create this cohesive healthcare system in November 2012, DASNY, IMC's largest creditor, stepped in and organized a meeting between all of the parties to resurrect the deal between TBHC and IMC  Attendants at the DASNY meeting included key personnel and counsel from DASNY, TBHC and IMC; however, while key to the success of the endeavor and invited, DOH did not attend the meeting.   Despite DASNY's efforts, the IMC/TBHC meeting did not result in an agreement between TBHC and IMC that would have eliminated the need for an IMC Chapter 11.   Thus, with threats of cut-off of funds by both DOH and DASNY, IMC filed for Chapter 11 without a restructuring plan or the substantial benefit of having a potential merger or affiliation partner.

### Restructuring Efforts

Continuing after its Bankruptcy filing, IMC at DOH's urging, continued working to develop a partnership/collaboration plan with TBHC to create a financially viable healthcare system in the Bedford Stuyvesant/Fort Greene communities.   IMC also sought to engage in discussions regarding the terms of a potential affiliation with one or more of the following Brooklyn hospitals:

### D.    Prepetition Third Party Proposals

Notwithstanding the foregoing, IMC remained steadfast in its mission to provide the Central Brooklyn community with the much-needed medical services it deserved but would otherwise be without.   That that end, IMC consulted with DOH and DASNY and sought proposals from entities interested in partnering with IMC to assist them in their effort to sustain quality community-based healthcare in the IMC catchment area.

### (i)    The TBHC MOU

IMC and TBHC, after many meetings with DOH and DASNY and among themselves, entered into a Memorandum of Understanding (the "TBHC MOU") that IMC believed would help reconfigure, enhance, and expand available resources to improve the provision of healthcare to the Central Brooklyn community and in Brooklyn generally.   In the MOU, TBHC agreed that there would be good faith efforts to maintain IMC as a general hospital with inpatient services. However, much to IMC's dissatisfaction, DOH insisted that the TBHC MOU also include a provision precluding IMC from soliciting alternative relationships with surrounding hospitals while TBHC performed its due diligence on IMC.   Those non-solicitation/exclusivity provisions were included despite IMC's insistence otherwise solely because DOH (and DASNY) required IMC to enter into the TBHC MOU under those terms.   On March 22, 2013, and after questioning the necessity of the non-solicitation/exclusivity provisions, the Bankruptcy Court approved IMC's entry into the TBHC MOU.

The TBHC MOU also set forth the terms pursuant to which IMC and TBHC would continue their IMC due diligence efforts, hopefully resulting in an IMC/TBHC business integration.   However, although months passed, TBHC never initiated its due diligence process

despite repeated attempts by IMC to facilitate and kick start that effort. Subsequently, IMC was advised that before TBHC would commence any due diligence on IMC it required and had been promised $1.6 million in State financing to fund TBHC's due diligence. However, as with the HEAL 21 grant money, that funding never materialized. During that extended delay, the TBHC MOU precluded IMC from pursuing any other alternative transaction.

### (ii)    Other Attempts by IMC

As TBHC sought to benefit from the diversion and potential closure of LICH, IMC worked feverishly to identify and pursue alternatives that would preserve hospital healthcare operations at IMC. During the extremely limited time available to IMC to explore the alternatives to TBHC, IMC's efforts did not realize an affiliation with a third party healthcare provider that would support operations by IMC and allow IMC to continue its hospital operations. Nevertheless, IMC did develop a proposed restructuring plan that would have created a stand-alone hospital restructuring of IMC. At the same time, IMC obtained an agreement with DOH (through DASNY) to provide IMC with debtor-in-possession financing to permit IMC to continue its operations while a comprehensive restructuring blueprint for many of Brooklyn's hospitals was being developed or until a potential stand-alone plan for IMC could be developed.

### Plan of Closure[2]

At a meeting with IMC on June 25, 2013, and by letter, dated June 25, 2013, DOH informed IMC that DOH would only consider a restructuring plan for IMC that was submitted to DOH by July 9, 2013, and which plan would enable IMC to operate without future State funding. DOH imposed the pre-requisite of no State funding even though (a) IMC's plight is one of the main reasons given by Gov. Cuomo to U.S. Department of Health and Human Services ("HHS") to support his request that HHS grant New York a $10 billion Medicare waiver[3] and (b) even though certain operations of IMC, such as Behavioral Health, would if not provided by IMC, must be transferred to other operators who then would require comparable or higher State funding than IMC would need to continue its operations. But, DOH's only alternative for IMC, was that if IMC agreed to a plan of closure for its hospital, then IMC would receive debtor-in-possession financing to facilitate that closure. (DOH/DASNY recently agreed to provide IMC with $15 million in DIP financing for that purpose.)

---

[2] On July 30, 2013, the Debtor filed a Motion for Entry of Orders Pursuant to Sections 105(a), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtor to Continue the Implementation, in Accordance with New York State Law, of a Plan of Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics and Practices.

[3] Indeed, in his May 7, 2013 letter to HHS Secretary Kathleen Sebelius seeking an 1115 Medicaid waiver amendment, New York State Governor Andrew Cuomo referred to IMC and other Brooklyn hospitals in danger of closing as "essential components of the health care services system in Brooklyn". Governor Cuomo also stated that "the outcome will be disastrous" if those hospitals close because among other things, "[a]ccess to care will be compromised and the remaining health care providers in the borough will be destabilized." In fact, as IMC is the primary acute care provider to its community, the failure of IMC to survive likely will have serious consequences for the provision of healthcare in that community. Consequently, IMC consistently has sought every means available for maximizing the chances for its survival.

**The Closure Plan and Related Matters**

IMC believed it presented DOH with a viable business restructuring plan that would not require post-chapter 11 State funding for IMC. IMC also believes that operations such as Behavioral Health could continue without greater State funding for IMC than likely would be required from the State when those operations are transferred to other operators who also would require State funding. Moreover, throughout its chapter 11 case, IMC has consistently operated better than the cash collateral budgets approved by DASNY. IMC submitted a form of the Closure Plan to DOH on July 25, 2013 for approval. In connection therewith, IMC also authorized the distribution of WARN notices to all of IMC's employees to the extent, if any, such notices are required by applicable law based on the impact of the Closure Plan. Until the Closure Plan is approved by this Bankruptcy Court, IMC is continuing its normal operations while preparing to implement the Closure Plan. IMF objects to this Bankruptcy Court's approval of the implementation of the Closure Plan.

