UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

In

Interfaith Medical center, Inc (IMC)

: Chapter 11 case

Debtor                         NO: 12-48226(CEC)

Disclosure statement pursuant to section 1125 of

The Bankruptcy code: For chapter reorganization plan

Honorable Judge Carla Craig

I Prasad Chalasani, MD, authorized by PALADIN HEALTH CARE CAPITAL (here in Paladin) and AETNA accountable care solutions (here in Aetna) to submit the letters of INTENT to this court, requesting a lease from the Interfaith Medical center (IMC) for 150 beds and manage as an acute care facility in the current form as licensed by the State of New York which includes Medical, Surgical and other Clinical services and ER. Should this be on interest to IMC / DASNY and DOH, we request this Court to Order the responsible parties to negotiate with Joel Freedman, President & CEO of Paladin as soon as possible.

Encl: Letters of Intent (LOI)

Respectfully submitted

Prasad Chalasani, MD

299 Oakley Court

Mill Neck, NY. 11765

(917) 549 7833

November 8th, 2013

RECEIVED 2013 NOV -8 P 4: 19

1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

In

Interfaith Medical center, Inc (IMC)

: Chapter 11 case

Debtor                                            NO: 12-48226(CEC)

Disclosure statement pursuant to section 1125 of

The Bankruptcy code: For chapter reorganization plan

Honorable Judge Carla Craig

Historical Background and Facts:

At Present Interfaith Medical Center IMC) is in bankruptcy (Chapter 11). IMC operates a hospital at 1545 Atlantic Avenue, Brooklyn, NY 11213 (the "Hospital") and eight (8) medical and mental health outpatient clinics (the "Clinics") serving approximately three hundred thousand (300,000) in-patient and out-patient visits annually. IMC is located in Central Brooklyn (Bedford Stuyvesant), within a 22.2 Sq Mile cluster of fifteen (15) contiguous Zip codes and is home to approximately 1.5 million populations. Central Brooklyn is densely populated by African Americans, Caribbean, Hispanic and Jewish ancestry. The community has their share of indigent people but also represents well settled, stable working class people. They do represent more than fair share of Chronic health conditions and also suffers from shortage of primary care providers. Thirty-one (31%) percent of Brooklyn residents live below the Federal poverty line; 21% are uninsured; and 29% are without primary healthcare provider. A large part of Central Brooklyn, has been designated by the Federal government as a Health Professional Shortage Area (HPSA)

PROPOSED NEW PLAN by Paladin and Aetna Health Insurance Carrier (Aetna) (Here in reorganization 'New Plan' for IMC):

Our plan proposes to maintain the following in-patient bed mix:

Medical-Surgery beds (Including ICU 10 Beds) ------------106

Pediatrics --------------------------------------------------------8

Acute Care Psychiatry Beds -------------------------------30

Chemical Dependency (Detox) Beds-------------------------- 4

Chemical dependency Rehabilitation Beds- -----------------2

2

Total Beds at IMC---------------------------------------------- 150

The above distribution of beds utilization is a tentative proposal and subject to negotiation with IMC and DOH. The existing ambulatory clinics leases also open for negotiation, including Bishop Walker Clinic and Urgent Center if IMC is willing to provide the leases.

In the New Plan for reorganization, Ambulatory Care facilities will remain with the IMC as part of the Hospital's current GME (Graduate Medical Education) teaching program. Federally funded Qualified Health Clinics (FQHC) ambulatory facilities are not an option (and we don't have any clinics currently in IMC network) because: (1) They will not be able to sponsor residency programs as proposed by IMC Doctors; (2) the FQHC plan would conflict with the Aetna Accountable Care Organization (ACO) plan should the Doctors and Hospital decide sponsor ACOs, as part of the main reorganization to self sustain IMC without any financial support from outside in a long run; (3) FQHC will not be a practical option to deliver 'collaborative health care' as per ACA (affordable health Act) guidelines and engage the beneficiaries (patients) and the community.

- Affiliation: We propose to affiliate IMC with "SUNY DOWNSTATE MEDICAL CENTER" for Tertiary clinical care and Academic services. Initial discussions are taking place with SUNY Downstate Medical center and the initial response is positive
- Behavioral Health: We keep about 30 Beds for acute inpatient care and work with the DOH to comply with their plan for Brooklyn Residents needs as a group.

We would be happy to work with DASNY / IMC to put unused office space for better use to meet the needs and improve the community health.

* PALADIN would fund IMC as needed and with their management expertise in managing FOUR hospitals in similar situations, we are confident of sustaining the clinical care services including ACUTE CARE inpatient services.

We also concur in general with the report / plan submitted by IM- foundation (Re: dk007750000) but differ in proposing the solutions.

* We agree that in Dec 2006 Berger Commission (Page # 11) IMC was not identified as an at-risk hospital, nor IMC slated for closure or merger in the final report.
Second, Commission report defined that IMC was a "safety net" hospital.

- Moreover, the commission report is almost SEVEN years old and out dated and not consistent with Governor Cuomo's Medicaid Reorganization Team (MRT) plan which called for GLOBAL PAYMENT REIMBURSEMENT for clinical services and phase out in FIVE years ( 3 more years left in the plan) 'fee-for-services' or DRG related reimbursement. What that means is- just because someone has excessive hospital beds, they are not going to be reimbursed and has no relevance for state Medicaid or HHS / CMS (Center for Medicare and Medicaid) Medicare budget / reimbursement.

- It would be wrong to look at the needs of TOTAL beds in Brooklyn and takes the eye off the COLLABORATIVE CARE and 'Medical Home' concept or ACOs plan advocated by the Department of HHS or MRT. Studies have shown this innovative clinical care delivery and reimbursement methodology savings in cost as much as 20 to 80 % (copy

3

enclosed) and simultaneously provide better individual care / outcomes, improve Community Health and reduce the cost. This is what Governor's MRT plan and HHS "Triple Aim" demands from the providers. The time to reimburse excessive beds or empty beds is over and the Berger Commission is totally outdated and there is no relevance today to address the needs of the Central Brooklyn community needs.

- *In fact Aetna Accountable Care Solutions (Aetna) consistent with MRT and Triple Aim objectives, proposed in the letter of Intent (LOI) submitted along with Paladin Health Care Capital, who has the experience of managing such population mix hospitals and self fund from the day one, should the lease and the management contract be approved by IMC and the executive committee, the Governor and the DOH. Aetna also spelled out the implementation policy to realize the above objectives and develop Medicaid, Medicare and Corporate (for mid size and small Business employees in Brooklyn) ACOs (Accountable Care Organizations) in partnership with the Doctors, the hospital and engaging the Community they serve. Aetna has developed so far 30 ACOs all over the country (and another 30 are in various phases of development) is one of the most experienced and one of the three largest health Insurance companies in the Country.