The Plan of Closure was negotiated with DOH, OMH and OASAS and, as summarized below, provided for the following: (i) the discontinuation of certain services provided by the Hospital, (ii) the transfer of outpatient services provided by the Hospital and the D&TC to IFH and (iii) arrangements for the disposition of other Hospital activities. All patients of the Hospital were notified of the closures and/or transfer of services.

The Plan of Closure provides that the Hospital (i) will cease accepting new admissions as of midnight on September 12, 2013, (ii) would discharge or transfer inpatients as soon as safely possible and (iii) would terminate operations of its hospital-based clinics and off-site clinics designated for closure. Outpatient services designated for transfer to new sponsors would continue to provide services without interruption.

The following represents the disposition of healthcare services at IMC under the Closure Plan:

**Services Discontinued**

1)      *Emergency Services*: The Emergency Department will close September 11, 2013. The following entities were advised of the Hospital's emergency department closure and diversion of patients elsewhere: (i) FDNY 911 ambulance service and (ii) the Regional Emergency Medical Services Council of New York. The FDNY is responsible for routing all emergencies to area emergency departments.

2)      *Inpatient Services*: The Hospital inpatient services will cease accepting new admissions as specified in the Plan of Closure on September 12, 2013. The Hospital continued to provide care to existing patients, and enlisted the assistance of DOH in finding suitable transfer facilities for patients not readily transferred or discharged in the course of ordinary care.

a)      *Surgical Services*: Surgical Services will cease August 26, 2013.

b)      *Substance Abuse Services*: The Hospital notified OASAS of the closure scheduled for November 11, 2013;

c)      *Mentally Ill Chemical Abuse Inpatient Services*: The Hospital notified the New York Office of Mental Health ("OMH") of the closure; and

d)      *Psychiatric Inpatient Services*: The Hospital notified OMH of the closure.

### Other Arrangements

The Plan of Closure made arrangements for the following Hospital matters during and after Hospital closure:

- Records management and retention;
- Notifications to patients, applicable regulatory entities, employees, state and municipal public services, the public, and elected officials and civic leaders;
- Disposition of hazardous materials;
- Medical equipment;
- Pharmaceuticals;
- Equipment;
- Supplies and inventory;
- Hospital facilities;
- Human resources;
- Medical staff; and
- Graduate medical education.

## V.  SIGNIFICANT EVENTS DURING THE DEBTOR'S CHAPTER 11 CASES

Based upon their lack of liquidity and their depressed income from operations, the Debtor determined to file the Chapter 11 Cases.

### First Day Motions

On or shortly after the Petition Date, the Debtor filed a number of motions to administer these Chapter 11 Cases in a timely and efficient manner. Pursuant to those motions, the Bankruptcy Court entered Orders that, among other things, granted the Debtor the authority to:

- establish procedures for payment of professionals;

- pay certain sales and use taxes and direct banks and other financial institutions to honor all checks and electronic payment requests;

- extend the period during which utility companies may not alter, refuse, or discontinue services to the Debtors;

- pay certain prepetition accrued wages, salaries, medical benefits, and reimbursable employee expenses;

- continue use of the cash management system and maintain existing bank accounts;

- authorize the entry into a postpetition financing agreement with DASNY for use of Cash Collateral;

- authorize, but not require, the payment of prepetition wages and obligations related to Medical Providers; and,

Three (3) significant events early in these chapter 11 cases were the entry of:

(A)     the Final Order (i) authorizing the Debtors to incur secured post petition indebtedness of approximately $15,000,000.00 from DASNY (the "DASNY DIP Loan"), (ii) granting DASNY Senior Security Interests and Superpriority Claims, (iii) authorizing the Debtor to use Cash Collateral, (iv) granting DASNY adequate protection and (v) other related relief;

## The Patient Care Ombudsman

On January 10, 2013, the U.S. Trustee appointed Mr. Eric M. Huebscher to serve as the patient care ombudsman required by 11 U.S.C. 333(a)(1)(the "PCO") to monitor the Debtor's quality of patient care and to represent the interests of the Debtor's patients.  The Debtor has cooperated with the PCO as he evaluated the Debtor's efforts in all healthcare operations.  The PCO filed a 4th report regarding same on August 13, 2013 in which he generally found the quality of patient care to have been effected in a professional manner.

## The Records Retention Agreement

In the course of the Debtor's provision of healthcare services, the Debtor has generated a large volume of patient medical records and pathology slides (the "Patient Records").  Under various federal and state laws, the Debtor has obligations with respect to the long-term storage and provision of the Patient Records to patients upon receipt of appropriate requests.  In order to provide for the discharge of these obligations in accordance with the requirements of law, the Debtor proposes to enter into an agreement, subject to Bankruptcy Court approval, with CitiStorage LLC and Iron Mountain.

**IMF's Entry**

It was during the above process and weeks prior to DOH's above determination that the Board of IMF, after discussion and retaining legal advice, determined that its Mission Statement supported and voted to retain Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") to develop a plan for IMC which would create a "New IMC", re-modeled, re-positioned and re-purposed as a healthcare facility and provider in the Bedford Stuyvesant, Central Brooklyn community.

In making this determination, IMF's Board considered the following factors concerning A&M:

- A&M has extensive experience with Safety Net Hospitals, CBOs and FQHCs and is currently engaged in similar projects throughout the country. Furthermore, A&M were the architects of the North General Hospital model of inner-city/urban safety-net hospital restructuring to meet the healthcare needs of the surrounding community;

- A&M's knowledge of the Brooklyn hospital markets is unmatched as over the past five (5) years, A&M has worked with five (5) hospitals in Brooklyn in various capacities and has developed a large repository of knowledge in serving both hospitals and their surrounding communities;

- A&M has worked with numerous hospitals in New York State and is dedicated to the serving the needs of their constituents; and

- A&M has hands on management experience that allows them to seamlessly step in and execute.