- The proposals to lease 150 beds and clinic space submitted by Paladin / Aetna has not received any response in three months since proposed.

Therefore we request this Court to identify and Order the party to negotiate with Paladin Health Care Capital the lease we proposed on behalf of IMC / DASNY (subject to management license approval by DOH). We also like to bring to the attention t that Paladin has not received the documents listed in our check list for "DUE DILIGENCE" and is required for negotiations and request should be provided immediately.

Should IMC / DASNY consider our proposal to lease 150 beds and manage the clinics, PALADIN is ready and willing to negotiate the leases expeditiously and work with them to satisfy the creditors as per DASNY plans and productive utilization of the excessive space intended to serve the community. (Not for real estate development).

Paladin also emphasize that we are not seeking any funding from the State government once the lease is signed.  .

Respectfully submitted

Prasad Chalasani, MD

299 Oakley Court, Mill Neck, NY. 11765. (917) 549 7833

4

INDEX:

1) Motion ---------------------------------------------------------------------- 1- 5
2) Letter of Intent from Paladin Health Capital ---------------------------------6 - 10
3) Letter of intent from Aetna Accountable Care solutions-------------------11
4) Request to Governor Cuomo, letter dated October 22, 2013-------------12 -13
5) Proposal forwarded to DOH -------------------------------------------------14
6) Mr. Joel Freedman, President & CEO, Paladin--------------------------------15
7) Avanti Hospitals, owned by Paladin in Los Angeles------------------------16 - 17
8) Paladin team ----------------------------------------------------------------18
9) Paladin Management Services---------------------------------------------20
10) Identifying and quantifying the cost of Uncoordinated Care--------------21 - 25
11) Authorization                                    26



Paladin Healthcare Capital, LLC

November 8, 2013

Honorable Carla Craig
Chief Judge, Bankruptcy Court
Easter District of New York
271-C Cadman Plaza
Brooklyn, NY 11201

Re: Interfaith Medical Center

Dear Honorable Judge Craig:

Paladin Healthcare Capital, LLC ("Paladin") is pleased to submit this non-binding indication of interest to provide financing and management services to Interfaith Medical Center ("IMC"), which is a debtor in possession in Bankruptcy Case No. 1:12-bk-48226 in the New York Eastern Bankruptcy Court (the "Bankruptcy Case"). The purpose of this letter is to summarize the proposed transaction (the "Transaction"), as well as to provide background information regarding Paladin and our preliminary thoughts regarding the current and future operations of IMC. Upon request, we will provide more complete terms and conditions in a formal letter of intent (the "Letter of Intent"). Please note that Dr. Prasad Chalasani is authorized to submit this proposal on Paladin's behalf.

BACKGROUND INFORMATION

Paladin is a special opportunity investor that makes private equity, structured debt and real estate investments in the healthcare sector. It provides capital to over-levered and/or underperforming hospitals that can be transitioned to stable and profitable enterprises, with a particular focus on urban community hospitals. In addition, through its affiliate, Paladin Healthcare Management, LLC ("PHM"), Paladin will assume operational (and in some cases financial) responsibility for underperforming hospitals. Management services agreements are typically entered into in conjunction with a recapitalization of the business. Paladin will assume operational responsibility in situations where financing is not required but where the hospital is a critical asset in an underserved community. Additional information regarding Paladin is available at pldn.com.

Having developed a distinct business model that is uniquely suited for urban community hospitals, Paladin's principals acquired and transformed several urban hospital facilities in South and East Los Angeles that were grossly underperforming both financially and clinically into a vibrant hospital system that delivers quality, cost-effective care and 24/7/365 emergency room access to some of the most under-bedded communities in the United States. One of the hospitals was in bankruptcy and slated to close prior to being acquired. Paladin's principals and advisors are recognized leaders in the healthcare industry, comprising a highly experienced and successful management team with broad collective strengths in the areas of hospital operations, emergency department operations, managed care, healthcare facilities management, insurance, finance, law, and real estate (bios are available upon request).

Prior to 2009, Paladin's principals led an investment banking practice that focused on distressed companies, completing more than 175 transactions totaling more than $3 billion. Several transactions involved underperforming hospitals. In many instances, Paladin served as an advisor to companies that were either in bankruptcy or facing the possibility of bankruptcy in their immediate future. As a result, the Paladin team is uniquely capable of guiding transactions to completion within a bankruptcy setting.

2121 Rosecrans Avenue, Suite 2320, El Segundo, CA 90245

Based on its initial review of the opportunity, and given the current momentum to wind down the operations of IMC, Paladin has a strong interest in facilitating a transaction that would yield comparable results for senior creditors, but on a basis that would enable the hospital's core acute care operations to remain operating and to ultimately transition to a stable delivery system that can deliver quality cost-effective acute care to the citizens of Brooklyn for many years to come.

## STRUCTURE OF THE TRANSACTION

In a typical transaction, a Paladin affiliate would acquire substantially all of the assets of the business free and clear of any encumbrances and seek to operate the business as a for-profit company. However, given that this is not an available option, Paladin is proposing an alternative structure that would involve the establishment of a public-private partnership between IMC and a special purpose management entity established by Paladin ("NewCo"), in which NewCo will operate up to 150 acute care beds as part of IMC's repositioning of its assets to best meet the healthcare needs of the Brooklyn community. Upon request, and subject to agreed-upon terms, Paladin/NewCo will also support the operation of non-acute assets in whatever manner is deemed appropriate by DASNY/IMC. This proposal, however, specifically relates to the operation of 150 acute care beds, which appears to be adequate to serve the current patient volumes that the hospital is experiencing, and to accommodate potential growth that may arise as the community moves towards an integrated healthcare delivery model, which may include the establishment of a community-centric accountable care organization in partnership with Aetna.

As currently contemplated, NewCo will enter into a lease (the "Lease Agreement") and management agreement (the "Management Agreement") that provides, among other terms, the following:

1.  Upon the execution of the Management Agreement (the "Closing"), NewCo shall assume the financial and operational responsibility for the operation of 150 acute care beds (herein referred to as the "Hospital"). NewCo shall have the sole and exclusive right and responsibility to provide such management services as it deems necessary or appropriate for the management and administration of said acute care operations in the ordinary course of business (the "Hospital Operations"). The Management Agreement shall remain in effect so long as NewCo continues to meet performance standards that shall be mutually agreed upon by NewCo and IMC and approved by the Board of Directors.