Immediately following their engagement and even prior to their formal retention by IMF, A&M reviewed a large range of data to develop an overview of IMC's current situation as buttressed by A&M's local market knowledge and deep experience with safety-net providers, their challenges and opportunities. A&M's range of data on IMC and the provision of healthcare in Central Brooklyn was, in the first instance derived from:

- Review of publicly available data and published analyses of market conditions, health status, and health disparities in Central Brooklyn from the New York City Department of Health and Mental Hygiene; other consultant reports and analyses; market studies of health disparities and access in Central Brooklyn; and Emergency Department utilization studies. Other external review included New York State "SPARCS", Hospital, Emergency Department and Ambulatory care data. A&M also received and reviewed information from IMC, although only partially complete and currently lacking some financial detail, inpatient data, ambulatory care/clinic data and employee data.

Most importantly, A&M immediately engaged in preliminary discussions with potential partners and parties to consider asset transfers, if necessary. A&M contacted fifteen (15) parties, held in-person meetings or conference calls with twelve (12) of those parties, received confirmed interest from four (4) groups and is in receipt of one (1) written expression of interest. Several of the seven (7) parties not expressing interest did indicate a strong interest in learning more and delving deeper into IMC's operations and financial statements. The organizations A&M contacted and with whom A&M is having continuing conversation as it assembles the model for a "New IMC" are listed below:

| DATE | TYPE | ORGANIZATION | POINT OF CONTACT |
|------|------|--------------|------------------|
| July 25 | FQHC | Harlem United/HelpPSI/Housing Works | Paul Vitale-CEO; Charles King-CEO |
| Aug 2 | FQHC | The Institute for Family Health | Neil Calman, MD, ABFP, FAAFP-President/CEO |
| Jul 29 | Hospital | HHC-Kings County/Woodhull, Coney Island | LaRay Brown-SVP of Corporate Planning, Community Health & Intergovernmental Relations |
| Jul 30 | Hospital | Wyckoff Heights Medical Center | Ramon Rodriguez-President/CEO |
| Jul 30 | FQHC | Sunset Park Health Council | Larry McReynolds-CEO |
| Jul 30 | Hospital | Brookdale University Hospital and Medical Center | Mark Toney-President/CEO Steven Korf-Chief Operating Officer |
| Jul 30 | Hospital | New York Methodist Hospital | Ed Zatberg-CFO |
| Jul 30 | Hospital | Kingsbrook Jewish Medical Center | Linda Brady-CEO |
| Jul 31 | FQHC | Community Health Care Network | Catharine Abate-President/CEO |
| Aug 5 | FQHC | Bedford Stuyvesant Family Health Center | Patricia Fernandez-CEO |
| TBD | FQHC | The Floating Hospital | Sean Granahan-CEO |
| TBD | Hospital | Downstate | John Williams, MD-CEO |
| TBD | Hospital | New York Community Hospital | Lin H. Mo-CEO |
| Aug 1 | Hospital | Maimonides | David Cohen-SVP of Clinical Integration |
| Aug 2 | Hospital | The Brooklyn Hospital | Richard Becker-President/CEO |

A.    **The IMF Perspective**

Based on A&M's initial observations, assessment of public data and limited access to hospital data, IMC is an important locus for inpatient behavioral healthcare and a less relevant resource for inpatient admissions in central Brooklyn. The ED is functioning as a de-facto primary care resource and behavioral health entry point. These are A&M's conclusions after considering the following factors：

(A)    IMC serves a population with a disproportionately high disease and chronic disease burden;

(B)    Inpatient admissions are significantly skewed to behavioral health admissions; medical surgical admissions do not appear to favor traditionally higher economic yield surgical cases.

(C)    Behavioral Health appears to be IMC's essential franchise.  As set forth above, the regional behavioral health resources appear to be operating close to capacity.  Currently, 33% of inpatient chemical dependency and capacity in Kings County is inpatient behavioral health resources not likely sufficed by existing market resources;

(D)    ED volume is skewed to Level II, III and IV encounters, many of which appear to be related to Ambulatory Sensitive Conditions and behavioral health encounters;

(E)    Closure of IMC would result in an undersupply of approximately 41.4-81 psych beds in the Central Brooklyn community;

(F)    Primary care services are in general undersupply in IMC's primary service area.  IMC and the FQHC operations in the region appear undersized in comparison to unmet community needs.  FQHCs should be considered as an option for IMC based on their community orientation and their superior reimbursement capacity;

(G)    Training programs are large and may not be well supported by IMC's patient volume in the long term.  Current resident capacity in Brooklyn may not be able to sustain the absorption of IMC's residents.  Restarting the training programs in the new ambulatory environment should be an important priority; and

(H)    Significant interest from providers, FQHCs and CBOs, to partner with IMC exists.


From IMF's perspective, the first step in the restructuring process was the review of IMF's operations and potential operations with a view to continuing the provision of healthcare services from the Facility.  The IMF Board remained steadfast in its commitment and mission to fulfill its obligations to ensure the continued provision at the Facility of much-needed healthcare and medical services to the Central Brooklyn community.  To that end, IMF and its Board had consulted with various parties, private and public, interested in partnering or affiliating with IMC to assist the Board in their efforts to sustain quality community-based healthcare services in the IMC catchment area, revisited consultations and proposals along with their consultants, Alvarez & Marsal Healthcare Industry Group, LLC ("Alvarez & Marsal"), and counsel to arrive at a structure of a remissioned IMC which, unlike the situations at other closed hospitals (St. Mary's, Victory Memorial, Caritas and Parkway) would leave a fully functioning healthcare facility in place and would satisfy the Board's fiduciary obligation to the Central Brooklyn community.