2.  NewCo shall be paid a management fee equal to one hundred percent (100%) of all cash collections derived from Hospital Operations subsequent to the Closing; and shall be responsible for all future costs, expenses, obligations, liabilities, and risks of loss relating to the Hospital Operations. Thereby, as of the Closing, NewCo shall be solely responsible for the funding as well as the gains and/or losses associated with the Hospital Operations. NewCo shall be adequately capitalized to meet its obligations.

3.  NewCo shall enter into the Lease Agreement whereby it shall lease from DASNY/IMC on a long-term triple-net basis the owned real and personal property that it deems necessary to operate 150 acute care beds and all related clinical, financial, and administrative functions. The lease payment shall be $200,000 per month or $2.4 million per year; which, at a 10 cap, equates to a valuation of $24 million or $160,000 per bed. Please note that this valuation is a 22% premium to the top of the valuation range associated with the acquisition of most financially-challenged acute care hospitals in Southern California between 2004 and 2013. Paladin's intent is to offer a fair rental rate that is at or slightly above market. To the extent that DASNY/IMC has data that would support an alternative valuation, Paladin will consider an adjustment to the rental rate. In addition, NewCo shall assume the leases associated with any leased equipment that it deems necessary to support the Hospital Operations.

4. NewCo shall continue to operate the Hospital as a general acute care hospital with 24/7/365 emergency room services in compliance with all applicable regulatory requirements. NewCo shall work with IMC management to support as appropriate any clinical or other operations that IMC retains, establishes and/or repositions following the Closing (e.g., operation of the clinic network). NewCo shall work with the existing physicians, management, staff, and unions to ensure a smooth transition of personnel to the new operations, and to further ensure that continuity of patient care is maintained throughout the transition.

5. It is anticipated that NewCo will retain the vast majority of personnel specifically associated with the Hospital Operations. To the extent that NewCo assumes any payroll or other obligations that would otherwise remain on the balance sheet of IMC, said amounts shall be credited against the rental payments referenced in paragraph 3 above.

6. NewCo shall be paid a management fee (the "Management Fee") equal to 100% of all cash collections derived from Hospital Operations subsequent to the Closing; and shall assume all future costs, expenses, obligations, liabilities, and risks of loss relating to the Hospital Operations. Thereby, as of the Closing, NewCo shall be solely responsible for the funding as well as the gains and/or losses associated with the Hospital Operations. NewCo shall be adequately capitalized to meet its obligations.

7. To facilitate payment of the Management Fee, NewCo shall be assigned all accounts receivable ("A/R") and cash collections resulting from the Hospital Operations subsequent to the Closing. DASNY/IMC shall retain ownership of the A/R that is on its balance sheet immediately prior to the Closing, which NewCo shall collect on behalf of DASNY/IMC in exchange for an industry-standard collection fee.

8. If DASNY/IMC decides to sell the Real Property subsequent to the Closing, Paladin shall have a Right of First Refusal to purchase the Property for a market price as determined by a mutually acceptable third-party appraiser.

ADDITIONAL CONSIDERATIONS

The physician leadership at the hospital has presented us with ideas that appear to be tangible and potentially viable, which we are open to further evaluating. In addition, we and Aetna recognize the value of sustaining an integrated healthcare delivery system in a market that will be dramatically impacted by healthcare reform. Accordingly, we are open to prospectively leasing the Bishop Walker Clinic, as well as the urgent care center. We will further consider maintaining and operating an appropriate number of hospital beds that would be dedicated to supporting the behavioral health needs of the community, as we understand this to be a substantial issue in Brooklyn. If it is helpful to the creditors, we would also collaborate to maximize the value of ancillary real properties held by IMC.

THE TRANSITION PLAN

Paladin has conducted very limited due diligence to date and will need to thoroughly examine IMC's historical, budgeted, and projected financial statements and information, as well as material agreements and contracts, contingent liabilities, billing and utilization, litigation matters, and employees and medical staff. Subsequently, Paladin will develop its own financial projections and assumptions of the financial benefits expected to be derived from various profit improvement initiatives, economies of scale, and synergies that we have identified. However, based on its market knowledge, well defined business model, and deep experience in turning around comparable urban community hospitals, the principals of Paladin anticipate that a transition plan for IMC will include the profit improvement initiatives highlighted below.

- **Optimize Emergency Department Performance** — A particular strength and focus of Paladin's business model is emergency department ("ED") management. Previously at Avanti, the Company was able to achieve industry-leading metrics for quality and efficiency of ED operations at each of its facilities, as well as growing paramedic volumes. In the first year under Avanti management, each of Avanti's hospitals achieved dramatic increases in ED admissions of. At IMC, Paladin believes that its ED model can drive reductions in closure hours, length of stay, and LWBS (left without being seen), while increasing paramedic runs, patient throughput, and ultimately the census for the hospital.

- **Optimize Staffing Ratios and Implement Flex-Staffing Policies** — A hospital must maintain sustainable staffing ratios and enforce a flex-staffing model that varies based upon volume and seasonality. In optimal scenarios, salaries, wages, and benefits, including contract labor, should range between 50% and 60% of Net Revenue, a target that is necessary to ensure the ongoing financial viability of IMC. Based upon preliminary due diligence, it appears that IMC has experienced total labor costs closer to 70% of net revenue. Paladin would intend to collaborate with the labor unions and hospital management personnel to explore ways to achieve this necessary goal by establishing a sustainable staffing model that meets the needs of the Hospital, the employees, and the community for the long-term.

- **Tightening the Supply Chain** — Paladin has established a unique supply chain management system in conjunction with MedAssets, a leading group purchasing organization, which significantly reduced supplies expenses at Avanti's hospitals and which is expected to have a favorable impact on the cost structure at IMC. Among other benefits, the program will enable IMC to keep supplies expenses under efficient control by eliminating duplication, standardizing products, purchasing less expense equivalent products where possible and efficacious, controlling inventory levels, and streamlining production distribution methods, including the use of electronic distribution whenever possible. The system has enabled Avanti's hospitals to spend less than $200 per adjusted patient day on supplies, more than 50% below the averages for other hospitals in the State of California.