Based upon the observations and review of data to date, A&M developed an initial draft "IM Foundation Plan" which, in short, retains some "bed" capacity; stabilizes and expands primary care access; provides a "soft landing" for community programs; and, retains many of these healthcare services at their current locations.  The IM Foundation Plan provides for IMC to remain a base for a sustainable healthcare asset for Central Brooklyn.  The following chart compares IMC's current state with the IM Foundation Plan's proposal for a future re-purposed and remodeled IMC and identifies IMC's potential partner options in this endeavor:

| IMC's CURRENT MODEL | IMF PLAN FUTURE MODEL | IMF PLAN PARTNER OPTIONS |
|---|---|---|
| Behavioral Health IP and OP services | New operator retained, OP and; IP services retained | New operator (for-profit or non-profit) will be identified to retain some inpatient behavioral health and crisis services.  Ambulatory services will be coordinated with the ambulatory care partner |
| Hospital based ambulatory care services | FQHC operates ambulatory care services | Transition the existing ambulatory services to a FQHC operator |
| Hospital Based Training Programs | Ambulatory care based GME model. Dental residency retained and expanded | FQHC will develop a Teaching Health Center program and absorb/expand the current Dental residency program. Other primary care GME options will be explored |
| Grants, Contracts, etc. | Grants and program support contracts transition to ambulatory care operator | FQHC operator will assume grants, contracts and will continue programs |
| Real estate and other assets | Assets re-purposed to provide ambulatory and other healthcare related services | Re-purposing plan will develop a leasing model for operators of healthcare services such as SNF, ALF, Physical Rehab, LTC, healthcare education, other education services. Some assets will be transitioned to the ambulatory care partner to support community primary care access |
| Short-Stay Acute Care Hospital | No inpatient services | Regional IP hospitals can absorb low acuity admission volume |
| Emergency Services | Retain and expand urgent care; retain and expand primary care services | FQHC will assume primary care and urgent care; extended hours increase access; community education will help change habitual ED use |

It is respectfully submitted that the IM Foundation Plan is far superior to the Closure plan submitted by IMC.  The IM Foundation Plan retains healthcare service and jobs for the Central Brooklyn community, builds on the Brooklyn Jewish Hospital/St. John's Episcopal Hospital/IMC legacy, ensures that the Central Brooklyn community will have access to reliable and sustainable primary and urgent care services and responds to the concerns voiced by DOH. A comparison between the IMC Closure Plan and IM Foundation Plan makes those distinguishing factors evident:

| IMC CLOSURE PLAN | IM FOUNDATION PLAN |
|---|---|
| Behavioral health beds close; detox and drug rehab beds Close; patients "distributed" to the community | Behavioral health beds retained with a new operator |
| Ambulatory behavioral health dispersed to other community providers, services not retained at current sites of care | FQHC operator assumes control of behavioral health and ambulatory care operations, services retained in place, operated under medical home model |

| Primary care site volume dispersed to other community providers; IMC has begun discussions with hospitals to assume ambulatory care volume | FQHC operator assumes ambulatory care at current locations; community facing operation that includes expansion of services at current sites; addition of primary medical home model |
|---|---|
| Training programs discontinued, residents distributed to other programs | FQHC can develop a teaching health center GME program for primary care and retain dental residency. Behavioral health operator can assume psychology residency program |
| Emergency services discontinued | Urgent care services retained by the FQHC operator; both urgent care and primary care locations offer extended hours and community outreach to teach the community how to access the expanded resources |
| Grants, contracts, and the programs they support will terminate | Grants and contracts are transferred to the FQHC provider and retained in the community |
| In-patient services discontinued | In-patient services are not in the IM Foundation Plan |
| Real estate sold, no healthcare purpose retained | Hospital property will house behavioral health services, ambulatory care services, urgent care and a number of other healthcare and community oriented businesses as tenants of the property paying rent to "New IMC" for the benefit of DASNY |

The outcome of the review by A&M on behalf of IMF and the search for an answer to IMC's financial dilemma is captured in the outlines of the disposition of IMC's assets and the remission of the Facility as a provider of healthcare services through Third Party providers. The Plan embodies the transition of the Facility to (i) an FQHC with an urgicenter, (ii) partner with a third party provider for behavioral and psychiatric health and detox and rehab, and (iii) a 100-bed inpatient facility.

**B.**     **The Premise and Summary of the Plan**

The Debtors have their proposed Plan on file with the Bankruptcy Court, which provides for treatment of the various creditor constituencies as follows:

-   Administration and Priority Claims
Class 1 -  Secured Claims
Class 2 -  Priority Tax Claims
Class 3 -  General Unsecured Claims
Class 4 -  Membership Interests

The Plan Proponent's Plan provides for payment in full of Administration and Priority Claims. Class 1, Secured Claims, consisting of two (2) subclasses, (i) DASNY, who is undersecured and Impaired and, therefore, entitled to vote on the Plan and (ii) the New York City Water Board, which is oversecured and unimpaired, and the PBGC, which is undersecured and Impaired. There are no Class 2, Priority Tax Claimants. The two (2) subclasses of Class 3, General Unsecured Claims, are Impaired and entitled to vote on the Plan. There will be no distribution to Class 4, Membership Interests.

C.    **Effective Date**

The Plan provides for the Effective Date to be the first Business Day upon which each of the conditions in Article 14 of the Plan has been satisfied or waived pursuant to section 14.3 of the Plan and the tenth (10th) day after entry of the Order of the Bankruptcy Court confirming the Plan is final and, if an appeal is pending, there shall be no order entered staying the Confirmation Order.  The Plan Proponent shall confirm and consummate the Plan with respect to IMC within one hundred eighty (180) days after entry of that Confirmation Order.

## VII.    SUMMARY OF THE PLAN

**THIS IS A SUMMARY OF THE PROVISIONS OF THE PLAN AND, ACCORDINGLY, IT IS NOT AS COMPLETE AS THE FULL TEXT OF THE PLAN, WHICH ACCOMPANIES THIS  DISCLOSURE STATEMENT AS EXHIBIT "A" hereto. THE PLAN SHOULD BE READ IN ITS ENTIRETY.**

The Plan is based upon the Plan Proponent's analysis and determination that (i) the Debtor's operations cannot generate sufficient revenues to sustain the Hospital in the absence of substantial financial support from the State of New York and/or the Federal government, (ii) such financial assistance from the State of New York and/or the Federal government is not forthcoming, and (iii) without such financial assistance there are insufficient assets held or generated by the Debtors to (a) satisfy in full the Claims of Secured, Administration, Priority (including Tax Priority) and General Unsecured Claimants and (b) provide a distribution to the holders of the Membership Interests.