- **Re-establish Key Physician Relationships** — Because of its various challenges, physicians have typically become concerned about a distressed hospital's operations, and many reduce or eliminate their use of the hospital. Paladin has proven its ability to attract, develop, manage, and retain important relationships with key physicians who practice in similar urban environments. At each of Avanti's existing hospitals, large groups of community physicians willingly re-engaged with the hospitals after Avanti assumed operations, as management focused on building relationships that are based on trust and delivering on the promises of its management team. As this occurred, and in conjunction with increased efficiency in the emergency department and inpatient settings, Avanti experienced rapid increases in its census at all four facilities.

- **Improve Documentation** — Paladin places a significant emphasis on accurate and comprehensive documentation at its facilities. At each Avanti hospital, training and ongoing support programs were implemented that enabled providers to better and more easily document with consistently improving levels of precision, leading to a material impact on both clinical and financial outcomes.

- **Establish an Accountable Care Organization in conjunction with Aetna** — As reflected in the attached letter from Aetna, which operates one of the largest health insurance operations in the United States, Paladin and Aetna are engaged in a joint consulting project designed to create enablement and monetization solutions for hospitals that serve underserved communities and may be financially challenged. The goal of the joint-venture is to ensure that critical access hospitals and other health care facilities that serve underserved communities grow and thrive in post reform health care. Working together, IMC, Paladin and Aetna may be able to introduce multiple lines of business to the Brooklyn community, including Medicaid, Medicare, and commercial health plan services, on a basis that would greatly benefit IMC, its physicians, and the community at large.

- **Emphasis on Quality** — Paladin places a heavy emphasis on becoming a leader in providing quality care to underserved communities. Changes to the corporate culture and overall mission and values at each Avanti facility resulted in quality scores that measure up to, and in some categories beat, the best known hospitals in Southern California. In addition to patient quality metrics, Paladin tracks patient and employee satisfaction scores, turnover rates, and changes to the medical staff, as Paladin believes that total service excellence cannot be measured in patient outcomes alone.

- **Commitment to the Community** — There are a multitude of challenges facing the communities served by IMC. Many of these issues can be prevented or mitigated through education and early detection. Such problems often go untreated because the people affected by them are underinsured, uninsured, or simply uninformed. The Avanti hospitals have been acutely committed to educating, inspiring and improving the quality of life and overall health outcomes among the community members that it serves, while fostering a bond with the community that is unique among the hospitals in and around the Los Angeles area. Through IMC, Paladin intends to make a similar commitment to the Borough of Brooklyn and its neighboring communities.

The above-mentioned profit improvement initiatives form the basis of Paladin's plan to ensure that IMC becomes financially stable and capable of supporting the Brooklyn community's healthcare needs for many years to come. Due to the unique and diverse skills and experience of the Paladin team, along with the extensive benefits afforded by its tightly defined hospital management model, Paladin believes that it is the ideal partner for IMC to manage the hospital and serve the Brooklyn community.

It is understood that this letter is a non-binding indication of interest and does not create any obligation on the part of Paladin, its affiliates, or its capital partners. As is customary, the Transaction or any other transaction is contingent upon, among other things, the satisfactory completion of due diligence, as well as the negotiation, execution, and delivery of a mutually acceptable definitive documentation. However, despite submitting a basic information request list to IMC management and representatives of Gordian Group approximately 90 days ago, and having entered into what we considered to be an overreaching confidentiality agreement approximately 30 days ago, we have not been provided with any of the information that we requested despite it being promised many times. In addition, both Paladin and Aetna have respectively submitted two prior proposals to IMC administration, the IMC Executive Board, DASNY, Gordian Group, and Mr. John Leach, yet we have not received any response or feedback. At a minimum, Paladin represents a potentially viable solution that can help to preserve collateral value on behalf of creditors and to maintain a critical healthcare delivery system for the community, but we may have intruded on an agenda that may not be consistent with these fundamental objectives. Nonetheless, we have a team ready to commence comprehensive due diligence immediately upon receipt of the information.

Submitted respectfully,

Joel Freedman
President
Paladin Healthcare Capital, LLC
(310) 903-9009

cc.    Jamie MacPherson
       Nick Orzano
       Tim Ronan
       Dr. Charles Kennedy
       Dr. Prasad Chalasani
       Steve Warren, Esq.

Charles D. Kennedy, MD
Chief Executive Officer
Accountable Care Solutions

KennedyC3@Aetna.com
T: 860-273-1112
F: 860-754-1756
M: 805-217-6724

6303 Owensmouth Ave
Suite 900
Woodland Hills, CA 91367

**aetna**

September 12, 2013

Mr. Patrick Sullivan
Interim President and CEO
Interfaith Medical Center1545 Atlantic Avenue
Brooklyn, New York 11213

Dear Mr. Sullivan,

Aetna has a division known as Accountable Care Solutions (ACS).  The ACS subsidiary was formed to collaborate with hospitals, medical groups, and other aggregations of care services to help them transform from fee for service (volume based) to fee for value (value based) operations.  To date, the P& L has grown from almost no revenue in 2011 to a >$1 billion subsidiary today.

ACS's approach to potential ACO partners can be categorized into two segments: Enablement and Monetization.  ACS enablement provides the needed technical, operational, and analytic support for a health care delivery system to become an ACO.  We have over 30 hospitals currently under contract and in various stages of ACO development and a pipeline of over 200 additional IDNs, hospitals, and medical groups.  ACS monetization is the creation of gain share or risk share contracts, commercial health plan products, MSSP, MA products and/or joint ventures which are specifically designed to financially reward physicians and hospitals for achieving the triple aim.  ACS has creative contracting strategies which can help minimize the costs associated with this conversion.

Paladin Healthcare Capital, LLC. and ACS are engaged in a joint consulting project designed to create enablement and monetization solutions for hospitals who serve underserved communities and may be financially challenged.  Our goal is to ensure that critical access hospitals and other health care facilities that serve underserved communities grow and thrive in post reform health care.  We believe there are opportunities to leverage these low cost delivery systems in commercial health insurance settings, especially employers who have large numbers of low wage workers who may be eligible to enroll via state health insurance exchanges, may receive Federal subsidies, and will be penalized for a lack of health insurance. .