### Summary of the Designation and Treatment of Classes

The Plan provides for Administration and Priority Claims, three (3) classes of creditors and one (1) class of Membership Interests.

**(A)    Administration and Priority Claims**

This Class consists of all of the costs and expenses of administration, including consultant, attorneys' and accountant's fees, awarded by the Bankruptcy Court and payment of any quarterly fees due to the Office of the U.S. Trustee.  These claims shall be paid in full, in cash, on the later of the Effective Date or the date such claims becomes an Allowed Administration or Allowed Priority Claim, unless paid prior thereto, unless some other agreement between the Debtors and the claimant is reached and approved by the Bankruptcy Court.

**(B)    Class 1 - Secured Claims**

This Class consists of Claims secured by assets of the Debtors.  The members of this Class and their claims with respect to each Debtor, consists of the following:

(i)     Dormitory of the State of New York (Loan Agreement and Mortgage);

(ii)    Dormitory Authority of the State of New York (Restructuring Pool);

(iii)   Dormitory Authority of the State of New York (Mortgage interest and unpaid fees);

(iv)    Dormitory Authority of the State of New York (premium on mortgage bonds);

(v)     The New York City Water Board (water charges); and

(vi)    The Pension Benefit Guaranty Corporation (unfunded contributions).

1.      DASNY's four (4) claims total $_____, secured by the Debtor's real property, machinery, equipment, instruments and patients accounts receivable.  DASNY also holds Debtor-in-Possession, Super Priority and Administration Priority Claims.

In satisfaction of the secured portion of its Claim, which Secured Claim, if the Plan is confirmed, shall be valued at $_____ based upon appraisals of IMC's Real Property DASNY (or its designee) shall receive, subject to the approval of the Bankruptcy Court in the Confirmation Order, (i) all net income from the use and occupancy of the IMC Hospital by third party healthcare providers and (ii) fee simple title to any non-utilized Real Property located at 1545 Atlantic Avenue, Brooklyn, New York, subject to the liens of the Water Board and the IFH Lease (iii), any furniture, fixtures and equipment ("FF&E") and other assets that DASNY in its sole discretion believes is not necessary for the continuing healthcare mission at the Facility, (iv) the assignment of all Leases, (v) the assignment of any grants or other funding that the Debtor may receive from the United States and/or New York State, which grants or other funding may be used as a source of payment of the Debtor's Administration, Priority and other Secured Claims, and (vi) a full and general release of any and all claims in respect to the Debtors.

2.      The New York City Water Board (the "Water Board") holds one (1) claim in the amount of $_____, undisputed by both IMC and DASNY and secured by the Real Property which, by statute, primes DASNY's secured claims.  In complete and full satisfaction of its statutory lien claim, the Water Board shall receive payment in full in Cash from IMC and DASNY.  IMC waives any right to contest the validity of such lien and IMC has agreed, subject to Bankruptcy Court approval, that in the event that IMC, and/or DASNY, fails to satisfy the Water Board's claim within twelve (12) months, the Water Board may proceed to enforce all of its rights under non-bankruptcy law, without resort to the Bankruptcy Court.

The PBGC holds _____ contingent estimated Impaired Claims, dated _____, against the Debtor of which _____ proofs of claims against the Debtor are for $_____ plus interest, for the statutorily required minimum funding contributions due to the Pension Plan under U.S.C. §§412(c)(11) and 430 and 29 U.S.C. §1082(c)(11), secured by statutory liens.  These Claims are undersecured and subject to the oversecured claim of the Water Board and the undersecured Claims of DASNY and shall vote as a member of Class 3 Claims. The _____ remaining PBGC contingent estimated Claims against the Debtor are for (i) the unfunded benefit liabilities the Pension Plan under 29 U.S.C. §1362(b), totaling $_____; (ii) the unliquidated statutory liability to the Pension Plan for any shortfall and waiver amortization charge under 29 U.S.C. §§1362(c) and 1368; and (iii) the insurance premiums owed to PBGC

with respect to the Pension Plan under 29 U.S.C. §1306 (a)(3) and (7) totaling $_____.
The total approximate amount of PBGC's Claims is $_____..

**(C)      Class 2 – Priority Tax Claims**

      This Class consists of Priority Tax Claims entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.  The sole holder of a Claim in Class 2 is the PBGC.  Pursuant to the provisions of Section 1129(a) of the Bankruptcy Code, any such taxing authority shall receive in full settlement of its Claim an amount in cash equal to the total amount of its Priority Claim as allowed, payable on the Effective Date.

**(D)      Class 3 - General Unsecured Claims**

      This Class consists of the Claims of (i) unsecured non-priority undersecured creditors and (ii) medical malpractice claims.  On the Effective Date, all unsecured nonpriority and undersecured creditors in Class 3 will receive, in full and final satisfaction of its Claims, its pro rata share of proceeds from the Liquidation Trust.  Medical Malpractice claimants shall receive in full and final satisfaction of their Claims as estimated by the District Court or liquidated through the Mediation Procedures provided for in Article 7 of the Plan, a pro rata share of the Liquidation Trust.

**(E)      Class 4 – Membership Interests**

      This Class consists of the interest in the Membership Interest in IMC held by its Board.  There shall be no distribution to Class 4 claimants.  To the extent necessary, the Membership Interests in the Debtor shall be dissolved.

      3**.      Additional Provisions of the Plan**

      DOH shall make a determination, pursuant to its regulatory authority, that the continued use of the Real Property for healthcare purposes is necessary to the preservation of healthcare services in the Central Brooklyn community.  And, the Charities Bureau of the New York Attorney General's Office and a Justice of the Supreme Court of the State of New York, County of New York, shall approve the dissolution of the Debtor under the New York Not-for-Profit Law and the disposition of their assets.

      The Debtor are obligated to comply with certain covenants contained in the Plan until the payment in full of the amounts due to General Unsecured Creditors.  Accordingly, the Plan provides for the procedures to be followed in the event objection or opposition is made to the allowance of the Claims of any creditor.  All other miscellaneous provisions of the Plan relate to the retention of jurisdiction by the Bankruptcy Court.