Interfaith hospital is of interest to us.  In partnership with Paladin, there may be opportunities to introduce ACOs to Interfaith and the associated physician community for multiple lines of business including Medicaid, Medicare, and commercial health plan services.  We are monitoring the Interfaith bankruptcy process.  Although we generally do not enter into new agreements with financially unstable hospitals, the introduction of Paladin offers a potential path to engage with Interfaith and include conversion to value based operations as a part of the reorganization approach.  We look forward to further steps in the development of Paladin's role in Interfaith and a potential role for Aetna's ACO services.

Regards,

12

PRASAD CHALASANI, MD

October 22, 2013

Honorable Governor, Andrew Cuomo

State Of New York,

Albany, New York

Re: Solution for - Interfaith Medical Center (IMC), 1545 Atlantic Avenue, Brooklyn, NY. 11213

Dear Governor Cuomo,

On Behalf of Paladin Healthcare capital (Paladin) and Aetna Accountable Care Solutions (Aetna), I am enclosing a copy of the both proposals submitted to Mr. Patrick Sullivan, Interim President and CEO, Interfaith Medical Center (IMC).

PALADIN, a private equity company based in Los Angeles, revived FOUR hospitals those were in similar distressed situations with the patient mix similar to 'IMC'. They are currently managing all of them successfully in the name of "Avanti Hospitals" group. Paladin intends to produce similar results and submitted a Letter of Intent to lease about 150 beds (Total 287) from IMC and continue to operate / manage as an acute care community hospital.

AETNA who is engaged in a joint consulting project with Paladin also submitted a Letter of Intent to reorganize the innovative care delivery and fee reimbursement methodology at IMC in partnership with the Doctors and the staff that would lead eventually to termination of 'fee-for-service' model as visualized by your administration. Aetna also proposed to help the Doctors and the IMC to start (a) Medicare ACO, (b) Medicaid ACO and (c) Corporate Employees ACO to get certified by CMC and the State of New York in order to implement 'MRT' plan that would accomplish 'Triple Aim" as defined. Corporate ACO is intended to serve particularly mid and small size corporations to find affordable health care coverage for those employees.

Should the State, DOH, DASNY and IMC approve the proposed lease for 150 Beds, PALADIN / AETNA would not seek any funding from the State Government. With the expertise Paladin has developed in LA, they are confident to manage IMC efficiently and preserve DASNY's equity in the IMC.

AETNA on the other hand, with the experience of developing 30 ACOs all over the Country so far (30 more are in the pipeline), and having visited the facility along with the President of Paladin, excited of the potential to make IMC the pioneering leader in Brooklyn, to meet the 'Triple Aim' of the State. Should the State give Paladin / Aetna the opportunity to implement the 'Road Map' developed by the MRT you appointed, Paladin would fund the necessary capital to manage the hospital from day one.

1

/ 3`

The COURT date to make a decision is scheduled for November 4th, and that gives very little time to formalize the proposal and submit to the court in time in order to prevent the hospital 'closure plan' being activated.

I earnestly submit to you and request to find a few minutes in your busy schedule to evaluate the merits of our proposal to save a community hospital where it is needed most and give us an opportunity to meet you in your office and answer any questions you may have.

I am sure no one wants to see 1500 families go on unemployment line before Christmas, if the money is not an issue. 1500 families are counting and praying to celebrate this Christmas and thereafter, just like the previous one.

Sincerely,

Prasad Chalasani, MD

299 Oakley Court

Mill Neck, NY. 11765

(917) 549 7833

Encl: (1) LOI from Paladin to Mr. Patrick Sullivan

   (2) LOI from Aetna to Mr. Patrick Sullivan

2

*14*

**Response from Governor's office- Proposal forwarded to DOH**

Prasad Chalasani (917) 549 7833

**Greg Smiley**                    Oct 31 (8 days ago)

to me

The appropriate staff received your proposal.
Thanks.

Best Regards
Gregory O. Smiley

Regional Representative
Office of the Governor, Hon. Andrew Cuomo, Executive Chamber, 633 3rd Ave, New York, NY 10017
(Office)212.681.4566
(Fax) 212-681-7666
Greg.smiley@exec.ny.gov

*15*

August 12, 2013

Joel L. Freedman, Managing Partner (JFreedman@PLDN.com)

Direct — (303) 488-3412

Joel Freedman has more than 20 years of experience in the areas of capital strategy and implementation, mergers and acquisitions, divestitures, and business reorganizations. Since 1988, he has been involved in the analysis, structuring, and implementation of more than 175 investment banking transactions, including corporate reorganizations and turnarounds, recapitalizations, leveraged buyouts, acquisitions, divestitures, debt restructurings, debt placements, and equity placements. During his career, Joel has been involved in over $3.0 billion in transactions.

Joel is a co-founder and principal of Avanti Health System, LLC, a hospital holding company that currently owns and operates two Los Angeles-based hospitals Memorial Hospital of Gardena and East Los Angeles Doctors Hospital. In 2004, he co-founded Comp West Insurance Company, a California-based workers compensation insurance company that was sold in 2007 to Accident Fund Insurance Company of America, a unit of Blue Cross and Blue Shield of Michigan.

In addition to his role with Avanti, Joel currently serves as Managing Director of Paladin Capital, a corporate finance advisory firm with particular experience and expertise in the healthcare segment, having completed more than $700mm of recent healthcare transactions.

From 2002 to 2006, Joel led the activities of KGI Capital Partners, a division of Kibel Green Inc., a leading turnaround and operations management consultant firm. KGI Capital completed more than $1 billion in transactions under his leadership.

Between 1990 and 2002, Joel was a Partner at Paladin Investment Banking, the predecessor to Paladin Capital, and served as the firm's Managing Partner from 1997 until 2002. Prior to joining Paladin Investment Banking, Joel was an investment banker in Smith Barney's Direct Investments division University of Colorado.

# Avanti Hospitals: About Us

The key to our success is our ability to unlock value and transform operations.

AVANTI HOSPITALS
We offer proven healthcare experience and the know-how to promote the necessary changes that enable healthcare operations to realize their full potential.
We bring a recognized and respected track record of success
Avanti Hospitals leverages the unique capabilities and diverse expertise of its management team to create value in the areas of hospital and related healthcare operations, optimize its transactional, financial and real estate strategies, and drive change through effective turnaround strategies.

We offer proven healthcare experience and the know-how to promote the necessary changes that enable healthcare operations to realize their full potential. We've worked with doctors, investors, tenants, landlords, regulators, government agencies, and senior management teams, all while maintaining a reputation of trust and high integrity which affirms our credibility in the healthcare industry.