      Until the payments provided for in Articles 3 through Article 7 of the Plan shall have been paid in full, the Debtor shall comply with the following covenants:

<ol type="a" start="1">
<li>(a)     The Debtor shall not make any loan;</li>
<li>(b)     The Debtor will not create or permit to exist any lien or encumbrance upon their assets; and</li>
<li>(c)     The Debtor will not guarantee or otherwise in any way become responsible for obligations of any other Person, firm or corporation.</li>
</ol>

**THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.   CREDITORS ARE URGED TO READ THE PLAN IN FULL IN THAT IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BETWEEN THE DEBTOR AND EACH CREDITOR.   THE PLAN SHOULD BE READ TOGETHER WITH THIS DISCLOSURE STATEMENT SO THAT AN INFORMED JUDGMENT CONCERNING THE PLAN MAY BE MADE.**

## VIII.   THE FAIR AND EQUITABLE STANDARD

A condition precedent to confirmation of the Plan in the event of cram-down by reason of the failure of any Impaired class to approve a Plan will be the Court's determination that the Plan is fair and equitable and does not discriminate unfairly with respect to the rejected Impaired class or classes.  This determination will involve a detailed examination of the terms of the Plan in light of the requirements of Section 1129(a) and (b) of the Bankruptcy Code.  Should the Plan fail to meet the requirements of Section 1129(a) and (b) of the Bankruptcy Code, the Bankruptcy Court cannot confirm it.  Therefore, confirmation of the Plan is subject to the requirements of the Bankruptcy Code and the Bankruptcy Court's determination as to whether such requirements have been satisfied.

## IX.   ALTERNATIVES TO THE PLAN

The Plan Proponent believe that the Plan affords the holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, the alternatives include:  (a) continuation of the pending Chapter 11 Case; or (b) the closure of the Hospital.

### A.   Continuation of the Case

Continuation of this chapter 11 case is not in the best interest of the Debtor or Class 3 unsecured creditors as Administration, tax and mortgage interest Claims will only increase in amount without any corresponding benefit to the chapter 11 estate.

### B.   Alternative Plan of Reorganization

In the event the Plan is not confirmed, the Debtor, or any party-in-interest in the Case, could attempt to formulate and propose a different plan or plans.

C.    **Liquidation Under Chapter 7**

Normally, if a plan cannot be confirmed, the chapter 11 case would be converted to a case under chapter 7 of the Bankruptcy Code.  However, as noted above, the Debtor is a New York not-for-profit corporation and, therefore, cannot be converted to a Chapter 7 case without that Debtor's consent.

The Debtor will <u>not</u> consent to a conversion of its Chapter 11 Case to a chapter 7 case as the Debtor believes that (i) the Plan allows for the Facility to be used for healthcare purposes in the underserved community of Central Brooklyn in conformance with the charitable purposes for which IMC was created, whereas (ii) liquidation under chapter 7 will not, (iii)  the terms of the Plan provides the best opportunity for Creditors to maximize the value of their Claims, (iv) conversion of these Chapter 11 Cases to cases under chapter 7 would result in a substantial diminution of the value of the Debtor's Estate because of additional administration expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee and other additional expenses and Claims, some of which would be entitled to priority, that will arise by reason of the liquidation, and (v) conversion to chapter 7 is not in the public's interest as the Facility would not preserve healthcare services in the community formerly served by the Hospital.

## X.  MEANS OF EXECUTION OF THE PLAN

The Debtor shall create a grantor trust to be known as the Liquidation Trust into which the Debtor shall deposit all Estate Assets, other than any Assets to be conveyed to DASNY, free and clear of all Claims, Liens, encumbrances, charges, interests and other rights and interests of Creditors arising on or before the Effective Date.  The estimated value of Estate Assets to be deposited into the Liquidation Trust as of the Effective Date shall include, but not be limited to, the following assets and their proceeds of sale:

| Source | | Amount |
|---|---|---|
| (i) | Acute FFS | - $1,900,000 (2009) |
| | | - 9,400,000 (2011) |
| | | - 4,300,000 (2012) |
| (ii) | Transitional Funding | - 4,100,000 |
| (iii) | DASNY contribution | - 500,000 |
| (iv) | Amounts Recovered from Avoidance Actions | - -0- |
| (v) | Grant Restricted Funds | - -0- |
| | Estimated Total | $1,652,465.00 |

The Liquidation Trust shall be administered by Alvarez & Marsal, by Steven Bussey, as Liquidation Trustee, who shall exercise all of the right, powers and obligations provided for in Articles 8 and 13 of the Plan and in the Liquidation Trust Agreement to be filed in the Plan Supplement.

All funds received by the Debtor for distribution under the Plan, regardless of the source, shall be deposited in an interest bearing account in the name of Interfaith Medical Center, Inc., Debtor-in-Possession, at JPMorgan Chase Bank, NA with the Liquidation Trustee, Steven Bussey, as signatory and disbursed only upon presentation to an officer of Chase of certified Bankruptcy Court Orders and in accordance with the terms of the Plan and Confirmation Order. It is the Debtor's estimate, based upon its books and records that the funds that will ultimately be available for distribution to unsecured creditors from all sources and deposited into the Liquidation Trust will approximate $20,000.00.

## XII.    MISCELLANEOUS

### A. Retention of Jurisdiction

**Exclusive Jurisdiction of the Court**.  Except as provided in Section 12.2 and 12.3 of the Plan, following the Effective Date, the Court will retain exclusive jurisdiction of this Chapter 11 Case for the following purposes:

(a) to hear and determine any pending applications for the assumption or rejection of Executory Contracts, and the resulting allowance of Claims against the Debtor;

(b) to determine any adversary proceedings, applications, contested matters and other litigated matters pending on the Effective Date;

(c) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d) to hear and determine objections to or requests for estimation of Claims against the Debtor, including any objections to the classification of any Claims, and to allow, disallow and/or estimate Claims, in whole or in part;

(e) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f) to issue any appropriate orders in aid of execution of the Plan or to enforce the Confirmation Order and/or the discharge, or the effect of such discharge, provided to the Debtors;

(g) to hear and determine any applications to modify the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan or in any order of the Court, including, without limitation, the Confirmation Order;

(h) to hear and determine all applications for compensation and reimbursement of expenses of professionals under Sections 327, 328, 330, 331, 363 and 503(b) of the Bankruptcy Code;

(i) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

        (j)      to hear and determine other issues presented or arising under the Plan;

        (k)      to hear and determine other issues related to the Plan to the extent not inconsistent with the Bankruptcy Code; and

        (l)      to enter a final decree closing the Cases.