Avanti Hospitals began as a partnership of business and clinical professionals, all with the common bond to transform the healthcare industry. Our leadership team has a unique blend of experience, which includes billions of dollars worth of transactions, participation in over 900 real estate deals, the provision of emergency services for hundreds of thousands of patients, and the management of facilities for some of the largest hospital operators in the country. As a further complement to our team, we've partnered with some of the biggest names in healthcare and finance, adding additional capabilities to our strong core business competencies.

Giving back to the communities we serve is an important part of our mission. Providing ongoing patient education and community health events helps improve the overall health of our communities. Avanti Hospitals also preserves the legacy of caring for our communities by providing educational scholarships to students who demonstrate the discipline and interest in practicing medicine. For example, East Los Angeles Doctors Hospital has provided annual scholarships to young residents with medical aspirations for over seventeen years. In 2011, the scholarship was renamed in memory of Dr. Eduardo Alfonso Lopez, an Avanti Hospitals Emergency Medicine physician who was a strong advocate for higher education. Avanti Hospitals also collaborates with other organizations in our communities to provide toys and family entertainment to needy families during the holidays.

We believe that our broad range of abilities and commitment to our communities is unmatched in the marketplace. Our vision and proven ability to execute makes the difference in Avanti Hospitals successful navigation through the changing business and clinical dynamics of healthcare today.

*17*

EAST LOS ANGELES DOCTORS HOSPITAL
4060 E Whittier Blvd
Los Angeles, CA 90023
323.268.5514

## COMMUNITY HOSPITAL OF HUNTINGTON PARK
2623 E. Slauson Ave
Huntington Park, CA 90255
323.583.1931

## COAST PLAZA HOSPITAL
13100 Studebaker Road
Norwalk, CA 90650
562.868.3751

## MEMORIAL HOSPITAL OF GARDENA
1145 West Redondo Beach Blvd
Gardena CA 90247
310.532.4200

*18*

Paladin

# Our Team

Paladin's principals and advisors are considered to be leaders in their respective areas of healthcare expertise. Collectively, our team offers extensive knowledge and operational experience across multiple sectors of healthcare, which enables us to fully understand the unique challenges facing our portfolio companies. This further allows us to better understand and monitor the regulatory climate, pending and current reimbursement issues, and government policies and trends that impact the healthcare marketplace. This insight also enables an expeditious due diligence process, which can be critical for companies facing financial challenges and time-sensitive requirements.

### Joel Freedman, President
Joel Freedman currently serves as the President of Paladin. For the past four years, he served as the President and co-founder of Avanti Hospitals LLC, which has transformed..

### James MacPherson, Principal

Jamie MacPherson has more than 25 years of corporate finance and investment banking experience. During his career, he has completed more than $2 billion of transactions.

### Ravi Sharma, Principal
Ravi Sharma is among the healthcare industry's leading information technology experts. As rising star at GE Healthcare early in his career, he was selected to lead...

### Nicholas Orzano, Principal
Nick Orzano brings over eight years of healthcare finance and investment banking experience to Paladin. He is a co-founder and Principal of Avanti Healthcare Holdings.

### Timothy Ronan, Principal
Tim Ronan brings to Paladin more than eight years of real estate acquisition, finance and operations experience. He is an expert at identifying, acquiring..

### Mike Chernew, PhD, Advisor
Dr. Michael Chernew is a Professor of Health Care Policy in the Department of Health Care Policy at Harvard Medical School. He is considered to be among the leading experts...

3

Cástulo De La Rocha, JD, Advis

**Cástulo de la Rocha serves as the Chief Executive Officer and President of AltaMed Health Services Corporation, which is the largest independent Federally qualified...**

Dana Goldman, PhD, Advisor

Dr. Dana Goldman is a Professor and the Norman Topping Chair in Medicine and Public Policy at the University of Southern California. Until Fall 2009, he held RAND's Distinguished Chair...

Vinod Jivrajka, MD, Advisor

Dr. Vinod Jivrajka is co-founder, President and CEO of AppleCare Medical Enterprises, which is among the most successful and innovative physician-based managed care companies in...

Mark Carlin, Advisor

Mark Carlin is the Executive Vice President of Lockton Insurance Brokers, LLC, whose parent-company is the largest privately owned commercial insurance brokerage firm in the world since its acquisition of...

Warren Lazarow, Advisor

Warren Lazarow is a partner in O'Melveny's Silicon Valley and New York offices and Firmwide Chairman of O'Melveny's Transactions Department. He previously served as the.

Henry Loubet, Advisor

Mr. Henry R. Loubet serves as Chief Strategy Officer and Senior Vice President of Keenan & Associates, Inc., a leading insurance advisor and services provider...

PALADIN HEALTHCARE CAPITAL

310- 554-5565

12345 Street Name Avenue, los angeles, california 90044

PRIVACY POLICY   TERMS & CONDITIONS

# Management Services

Through its affiliate, Paladin Healthcare Management, LLC ("PHM"), Paladin will assume
operational and/or financial responsibility for underperforming hospitals and regional health
systems.

Management services agreements are typically entered into between PHM and a non-profit operator in
conjunction with a recapitalization of the business. In select instances, we will assume operational
responsibility in situations where financing is not required but where the hospital is a critical asset in
underserved communities. We are particularly focused on facilities that are a strategic complement to our
core business objectives, such as those in urban centers that are conducive to the development of
integrated healthcare delivery systems.

The Paladin team has an acute and proven understanding regarding the implementation of wide ranging
clinical and operational improvement initiatives that significantly improve the performance of urban
community hospitals. In spite of what many consider an unfavorable patient population comprised
predominantly of Medicare and Medicaid beneficiaries, we have proven that urban community hospitals
can deliver quality services in a financially viable manner by maintaining strong disciplines in the areas of
emergency department operations, care coordination, case management, documentation and coding,
recruiting, staff flexing, purchasing, facilities management, managed care, and financial controls.
**Key initiatives include:**
* Reducing Emergency Department wait times and left-without-being-seen percentage;
* Increasing paramedic runs and related inpatient admissions;
* Reducing lengths of stay, improving documentation and coding, enhancing charge capture, and achieving
  best-of-class quality metrics through sophisticated hospitalist and case management programs;
* Reducing supply chain procurement costs by consolidating purchasing activities and establishing more
  stringent protocols;
* Decreasing labor costs through more disciplined staffing policies and mitigating non-core labor expenses by
  improving employee retention and enhancing recruitment activities;
* Increasing recurring revenue streams, inpatient volumes, and profit margins by expanding and refining
  managed care activities;
* Realigning administrative infrastructure to better capitalize on system scale and to standardize best
  practices; and
* Engaging in community activities designed to educate, inspire, and improve the quality of life and overall
  health outcomes of the local community.
  Through these and other profit improvement initiatives, Paladin's mission is to build hospital systems that
  are viewed as innovative leaders in quality of care, operational efficiency, patient satisfaction, financial
  success, and community contribution.