**Non-Exclusive Jurisdiction of the Court**.   Following the Effective Date, the Court will retain non-exclusive jurisdiction of the Case for the following purposes:

        (A)      to recover all Assets of the Debtor and property of the Estate, wherever located;

        (B)      to hear and determine any actions commenced on or after the Effective Date by the Liquidation Trustee, including, but not limited to, Avoidance Actions or other Causes of Action;

        (C)      to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtor or the Estate arising prior to the Effective Date or relating to the period of administration of this Chapter 11 Case, including, without limitation, matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code; and

        (D)      to hear and determine any other matters to the extent not inconsistent with the Bankruptcy Code.

**Failure of the Court to Exercise Jurisdiction**. If the Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Case, including with respect to the matters set forth in Article 12 of the Plan, which Article does not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## B.    **Rejection of Executory Contracts**

All executory contracts, excluding CBA's and leases not assumed or rejected prior to the date on which the Plan is confirmed, or set forth on a schedule of contracts to be rejected pursuant to the Order confirming the Plan, shall be deemed rejected on and as of the Effective Date.

## C.    **Payment Defaults**

Should a default occur on any payment to be made pursuant to the Plan, including any post-confirmation payment to the Office of the U.S. Trustee, the Court shall retain jurisdiction so that any claimant herein shall have recourse to the Court.

**D.**     **Disallowance of Contribution Claims**

Except as otherwise provided in the Plan, the Confirmation Order will provide that any Interest, claim for reimbursement, indemnification, contribution or subrogation of an entity that is liable with Debtor on, or that has secured, the Claim of a Creditor not disallowed by a prior order of the Bankruptcy Court, will be disallowed to the extent (a) such Creditor's Claim against the Debtorsis disallowed, (b) such Claim for reimbursement, indemnification, contribution or subrogation is contingent as of the Confirmation Date, or (c) such entity asserts a right of subrogation to the rights of such Creditor under Section 509 of the Bankruptcy Code.

**E.**     **Rights of Subordination**

To the Debtor's knowledge, there is no claimant with subordination rights.

**F.**     **Exclusions of Liability, Injunction and Releases** [4]

**(i) Exclusion of Liability.  Except for its own gross negligence or willful misconduct, but subject to the discharge of Claims pursuant to the Confirmation Order, the Debtor will not be responsible for any recitals, representations or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of, the Plan, this Disclosure Statement or any exhibit thereto or hereto, or be liable to any Person or entity for any action taken or omitted by them in the Chapter 11 cases or otherwise in connection with their duties during these Chapter 11 cases.**

**(ii) Covered Persons Injunction.  Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date, all Persons are permanently enjoined from commencing or continuing any medical malpractice action against any Covered Person and/or from enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to a claim that would entitle a Covered Person to an Indemnification Claim, *provided however*, that such injunction shall not extend to recoveries against any available insurance.  In exchange for this injunction, each Covered Person shall be deemed to waive any Indemnification Claim against the Debtor and its estate, provided that the waiver of the Indemnification Claims shall not impair the injunction in this Section of the Plan and neither the waiver of the Indemnification Claims nor this injunction shall release the obligations of any other insurance company to defend a Covered Person under an otherwise applicable insurance policy.**

**(iii) Injunction.  Except as otherwise expressly provided herein, including, without limitation, the treatment of Claims against the Debtor and Interests, the entry of the Confirmation Order shall, provided that the Effective Date shall have occurred, operate to enjoin permanently all Persons that have held, currently hold or may hold a Claim against**

---

[4] Nothing in the Disclosure Statement, the Plan of Liquidation, or any Order confirming the Plan shall be construed as discharging, releasing, or relieving the Debtor or the Debtor's officers, directors, or other representatives, in any capacity, from any liability with respect to the United States or the Pension Plan, under any law, government policy or regulatory provision.  The United States nor the PBGC and the Pension Plan shall be enjoined or precluded from enforcing such liability against any person as a result of the Plan's provisions for satisfaction, release and discharge of claims.

the Debtor, or who have held, currently hold or may hold an Interest that is terminated pursuant to the Plan, from taking any of the following actions against the Debtor, the Liquidation Trustee, the Creditors' Committee or members thereof, present and former officers, trustees, agents, attorneys, advisors, members or employees of the Debtors, the Creditors' Committee or members thereof, or the Liquidation Trustee, or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim against the Debtor or any Interests: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind with respect to a Claim against the Debtor or any Interests; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order with respect to a Claim against the Debtor or any Interests; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind with respect to a Claim against the Debtor or any Interests; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any Debt, liability or obligation due to the Debtor or its property or Assets with respect to a Claim against the Debtor or any Interests; and (e) proceeding in any manner in any place whatsoever that does not conform to or comply with or is inconsistent with the provisions of the Plan; *provided, however*, nothing in this injunction shall preclude the holder of a Claim against the Debtor from using any applicable insurance after these Chapter 11 cases are closed from seeking discovery in actions against third parties or from pursuing third-party insurance that does not cover Claims against the Debtor; provided further, however, nothing in this injunction shall limit the rights of a holder of a Claim against the Debtors to enforce the terms of the Plan.[5]