PALADIN HEALTHCARE CAPITAL

310- 554-5565
12345 Street Name Avenue, los angeles, california 90044
PRIVACY POLICY   TERMS & CONDITIONS



# Identifying and Quantifying the Cost of Uncoordinated Care:
## Opportunities for Savings and Improved Outcomes

Mary Kay Owens, R.Ph., C.Ph.,
President, Southeastern Consultants, Inc.,
Clinical Associate Professor, University of Florida College of Pharmacy
Department of Pharmaceutical Outcomes and Policy

Southeastern Consultants, Inc. (SEC) performed comprehensive claims analyses on over 9 million Medicaid-only enrolled patients and Medicaid/Medicare dually enrolled patients for five large states, which included utilization and expenditure analyses of drugs and medical services, a disease profile of the population, and the identification of access patterns indicative of uncoordinated care in a subset of the population. SEC examined drug and medical utilization and costs attributed to these extremely uncoordinated care patients in an effort to supply policy makers addressing health care reform at the state and federal levels with compelling new data as to the importance of improving the coordination of care. In addition, SEC conducted statistical-based, predictive modeling to estimate future expected costs and created matched comparison groups to further evaluate potential program savings.

Using the claims data, patients were separated into Medicaid only, dual eligibles and long-term care subgroups and screened for patterns of uncoordinated episodes of care and the absence of a medical and pharmacy home. Patterns identified included utilizing excessive numbers of prescriptions, therapeutically duplicative drugs, frequently changing drug therapies, using multiple prescribers and multiple pharmacies concurrently and in random patterns, accessing the ER frequently and/or for non-emergent care, and numerous other access patterns indicative of uncoordinated care. The vast majority of identified uncoordinated care patients had at least one chronic condition.

## Analysis Findings

1. **For the Medicaid only enrolled group, patients exhibiting patterns of extreme uncoordinated care represent a small percentage of all patients (10%), yet account for a significant percentage of program costs (30%).**

   - Uncoordinated care patients represented less than 10% of patients yet accounted for an average of 46% of drug costs, 32% of medical costs, and 36% of total costs for the population. **(Figure 1)**

2. **For the Medicaid only enrolled group, extreme uncoordinated care patients have significant differences in all cost service components, including lab, outpatient, emergency room, pharmacy, practitioner, and hospital services.**

   - Uncoordinated care patients had average annual total costs of $15,100 Vs $3,116 for those with better coordinated care in the remaining population. **(Figure 2)**

**Figure 1**



**Figure 2**



COPYRIGHT © 2010 SOUTHEASTERN CONSULTANTS, INC.

**For the subset of elderly (Pre-Medicare) patients aged 55-64 years old, those exhibiting patterns of extreme uncoordinated care represented about 28% of patients, yet accounted for a very large percentage of costs (52%).**

- Uncoordinated care patients represented 28% of patients in that age group yet accounted for an astounding 71% of drug costs, 44% of medical costs, and 52% of total costs for that population. **(Figure 3)**

Figure 3



National Cost Savings Estimates Published By The Institute of Medicine

**SEC analyses support average overall potential savings of approximately $240B per year (average of 9%) of the total direct medical and drug costs incurred per year as published by The Institute of Medicine.**[1]

The subset of the population with the most savings opportunities are those that are receiving extremely fragmented care and are accessing the system in a very inefficient and uncoordinated manner which in turn creates unnecessary costs and compromises quality of care for the entire system. These patients account for a disproportionate share of costs which averages approximately 30% of total plan costs. Based on multiple analyses completed, an average of 35% of the costs contributed by patients with extremely uncoordinated care should be avoidable with improved efforts of care integration, enhanced and targeted interventions, and coordination of care between providers.    SEC extrapolated projected savings for the entire U.S. healthcare system by using National Health Expenditure (NHE) data for annual total health expenditure projections for the periods 2010 through 2018. The categories of NHE spending that were used mirrored the cost service categories used by SEC in the state level data and included direct care expenditures for hospital, professional, home health care, and medical products including drugs and excluded expenditures for administrative, nursing home care, structures and investments.

The projected annual savings were calculated using the NHE 2009 released data for the period 2010 through 2018. The total NHE annual projected expenditures were multiplied by a factor of 0.3 to obtain the total NHE annual expenditures attributed by patients with extreme uncoordinated care and then that total annual amount was multiplied by a factor of 0.35 to obtain the annual estimated savings to be achieved by reducing the excessive costs due to uncoordinated care. A phase in savings factor of 0.25, 0.50 and 0.75 was applied in each of the first 3 years (2010-2012) to allow for implementation of a program to identify and target these uncoordinated care patients and create the processes, procedures and financial incentives needed by plans and providers to cooperatively achieve the savings objectives.

---

[1] **The Healthcare imperative: Lowering Costs and Improving Outcomes***: Workshop Series Summary.* **Institute of Medicine. 2010. Washington, DC: The National Academies Press.** Owens,MK. Chapter 3: Inefficiently Delivered Services, *Costs of Uncoordinated Care*, pages 131-138. http://books.nap.edu/openbook.php?record_id=12750&page=131

COPYRIGHT © 2011 SOUTHEASTERN CONSULTANTS, INC.

### Savings Estimates

SEC used the above methods and data sources from NHE to estimate the annual public program savings (Medicaid and Medicare). The public program savings were calculated to be $133.5 billion on average per year for each year in the period 2010-2018. SEC used the above methods and data sources to also extrapolate the total national savings for both public and private health care spending. **The average savings for both public and private spending combined were calculated to be $240.1 billion on average per year for each year in the period 2010-2018.**

## Methods

Various methods have been tested for calculating and estimating potential cost savings from better coordination of care. SEC has performed multiple regression analyses to test specific variables for their independent contribution to the overall cost. These included variables such as age, gender, severity of illness, number and type of chronic conditions. Other variables studied included numbers of prescribers, treating providers, dispensing pharmacies, and number and type of prescriptions utilized. Surprisingly, the variables that seem to be predictors of higher than expected total cost and thus are markers for identifying patients with the greatest savings opportunities were those that were correlated with episodes of uncoordinated care and treatment.