(iv)  **Releases.**  Upon the Effective Date, (a) (i) Each Person that receives and retains a distribution under the Plan, (ii) each Person who obtains a release under the Plan or obtains the benefit of an injunction provided pursuant to the Plan, and (iii) each Person who received any benefit from any third party insurance providers on account of a claim against the Debtors or a Covered Person, in consideration therefor, conclusively, absolutely, unconditionally, irrevocably and forever releases and discharges the Debtor's present and former directors, officers, trustees, agents, attorneys, advisors, or members (solely in their capacity as such), and (b) the Debtor conclusively, absolutely, unconditionally, irrevocably and forever release and discharge each member of IMC 's Board of Trustees and the officers (solely in their capacity as such): of and from any and all past, present and future legal actions, causes of action, chooses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, and any and all alter-ego, lender liability, indemnification or contribution theories of recovery, and interest or other costs, penalties, legal,  accounting and other professional fees and expenses, and incidental,

---

[5]  Furthermore, as to the United States, its agencies, departments or agents (collectively the "United States"), nothing shall discharge, extinguish, release, or otherwise preclude any valid right of setoff or recoupment including but not limited to any right of setoff or recoupment with respect to any Medicare overpayments.

consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against the Debtor and its present and former directors, officers, trustees, agents, attorneys, advisors, or members (solely in their capacity as such) occurring from the beginning of time to and including the Effective Date related in any way, directly or indirectly, arising out of, and/or connected with any or all of the Debtor and its Estate, the Case, the Debtor's Prepetition financing arrangements, the Debtor-in-Possession Financing Facility and the failure of any person or  entity to maintain malpractice insurance, provide funding for a self-insurance trust for medical malpractice claims, or cause the Debtor to cease operations (including any such claims based on theories of alleged negligence, misrepresentation, nondisclosure or breach of fiducially duty) on account of any such action or proceeding; provided, however, that this shall not limit the Debtor's obligations under the Plan.  Except as provided in Subsection (b) of Section 11.2 of the Plan, nothing contained in Section 11.2 of the Plan shall be a release by the Debtor of any Claim or Cause of Action, including, without limitation, those arising under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law, or a release by any Professional Persons of any Professional Fee Claims.  And, nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (i) any liability that is not a Claim; (ii) any Allowed Claim of a governmental unit that is not fully satisfied; or (iii) any liability to a governmental unit on the part of any Persons other than the Debtor.

(v)  **Exculpation.** None of (i) Windels Marx Lane & Mittendorf, LLP, in its capacity as counsel to the Plan Proponent, (ii) the Debtor's Trustees, in-house counsel, officers and directors (in their capacities as such); (iii) the Liquidation Trustee and its representatives (in their capacities as such); (iv) the Committee, (v) the members of the Committee, in their individual capacities as members of the Committee, (vi) Alston & Bird LLP, in its capacity as counsel to the Committee, (vii) CBIZ Accounting, Tax & Advisory of New York, LLC, in its capacity as financial advisor for the Committee, (viii) Nixon Peabody, LLP,  in its capacity as Special Corporate and Healthcare counsel to the Debtor, (ix) Donlin, Recano & Company, in its capacity as claims, noticing and balloting agent, and (x) DASNY and its attorneys and advisors, shall have or incur any liability for any act or omission in connection with, related to, or arising out of, the Case, the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions shall not affect the liability of any Person that would result from any such act or omission to the extent that act or omission is determined by a Final Order of the Court to have constituted willful misconduct or gross negligence; and in all respects, such Persons shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and shall be fully protected from liability in action or refraining to act in accordance with such advice; provided further, however, that Section 11.3 of the Plan shall not limit the Debtor's obligations under the Plan.

**(vi)  Cause of Action Injunction.** On and after the Effective Date, all Persons other than the Liquidation Trustee will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of, or respecting any, claim, debt, right or Cause of Action that the Liquidation Trustee retains authority to pursue in accordance with the Plan.  However, nothing herein shall enjoin or otherwise bar any governmental unit, as defined in 11 U.S.C. §101(27), from initiating or continuing any criminal, police or regulatory action against any of the Debtors to the extent permitted under 11 U.S.C. §362(b).

## G.    Transfer Taxes

The transfer of any of the Debtor's assets or interest in assets under the Plan, shall be fully exempt from any stamp tax or similar tax in accordance with Section 1146(c) of the Bankruptcy Code.

## H.    Amendment, Modification, Revocation or Withdrawal

Modification of Plan: Generally.  The Plan Proponent may alter, amend or modify the Plan pursuant to Section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After such time and prior to substantial consummation of the Plan, the Plan Proponent may, so long as the treatment of holders of Claims against the Debtor or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; *provided, however,* notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002 or as the Bankruptcy Court shall otherwise order.

Revocation or Withdrawal of Plan.  The Plan Proponent has reserved the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Plan Proponent revokes or withdraws the Plan prior to the Effective Date, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

## I.    Headings

The headings of the articles, sections and subsections of this Disclosure Statement are inserted for convenience only and shall not affect the interpretation hereof.

## J.    Construction

The rules of construction used in Section 102 of the Bankruptcy Code shall apply to the construction of this Disclosure Statement and the Plan.

**K**.        <u>**Governing Law**</u>

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under this Disclosure Statement and the Plan shall be governed by, construed and enforced in accordance with the laws applicable to contracts made and performed in the State of New York.

**L.**        <u>**Successors and Assigns**</u>

The rights, duties and obligations of any Person named or referred to in this Disclosure Statement and Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

**[SIGNATURE PAGE TO FOLLOW]**

## **CONCLUSION**

The Debtor considers the Plan to be in the best interests of the Debtor's creditors since the Plan will permit such Persons to receive an amount in excess of what they would receive were the Debtor liquidated under Chapter 7 of the Bankruptcy Code.

Dated:  New York, New York
           August 19, 2013


                              **IM FOUNDATION, INC.,**
                                **Creditor and Plan Proponent**

                      **By:**      **s/s/ Diane M. Porter**
                                Name:  Canon Diane Porter
                                Title:   President and Chief
                                          Executive Officer


**WINDELS MARX LANE & MITTENDORF, LLP**

**By:  /s/ Charles E. Simpson**
        **Charles E. Simpson**
        **A Member of the Firm**
        156 West 56th Street
        New York, New York 10019
        (212) 237-1000
        (**csimpson@windelsmarx.com**)

*Attorneys for IM Foundation, Inc., Creditor*
*       And Plan Proponent*