Variables with high significance included using excessive numbers of prescriptions, high numbers of different prescribing and treating physicians, utilizing a high number of different pharmacies, accessing the ER frequently and/or for non-emergent care, all of which contribute to unnecessary costs due to resulting usage of therapeutically duplicative drugs, inappropriate drug usage, drug compliance problems, frequently changing drug therapies, excessive and duplicative lab and diagnostic tests, excessive office visits and excessive and inappropriate utilization of all types of services.

In addition, SEC also created matched comparison groups with thousands of patients matched by age, gender, severity of illness scores, primary disease, and major co-morbid conditions to further evaluate the cost savings potential for patients that are extremely uncoordinated in their care and treatment when compared to like patients that are receiving better coordinated care. The results of these matched comparisons indicate there is significant potential savings available in the system if patients are provided more consistent and coordinated care from their providers.

- **Estimated cost savings for a Medicaid only matched comparison group of 10,081 uncoordinated care patients matched to 37,873 coordinated care patients by age, gender, primary disease, primary co-morbid disease and severity score (CCI) is $74M (43% of the total actual cost of $172M) or $7,340 per patient annual savings. (Figure 4)**

**Figure 4**



## Recommended Strategies for Improving the Coordination of Care

### Conduct baseline analysis

Private and commercial health plans should conduct a baseline claims analysis to identify patterns of uncoordinated episodes of care using defined criteria driven algorithms, create a disease profile of the entire population, and examine drug/medical utilization and cost components to risk stratify and characterize uncoordinated care patients by the specific contributing factors identified, such as therapeutic duplication, diagnostic service duplication, narcotic usage, ER frequency and types of visits, multiple treating providers, multiple prescribers, and multiple pharmacies providing care. Additional activities of the baseline analysis include mapping identified patients into geographic regions and to existing care providers to assist with planning and implementation of care coordination activities.

### Evaluate and retool existing systems and programs

Plans should periodically evaluate and modify current technology, system edits, existing utilization review program criteria, and existing disease and care management programs to assess the efficiency and effectiveness of these programs and systems. Current utilization review programs, care management and audit/investigative programs are often not well coordinated with each other in terms of common criteria applied, procedures for referrals and follow-up, and a shared focus and intervention strategy specifically for an identified subset of patients that will generate the greatest return on investment.

### Target and expand existing intervention programs for identified patients to improve care coordination

- Implement patient-centered "medical and pharmacy home" programs with focused and enhanced care management and medication therapy management programs
- Enhanced on-line utilization edits and real time claims monitoring systems for providers
- Disease and care management program interventions specifically for targeted uncoordinated care patients
- Patient education/incentive programs to improve compliance with treatment plans and coordination goals
- Emergency room diversion programs to redirect access to primary care providers

### Integrate technologies to improve efficiency and patient outcomes

Technologies that are currently being implemented in many plans, such as electronic health information exchange systems, e-prescribing, and other web-based provider monitoring and communication tools, offer the best return on investment for patient and provider monitoring of service utilization, costs, and quality of care. Patients that are identified in the claims analysis as receiving uncoordinated care should be prioritized to receive focused interventions and their providers could be prioritized to receive allocations of new technologies and resources first, as part of a plan-wide effort or in regional pilot programs to expand medical and pharmacy home models of integrated care.

### Develop new provider delivery and payment models

There must be a concerted effort to engage providers to be active participants in assisting patients with achieving coordinated care via new models such as medical and pharmacy homes. It is also important to engage stakeholders, such as hospitals, physician groups, pharmacists, patient advocates, and others to design care delivery and reimbursement models that create incentives for providers to assume enhanced patient management activities in a multidisciplinary team approach. Initially, resources should be focused on the identified, targeted uncoordinated care patients. Providers should be adequately compensated and encouraged to perform these added responsibilities, such as through increased care management fees, shared savings arrangements, medication therapy management fees, receiving enhanced practice management technology tools, pay for performance, and other appropriate incentives.

COPYRIGHT © 2011 SOUTHEASTERN CONSULTANTS, INC.

*25*

### Conclusion

The findings from these comprehensive claims analyses provide compelling evidence that effective cost avoidance measures are readily available and should be implemented within existing state, federal and commercial program structures. Healthcare reform efforts must recognize and address the problem and significant costs of uncoordinated care if there are going to be "real" and "meaningful" changes to the healthcare delivery and payment systems. Public and private health plans can reduce unnecessary expenditures due to uncoordinated care, preserving valuable resources without reducing appropriate access to care or needed services. These preserved resources can also be used for funding expansion programs for the uninsured and underinsured populations and improving the quality of healthcare for all citizens.

Mary Kay Owens is president and principal consultant for Southeastern Consultants, Inc. (SEC). She is a pharmacist and Clinical Associate Professor at the University of Florida College of Pharmacy, Department of Pharmaceutical Outcomes and Policy. mowens@sec-rx.com

*Southeastern Consultants, Inc.*
*Pharmaceutical and Health Care Consulting and Data Services*

3019 N. Shannon Lakes Drive, Suite 202 | Tallahassee, Florida 32309
Telephone (850) 668-8524 | Facsimile (850) 668-6587
www.sec-rx.com

Southeastern Consultants, Inc. is a national pharmaceutical and health care consulting and data analysis firm providing services to health plans, benefit managers, employer and provider groups, government agencies, associations, medical and pharmaceutical industry, disease management organizations, and academic institutions. For more information about SEC and their services, please visit the web site at www.sec-rx.com.

November 8th, 2013

Joel Freedman            2:20 PM (9 minutes ago)

to me  Charles

Prasad, please find attached a modified executed proposal. As discussed and reiterated in the proposal, you are authorized to submit the proposal on our behalf. We have also attached an overview on Paladin, and as you already learned, our website is up and running at pldn.com so feel free to forward this link to whomever you deem appropriate.

Please call or emial if you have any news.

All the best,

Joel Freedman
President
**Paladin Healthcare Capital, LLC**
2121 Rosecrans Avenue, Suite 2320
El Segundo, CA 90245
Phone: (310) 903-9009
Email: jfreedman@pldn.com
**2 attachments** — Download all attachments

**Paladin IMC Proposal 11-08-13.pdf**
5218K  View  Download
**Paladin Overview for IMC 11-08-13.pdf**
745K  View  Download